## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### MIAMI DIVISION

HYDENTRA HLP INT. LIMITED,
a foreign corporation d/b/a METART,

    Plaintiff,

v.

CONSTANTIN LUCHIAN, an individual,
KONSTANTIN BOLOTIN, an individual,
SUN SOCIAL MEDIA, INC., a
corporation, individually and d/b/a
PLAYVID.COM, FEEDVID.COM,
PLAYVIDS.COM and PEEKVIDS.COM;
PLAYVID.COM; FEEDVID.COM;
PLAYVIDS.COM; PEEKVIDS.COM; and
John Does 1-20,

    Defendants.

**Case No.
1:15-cv-22134-UU**

### MOTION AND MEMORANDUM OF LAW OF
### DEFENDANTS SUN SOCIAL MEDIA, INC. AND KONSTANTIN BOLOTIN
### FOR SUMMARY JUDGMENT

i

# TABLE OF CONTENTS

Page

**MOTION**                                                                                          1

**MEMORANDUM OF LAW**                                                                                1

I.      **INTRODUCTION**                                                                             1

II.     **BACKGROUND ON SUN SOCIAL MEDIA ("SSM") AND RELEVANT
        FACTS**                                                                                      2

III.    **LEGAL STANDARD**                                                                           3

        A.      Summary Judgment Standard                                                            3

        B.      The Digital Millennium Copyright Act (the "DMCA")                                    4

IV.     **ARGUMENT**                                                                                 6

        A.      SSM Did Not Upload Any of the Videos on the Websites, Including the Files-in-
                Suit, and Therefore Cannot Be Liable for Direct Infringement                         6

        B.      SSM is Entitled to the Protections Afforded by the DMCA Safe Harbor                  8

                1.      SSM Designated a DMCA Agent by Making Available on the Websites
                        and by Providing to the Copyright Office the Contact Information for the
                        DMCA Agent                                                                   8

                2.      SSM Has No Actual Knowledge of Infringing Material (Including the
                        Operative Files-in-Suit) and Was Not Aware of Facts or Circumstances
                        from Which Specific Infringing Activity Was Apparent                         9

                3.      SSM Acts Expeditiously to Disable Access to Files Upon Notice or
                        Knowledge That Are Allegedly Infringing (Including the Files-In-Suit)       11

                4.      SSM Receives No Financial Benefit Directly Attributable to Infringing
                        Activity, and in Any Case Has No Right and Ability to Control               13

                5.      SSM Adopted and Reasonably Implements, and Informs Users of, a
                        Repeat Infringer Policy                                                     15

                6.      SSM Accommodates and Does Not Interfere with Standard Technical
                        Measures Used by Copyright Owners to Identify or Protect Work               16

C.      Even if SSM Did Not Qualify for the DMCA Safe Harbor (which it does) SSM
        and Bolotin Would Still Not Be Liable to Hydentra                            16

        1.      SSM is Not Liable for Contributory Infringement                      17

        2.      SSM is Not Liable for Inducement of Copyright Infringement           18

        3.      SSM is Not Liable for Vicarious Copyright Infringement               18

D.      Even if SSM Was Liable for Copyright Infringement (Which it is Not) The
        Infringement Should Be Deemed Innocent                                       19

E.      Count V of the Complaint Should Be Dismissed                                 19

V.    CONCLUSION                                                                     20


Annex 1 – Pertinent Portions of the DMCA
Annex 2 – List of Lawsuits Filed by Hydentra

## MOTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Sun Social Media, Inc. ("SSM") and Konstantin Bolotin hereby move for summary judgment on Plaintiff's copyright and trademark infringement claims.  There is no genuine dispute as to material fact that SSM has at all relevant times qualified for the Digital Millennium Copyright Act ("DMCA") safe harbor protection.  And, even if there was a dispute as to such facts, there is no genuine dispute as to the material facts that preclude finding SSM or Mr. Bolotin liable for either direct or secondary infringement.  SSM and Mr. Bolotin are accordingly entitled to judgment as a matter of law.  In support of this motion, SSM and Konstantin Bolotin[1] rely on the attached and/or concurrently filed declarations of Konstantin Bolotin and Constantin Luchian, the accompanying memorandum of law, SSM and Mr. Bolotin's Statement of Material Facts, and such other matter as may be presented.

## MEMORANDUM OF LAW

## I.     INTRODUCTION

Plaintiff Hydentra HLP Int. Limited ("Hydentra") is a copyright troll whose present business model revolves around the filing of baseless and frivolous lawsuits in the hopes of forcing defendants to settle in the face of incurring high defense costs.  Hydentra has intentionally ignored the threshold matter that Defendants are entitled to the safe-harbors under the Digital Millennium Copyright Act (the "DMCA") and instead has attempted to bully Defendants into submission and settlement through blunt, unnecessary, and costly litigation tactics as are evident by the docket in this matter.  Although Hydentra purports to be a producer of pornographic films, its practices over the past year demonstrate that its primary business

---

[1] Mr. Luchian also incorporates this memorandum by reference in his Motion for Summary Judgment, which he files separately.

1

model is now copyright trolling.  Since February of 2015, Hydentra has initiated at least 18 lawsuits around the country against website operators like SSM and their alleged principals with complaints that look almost identical to the complaint in the present case.  *See* Annex 2. Hydentra's strategy is clear: force targets to settle in the face of high litigation costs over a frivolous lawsuit.  The fact remains however, as detailed herein, that SSM is not liable as a matter of law.

## II.    BACKGROUND ON SUN SOCIAL MEDIA ("SSM") AND RELEVANT FACTS

SSM is an online service provider that started in or about 2010 by operating an online dating website called FindandTry.com.  *See* Declaration of Konstantin Bolotin in Support of Motion for Summary Judgment, ¶ 3 ["Bolotin Decl."].  In approximately 2013, SSM started developing a video hosting website, PlayVid.com, to satisfy the desire of some FindandTry.com users to share their videos.  *Id.*, ¶ 4.  In the years since, SSM has created its other video sharing websites PlayVids.com, PeekVids.com, and FeedVid.com (all four collectively referenced as the "Websites").  *Id.*, ¶ 5.  SSM (including its agents and contractors) does not upload any of the videos available on the Websites – they are all uploaded by SSM's users.[2]  *Id.*, ¶ 6.

SSM hosts more than 475,000 videos which have been uploaded to the Websites by its users.  *Id.*, ¶ 7.  SSM requires that its users only upload videos which do not improperly contain the intellectual property of anyone other than the person uploading the file or of a person who has given the uploader appropriate permission to upload the video.  *Id.*, ¶ 8.  SSM requires that the uploader of a video affirm that he or she owns the intellectual property to a file (or has the necessarily licenses) to upload the file to the Websites.  *Id.*, ¶ 9-10.  Users must agree to these terms before they upload files to the Websites.  *Id.*, ¶ 11.

---

[2] The only exception are videos that are uploaded pursuant to SSM's affiliate relationship with the affiliate program for the company Mindgeek, which owns the brand "Brazzers" in addition to others.  Bolotin Decl., ¶ 6.

SSM complies with the requirements set forth under the DMCA, codified as 17 U.S.C. § 512, to qualify for its safe harbor against claims of copyright infringement.  As part of its compliance thereof, SSM maintains a designated agent for the receipt of claims of infringement, posting its agent's information both on its Websites and by filing the required form with the Copyright Office.  *Id.*, ¶ 12.  SSM also adopted and reasonably implements, and has informed users of, a policy under which it terminates repeat infringers.  *Id.*, ¶ 13.  SSM also acts expeditiously to remove files upon receiving any form of notification of infringement.  *Id.*, ¶ 14. Further details of SSM's compliance with the DMCA are discussed in detail below.

Similarly, when SSM receives notification that any of the content on its websites allegedly infringes a third party's trademark rights, SSM promptly removes such content.  *Id.*, ¶ 15.  All of the allegedly infringing uses of Plaintiff's trademarks as alleged in the Complaint were as a result of information input by users.  *Id.*, ¶ 16.

## III.   LEGAL STANDARD

### A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *Accord* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  Once a party demonstrates the absence of a genuine issue of material fact, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.*, at 324.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment is appropriate.  *See* <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,

587 (1986) (*quoting* <u>First Nat'l Bank of Ariz. V. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

**B.    The Digital Millennium Copyright Act (the "DMCA")**

The purpose of the DMCA, and the DMCA's safe harbors, is to balance the competing interests between protecting intellectual property rights of content holders and protecting the rights of online service providers so as to promote innovation and the growth of services on the Internet.  *See* <u>Capitol Records, Inc. v. MP3tunes, LLC</u>, 821 F.Supp.2d 627, 646 (S.D.N.Y. 2011) (purpose of DMCA is "innovation and growth of internet services").  In enacting the DMCA, "Congress recognized that '[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability.'"  <u>UMG Recordings, Inc. v. Veoh Networks, Inc.</u>, 718 F.3d 1006, 1014 (9th Cir. 2013) (*quoting* S. Rep. No. 105-190, at 8 (1998)).  Congress was aware that the services provided by service providers could be "misused to facilitate copyright infringement," but it "was loath to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions."  *Id.*  *See*, *also*, <u>Wolk v. Kodak Imaging Network, Inc.</u>, 2011 WL 940056, at *9 (S.D.N.Y. Mar. 17, 2011) (purpose of DMCA is "to facilitate the growth of electronic commerce, not squelch it.");  Nimmer on Copyright § 12B.01[C][1] (it "will not serve anyone's interest if the Internet's backbone and infrastructure are sued out of existence for involvement in purportedly aiding copyright infringement").  Given the foregoing, "courts have counseled that the advantages of the DMCA should be viewed capaciously….  Although an affirmative defense, the DMCA has often been construed in favor of service providers, requiring relatively little effort by their operations to maintain immunity."  <u>Disney Enters., Inc. v. Hotfile Corp.</u>, 2013 WL 6336286, at *19 (S.D. Fla. Sept. 20, 2013) ["Hotfile MSJ"].

Service providers like SSM that satisfy the conditions of the DMCA have a safe harbor

from all monetary relief and all but limited injunctive relief[3] relating to infringement of copyright

by reason of storing files at the direction of their users.  17 U.S.C. § 512(c)(1).  The conditions

for the safe harbor are as follows:[4]

1.    Designate an agent to receive notifications of claimed infringement (a "DMCA Agent") by making available on its website and by providing to the Copyright Office the contact information for the DMCA Agent.  17 U.S.C. § 512(c)(2).

2.    Have no actual knowledge of infringing material or be aware of facts or circumstances from which infringing activity is apparent.  17 U.S.C. § 512(c)(1)(A)(i) and (ii).

3.    Upon obtaining knowledge or awareness of infringement, whether by notice to the DMCA Agent or otherwise, act expeditiously to remove, or disable access to, the material.  17 U.S.C. § 512(c)(1)(A)(iii) and (c)(1)(C).

4.    Receive no financial benefit directly attributable to infringing activity, in a case where the provider has the right and ability to control such activity.  17 U.S.C. § 512(c)(1)(B).

5.    Adopt and reasonably implement, and inform users of, a policy that provides for the termination in appropriate circumstances of users who are repeat infringers.  17 U.S.C. § 512(i)(1)(A).

6.    Accommodate and not interfere with technical measures that are used by copyright owners to identify or protect copyrighted works.  17 U.S.C. § 512(i)(1)(B) and (i)(2).

Where, as here, the facts establishing that the service provider has met these requirements

are not in genuine dispute, courts have not hesitated to grant summary judgment:

- Viacom Intern. Inc. v. YouTube, Inc., 940 F.Supp.2d 110 (S.D.N.Y.) ["Viacom Dist. II"], granting summary judgment in favor of video sharing giant YouTube.com that it was entitled to the DMCA safe harbors following Second Circuit's remand on issues of, *inter alia*, whether YouTube willfully blinded itself to specific infringement and whether YouTube had the right and ability to control infringing activity.  *See* Viacom Intern. Inc. v. YouTube, Inc., 676 F.3d 19 (2nd Cir. 2012) ["Viacom Cir."] on appeal from 718 F.Supp.2d 514 (S.D.N.Y. 2010).

- UMG Recordings Inc. et al. v. Shelter Capital Partners LLC et al. and Veoh Networks, Inc., 718 F.3d 1006 (9th Cir. 2013) ["UMG Cir."] affirmed the safe

---

[3] The scope of and considerations for injunctive relief that can be granted against DMCA compliant service providers are set forth in 17 U.S.C. § 512(j).
[4] All pertinent portions of the DMCA are included in Appendix 1 hereto.

harbor for video hosting site Veoh, and found that Veoh was not liable for infringements by users of which it was unaware.  *See*, *also*, <u>UMG Recordings, Inc. v. Veoh Networks Inc.</u>, 665 F.Supp.2d 1099 (C.D. Cal. 2009) ["UMG Dist."] (trial court's granting summary judgment of safe harbor for Veoh).

- <u>Wolk v. Kodak Imaging Network, Inc.</u>, 840 F.Supp.2d 724 (S.D.N.Y. 2012) found that the photo-sharing internet service provider Photobucket.com was entitled to the DMCA safe harbor in face of claims that its users were copying, displaying and modifying copyrighted works.

- <u>Corbis Corp. v. Amazon.com, Inc.</u>, 351 F.Supp.2d 1090 (W.D. Wash. 2004) concluded on a motion for summary judgment that internet retailer Amazon was entitled to the safe harbor protections under the DMCA against claims that one of its retailer user uploaded copyright infringing materials onto its website.

## IV.   ARGUMENT

### A.   SSM Did Not Upload Any of the Videos on the Websites, Including the Files-in-Suit, and Therefore Cannot Be Liable for Direct Infringement

In Count I, Hydentra has alleged that all the Defendants[5] are liable for direct copyright infringement.  To state a claim for copyright infringement, a plaintiff must show that the defendant engaged in a volition act causing the copying of the copyrighted material at issue.  *See* <u>Fox Broadcasting Co. v. Dish Network, LLC</u>, 747 F.3d 1060, 1066-68 (9th Cir. 2014); <u>The Cartoon Network LP, LLLP v. CSC Holdings, Inc.</u>, 536 F.3d 121, 131 (2d Cir. 2008); <u>Wolk</u>, 840 F.Supp.2d at 741-42 ("Direct liability requires 'volitional conduct' that 'causes' the infringement.").  As the United States Supreme Court held:

> A defendant may be held directly liable only if it has engaged in volitional conduct that violates the Act....  Every Court of Appeals to have considered an automated-service provider's direct liability for copyright infringement has adopted that rule....  Although we have not opined on the issue, our cases are fully consistent with a volitional-conduct requirement.  For example, we gave several examples of direct infringement in *Sony*, each of which involved a volitional act direct to the plaintiff's copyrighted material.

---

[5] Defendant Luchian has concurrently filed his own Motions for Summary Judgment.  Because Plaintiff's basis for liability against Defendants Bolotin and Luchian under all of the counts is premised on their purported relationships with SSM and its Websites, each of the arguments herein in favor of SSM apply with equal force (or even more so) in favor of Defendants Bolotin and Luchian.

<u>Am. Broad. Companies, Inc. v. Aereo, Inc.</u>, 134 S. Ct. 2498, 2512-13 (2014) (citations omitted).

The volitional conduct requirement – a fundamental element of Hydentra's claim – requires that there be sufficient allegations that the defendants engaged in volitional conduct with a nexus sufficiency close and causal to the alleged infringement such that it was the defendants, themselves, who actually trespassed on the rights of the copyright owner.  <u>Cartoon Network</u>, 536 F.3d at 131-32; <u>CoStar Group, Inc. v. Loopnet, Inc.</u>, 373 F.3d 544, 549 (4th Cir. 2004) ("[S]omething more must be shown than mere ownership of a machine used by others to make illegal copies[;] [t]here must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner.").  Merely alleging that the defendants operated a service that "allows users to upload and download copyrighted material without volitional conduct" is insufficient even on a site where the Court finds the existence of "massive infringement."  <u>Disney Enters. v. Hotfile Corp.</u>, 798 F. Supp. 2d 1303, 1308 (S.D. Fla. 2011).  In granting the defendants' Motion to Dismiss claims of direct copyright infringement, the *Hotfile* Court held that, "[N]othing in the complaint alleges that Hotfile or Mr. Titov took direct, volitional steps to violate the plaintiffs' infringement.  There are no allegations, say, that Hotfile uploaded copyrighted material.  Therefore, under the great weight of authority, the plaintiffs have failed to allege direct copyright infringement."

Neither Defendant Bolotin nor Luchian, nor any agent, employee or contractor of SSM uploaded any of the files-in-suit in this matter.  *See* Bolotin Decl., ¶ 17 and Declaration of Constantin Luchian in Support of Motions for Summary Judgment, ¶ 14.  In fact, neither Defendant Bolotin nor Luchian, nor any agent, employee or contractor of SSM, uploaded any

videos at all onto the Websites.[6]  Bolotin Decl., ¶ 18; Luchian Decl., ¶ 15.

With respect to Hydentra's claims of the use of its trademarks on the Websites, all such uses were also at the direction of the users of the Websites, and not by SSM.  *Id.*, ¶ 16. Therefore, Defendants can similarly not be liable for direct trademark infringement.

Accordingly, because no volitional conduct was undertaken by any of the Defendants, and the allegedly infringing files were uploaded by SSM's users only, Hydentra's Counts I, VI and VIII for direct infringement must be dismissed.

**B.      SSM is Entitled to the Protections Afforded by the DMCA Safe Harbor**

Hydentra has also alleged that SSM is liable for various forms of secondary copyright infringement (Counts II-IV).[7]  All such claims for secondary infringement would be limited by the DMCA's safe-harbors.  *See* 17 U.S.C. § 512(c)(1).  For the following reasons, SSM has satisfied the requirements to qualify for the DMCA's safe harbor and cannot be liable for monetary damages of any kind:

> 1.      *SSM Designated a DMCA Agent by Making Available on the Websites and by Providing to the Copyright Office the Agent's Contact Information.*

Section 512(c)(2) requires that a service provider "designate[] an agent to receive notifications of claimed infringement … by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information: (A) the name, address, phone number, and electronic mail address of the agent." 17 U.S.C. § 512(c)(2).  "Per the express terms of the statute, '[o]nly substantial compliance with the enumerated requirements is required by subsection 512(c)(2), as is also the case with subsection (c)(3).'"  Hotfile MSJ, *supra* at * 25 (*quoting* Perfect 10, Inc. v.

---

[6] With the exception of certain Brazzers videos – see footnote 2 *supra*.
[7] SSM accepts as true only for the purposes of this Motion that Hydentra has made a prima facie case of direct infringement by third parties.

Amazon.com, Inc., 2009 WL 1334364, at \*8 (C.D. Cal. May 12, 2009)).[8]

Dating back to September of 2010, SSM has designated a DMCA Agent by making available on the Websites (as they were created) and by providing to the Copyright Office the contact information for its DMCA Agent.  Bolotin Decl., ¶ 20.  Every page of each of the Websites contains a link to a copyright notification page listing SSM's DMCA Agent's contact information.  Bolotin Decl., ¶ 21.  In or about September of 2010, SSM filed its first "Interim Designation of Agent to Receive Notification of Claimed Infringement" with the United States Copyright Office in the form as provided by the Copyright Office.  *Id.*, ¶ 24.  Since that time, SSM has periodically filed amended designations with the Copyright Office to indicate changes in the contact information for the DMCA Agent and other relevant information.  *Id.*, ¶ 22.  SSM has therefore complied with its obligations pursuant to 17 U.S.C. § 512(c)(2).

> 2. *SSM Has No Actual Knowledge of Infringing Material (Including the Operative Files-in-Suit) and Was Not Aware of Facts or Circumstances from Which Specific Infringing Activity Was Apparent*

Courts have acknowledged that a service provider may lose its DMCA safe harbor if it has either actual knowledge of infringement or "red flag" knowledge of infringement on its service – but in both cases that knowledge must be "specific."  *See* Viacom Cir., 676 F.3d at 30-32 (and cases discussed therein).  "[A]ctual knowledge or awareness of facts or circumstances

---

[8] The legislative history for the provision includes the following committee statement:

> The Committee intends that the substantial compliance standard in subsections (c)(2) and (c)(3) be applied so that technical errors (such as misspelling a name, supplying an outdated area code if the phone number is accompanied by an accurate address, or supplying an outdated name if accompanied by an e-mail address that remains valid for the successor of the prior designated agent or agent of a copyright owner) do not disqualify service providers and copyright owners from the protections afforded under subsection (c). The Committee expects that the parties will comply with the functional requirements of the notification provisions—such as providing sufficient information so that a designated agent or the complaining party submitting a notification may be contacted efficiently—in order to ensure that the notification and take down procedures set forth in this subsection operate smoothly.

S.Rep. No. 105-190 (1998).  "[T]he statute focuses on whether someone with an infringement complaint would be able to contact the company."  Hotfile MSJ, *supra* at \*26.

that indicate specific and identifiable instances of infringement will disqualify a service provider from the safe harbor." *Id.* at 32. With respect to actual knowledge, SSM did not have any actual knowledge of infringement on the Websites, nor did Defendants Bolotin and Luchian. Bolotin Decl., ¶ 27; Luchian Decl., ¶ 16. There is no evidence to the contrary. Therefore, SSM has been in compliance with Section 512(c)(1)(A)(i).

With respect to 512(c)(1)(A)(ii), the so-called "red flag" knowledge provision, SSM has also been in compliance. Red flag knowledge does not mean generalized knowledge of infringement, but is rather an objective standard to be compared against subsection (i)'s subjective standard. As the Second Circuit explained: "[T]he actual knowledge provision turns on whether the provider actually or 'subjectively' knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement "objectively" obvious to a reasonable person…. Both provisions do independent work, and both apply only to specific instances of infringement." Viacom Cir., 676 F.3d at 31. *See also* UMG Recordings, Inc. v. Shelter Capital Partners LLC, 667 F.3d 1022, 1038 (9th Cir. 2011) ("[W]e hold that Veoh's general knowledge that it hosted copyrightable material and that its services could be used for infringement is insufficient to constitute a red flag."). Moreover, the question of actual knowledge and red-flag knowledge apply only with respect to the works at issue in the litigation. *See* Viacom Cir., 676 F.3d at 34 ("By definition, only the current clips-in-suit are at issue in this litigation. Accordingly, we vacate the order granting summary judgment and instruct the District Court to determine on remand whether any specific infringements of which YouTube had knowledge or awareness correspond to the clips-in-suit in these actions."). SSM, including Defendants Bolotin and Luchian, were not aware of any facts that would have make specific infringement obvious to a reasonable person. Bolotin

Decl., ¶ 28; Luchian Decl., ¶ 17.  Quite to the contrary, as detailed herein, SSM has gone to

extraordinary lengths in order to remove any content which it has any reason to believe is

infringing.[9]  Therefore, SSM has satisfied the obligations of Section 512(c)(1)(A)(i) and (ii).

3.   *SSM Acts Expeditiously to Disable Access to Files Upon Notice or Knowledge That Are Allegedly Infringing (Including the Files-In-Suit)*

Upon receipt of any form of notice that files on the Website are infringing, SSM

expeditiously disables access to and/or deletes all infringing files.  When SSM receives notices

of alleged copyright infringement by email, where it can easily copy and paste the allegedly

infringing URL, SSM generally disables access to the allegedly infringing file within 48 business

hours of receipt.  Bolotin Decl., ¶ 29.  *See*, *also*, Defendant Sun Social Media, Inc.'s Objections

and Responses to Plaintiff's First Set of Interrogatories ["SSM Int. Resp."], pertinent portions of

which are attached as <u>Exhibit 1</u> to SSM's Statement of Material Fact, pp.10-12.

SSM provides four general ways in which interested parties may submit claims of

copyright infringement, upon which SSM will promptly react: (a) by sending an email to any of

five different email addresses (including the one listed on SSM's registration with the Copyright

Office); (b) by sending physical copies of a notification to SSM's DMCA agent registered with

the Copyright Office or at the address listed on the Websites; (c) by sending a fax of a

notification to SSM's DMCA Agent (also listed with the Copyright Office and on the Websites);

or (d) by using the "Contact Us" form on any of the Websites.  *See* SSM Int. Resp., p. 10.

SSM thereafter utilizes two back-end systems to process copyright requests: its custom

general Ticket System and its customer Blocking Tools System ("BTS").  *Id.*  If a notice is

delivered by email or is sent using a Contact Us form, a ticket is created in the Ticket System and

---

[9] It should be noted that pursuant to Section 512(m), the DMCA safe harbor is explicitly *not* conditioned on SSM "monitoring its service or affirmatively seeking facts indicating infringing activity."

reviewed within 48 business hours to assign it to the BTS.  *Id.*  Notices that are sent to SSM's

DMCA Agent are generally scanned within 48 business hours and emailed to SSM, which then

manually enters them into the BTS.  *Id.*, at p. 11.  Then, pursuant to a largely automated system

(the details of which are discussed in SSM's Interrogatory Responses), the BTS collects the

necessary information about the allegedly infringing file, removes the file from the website and

runs the notice through its automated repeat infringer policy program to determine whether the

request triggers the termination of the user that uploaded the complained of content.  *Id.*  SSM

has expended considerable manpower in order to develop its Ticket System and the BTS, both of

which have been part of the backend of the Websites since their conception.  *Id.*, at p. 12.

SSM has produced in this litigation well over fifteen thousand pages of DMCA takedown

notices that it has received and has expeditiously responded to by removing the complained of

files and terminating in appropriate circumstances repeat infringers.  Bolotin Decl., ¶ 32.

Until such time as SSM received the Complaint in this matter, SSM was unaware that the

files listed in Exhibit A to the Complaint were alleged to be infringing.  *Id.*, ¶ 33.  Upon

receiving a copy of the Complaint, SSM promptly disabled access to the files referenced therein

from the Websites.  *Id.*, ¶ 34.  Although Hydentra alleges (Complaint, ¶¶ 61, 64) that it delivered

takedown notices for 37 of the works-in-suit in or about January of 2015, SSM never received

those takedown notices.  *Id.*, ¶ 35.  It appears as if the notices were lost by SSM's DMCA

Agent's landlord.  Luchian Decl., ¶ 18-23.  For the remainder of the works-in-suit, Hydentra

does not even allege that it sent notices related thereto to SSM.

The only person to ever send SSM paper DMCA notices is Hydentra's agent Jason

Tucker.  Bolotin Decl., ¶ 36.  It bears noting that on other occasions, Hydentra has sent copyright

notices to SSM, both before and after January of 2015, which SSM has promptly responded to,

including pursuant to notices sent on October 13, 2013 (sent by email, by Hydentra's agent Nate Glass), March 10, 2014 (sent by email, by Mr. Glass), March 4, 2015 (sent by email, by Mr. Glass), October 20, 2015 (sent by physical mail, by Mr. Tucker), and February 3, 2016 (sent by physical mail, by Mr. Tucker). *Id.*, ¶ 37. Given that SSM promptly responded to all of Mr. Glass's notices both before and after the alleged January 2015 notices, Mr. Tucker's paper notices (to the extent they were actually sent) were clearly sent in bad faith and in the hope that they would be lost or improperly processed in order to manufacture a pretext for filing a lawsuit. Because the links complained of are usually comprised of very long strings of characters, sending paper notices increases the chances that a recipient will accidentally be unable to locate the complained-of link.[10]

4. *SSM Receives No Financial Benefit Directly Attributable to Infringing Activity, and in Any Case Has No Right and Ability to Control*

Section 512(c)(1)(B) states that a DMCA complaint service provider "does not receive financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." In the first case, SSM does not receive any financial benefit directly attributable to any infringing activity, regardless of its right and ability to control such activity. But in any case, pursuant to the accepted interpretation of the DMCA, SSM does not have the right and ability to control the activity of its users at all.

SSM's revenues from the Websites comes solely from advertisements on its websites.[11] SSM Int. Resp., p. 12. SSM does not charge users to upload any content onto the Websites

---

[10] Mr. Tucker's paper notices on behalf of Hydentra, given the established mode of communicating DMCA notices by email (which is faster, safer and easier to send and process for both the complaining party and the receiving party) potentially sets forth the basis for a cause of action against Hydentra for abuse of process. SSM believes that Hydentra's sending of paper notices was not an attempt to vindicate legitimate rights, but a set up to entrap potential defendants into unintentional violations.

[11] The only exception is a small amount of revenue that that SSM has recently received as part of its affiliate relationship with Mindgeek's affiliate program. Bolotin Decl., ¶ 19.

(including any of the files-in-suit) nor does it charge users to view any content on the Websites (including any of the files-in-suit).  *Id.*  With the exception of content partners who may place their own ads on pages containing their own content, advertisers do not get to select which content on the Websites their ads appear alongside.  *Id.*  SSM does not solicit any advertisers with any statements that the content on the Websites are infringing.  *Id.*  In fact, SSM does not directly solicit advertisers at all – all of the advertisements on its websites are through advertising brokers or by advertisers who approach SSM on their own.  *Id.*  SSM does not solicit those advertising brokers with any statements that the content on its websites are infringing.  *Id.*

Cases examining what constitutes a direct financial benefit have stressed the difference between a service provider that receives a financial benefit as a result of providing services generally and one that receives a financial benefit directly attributable to infringing activity. "[W]here there is no evidence in the record that the service provider 'attracted or retained subscriptions because of the infringement or lost subscriptions because of its eventual obstruction of the infringement,' no reasonable jury could conclude that the service provider received a direct financial benefit from providing access to the infringing material."  Wolk, 840 F.Supp.2d at 748 (*quoting* Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1118 (9th Cir. 2007)). *See*, *also*, Capital Records, 821 F.Supp.2d at 645 ("[T]he financial benefit must be attributable to the infringing activity."); Perfect 10, 488 F.3d at 1117 ("[T]he relevant inquiry is whether the infringing activity constitutes a draw for subscribers, not just an added benefit…."); Religious Tech. Ctr. V. Netcom On-Line Commun. Servs., 907 F.Supp. 1361, 1377 (N.D. Cal 1995) (finding no "direct financial benefit" where there was no evidence that the allegedly infringing materials "in any way enhances the value of Netcom's services to subscribers or attracts new subscribers").  Given that SSM receives no revenue from its users, and that its only revenue

14

comes from advertisers, who have no choice as to where on the site their advertisements appear, there is no direct financial benefit to SSM from any alleged infringing files on the Websites, including the files-in-suit.

In any case, SSM does not have the "right and ability to control."  Both the Second and the Ninth Circuit[12] have held that to have such control, the service provider must "exert [ ] substantial influence on the activities of users."  UMG Recordings, 718 F.3d at 1030; Viacom Cir., 676 F.3d at 38.  Both of these courts have gone on to state that to have the appropriate "right and ability to control," the service provider needs "something more than the ability to remove or black access to materials posted on a service provider's website."  *Id.*  SSM has no more than that ability, nor is there any triable issue to the contrary.  In both the *UMG Recordings* case and the *Viacom* case, including many others similar to them and similar to this case, the Circuit Courts affirmed summary judgments that video sharing websites like SSM did not have the requisite right and ability to control.  Therefore, SSM is compliant with Section 512(c)(1)(B).

> 5.     *SSM Adopted and Reasonably Implements, and Informs Users of, a Repeat Infringer Policy*

SSM has, since the inception of the Websites, adopted and informed users of its repeat infringer policy in accordance with Section 512(i)(1)(A).  That policy, as indicated in the Terms of Use/Terms of Service for each of the Websites and on the Copyright page for each of the Websites states that "As part of our repeat-infringement policy, any user for whose User Submissions or Third Party Content we receive three good-faith and effective complaints within a six-month period will be barred from using the website."  SSM Int. Resp., p. 12.  SSM has implemented its repeat infringer policy by building it directly into the back-end of its website, which automatically runs the repeat infringer test on every single takedown notice received by

---

[12] The Eleventh Circuit has yet to take up this issue.

SSM and terminates any user who has violated the repeat infringer policy.  *Id.*, pp. 12-13.  SSM has terminated over a thousand users pursuant to its repeat infringer policy, documents and details of which have been produced in discovery.  *Id.*, p. 13; Bolotin Dec., ¶ 38.

6.       *SSM Accommodates and Does Not Interfere with Standard Technical Measures Used by Copyright Owners to Identify or Protect Works*

A service provider accommodates standard technical measures by not interfering with mechanisms copyright owners use to identify or protect copyrighted works.  *See* 17 U.S.C. § 512(i)(2).  "An example of a party's failure to comply with standard technical measures may include conduct that advises or encourages users to conceal a work's copyrighted status."  Obodai v. Demand Media, Inc., 2012 WL 2189740 (S.D.N.Y. June 13, 2012).  SSM accommodates and undertakes no action that interferes with any measure that are used by copyright owners to identify or protect copyrighted works.  SSM Int. Resp., p. 13.  SSM does not alter any of the content uploaded by users onto the Websites other than to format it for proper playback on the Internet.  *Id.*  It does not remove or otherwise interfere with any watermarks or logos on the works.  *Id.*  It does not advise or encourage users to conceal a work's copyrighted status and, to the contrary, SSM cautions users that they may only post those files which they are legally permitted to post.  Bolotin Decl., ¶¶ 8-11.  SSM satisfies Section 512(i)(2).

Given that SSM satisfies all the requirements to qualify for the DMCA safe harbor, it cannot be liable for monetary damages for Hydentra's copyright claims.

**C.     Even if SSM Did Not Qualify for the DMCA Safe Harbor (which it does) SSM and Bolotin Would Still Not Be Liable to Hydentra**

Pursuant to Section 512(l), even if SSM does not qualify for the DMCA safe harbor (which it does), SSM's actions and omissions would not constitute infringement under any of the theories of secondary liability, whether for copyright or trademark infringement.

1.      *SSM is Not Liable for Contributory Infringement*[13]

To be liable for contributory copyright infringement, the defendant must, with knowledge of the infringing activity, cause or materially contribute to the infringing conduct of another. Cable/Home Comm. Corp. v. Network Prod., Inc., 902 F.2d 829, 845-46 (11th Cir. 1990).  The standard of knowledge of objective (know or have reason to know) and contributory infringement will not be found if the product in question is capable of "substantial noninfringing uses."  *Id.* (*citing*, Sony Corp. of Am. V. Universal City Studios, Inc., 464 U.S. 417, 442 (1984)).  As detailed above, SSM had no knowledge of the infringement on the Websites until it was notified of them in the Complaint, after which it promptly removed them.  Because "contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement," and because SSM did in fact halt any alleged infringement of which it was aware, SSM cannot be liable for contributory infringement.  *See* Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1175 (9th Cir. 2007).  Moreover, because the Websites are "widely used for legitimate, unobjectional purposes" and is more than merely capable of substantial noninfringing use, SSM is also not liable for contributory infringement.  Sony Corp., 464 U.S. at 442.  *See also* Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 933 (2005).

With respect to contributory trademark infringement, the test is largely the same.  *See*, *e.g.*, Duty Free Ams., Inc. v Estee Lauder Cos., 797 F.3d 1248, 1274-75 (11th Cir. 2015); Inwood Labs., Inc., v. Ives Labs., Inc., 456 U.S. 844, 854 (1982) (distributor can be liable if it "continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement"); Bauer Lamp Co. v. Shaffer, 941 F.2d 1165, 1171 (11th Cir. 1991) ("A

---

[13] Although inducement of infringement is classically considered to be one of two forms of contributory infringement, *see* Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005), Hydentra has alleged it as two separate causes of action, and therefore SSM responds to them separately.

person who knowingly participates in furthering the trade dress infringement is liable as a contributing party.").  Because, as set forth in detail above, SSM did not have any actual knowledge of alleged trademark infringement by its users, SSM cannot be liable.

2.     <em>SSM is Not Liable for Inducement of Copyright Infringement</em>

To be liable for inducing copyright infringement, the defendant must "with knowledge of the infringing activity, induce ... the infringing conduct of another."  <u>Casella v. Morris</u>, 820 F.2d 362, 365 (11th Cir. 1987).  "The inducement rule … premises liability on purposeful, culpable expression and conduct…."  <u>Grokster</u>, 545 U.S. at 937.  SSM has not induced or encouraged any user to engage in direct infringement.  Bolotin Decl., ¶ 40.  Nor is there evidence that SSM has a purpose to cause and profit from infringement.  <em>Compare</em> <u>Grokster</u>, 545 U.S. at 941 ("Here, evidence of the distributor's words and deeds going beyond distribution as such shows a purpose to cause and profit from third-party acts of copyright infringement.").

3.     <em>SSM is Not Liable for Vicarious Copyright Infringement</em>

"One … infringes [copyrights] vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it."  <u>Grokster</u>, 545 U.S. at 930 (<em>citing</em> <u>Shapiro, Bernstein & Co., v H.L. Green Co.</u>, 316 F.2d 304, 307 (2nd Cir. 1963).  A website operator does not "exercise control" over infringement unless it "has both a legal right to stop or limit the directly infringing conduct, <em>as well as the practical ability to do so</em>."  <u>Perfect 10, Inc.</u>, 508 F.3d at 1173 (emphasis added).  Because the question of vicarious copyright infringement is virtually the same as the question of whether SSM complies with Section 512(c)(1)(B), covered in detail above, which is does, SSM is not liable for vicarious copyright infringement.

18

**D.**   **Even if SSM Was Liable for Copyright Infringement (Which it is Not) The Infringement Should Be Deemed Innocent**

Even though, as set forth above, SSM is not liable for Hydentra's claims of monetary infringement, to the extent that this Court finds otherwise that SSM is monetarily liable for the purported DMCA notices that were apparently lost by SSM's DMCA Agent's landlord, such infringement should be deemed unintentional because it stemmed solely from an unintentional loss of the notices.  Given SSM's history of compliance with the DMCA, including the expeditious takedown of all files that it received notice that were infringing, including many of Hydentra's files in the past, there is no question that SSM would have removed the files in those notices had it received them.  Therefore, if Hydentra is seeking statutory damages pursuant to 17 U.S.C. § 504(c), this court should find that SSM "was not aware and had no reason to believe that [its] acts constituted the infringement of copyright" and reduce the award of statutory damages to a sum of not less than $200 in accordance with Section 504(c)(2).

**E.**   **Count V of the Complaint Should Be Dismissed**

Count V of the Complaint for unauthorized publication of name or likeness in violation of Florida Statute 540.08 can be dismissed for multiple reasons.  First, pursuant to 47 U.S.C. § 230, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  Because the content complained of by Hydentra was provided by SSM's users and not SSM, SSM cannot be deemed the publisher of that content.  Second, 540.08 explicitly does not apply to "[t]he use of such name, portrait, photograph, or other likeness in connection with the resale or other distribution … where such person has consented to the use of her or his name, portrait, photograph, or likeness on or in connection with the initial sale or distribution thereof."  Fla. Stat. 540.08(4)(b).  Paragraph 156 of the Complaint states that each of the models in Hydentra's

19

videos performed under contract in the files-in-suit – thereby indicating that they consented to use of their name and likeness in the initial distribution of Hydentra's works.  Third, SSM did not use these models' images for trade, commercial, or advertising purposes as those terms are used in the statute.  *See, e.g.*, <u>Tyne v. Time Warner Ent. Co., L.P.</u>, 901 So.2d 802, 808 (Fla. 2005) ("[T]he purpose of section 540.08 is to prevent the use of a person's name or likeness to directly promote a product or service because of the way that the use associates the person's name or personality with something else."); <u>Loft v. Fuller</u>, 408 So. 2d 619, 622-23 (Fla. Dist. Ct. App. 1981) ("Section 540.08, by prohibiting the use of one's name or likeness for trade, commercial or advertising purposes, is designed to prevent the unauthorized use of a name to directly promote the product or service of the publisher.  Thus, the publication is harmful not simply because it is included in a publication that is sold for a profit, but rather because of the way it associates the individual's name or his personality with something else.").  It is clear that SSM has not used any of these models' likenesses to directly promote the Websites.

## V.      CONCLUSION

SSM, as an operator of user generated content websites, cannot be directly liable for the infringing actions of its users.  SSM has further complied with the safe harbor provisions of the DMCA.  In any case, SSM could not be liable under any theory of secondary liability for copyright or trademark infringement.  And even if SSM is somehow found liable, Mr. Bolotin, who has done all he could to limit infringement, should not be held liable for the actions of SSM's users.[14]  For these reasons, and as detailed above, SSM and Mr. Bolotin move this honorable court to dismiss the entirety of the Complaint and to issue a ruling that SSM is subject to the safe-harbor provisions of the DMCA.

---

[14] And furthermore, to the extent liability is based on the notifications purportedly sent in January of 2015, Mr. Bolotin certainly should not be held personally liable for an issue purposefully created by Hydentra to file suit.

**Respectfully submitted:**

/s/ Brady J. Cobb
Brady J. Cobb, Esquire
Florida Bar No. 031018
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone (954) 527-4111
Facsimile (954) 900-5507
bcobb@cobbeddy.com

*Attorney for Defendants*
*Constantin Luchian,*
*Konstantin Bolotin and*
*Sun Social Media Inc.*

Dated: February 12, 2016

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record on the service list below this 12th day of February, 2016.

/s/ Brady J. Cobb
Brady J. Cobb

## SERVICE LIST

Aaron Behar, Esquire
Jaclyn Behar, Esquire
BEHARBEHAR
1840 North Commerce Parkway
Suite One
Weston, Florida 33326
Telephone: (954) 688-7642
Facsimile: (954) 332-9260
AB@BeharBehar.com
JB@BeharBehar.com

Spencer D. Freeman
Freeman Law Firm, Inc.
1107 1/2 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (206) 516-3800
Facsimile: (206) 516-3888
sfreeman@freemanlawfirm.org

**<u>Annex 1</u>**
**<u>Pertinent Portions of the DMCA</u>**

**<u>17 U.S. Code § 512 - Limitations on liability relating to material online</u>**

. . .

**(c) Information Residing on Systems or Networks At Direction of Users. —**

    (1)  *In general.* — A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

        (A)

            (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

            (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

            (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

        (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

        (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

    (2) *Designated agent.* — The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

        (A) the name, address, phone number, and electronic mail address of the agent.

        (B) other contact information which the Register of Copyrights may deem appropriate.

    The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, and may require payment of a fee by

service providers to cover the costs of maintaining the directory.

(3) *Elements of notification.* —

    (A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

        (i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

        (ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

        (iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

        (iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

        (v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

        (vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

    (B)

        (i) Subject to clause (ii), a notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.

        (ii) In a case in which the notification that is provided to the service provider's designated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A), clause (i) of this subparagraph applies only if the service provider promptly attempts to contact the

person making the notification or takes other reasonable steps to assist in the receipt of notification that substantially complies with all the provisions of subparagraph (A).

. . .

(f) **Misrepresentations.** — Any person who knowingly materially misrepresents under this section —

(1) that material or activity is infringing, or

(2) that material or activity was removed or disabled by mistake or misidentification, shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

(i) **Conditions for Eligibility.** —

(1) *Accommodation of technology.* — The limitations on liability established by this section shall apply to a service provider only if the service provider —

(A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures.

(2) *Definition.* — As used in this subsection, the term "standard technical measures" means technical measures that are used by copyright owners to identify or protect copyrighted works and—

(A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

(B) are available to any person on reasonable and nondiscriminatory terms; and

(C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

(j) **Injunctions.** — The following rules shall apply in the case of any application for an injunction under section 502 against a service provider that is not subject to monetary remedies

iii

under this section:

(1) *Scope of relief.* —

(A) With respect to conduct other than that which qualifies for the limitation on remedies set forth in subsection (a), the court may grant injunctive relief with respect to a service provider only in one or more of the following forms:

(i) An order restraining the service provider from providing access to infringing material or activity residing at a particular online site on the provider's system or network.

(ii) An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is engaging in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

(iii) Such other injunctive relief as the court may consider necessary to prevent or restrain infringement of copyrighted material specified in the order of the court at a particular online location, if such relief is the least burdensome to the service provider among the forms of relief comparably effective for that purpose.

(B) If the service provider qualifies for the limitation on remedies described in subsection (a), the court may only grant injunctive relief in one or both of the following forms:

(i) An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is using the provider's service to engage in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

(ii) An order restraining the service provider from providing access, by taking reasonable steps specified in the order to block access, to a specific, identified, online location outside the United States.

(2) *Considerations.* — The court, in considering the relevant criteria for injunctive relief under applicable law, shall consider —

(A) whether such an injunction, either alone or in combination with other such injunctions issued against the same service provider under this subsection, would significantly burden either the provider or the operation of the provider's system or network;

iv

(B) the magnitude of the harm likely to be suffered by the copyright owner in the digital network environment if steps are not taken to prevent or restrain the infringement;

(C) whether implementation of such an injunction would be technically feasible and effective, and would not interfere with access to noninfringing material at other online locations; and

(D) whether other less burdensome and comparably effective means of preventing or restraining access to the infringing material are available.

(3) *Notice and ex parte orders.* — Injunctive relief under this subsection shall be available only after notice to the service provider and an opportunity for the service provider to appear are provided, except for orders ensuring the preservation of evidence or other orders having no material adverse effect on the operation of the service provider's communications network.

(k) **Definitions.** —

(1) *Service provider.* —

(A) As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

(B) As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A).

(2) *Monetary relief.* — As used in this section, the term "monetary relief" means damages, costs, attorneys' fees, and any other form of monetary payment.

(l) **Other Defenses Not Affected.** — The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense.

(m) **Protection of Privacy.** — Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on —

(1) a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i); or

v

(2) a service provider gaining access to, removing, or disabling access to material in cases in which such conduct is prohibited by law.

. . .

**Annex 2**
**List of Lawsuits Filed by Hydentra**

1.   Hydentra HLP Int. Limited v. Kporno.com et al, Case No. 2:2015-cv-00238 (D. Arizona) (filed Feb. 10, 2015)
2.   Hydentra HLP Int. Limited v. Tubenn.com et al, Case No. 2:2015-cv-00239 (D. Arizona) (filed Feb. 10, 2015)
3.   Hydentra HLP Int. Limited v. Pornvideoxo.com et al, Case No. 2:2015-cv-00240 (D. Arizona) (filed Feb. 10, 2015)
4.   Hydentra HLP Int. Limited v. Spankbang.com et al, Case No. 2:2015-cv-00199 (W.D. Wash.) (filed Feb. 10, 2015)
5.   Hydentra HLP Int. Limited v. HDPorn1080.com et al, Case No. 2:2015-cv-00442 (D. Arizona) (filed March 11, 2015)
6.   Hydentra HLP Int. Limited v. Pornburst.xxx et al, Case No. 2:2015-cv-00443 (D. Arizona) (filed March 11, 2015)
7.   Hydentra HLP Int. Limited v. Pornowow.com et al, Case No. 2:2015-cv-00444 (D. Arizona) (filed March 11, 2015)
8.   Hydentra HLP Int. Limited v. Seesexvideo.net et al, Case No. 2:2015-cv-00371 (W.D. Wash.) (filed March 11, 2015)
9.   Hydentra HLP Int. Limited v. Sextvx.com, Case No. 2:2015-cv-00372 (W.D. Wash.) (filed March 11, 2015);
10.  Hydentra HLP Int. Limited v. Porn69.org et al, Case No. 2:2015-cv-00451 (D. Arizona) (filed March 12, 2015)
11.  Hydentra HLP Int. Limited v. Motherless, Inc. et al, Case No. 2:2015-cv-03834 (C.D. Cal.) (filed May 20, 2015)
12.  Hydentra HLP Int. Limited v. Jojobaa.net, Case No. 2:2015-cv-03904 (C.D. Cal.) (filed May 22, 2015)
13.  Hydentra HLP Int. Limited v. Adultpornvideoxx.com et al., Case No. 2:2015-cv-03950 (C.D. Cal.) (filed May 25, 2015)
14.  Hydentra HLP Int. Limited v. Luchian et al, Case No. 1:2015-cv-22134 (S.D. Fla.) (filed June 4, 2015)
15.  Hydentra HLP Int. Limited v. Maximum Apps Inc. et al, Case No. 1:2015-cv-22463 (S.D. Fla.) (filed June 30, 2015)
16.  Hydentra, L.P. HLP General Partner, Inc. et al v. Mindgeek USA Inc. et al, Case No. 1:2015-cv-23230 (S.D. Fla.) (filed August 27, 2015)
17.  Hydentra, L.P. HLP General Partner, Inc. et al v. Era Technologies, Ltd. et al, Case No. 1:2015-cv-24293 (S.D. Fla.) (filed November 18, 2015)
18.  Hydentra, L.P. HLP General Partner, Inc. et al v. Siracusa Management S.A. et al, Case No. 1:2016-cv-20191 (S.D. Fla.) (filed January 15, 2016)