IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
IN AND FOR MIAMI-DADE  COUNTY, FLORIDA

CASE NO. 15-cv-22134-UU

HYDENTRA HLP INT. LIMITED, a foreign
corporation d/b/a METART,

       Plaintiff,

vs.

CONSTANTIN LUCHIAN, an individual,
KONSTANTIN BOLOTIN, an individual,
Sun Social Media, INC., a corporation,
individually and d/b/a Playvid.com,
FEEDVID.COM, PLAYVIDS.COM,

and

PEEKVIDS. COM; Playvid.com; FEEDVID.COM;
PLAYVIDS. COM; PEEKVIDS.COM and; and
John Does 1-20,

       Defendants.
_____/


CORRECTED TRANSCRIPT AS TO TIME STAMP ONLY

VIDEOTAPED DEPOSITION OF CONSTANTIN LUCHIAN

TAKEN ON BEHALF OF THE PLAINTIFF
JANUARY 19, 2016
2:15 P.M. TO 4:02 P.M.


BRYN & ASSOCIATES, P.A.
ONE BISCAYNE TOWER
2 SOUTH BISCAYNE BLVD.
#2680
MIAMI, FLORIDA 33131


REPORTED BY:
MELISSA KALLAS
NOTARY PUBLIC, STATE OF FLORIDA



877.291.3376
www.UCRinc.com

Luchian, Constantin 01-19-2016

---

**2**

```
 1              APPEARANCES OF COUNSEL
 2  ON BEHALF OF THE PLAINTIFFS:
 3     AARON BEHAR, ESQUIRE
        BEHAR BEHAR
 4     1840 NORTH COMMERCE PARKWAY
        SUITE ONE
 5     WESTON, FLORIDA 33326
        TELEPHONE: (954) 688-7642
 6     AB@BEHARBEHAR.COM
 7     SPENCER D. FREEMAN, ESQ.
        FREEMAN LAW FIRM, INC.
 8     1107 1/2 TACOMA AVENUE SOUTH
        TACOMA, WASHINGTON 98402
 9     TELEPHONE: (253) 383-4500
        E-MAIL: SFREEMAN@FREEMANLAWFIRM.ORG
10
    ON BEHALF OF THE DEFENDANTS:
11
        BRADY COBB, ESQUIRE
12     COBB EDDY, PLLC
        642 NORTHEAST 3RD AVENUE
13     FT. LAUDERDALE, FLORIDA 33304
        954.527.4111
14     BCOBB@COBBEDDY.COM
15
16
17
18
19
20
21
22
23
24
25
```

---

**4**

```
 1              INDEX OF EXHIBITS
 2  EXHIBITS        DESCRIPTION           PAGE
 3    7        PACKING SLIP              45
 4    8        TRACKING SLIP             47
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**3**

```
 1              INDEX OF EXAMINATION
 2  WITNESS:  CONSTANTIN LUCHIAN
                                        PAGE
 3  DIRECT EXAMINATION BY
        By MR. SPENCER FREEMAN, ESQUIRE      5
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**5**

```
 1              CONSTANTIN LUCHIAN,
 2  Being called as a Witness, was duly sworn at this time
 3  by the court stenographer and testified as follows:
 4              DIRECT EXAMINATION
 5  BY MR. FREEMAN:
 6     Q.   Can you state your name and spell it?
 7     A.   Constantin Luchian, C-O-N-S-T-A-N-T-I-N, last
 8  name, L-U-C-H-I-A-N.
 9     Q.   Pronounce your last name for me, again.
10     A.   "Luchian," you were very close.
11     Q.   I was close.
12          You and I were formerly introduced, I'm
13  Spencer Freeman, I represent the Plaintiff in this
14  action.  I know you were here yesterday, but for
15  purposes of today's deposition, I will go over those
16  rules again.
17          Have you ever had your deposition taken
18  before?
19     A.   Yes.
20     Q.   When was your last deposition?
21     A.   Several years ago.
22     Q.   How many times have you had your deposition
23  taken?
24     A.   Once.
25     Q.   What context was your deposition taken?
```

---



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

Luchian,  Constantin  01-19-2016

6

1   A.  Can you explain?
2   Q.  Were you a named party in the litigation?
3   A.  No.
4   Q.  You were just a witness?
5   A.  Yes.
6   Q.  Do you remember what the litigation was?
7   A.  Yes.
8   Q.  What was it?
9   A.  It is a law case against.
10   Q.  Do you remember the parties were?
11   A.  One party was Hotfile, the other party, I'm
12  not sure.
13   Q.  "Hotfile" was one of your clients?
14   A.  Yes.
15   Q.  Have you had any alcohol or drugs in the last
16  24 hours that would affect your ability to testify
17  today?
18   A.  No.
19   Q.  When you and I are interacting, it is
20  important that you and I don't interrupt one another, so
21  the court reporter can get down on paper what we are
22  saying; is that fair?
23   A.  Yes.
24   Q.  If there's a question that I ask you, that you
25  do not understand, please ask me to ask it again or

7

1  rephrase it, okay?
2   A.  Okay.
3   Q.  Any "yes" or "no" answers, rather than using
4  nods or shakes of the head or phrases like "um-huh," or
5  "uh-huh," I need verbal response of "yes" or "no," is
6  that fair?
7       MR. COBB:  Most importantly, speak towards the
8       court reporter, so that she can hear you with
9       conviction so she can type.
10  BY MR. FREEMAN:
11   Q.  It is the last word that is key, "conviction."
12       What is your date of birth?
13   A.  July 13, 1986.
14   Q.  Where were you born?
15   A.  Moldova.
16   Q.  Where is that?
17   A.  Eastern Europe.
18   Q.  When did you come to the United States?
19   A.  From my recollection, it was around 2003.
20   Q.  So you would have been how old?
21   A.  From my recollection, I think I was around 17
22  years old.
23   Q.  Did you come here with your family?
24   A.  Yes.
25   Q.  Where in the United States did you first move?

8

1   A.  Florida.
2   Q.  Have you lived in Florida ever since you have
3  been in the United States?
4   A.  Yes.
5   Q.  Where do you currently live?
6   A.  In Jupiter, Florida.
7   Q.  Jupiter?
8   A.  Yes.
9   Q.  What is your address?
10   A.  240 Palmetto Court.
11   Q.  Can you it spell that?
12   A.  P-A-L-M-E-T-T-O, Jupiter, Florida.
13   Q.  Who do you live with?
14   A.  My girlfriend.
15   Q.  What is your girlfriend's name?
16   A.  I would like to keep my girlfriend's name
17  privacy.
18   Q.  You need to answer the question, I'm sorry.
19   A.  Okay, her name her is A-L-I-N-A.
20   Q.  And last name?
21   A.  D-O-M-B-R-V-S-K-Y-A, I think, I don't recall
22  the exact spelling in English.
23   Q.  How long have you guys been together?
24   A.  About 3 years or 2-and-a-half years.
25   Q.  If you moved here when you were 17, did you go

9

1  to schools here?
2   A.  Yes, I have.
3   Q.  Which school?
4   A.  Mariner High School.
5   Q.  What year did you graduate?
6   A.  I do not remember the exact year.
7   Q.  You did graduate, though?
8   A.  Yes.
9   Q.  How many years did you go there?
10   A.  I believe it was two-and-a-half years.
11   Q.  What did you do after high school?
12   A.  I went to college.
13   Q.  Where did you go to college?
14   A.  Florida Atlantic University.
15   Q.  What did you study at FAU?
16   A.  Management Information Business.
17   Q.  Management Information Business?
18   A.  Management Information Systems, MIS.
19   Q.  Information "Systems"?
20   A.  "Systems."
21   Q.  Did you get a degree?
22   A.  Yes.
23   Q.  Was it a two-year degree or four-year degree?
24   A.  Four-year.
25   Q.  Bachelor of Science or bachelor of arts?



Luchian,  Constantin  01-19-2016

10

1    A.  I'm not sure.
2    **Q.  What year did you get your degree?**
3    A.  I can't recall the exact year.
4    **Q.  Approximation?**
5    A.  About five years ago.
6    **Q.  How old are you right now?**
7    A.  29.
8    **Q.  Did you go straight from high school to**
9    **college?**
10   A.  Yes.
11   **Q.  You said it was a four, I asked if it was a**
12   **four-year degree, how many years did you spend in**
13   **college?**
14   A.  I think about seven years.
15   **Q.  What else were you doing while you went to**
16   **college?**
17   A.  Working.
18   **Q.  Where were you working?**
19   A.  Various places.
20   **Q.  Okay.  Why don't you give me a rundown of the**
21   **various places.**
22   A.  At one company, I did phone systems
23   installation.
24   **Q.  Phone systems installation?**
25   A.  Yes, and related services to that.

11

1    **Q.  Related services meaning "repairs"?**
2    A.  Yes, repairs, cable installations, phone
3    system programming, to an extent.
4    **Q.  What else did you do?**
5    A.  I worked for a company that provided a
6    customer software solution for retail business.
7    **Q.  You worked for a company that provided**
8    **customer software solution for a retail business or**
9    **retail businesses in general?**
10   A.  Retail businesses in general, it was a
11   software product that they sold.
12   **Q.  What was the software product?**
13   A.  It was called PM Systems, I was a
14   subcontractor to that company.
15   **Q.  Was it like a pay system for retailers?**
16   A.  It was a point-of-sale system.
17   **Q.  A point-of-sale system.**
18   **What else did you do while you were in**
19   **college?**
20   A.  After that, I joined Webzilla.
21   **Q.  What year did you join Webzilla?**
22   A.  I don't remember exactly.
23   **Q.  Can you give me an approximate?**
24   A.  I think it was about six years ago, six to
25   seven years ago.

12

1    **Q.  Six to seven years ago?**
2    A.  Yes, maybe less.
3    **Q.  The last seven years of your you were working**
4    **at Webzilla?**
5    A.  Yes.
6    **Q.  Were you taking classes consistently**
7    **throughout the seven years, like a class here and there**
8    **or did you take time off?**
9    A.  I took consistent classes, but not the full
10   12.
11   **Q.  So you were a consistent student over the**
12   **course of the seven years?**
13   A.  Yes, that can be told.
14   **Q.  Who hired you at Webzilla?**
15   A.  It was Alex Dub.
16   **Q.  He was here at the United States at the time?**
17   A.  No.
18   **Q.  How did you get introduced to Mr. Dub?**
19   A.  Through Constantine Bolotin.
20   **Q.  You knew Constantine Bolotin before working at**
21   **Webzilla?**
22   A.  Yes.
23   **Q.  How did you meet Constantine?**
24   A.  Our family met and then I met Constantine.
25   **Q.  Here in the United States?**

13

1    A.  Yes.
2    **Q.  Socially?**
3    A.  My parents met Constantine's family during
4    vacation here in Florida.
5    **Q.  Do you remember when that was?**
6    A.  No.
7    **Q.  Do you remember approximately what year that**
8    **you met Mr. Bowl?**
9    A.  I don't want to guess, I don't remember the
10   exact year.  Approximate, it was eight years ago, nine
11   years ago, give or take.
12   **Q.  When you were hired at Webzilla, was Mr. Bol**
13   **working there at the time?**
14   A.  We joined together.
15   **Q.  At the same time?**
16   A.  Yes.
17   **Q.  So I thought I had the understanding that Mr.**
18   **Bol introduced you to Alexy Goubarev?**
19   A.  That is correct.
20   **Q.  But you started working at the same time?**
21   A.  Yes.
22   **Q.  So Mr. Bolotin knew Mr. Goubarev prior?**
23   A.  Yes, but I'm not sure how much prior, probably
24   a couple of weeks.
25   **Q.  Did you have an understanding of how Mr.**



Luchian, Constantin 01-19-2016

14

1 **Bolotin met Mr. Goubarev?**
2     A. As far as I understand, it was met on-line.  I
3 don't know exact details.
4     **Q.   Did you have a job interview with Mr.**
5 **Goubarev?**
6     A. No.
7     **Q.   What were you hired to do?**
8     A. To deal with accounts payables, to manage
9 incoming invoices from vendors.
10     **Q.   Part-time or full-time job?**
11     A. I was a subcontractor, and...
12     **Q.   Part-time or full-time?**
13     A. I don't believe subcontractors have part-time/
14 full-time, but it took most of my time, yes.
15     **Q.   Well, were you working go 40 hours a week, 10**
16 **hours a week, 20 hours a week, on average, how many**
17 **hours were you working?**
18     A. We did not record the hours worked, but I
19 would say 30 to 40 hours a week.
20     **Q.   How were you paid?**
21     A. By checks or fund transfers.
22     **Q.   A check with Webzilla's name on it?**
23     A. Yes.
24     **Q.   What rate of pay were you given, were you paid**
25 **a flat rate?**

15

1     A. Yes.
2     **Q.   So when you graduated college, approximately**
3 **five years ago, you were working for Webzilla?**
4     A. Yes.
5     **Q.   What did you do after you graduated college,**
6 **you kept working for Webzilla?**
7     A. Yes.
8     **Q.   After you earned your MIS degree, did your**
9 **duties with Webzilla change?**
10     A. No.
11     **Q.   Did your duties continue to be dealing with**
12 **accounts payables and dealing with invoices from**
13 **vendors?**
14     A. Correct.
15     **Q.   When you say "dealings with accounts**
16 **payables," were you reaching out to entities that owed**
17 **money and requesting money from them to pay their**
18 **accounts?**
19     A. Sorry.  I was dealing with vendors and
20 receiving invoices from vendors, and recording them, and
21 vendor history, I did not deal with customers.
22     **Q.   So when you use the word "account payable,"**
23 **you mean accounts that Webzilla was paying vendors?**
24     A. What I mean by "accounts payables," is a
25 relationship of Webzilla with its vendors.

16

1     **Q.   And its paying the vendors?**
2     A. Webzilla is paying the vendors for the
3 services provided.
4     **Q.   Did you have access to Webzilla bank accounts?**
5 **Could you write checks and pay the vendors?**
6     A. Originally, no.
7     **Q.   At some point that changed?**
8     A. Yes.
9     **Q.   Do you remember when that changed?**
10     A. A couple of years ago.
11     **Q.   You still work for Webzilla today?**
12     A. Yes.
13     **Q.   What are your job duties today?**
14     A. Similar job duties, I deal with vendors.
15     **Q.   But those job duties have changed, because now**
16 **you have access to pay vendors?**
17     A. Yes, now I can also make payments to the
18 vendors.
19     **Q.   And that responsibility, was that a few years**
20 **ago?**
21     A. Yes.
22     **Q.   Before that, how would that process work?  You**
23 **would tell somebody else in the company to make the**
24 **payment?**
25     A. Webzilla had access to the banking, and they

17

1 would make the payments.
2     **Q.   What is your title with Webzilla?**
3     A. "Financial Director."
4     **Q.   When you first started with Webzilla, was your**
5 **title "Financial Director"?**
6     A. Yes.
7     **Q.   Do you recall what Mr. Bolotin's title was at**
8 **Webzilla?**
9     A. I believe it was "Operations Director."
10     **Q.   Do you remember what his responsibilities**
11 **were?**
12     A. General operations of Webzilla.
13     **Q.   What is your understanding of what Webzilla's**
14 **business is?**
15     A. It is a web hosting provider.
16     **Q.   What is your current compensation from**
17 **Webzilla?**
18     A. $4,000 a month.
19     **Q.   How many hours a month are you spending with**
20 **your duties as financial director with Webzilla?**
21     A. Again, I don't count hours.  I usually spend
22 30 to 40 hours a week, if I approximate, but hours are
23 not recorded.
24     **Q.   Is this a job you do from your home?**
25     A. Yes.



Luchian,   Constantin   01-19-2016

18

1   Q.   You have a computer from your home?
2   A.   Yes.
3   Q.   Did Webzilla buy you the computer?
4   A.   No.
5   Q.   It is yours?
6   A.   Yes.
7   Q.   You have Internet access from home?
8   A.   Yes.
9   Q.   Does Webzilla pay for that?
10   A.   No.
11   Q.   Do you have any other jobs right now?
12   A.   No.
13   Q.   Do you have any other titles right now?
14   A.   Yes.
15   Q.   What other titles?
16   A.   I am the director of InCorporate Now, Inc.
17   Q.   InCorporate Now, Inc.
18        What are your duties as director of
19   InCorporate Now, Inc.?
20   A.   General business operations.
21   Q.   When I asked if you had another job, why
22   didn't you list that as another job?
23   A.   I thought you meant like a paycheck job, like
24   a W2 situation.
25   Q.   Do you not make any money as your role of

19

1   Director of InCorporate Now?
2   A.   Yes, I do not.  I don't make any money, no.
3   Q.   Do you do it for free?
4   A.   Yes.
5   Q.   Why?
6   A.   I own the business.
7   Q.   The business is intended to be a for profit
8   business?
9   A.   Yes.
10   Q.   It is not that you do it for free, you do it
11   in hopes of making money with it some day?
12   A.   That is correct.
13   Q.   How long have you owned InCorporate Now, Inc.?
14   A.   From my recollection, 2009.
15   Q.   Did you start it?
16   A.   Yes.
17   Q.   Did you start it by yourself?
18   A.   That is confidential information that I cannot
19   disclose.
20   Q.   You have to answer the question?
21   A.   I incorporated the business.
22   Q.   Do you have any partners in the business?
23        MR. COBB:  Objection, relevance.  You can
24   answer.
25        THE WITNESS:  Yes.

20

1   BY MR. FREEMAN:
2   Q.   Who are your partners?
3        MR. COBB:  Same objection.
4        You want to take a break?
5        MR. FREEMAN:  He has to answer the question.
6   The deposition yesterday indicated that Sun Social
7   Media believed that InCorporate Now, Inc., was its
8   registered agent.
9        MR. COBB:  He's the director of operations,
10   how does his shareholders have anything to do with
11   the operations of the business?
12        MR. FREEMAN:  I at least get to explore it,
13   there's no rule of law that prevents me from asking
14   the question.
15        MR. COBB:  There's a relevance, if InCorporate
16   Now were a party, you could crawl all of the way
17   down the tree.  This time, he doesn't want to
18   disclose it for confidentiality reasons, you have
19   something else to include in your motion.  I'm not
20   instructing him not to answer, but is if he's not
21   not going to answer, he's not going answer the
22   question.
23        MR. FREEMAN: You are not not instructing him
24   not to answer.
25        MR. COBB:  I am not not instructing him not to

21

1   answer.  I am kidding.
2        I have an objection.  He can answer the
3   question.  If he refuses to answer the question,
4   then you have more fodder for your motion to
5   compel.
6        I have no problem with having a protective
7   order over this issue, this question.
8        MR. FREEMAN:  We are fine with that, but until
9   it's there.  Until it's there...
10        THE WITNESS:  Can you repeat the question,
11   please?
12   BY MR. FREEMAN:
13   Q.   When you started InCorporate Now, did you have
14   partners in the business?
15   A.   Yes.
16   Q.   Who are the partners?
17   A.   I would like to provide that information at a
18   later date with the proper request.
19        MR. COBB:  Protective order.
20   BY MR. FREEMAN:
21   Q.   Who is Vasilis Kallas?
22   A.   It was an acquaintance of ours, if I recall
23   correctly, he was included in the original registration
24   of InCorporate Now, because he was supposed to provide
25   his share of customers to the company.



877.291.3376
www.UCRinc.com

Luchian,  Constantin  01-19-2016

22

1   Q.  Is it Vasilis?
2   A.  Yes.
3   Q.  Last name?
4   A.  Kallas.  I'm not sure, I will double-check.
5   Q.  Is it a "he" or a "she"?
6   A.  It is a "he."
7   Q.  Is he still involved in the business?
8   A.  No.
9   Q.  He was originally, though?
10  A.  Yes.
11  Q.  Was Alexy Goubarev involved with the business
12  originally?
13  A.  No.
14  Q.  Is Constantine Bolotin involved with the
15  business originally?
16  A.  Yes.
17  Q.  Is Constantine Bolotin involved with the
18  business now?
19  A.  No.
20  Q.  When did that change?
21  A.  I cannot recall exactly.
22  Q.  Give me an estimate?
23  A.  A couple of years ago.
24  Q.  What was his role until a couple of years ago?
25  A.  Same as mine, as a director.

24

1   A.  No.
2   Q.  Have you paid yourself back yet?
3   A.  I need to double-check, I don't remember.
4   Q.  Okay.  It is not that important.  Was Constan
5   Borachenko part of the business?
6   A.  No.
7   Q.  Is he currently part of the business?
8   A.  No.
9   Q.  Val Gervitz part of the company?
10  A.  No.
11  Q.  What was the business purpose of InCorporate
12  Now?  What is the business purpose?
13  A.  To provide business services, corporate
14  services to its clients.
15  Q.  Can you be more specific as to what services
16  are being offered?
17  A.  Yes, company incorporation, company
18  maintenance.
19  Q.  Corporate doc maintenance?
20  A.  What do you mean by "corporation doc
21  maintenance?"
22  Q.  Maintaining documents necessary to keep
23  incorporation status?
24  A.  Yes.
25  Q.  Go on.

23

1   Q.  The person or persons that you referenced as
2   being a partner in the business at its inception, are
3   they still involved in the business?
4   A.  No.
5   Q.  When did that change?
6   A.  From what I recall, after a year after the
7   business started.
8   Q.  Did that person give up any money into the
9   business?
10  A.  No.
11  Q.  Where did the money come from?
12  A.  Personal loan.
13  Q.  Personal loans?
14  A.  Yes.
15  Q.  That you were responsible for?
16  A.  Yes.
17  Q.  Were those commercial loans or from people you
18  knew in your life?
19  A.  From myself.
20  Q.  From yourself?
21  A.  Yes.
22  Q.  You funded the business?
23  A.  Yes.
24  Q.  Have you taken out any loans to fund the
25  business?

25

1   A.  And DMAC agent service.
2   Q.  What states will InCorporate Now, Inc., assist
3   companies with regard to incorporating?
4   A.  Florida.
5   Q.  Any others?
6   A.  Delaware.
7   Q.  Any others?
8   A.  No.
9   Q.  Do you have knowledge of the laws regarding
10  incorporation in Florida?
11  A.  Can you explain, please?
12  Q.  Well, there's a legal process with regard to
13  incorporating a business, correct?
14  A.  Yes.
15  Q.  Do you have knowledge of what that process and
16  requirements are in the State of Florida?
17  A.  Yes, to an extent, I'm not an attorney, on the
18  law.
19  Q.  How about in Delaware?
20  A.  Same answer.
21  Q.  To an extent?
22  A.  To an extent.
23  Q.  How did you gain that knowledge?
24  A.  Research.
25  Q.  Does InCorporate Now utilize the services of



Luchian,  Constantin  01-19-2016

26

1  any attorneys in insuring its services with
2  incorporating for clients?
3      A.  Yes.
4      Q.  Are those attorneys a regular part of the
5  business?
6      A.  No.
7      Q.  Is that a service of attorneys used with
8  regard to every client?
9      A.  No.
10     Q.  In what circumstances would InCorporate Now
11  use the services of an attorney?
12     A.  There's no direct circumstance.  I mean I
13  can't point out a direct circumstance where InCorporate
14  Now would require an attorney to do anything.
15     Q.  You can't or you can point that out?
16     A.  I'm not sure exact circumstance would be where
17  InCorporate Now would require an attorney.
18     Q.  What do you mean when you say "DMCA agent
19  services"?
20     A.  It is a service for receiving corporate
21  notices and we also provide a service of registering our
22  clients to the corporate offices, registration.
23     Q.  You mean takedown notices, Copyright
24  infringement takedown notices, is that what you mean
25  when you say "receive notices"?

27

1      A.  Yes, receive all mail associated with to the
2  client.
3      Q.  You are the also the registered agent with
4  regard to the State?
5      A.  It is pertaining to DMAC agent services, we
6  are not registered agent for the client, we are "DMAC
7  agent" as we call it to the customer, we provide the
8  services of receiving the mail, which is usually any
9  type of a corporate notice on behalf of the client.
10     Q.  As a DMAC agent, you were receiving general
11  corporate notices?
12     A.  Our policy is to receive any piece of mail on
13  behalf of the client, what that piece of mail is, we
14  don't discriminate.
15     Q.  Who works for the business as of right now?
16     A.  I do.
17     Q.  That is it?
18     A.  Yes.
19     Q.  How much of your time is spent doing business,
20  doing work for InCorporate Now?
21     A.  Give or take, full-time.
22     Q.  In addition to the 30 to 40 hours a week, you
23  spend with your duties as financial director of
24  Webzilla?
25     A.  Yes.

28

1      Q.  So you are working about 80 hours a week?
2      A.  It is sporadic work, I don't calculate hours,
3  but I do work, you can say a lot, if you would like to
4  say that.
5      Q.  Do you have any job duties anywhere else?
6      A.  No.
7      Q.  Do you have any job titles anywhere else?
8      A.  No.
9      Q.  Did you make any money from InCorporate Now in
10  2015?
11     A.  Can you specify, please, or rephrase the
12  question?
13     Q.  Did InCorporate Now generate any revenue in
14  2015?
15     A.  I have to double-check the financial
16  statements.
17     Q.  Were they paid anything?  I'm not asking about
18  net or profit.
19     A.  Yes.
20     Q.  Did you earn any profit from it in 2015?
21     A.  Personally, I did not earn any profit.
22     Q.  What are the rates for InCorporate Now?
23         MR. COBB:  Object to the form.
24  BY MR. FREEMAN:
25     Q.  If I was going to hire you, your company, to

29

1  do DMCA agent services for me, how much would you charge
2  me?
3      A.  The rate varies.
4      Q.  On what variables?
5      A.  If we provide a discount or per our standard
6  rate is from $500 a month to $200 -- sorry, correction.
7  From $200 dollars a year to $2,000 a year, correction.
8      Q.  It is a rather wide range.  What determines
9  where I would fall in that range?
10     A.  Amount of work we have to perform on the
11  client's basis.
12     Q.  So I would not necessarily know ahead of time
13  what my cost would be with you at the time?  It would be
14  what actions take place throughout the year?
15     A.  No, we would charge you a specific amount for
16  the year, and that is it.  There's a fixed cost to the
17  client.
18     Q.  How are you determining what that fixed amount
19  is going to be?
20     A.  A standard rate, usually applies to I will
21  determine according to the client, if I would like to
22  give him a discount, I would give him a discount.
23     Q.  I don't want to talk about the discount, I
24  want to talk about standard across the board.  We can
25  get into discounts at a later time.  Let's just take Sun



30

1  Social Media to use as an example, how much did Sun
2  Social Media pay InCorporate Now last year?
3      A.  $300 a year.
4      Q.  For all four websites?
5      A.  For the services we provide.
6      Q.  Did you provide DMAC services for more than
7  one website?
8      A.  We provide DMAC services for Sun Social Media.
9      Q.  Does it matter to you when you set the rate
10  how many websites they have?
11      A.  No.
12      Q.  Wouldn't that affect potentially how many
13  notices you may get a year?
14      A.  Yes.
15      Q.  Did Mr. Bolotin get a cut rate because of your
16  prior relationship with him?
17      A.  Mr. Bolotin on Sun Social Media received a
18  discount.
19      Q.  Because?
20      A.  Prior relationship.
21      Q.  With Mr. Bolotin?
22      A.  Yes.
23      Q.  With anybody else?
24      A.  No.
25      Q.  So if he had not gotten the discount, how much

31

1  would InCorporate Now have charged Sun Social Media?
2      A.  I would approximate $500 a year.
3      Q.  How many takedown notices did you receive for
4  Sun Social Media?
5      A.  Can you specify "takedown notice"?  What do
6  you mean?
7      Q.  I'm not here to play games.
8      A.  Let me clarify.  Do you mean, we receive
9  physical notices, so talk about physical pieces of mail
10  we received?
11      Q.  So that is fair.  How many mailings did you
12  receive?  Let's say one mailing had 500 notices in it.  I
13  don't want to know that right now, I want to know how
14  many times you received a mailing on behalf of?
15      A.  I have to check my records.
16      Q.  Can you give me an approximation?
17      A.  About 10, 15.
18      Q.  10 to 15?
19      A.  Yes.
20      Q.  What is your address for InCorporate Now?
21      A.  6715 -- sorry.
22      Q.  How about, is it 6750 North Andrews Avenue,
23  Suite 200 in Fort Lauderdale?
24      A.  Yes.
25      Q.  That is a UPS store?

32

1      A.  No.
2      Q.  Is this a mailbox of some sort?
3      A.  No, it is an office location.  We rent the
4  address from Regis Group or Regis.
5      Q.  Do other people have the same address?
6      A.  Yes.
7      Q.  Do you know how many others have the same
8  address?
9      A.  No.
10      Q.  So describe it for me, physically, literally,
11  describe the location for me.
12      A.  It is similar to the location we are at right
13  now, it is a big office space, run by Regis, where
14  individuals or businesses can purchase services from
15  them, like an office or any other service that they
16  provide.
17      Q.  What service do you purchase from them?
18      A.  Virtual office service.
19      Q.  Virtual office service?
20      A.  Yes.
21      Q.  What does that mean?  What does that get you?
22      A.  The location -- sorry, the address that we can
23  use the address as the address for the company.  We
24  also.
25      Q.  For purposes of things being delivered to the

33

1  company?
2      A.  Yes.
3      Q.  Does it also provide you a phone number,
4  receptionist support, anything like that?
5      A.  As far as I understand, Regis does that
6  service, we do not purchase that service from them.
7      Q.  How about access to physical office space,
8  like a desk, if you need it?
9      A.  Yes.
10      Q.  Conference room?
11      A.  Yes, we have access to an office.
12      Q.  Do you pay that a la carte or you have a
13  certain amount of hours you can use a month?
14      A.  I do not recollect the terms of the contract,
15  I have to check.
16      Q.  Do you know how much you pay a year for those
17  services?
18      A.  I also have to check the yearly cost.  I can't
19  recall right now.
20      Q.  What is the process like, so a mailing is sent
21  to that address for you, what happens?
22      A.  I come to the location, I pick up the mail,
23  and process it accordingly.
24      Q.  Do they call you and tell you have mail?
25      A.  No.



Luchian,  Constantin  01-19-2016

34

1    Q.  You stop by on your own accord to see if you
2  have mail?
3    A.  Either I stop by, or I give them a call
4  firsthand to ask them if there are any pieces of mail
5  for us.  If there is, I always come and pick it up.
6    Q.  They don't give you an e-mail or text message
7  that you received something?
8    A.  As far as I understand, they do not have that
9  type of a service.
10    Q.  How often do you check in?
11    A.  Every 24 to 48 hours.
12    Q.  Do you receive mail in both your name,
13  Constantine Luchian and InCorporate Now?
14    A.  Yes, Regis has that.  I stipulated that to
15  them.
16    Q.  When did you stipulate that to them?
17    A.  When we acquired the services.
18    Q.  When did you acquire those services?
19    A.  I cannot recall.  Several years ago.
20    Q.  Was InCorporate Now located somewhere else
21  before that?
22    A.  Yes.
23    Q.  Where?
24    A.  I don't recall the exact address.
25    Q.  Can you give me what you do recall?

36

1  right?
2    A.  Correct.
3    Q.  Do you remember who else was in there?
4    A.  No. We don't have that information.
5    Q.  How many people worked there on behalf of
6  Webzilla when you were there?
7    A.  It was me and Konstantin, too.
8    Q.  You don't go there for work anymore?
9    A.  Yes.
10    Q.  How about 1007 North Federal Highway, Suite
11  240, is that an address for InCorporate Now?
12    A.  From my recollection, could have been the
13  older address of InCorporate Now.
14    Q.  Was that another virtual office for services
15  that you purchased?
16    A.  I believe it was a mailbox service.
17    Q.  Such as Mailbox, Etc., or something?
18    A.  Like UPS Store type of location.
19    Q.  How long did you use that address?
20    A.  I do not recall at this time, I have to
21  double-check.
22    Q.  How many addresses have you had for
23  InCorporate Now?
24    A.  From my recollection, it was this address, the
25  one that you just mentioned, then we moved to the Regis

35

1    A.  Florida.
2    Q.  Was it ever at 110 East Broward Boulevard,
3  Suite 1700?
4    A.  From my recollection, no, but there could be
5  for a short period of time, I'm not sure.
6    Q.  You used to work at that address?
7    A.  Yes.
8    Q.  You still work at that address?
9    A.  No.
10    Q.  That address was for Webzilla.
11    A.  It was also used for Webzilla.
12    Q.  It was also used for Webzilla?
13    A.  Yes.
14    Q.  What else was it used for?
15    A.  It was the Regis company, but different
16  physical location, so other companies must have used it.
17    Q.  I see, so the address of 110 East Broward
18  Boulevard, Suite 1700, was a Regis owned operated
19  address and Webzilla purchased services to utilize that
20  address as a virtual office for them?
21    A.  Webzilla purchased services for the physical
22  office.
23    Q.  Physical?
24    A.  Yes.
25    Q.  They were not the only entity there; is that

37

1  facility.
2    Q.  On Andrews?
3    A.  No, Regis had a different facility, a
4  different location, I don't recall the exact address
5  right now, but they moved, so they moved our address.
6    Q.  Did you start InCorporate Now in conjunction
7  with Constantine Bolotin started Sun Social Media?
8    A.  Can you rephrase the question?
9    Q.  Did you start InCorporate Now at the same time
10  Constantine Bolotin started Sun Social Media?
11    A.  No.
12    Q.  Did you start it before or after?
13    A.  From my recollection, InCorporate Now started
14  before Sun Social Media.
15    Q.  You incorporated Sun Social Media?
16    A.  Yes.
17    Q.  Did you do the Copyright registration with the
18  United States Copyright office?
19    A.  Yes, we provide services of Copyright agent to
20  Sun Social Media.
21    Q.  I want to be clear, there were several
22  services that you could provide for the DMAC agent, one
23  of them could be the filing with the US Copyright
24  office?
25    A.  It is included in one service.



877.291.3376
www.UCRinc.com

Luchian,  Constantin  01-19-2016

38

1    Q.  So I'm going to show you marked as Exhibit 5
2  to this deposition (Handing), to yesterday's deposition.
3        MR. COBB:  I figured for logistical purposes,
4    we would continue marking them numerically.
5        MR. FREEMAN:  Yes.
6        MR. COBB:  I am.
7  BY MR. FREEMAN:
8    Q.  You recognize that document?
9    A.  I don't recall that particular document.
10   Q.  Did you prepare that document?
11   A.  I believe so, perhaps, I do not recall at this
12  time.
13   Q.  So part of the services provided by
14  InCorporate Now, is the preparation and filing of
15  documents at the United States Copyright office,
16  correct?
17   A.  Yes.
18   Q.  That document is signed by Val Gervitz, why?
19   A.  Our client, Sun Social Media, instructed us to
20  provide the document, for the signature of their
21  attorneys.
22   Q.  You may have filled out the documents
23  yourself?
24   A.  I do not recall exactly.
25   Q.  You specifically, Constantine Luchian, is

39

1  listed as the Copyright agent on that document, correct?
2    A.  Yes.
3    Q.  You were here yesterday for Mr. Bolotin's
4  testimony as the corporate rep, that he believed
5  InCorporate Now was the Copyright agent; is that
6  correct?
7    A.  Yes.
8    Q.  Is it fair to say that you were listed as the
9  Copyright agent personally?
10   A.  Yes.
11   Q.  That may be based off of a document that you
12  drafted?
13   A.  Yes.
14   Q.  Let me show you what is marked as Exhibit 6
15  for purposes of identification, do you recognize that
16  document?
17   A.  No.
18   Q.  That is a printout from the Sun Social Media's
19  website, Playvid.com, on that lists you personally as
20  the Copyright agent, you see that?
21   A.  According to this document, it lists
22  Constantine Luchian and then the address below the name.
23   Q.  The name and address is consistent with what
24  is on file with the Copyright office?
25   A.  Yes.

40

1    Q.  You didn't have anything to do with filling
2  out the -- what is on the Web page, correct?
3    A.  No.
4    Q.  Do you have access to the play individual
5  websites to do any administrative changes or anything
6  like that?
7    A.  No.
8    Q.  Go back and look at No. 5.  The websites
9  listed under the category "Alternate Names of Service
10  Provider," findandtry.com and Playvid.com?
11   A.  According to this document, it says
12  findandtry.com and Playvid.com and alternative names
13  field.
14   Q.  According to that document, it is filed in
15  January of 2014, is that accurate?
16   A.  According to the document, received January
17  23, 2014.
18   Q.  Do you have any personal recollection of
19  drafting this document?
20   A.  I do not recall the exact time and date the
21  document was drafted.
22   Q.  Would this be something that you would have
23  done on behalf of InCorporate Now, or is this something
24  that would be done at the attorney's office by the
25  attorney?

41

1    A.  This is something done on behalf of
2  InCorporate Now.
3    Q.  So you would have done this document?
4    A.  Most likely, sir.
5    Q.  If I understand your testimony correctly, on
6  Mr. Bolotin's direction, sent it to Mr. Gervitz for his
7  signature?
8    A.  For the signature.
9    Q.  Is there somebody else at Sun Social Media
10  besides Mr. Bolotin that would give that you
11  instruction?
12   A.  From my recollection, no.
13   Q.  Once Mr. Gervitz signs it, who files it?
14   A.  InCorporate Now files the document after
15  receiving the signature, receiving the signed document.
16   Q.  Who gives you the information to fill out the
17  section on Alternative Names For Service Provider?
18   A.  Clients provide the information.
19   Q.  Mr. Bolotin did?
20   A.  Yes.
21   Q.  Anybody else at Sun Social Media besides Mr.
22  Bolotin?
23   A.  Authorized agent services.
24   Q.  Can you give me an approximation?
25   A.  No.



42

1   Q.  More than 20?
2   A.  Yes.
3   Q.  More than 50?
4   A.  Yes.
5   Q.  More than 100?
6   A.  Perhaps, I do not recall that.
7   Q.  Of those approximate 100 or more, I understand
8   we are not holding you to any specific numbers, how many
9   are adult-entertainment related?
10      A.  InCorporate Now doesn't filter the client to
11  be of any type of industry, associated with any type of
12  industry.
13      Q.  How do you advertise the services of
14  InCorporate Now?
15      A.  Word of mouth.
16      Q.  Who was your first client?
17      A.  I don't recall it.  I don't remember.
18      Q.  If you thought about it for a moment, I will
19  never forget as an attorney, who my first client was, it
20  is a memorable thing?
21      A.  I have to double-check the records and let you
22  know later.  I really don't recall who was the first.
23      Q.  Is Eporner one of your clients?
24      A.  I have to double-check the records.
25      Q.  Spankbank?

43

1       A.  I have to double-check the records.
2       Q.  As you sit here right now, do you recall
3   anybody besides Sun Social Media?
4       A.  Yes, I do.
5       Q.  Who do you recall?
6       A.  I have a confidentiality of the client, I
7   can't recall particular names, but Sun Social Media is
8   not the only client.
9       Q.  It is not that you can't recall, but
10  confidentiality prevents you from telling me?
11      A.  Yes.
12      Q.  You have a written contract with your clients?
13      A.  Yes.
14      Q.  What are the terms of the contract?
15      A.  Can you be more specific, please?
16      Q.  What are the terms of your contractual
17  relationship with your clients through InCorporate Now?
18      A.  In summary, we provide DMAC service, we
19  provide the physical address, phone and fax numbers,
20  according to which we can receive any type of a mail on
21  behalf of the client, then we process, digitize the mail
22  and forward it to the client.
23      Q.  You talked about as a confidentiality
24  provision, but you are filing on behalf of each one of
25  them, a public document acting as a DMAC agent, correct?

44

1       A.  Yes.
2       Q.  So it is public knowledge?
3       A.  Yes.
4       Q.  So there's no confidentiality?
5       MR. COBB:  Object to the form.  We can do it
6   pursuant to a protective order.  If you do a
7   protective order, we will give you the contract.
8       MR. FREEMAN:  Are you instructing him not to
9   answer?
10      MR. COBB:  He can answer the question.
11      THE WITNESS:  Repeat the question.
12  BY MR. FREEMAN:
13      Q.  What information is deemed confidential?
14      A.  Communication with the client.
15      Q.  I did not ask you about communications with
16  the client yet.
17      A.  Can you --
18      Q.  What else is deemed confidential?
19      A.  Who the clients are.
20      Q.  Again, you file a document with the United
21  States Copyright Office acting as their agent,
22  specifically listing them, so you are stating to the
23  public who the clients are?
24      A.  Correct.
25      Q.  So it is not confidential?

45

1       A.  You can assume that, public record.
2       Q.  It is part of the public record.
3       How many clients in January of 2015, did you
4   have?
5       A.  I have to double-check the records.
6       Q.  More than a hundred?
7       A.  I do not want to guess, but yes, probably
8   around more than a hundred.
9       (Plaintiff's Exhibit No. 7, PACKING SLIP, was
10      marked for identification.)
11      Q.  Mr. Luchian, your attorney has in his hand,
12  Exhibit 7 for identification, it is the United States
13  postal packing slip.  I direct your attention to the
14  ship to information.  It says Constantine Luchian, 675
15  North Andrews Avenue, Suite 200, Fort Lauderdale,
16  Florida?
17      A.  According to "shipped to" information,
18  Constantine Luchian, 6750 North Andrews Avenue, Suite
19  200, Fort Lauderdale, Florida, 33309.
20      Q.  Can you direct your attention up to the corner
21  right from there, "Expected Delivery Date:  1/17/15," is
22  that what it says?
23      A.  According to this document, it states
24      "Expected Delivery Date:  1/17/15."
25      Q.  Is that the correct address for receipt of



46

1  DMAC takedown notices on that date?
2      A.  Can you specify, can you rephrase the
3  question.
4      Q.  Is that a correct address for you to receive
5  DMAC takedown notices on January 17, 2015?
6      A.  Yes, that is correct address for InCorporate
7  Now, Inc.
8      Q.  I would like to direct your attention to the
9  language underneath the date, where it says: "Reference
10  Number," you see where it says "Playvid.com"?
11      A.  According to this document, it says "Reference
12  Number" or hashtag and it says "Playvid.com."
13      Q.  Do you know who, in regard to the -- I
14  apologize, I forget the name, is it Regis that owns the
15  location.
16      A.  Which location?
17      Q.  Andrews?
18      A.  Yes.
19      Q.  Do you know the people that work at Regis by
20  name?
21      A.  No, I do not.
22      Q.  How does the process work, if a delivery
23  requires signature, do you come in and sign for the
24  delivery, or does a Regis employee or agent do that?
25      A.  A Regis employee or agent does that.

47

1      Q.  Then you come in and the documents themselves
2  are held where in the building for you?  Is there a
3  specific bin, mailbox or cubby that is just for you?
4      A.  I'm not sure how Regis handles the documents,
5  when I come in, I request it at the front desk, and they
6  bring it out to me.
7      Q.  Okay.  Do you know anybody's name there?
8      A.  Not that I recall, they have changes on a
9  constant basis.
10      (Plaintiff's Exhibit No. 8, USPS TRACKING
11      SLIP, was marked for identification.)
12      Q.  So you have been handed what is marked as
13  Exhibit 8.  That is a UPS tracking slip and you see the
14  tracking number on that slip?
15      A.  According to this document, it has a tracking
16  number field space.
17      Q.  And if you look back at Exhibit 7, do you see
18  on the click and ship label record, Exhibit 7, look at
19  that tracking number?
20      A.  Oh.
21      Q.  Can you compare those for me?
22      A.  This is Exhibit 7, correct?
23      Q.  Yes.
24      A.  According to the Exhibit 7, tracking number is
25  -- what would you like me to do?

48

1      Q.  Confirm for me that they are the same number?
2      MR. COBB:  You want to use the last four?
3      MR. FREEMAN:  However you want to.
4      THE WITNESS:  Exhibit 7, the tracking number
5  or the number listed on the Exhibit, last four
6  digits is 5365.
7  BY MR. FREEMAN:
8      Q.  Yes.
9      A.  According to Exhibit 8, in the tracking number
10  field, last four digits is 5365.
11      Q.  So these two numbers are the same, what this
12  establishes to me is that this package was delivered in
13  your name at the North Andrews address in January of
14  2015 referencing Playvid.com, do you recall getting this
15  package?
16      MR. COBB:  Object to the form.
17      You can answer.
18      THE WITNESS:  According to this document, it
19  states that the numbers match on both exhibits?
20  BY MR. FREEMAN:
21      Q.  Yes.
22      A.  And I do not recall seeing any of those
23  exhibits before.
24      Q.  I'm sure you haven't, I don't know if you saw
25  the exhibits before or not, but the question is do you

49

1  recall getting a package referencing Playvid.com?
2      A.  I would have to double-check the records as to
3  when we received any notices according to any client,
4  so...
5      Q.  How do you keep your records?
6      A.  We save the notices in the client's folder.
7      Q.  Electronic or physical folder?
8      A.  Electronic folder.
9      Q.  So you scan them?
10      A.  Yes.
11      Q.  So you will stop by the North Andrews address,
12  the Regis place, get physical documents, you will go
13  home and scan them?
14      A.  Correct.
15      Q.  Do you record anywhere else the receipt of
16  these documents, any sort of chart or form you filled
17  out that says you received these documents on this date
18  or you hand-record this?
19      A.  Not at this time, we are working on a better
20  system, but right now, we don't.
21      Q.  Why are you working on a better system?
22      A.  To keep better records.
23      Q.  Have things been lost?
24      A.  Not to my knowledge.
25      Q.  Then why do you need to keep better records?



877.291.3376
www.UCRinc.com

Luchian,   Constantin   01-19-2016

---

50

1     A.   To provide better services to the client.
2     Q.   In what way are your services not good enough
3  for your clients at this point?
4     A.   I personally believe we can provide a better
5  service to the client and keep a better track of the
6  records for further review and history.  So it is my
7  personal belief that the current system is not perfect.
8     Q.   Have you had problems with the current system?
9     A.   Not to my knowledge.
10     Q.   How often do you pick up physical documents
11  from the Regis address on Andrews?
12     A.   I usually call every 24 to 48 hours, if
13  there's a physical mail there, I come to pick it up or I
14  stop by every 3 to 5 business days regardless of the
15  fact if I called or not to check if there is any mail
16  and pick up any mail if there's some.
17     Q.   So you are there at least once a week?
18     A.   Yes, at least once a week, but usually more.
19     Q.   Have you ever had occasion where documents
20  were delivered to Regis at Andrews, but they somehow got
21  lost there and were never given to you, to your
22  knowledge?
23     A.   Not to my knowledge.
24     Q.   Do you know what processes they use that would
25  prevent that from happening?

---

51

1     A.   I don't know.
2     Q.   Did you ask them when you hired their
3  services?
4     A.   No, I did not.
5     Q.   Do you know whether or not they themselves
6  record receipt of any deliveries on your behalf?
7     A.   I do not know if they do this.
8     Q.   Who is your contact person at Regis?
9     A.   There is no particular contact.
10     Q.   What is their phone number?
11     A.   I don't remember.  I have to check.
12     Q.   Can you check right now?
13     A.   No.
14     Q.   Why not?
15     A.   I have to look at my records, they are not
16  with me.
17     Q.   You don't have their number, you have your
18  phone with you?
19     A.   Yes.
20     Q.   Is it in your phone?
21     A.   If I can use the phone, I didn't know I could
22  use the phone.
23     MR. FREEMAN:  Let's take a break.
24     MR. COBB:  Break.
25     (Discussion held off the record.)

---

52

1     MR. FREEMAN:  Okay, we are back on the record.
2  BY MR. FREEMAN:
3     Q.   You were on the break to check to see if you
4  could find a phone number for Regis that you call?
5     A.   Yes.
6     Q.   Did you?
7     A.   Yes.
8     Q.   What is the number?
9     A.   The 1-954-928-2800.
10     Q.   You said the one that you use, is there
11  another one that you have?
12     A.   No, that is the only one that I have.
13     Q.   Okay.  You call and you don't ask for anyone
14  specific?
15     A.   No.
16     Q.   There's no person that manages your account?
17     A.   No.
18     Q.   So you heard testimony yesterday that Mr.
19  Bolotin takes the position that Sun Social Media did not
20  receive any takedown notices from plaintiff Hydentra in
21  2015, were you present for that testimony?
22     A.   I was present in the room, I do not recall the
23  exact words that were stated.
24     Q.   Just generally speaking, you recall that, yes?
25     A.   I do not remember.  I don't want to guess.  I

---

53

1  don't want to make assumptions, so if we have to double-
2  check the records to see.
3     Q.   I'm not trying to play games with you.  Either
4  you generally recall the testimony or you don't, I don't
5  mean word for word, but generally?
6     A.   Generally, I recall the testimony.
7     Q.   Do you have a position on whether or not you
8  or your company, InCorporate Now, received any takedown
9  notice from Hydentra in 2015?
10     A.   Can you specify, what do you mean by
11  "position"?
12     Q.   Is it your position that you did or did not
13  receive any notices?
14     A.   I will have to double-check the records to
15  make sure if we did or did not receive notices or any
16  pieces of mail during the time period specified.
17     Q.   You have not done that?
18     A.   No.
19     Q.   Up until now?
20     A.   No.
21     Q.   Mr. Bolotin at some point, while the lawsuit
22  is pending, hasn't asked you, "Did you receive any
23  takedown notices in January of 2015?"
24     A.   We were asked to provide by Sun Social Media
25  attorneys the notice that we received which were

---

54

1  provided.
2      Q.  If those January notices were not included in
3  there, is it your position that you never received them?
4      A.  I would have to double-check the records, but
5  if those notices were not provided, there could be the
6  possibility that we did not receive them.
7      Q.  You see in front of you, a delivery
8  referencing Playvid.com to your location in January of
9  2015, correct?
10      A.  According to the documents provided in Exhibit
11  7 and 8, seems to be a postage label and a delivery
12  confirmation, so correct.  It is from the documents in
13  front of me, those are delivery notices to 6750 North
14  Andrews Avenue, Suite 200, Fort Lauderdale, Florida,
15  which is the address for InCorporate Now, Inc.
16      Q.  Do you have a recollection of what you would
17  have done -- whether or not you received any documents
18  when you stopped by the Regis location?
19      A.  Can you specify, please?
20      Q.  Do you recall on January 20th or shortly
21  thereafter, whether you stopped by the Regis location
22  and picked up documents sent to you referencing
23  Playvid.com?
24      A.  No, I do not remember.
25      Q.  I believe you testified that you call and

55

1  check in with Regis every -- at the most 48 hours,
2  business hours?
3      A.  That is correct.
4      Q.  So January 20, 2015, was a Tuesday, you would
5  have most likely checked in with them by that Thursday,
6  the 22nd?
7      A.  Most likely, yes.
8      Q.  If you then stopped by and picked up some
9  documents, would you have gone directly home to scan
10  them or would you have gone and done other things with
11  the intention to scan them later?
12      A.  I would stop by Regis, do what I do all of the
13  times, pick up the documents the secretary provides to
14  me, and then usually, I will go home and digitize them
15  and deliver them to the client.
16      Q.  Usually?
17      A.  Well, I might stop by a coffee shop or
18  something, but yes, my intention is to process the
19  notices as soon as possible.  I do not plan any other
20  activity when I pick up the mail from the Regis
21  location.
22      Q.  Is it possible that you could leave the
23  documents that you received from Regis in your car, drop
24  them, anything like that?
25      A.  Human error is always possible, so I usually -

56

1  - what is the word?  I try to be very careful with any
2  pieces of mail that I receive, not only on behalf of the
3  clients, but on behalf of the company itself.  So, yes,
4  documents could have been left somewhere, but I mean it
5  is a human error, could have been, yes, there is a
6  possibility for that to happen.
7      Q.  So I have a situation where I have proof that
8  my client sent these notices to an address in your name
9  and a situation where the Internet service provider is
10  saying they never received the documents that were sent
11  to you, I'm trying to figure out where the hole is?
12      A.  There could be a possibility that I have not
13  received the document at all.
14      Q.  There's a possibility that you did not receive
15  the document at all?
16      A.  Yes.
17      Q.  How is that possible?  Where does that
18  possibility come up in your mind?
19      A.  In case they were misplaced at the Regis
20  location.  Regis has, as I understand, a sufficient
21  amount of clients that receive mail at the same address,
22  which, again, it is possibility of human error for them
23  to misplace the mail.
24      Q.  Which is more possible, them misplacing the
25  mail or you misplacing the mail?

57

1      MR. COBB:  Object to the form.  Calls for
2  speculation.
3      You can answer.
4      THE WITNESS:  I don't want to guess or
5  speculate, so I don't know.
6  BY MR. FREEMAN:
7      Q.  If the folks at the Regis location indicate
8  that you showed up every Friday to pick up your mail, is
9  that accurate or inaccurate?
10      A.  That should be accurate.
11      Q.  What is your understanding as to what your
12  responsibilities are as a DMAC agent?
13      A.  To receive mail on behalf of the client, to
14  digitalize physical mail and deliver to the client,
15  copies of the pieces of mail.
16      Q.  Would you agree or disagree with the assertion
17  that it is your responsibility as a DMAC agent to
18  provide a workable feasible address to deliver notices?
19      A.  Yes.
20      Q.  Is it Regis's responsibility under the DMCA to
21  make sure that you receive the notices?
22      A.  Regis responsibility is to receive mail on
23  behalf of InCorporate Now, Inc.
24      Q.  Did you have a written contract with Regis?
25      A.  I have to check the records.



58

1    Q.  Do you know whether or not there's a
2  indemnification provision, where they misplace mail that
3  they will indemnify you for any damages as a result of
4  the misplaced mail?
5    A.  What do you mean by "indemnify"?
6    Q.  Hold on.  Let me think of another way to put
7  it.  Protect you, back you, pay for any damages that
8  result from the -- from their loss of your mail?
9    A.  No, I'm not aware of any particular contract
10  or clauses in the contract specifying what you are
11  saying.
12    Q.  Are there any clauses in the contract whereby
13  they ask you and you agree to waive any liability for
14  any lost mail?
15    A.  I do not know.  I have to check if the
16  contract is there, and what the terms of the contracts
17  are.
18    Q.  Your contracts with your clients as their DMAC
19  agent, do you provide any indemnification to your
20  clients if mail is lost, and they are not notified of
21  delivered DMAC takedown notices?
22    A.  I have to double-check the contract itself to
23  provide the information, I don't remember exact clause
24  of that nature.
25    Q.  Is that something that you contemplated as a

59

1  situation that needed to be addressed contractually?
2    A.  Can you -- contemplate what exactly?  Just be
3  more specific or...
4    Q.  Have you ever thought about this as a
5  potential that you misplace some mail and it causes a
6  problem for one of your clients?
7    A.  Yes.
8    Q.  How have you thought to account for that?
9    A.  This is why we hired or purchased Regis'
10  services, because I personally feel -- or InCorporate
11  Now feels it is a better way to provide a proper service
12  to the client, compared to the address we had before.
13    Q.  What address did you have before?
14    A.  At UPS Store address, at the mailbox address,
15  sorry.
16    Q.  Did you lose mail while you were at the UPS
17  Store?
18    A.  Not to my recollection.
19    Q.  So what was your concern, your worry?  You
20  were worried that it could happen?
21    A.  My concern was having a larger company that
22  provides the services and physically having people at
23  the location at business hours should help with the
24  proper delivery of the mail.
25    Q.  Did you ever address concerns with your

60

1  clients, the clients of InCorporate Now, the potential
2  of misplaced mail?
3    A.  Can you rephrase?
4    Q.  Was it ever part of your conversation with any
5  of your clients concerns about misplaced takedown
6  notices?
7    A.  I do not recall such conversations or such
8  concerns raised by clients.
9    Q.  Do you have an understanding as to whether or
10  not your receipt of a takedown notice and failure to
11  deliver to a client, whether or not that could cause
12  problems for your client?
13    A.  Can you repeat the question, please?
14    Q.  Are you aware of whether problems could be
15  created for your clients of InCorporate Now, if
16  InCorporate Now receives takedown notices but then does
17  not then deliver them to the client?
18    A.  I'm not aware of exact complications that the
19  client might receive, but if our services are not
20  sufficient, that means the client could suffer from the
21  insufficiency of our services.
22    Q.  Do you know what the purposes of the takedown
23  notices are?
24    A.  I have a general understanding of those
25  purposes.

61

1    Q.  What is your general understanding?
2    A.  The general understanding is that the
3  Copyright holder requests the service provider to act or
4  to review the notice and perform the actions in the
5  notice.
6    Q.  Were you aware that this is a mechanism under
7  the law for entities to police their intellectual
8  property?
9    A.  Can you rephrase the question?
10    Q.  Are you aware that this is a tool, the
11  takedown notice, this is a tool authorized by law for
12  Copyright holders to enforce their copyrights and make
13  sure their copyrighted work are not unlawfully
14  infringed?
15    A.  Yes, I'm aware that the Copyright office
16  requires content providers to have registration with the
17  Copyright office in order to be a subject of the Safe
18  Harbor Provisions, I believe that is what the term is.
19  So, it is a requirement for the service provider to
20  have, similar to the requirement of a corporation to
21  have a registered agent.
22    Q.  Do you have an opinion as to whether or not it
23  is important for companies to enforce their Copyrights?
24  Do you think it is a big deal?
25    A.  I don't have a specific opinion.  I don't want



62

1  to guess.  But if you can rephrase the question or ask
2  it differently?  What do you mean exactly?
3      **Q.   How important do you think the takedown**
4  **notices are that you receive on behalf of your clients**
5  **as their DMCA agent?**
6      A.   I don't want to express the level of
7  importance.  Any piece of mail received by InCorporate
8  Now is treated equally, and so I'm not sure for the
9  center, obviously, if a piece of mail is sent to the
10 client or to the service, it has to be dealt with.
11 There's no discrimination of importance of any type of a
12 notice or pieces of mail.
13     **Q.   Have you made yourself aware of the**
14 **ramifications of the failure of your company to do its**
15 **business as a DMAC agent correctly?**
16     A.   Can you rephrase the "ramifications"?
17     **Q.   Have you made yourself aware of the potential**
18 **problems that can be caused by InCorporate Now's failure**
19 **to pass on delivered takedown notices as their DMAC**
20 **agent?**
21     A.   In other words, can you repeat the question?
22     **Q.   I'm going to say it again.**
23          **Have you made yourself aware of the potential**
24 **problems that can be caused for InCorporate Now's**
25 **clients, if InCorporate Now doesn't properly pass on**

63

1  DMAC notices?
2      A.   We never set up a list of potential problems
3  that could have been made, because our goal is to
4  provide the best service that we can provide and
5  therefore, there was no document or statement stating
6  that a list of potential problems that could arise.
7      **Q.   You don't know what risks you are taking in**
8  **your business?**
9      A.   From my understanding, the main reason for
10 InCorporate Now in failing to provide sufficient
11 services, we could lose client, our focus is on the
12 client.
13     **Q.   But you don't know what risks you are running**
14 **for the client in failing to run the business properly?**
15     A.   I have a general understanding that there
16 could be potential risks.  I don't know exactly the type
17 of risks.
18     **Q.   What is your general understanding?**
19     A.   That the client has to receive those notices
20 and act on them accordingly.
21     **Q.   And if they don't, what is your understanding**
22 **of what can could happen?**
23     A.   The sender of the notice could act in various
24 ways to --
25     **Q.   -- including suing them?**

64

1      A.   Perhaps.
2      **Q.   You mentioned the Safe Harbor?**
3      A.   Yes.
4      **Q.   Is it your understanding of failure of**
5  **InCorporate Now to deliver the takedown notices to a**
6  **client could take them out of the Safe Harbors?**
7      A.   No. My understanding is that the failure to
8  deliver the notices that InCorporate Now received on of
9  client's behalf could cause potential complications to
10 the client.
11     **Q.   What are those complications?**
12     A.   As I said before, the sender of the notice,
13 from my understanding, can do various things, including
14 lawsuit, as you mentioned.
15     **Q.   What is your understanding of the Safe Harbor**
16 **provision that you mentioned?**
17     A.   My understanding of the service is that the
18 Copyright office requires service providers to have a
19 listing of the Copyright agent on their website, it is a
20 requirement.
21     **Q.   For what?  What is the Safe Harbor provision?**
22 **What does it do?**
23     A.   From my understanding, it is a requirement for
24 the service provider to specify the Copyright agent that
25 could receive the claims of the Copyright infringement

65

1  or any other claims I would assume, and then process
2  them accordingly.
3      **Q.   Process the notices accordingly?**
4      A.   Yes.
5      **Q.   So do you have any other knowledge or**
6  **understanding with regard to the Safe Harbor Provision**
7  **you mentioned other than what you stated?**
8      A.   As I stated, I have a general understanding, I
9  do not know exact law.
10     **Q.   I know.  I'm not expecting you to.  I want to**
11 **know your general understanding is.**
12     A.   My general understanding of the service is
13 that the service provider has to have a listing of the
14 Copyright agent on the US Copyright website for the
15 general public to have access to the information to
16 where any party can contact the service provider with,
17 for example, an intent to receive or to deliver
18 corporate notice.
19     **Q.   Do you think Regis has missed any other mail**
20 **on your behalf?**
21     A.   I do not know.
22     **Q.   So when you scan the notices, what program do**
23 **you use to scan them?**
24     A.   Image scanner on my computer, it is called
25 image scanner, but I'm not sure of the exact name.



Luchian,  Constantin  01-19-2016

66

1    Q.   Then where do you store the images?
2    A.   I scan the notices in the PDF format and store
3    them in Google Apps, Google Drive Service.
4    Q.   So they are stored in a Cloud?
5    A.   They are stored with Google Apps, if you would
6    like to refer to it as a "Cloud," you might.
7    Q.   But they are stored offsite from you?
8    A.   They are stored in a secure location, yes,
9    using Google Apps.
10   Q.   But they are not stored on your desk top?
11   A.   No.
12   Q.   They are not stored on a physical device owned
13   by you?
14   A.   No.
15   Q.   Once they are stored, I take it you store them
16   with the Google Drive application prior to delivering
17   them to a client?
18   A.   Yes.
19   Q.   How do you then deliver them to the client
20   from the Google Drive?
21   A.   The client is sent an e-mail with an
22   attachment of the PDF file with the mail we received on
23   behalf of the client.
24   Q.   That e-mail is from you?
25   A.   From InCorporate Now.

67

1    Q.   You do that, though?
2    A.   Yes.
3    Q.   That is not an automatic programmed function
4    of the Google Drive to send such an e-mail?
5    A.   No.
6    Q.   Do you send the PDF attachment itself or do
7    you send a link with access to the Google Drive?
8    A.   The PDF attachment itself.
9    Q.   What if the PDF attachment is rather large?
10   A.   Google has an option to provide the link if it
11   is too large, you break it into several pieces or
12   provide a temporary link, just particular link for the
13   customer to access the file.
14   Q.   What e-mail address do you use to e-mail the
15   InCorporate Now client with the notices?
16   A.   Our outgoing e-mail address, according to the
17   DMAC service, is DMAC@INCORPORATENOW.COM.
18   Q.   So you have an exchange server?
19   A.   We use Google Apps' products.
20   Q.   Where is that sent e-mail, do you save it
21   somewhere?
22   A.   The e-mail is recorded by Google mail or Gmail
23   service recorded in Google Apps.
24   Q.   Let's just say you receive this January 20,
25   2015, delivery, you would have gone home, scanned it

68

1    with the PDF scanning program, saved it in Google Drive,
2    then E-mailed it using the address
3    DMAC@INCORPORATENOW.COM, and E-mailed it over to Sun
4    Social Media, right?
5    A.   Our standard operations, when we receive any
6    mail on behalf of the client, I scan it via the PDF
7    software to convert the files into PDF.  I save it in
8    the client's folder using Google Apps services, then I
9    e-mail the files to the client, using again, Google Apps
10   services.  That is the standard operations for any
11   client.
12   Q.   Using the DMAC@INCORPORATENOW.COM address?
13   A.   Yes.
14   Q.   Would you ever use any other e-mail address to
15   send an e-mail like that?
16   A.   Yes, my personal address.
17   Q.   Which is?
18   A.   CL@INCORPORATENOW.COM.
19   Q.   You were served with a complaint in this case?
20   A.   Yes, yes.
21   Q.   You were personally served with the complaint?
22   A.   No, I do not recall personally being served
23   with a complaint.  I'm not sure what you mean.
24   Q.   Somebody walked up to you and handed you a
25   copy of the Complaint?

69

1    A.   No.
2    Q.   How did you get a complaint?
3    A.   I believe our attorney, my attorney contacted
4    me.
5    Q.   All right.  I have a document that says you
6    were personally served with a complaint, are you
7    disagreeing with that?
8    A.   I don't recall meeting any person and
9    receiving the physical document by hand.
10   Q.   Okay.  We can address that later.
11        MR. COBB:  We are not contesting service.
12   BY MR. FREEMAN:
13   Q.   Have you read the Complaint?
14   A.   Yes, I have.
15   Q.   You are aware that the Complaint alleges
16   delivery of the takedown notices on behalf of Hydentra
17   in January 2015?
18   A.   I do not recall the exact date, but yes, I'm
19   aware that some notices were delivered.
20   Q.   So you are aware that they were delivered?
21   A.   I'm aware in the Complaint that it was stated
22   that something was delivered to -- I'm not sure what it
23   stated in the Complaint.
24   Q.   Did you do any investigation on that
25   allegation about whether or not those notices were



Luchian,  Constantin  01-19-2016

70

1  actually delivered to you?
2      A.  InCorporate Now provided all of the notices
3  delivered on behalf of Sun Social Media.
4      Q.  That is a nice can stock answer that you said
5  before.  The question was:  Did you go and do any
6  investigation to determine whether or not that
7  allegation was correct?
8          MR. COBB:  Object to the form.
9          You can answer.
10         THE WITNESS:  There was no formal
11  investigation performed.  If the Complaint is
12  stating that something was delivered, we provided
13  all of the documents that were delivered on behalf
14  of Sun Social Media, Inc. Received, sorry, on
15  behalf of Sun Social Media.
16     Q.  Did you at some point go into Sun Social Media
17  into the Google Drive to see if there were any notices
18  from January of 2015?
19     A.  When the request to provide the notices was
20  requested, performed, I went to the Google Drive and
21  provided all of the notices available on the Sun Social
22  Media.
23     Q.  You did that when the attorneys contacted you
24  and said you have to turn this stuff over, right, that
25  is when you did that?

71

1      A.  Yes.
2      Q.  You did not do that in response to reading the
3  Complaint?
4      A.  Can you specify?  Rephrase the question.
5      Q.  To me in human nature, you read a complaint,
6  there's an allegation that there's this delivery of
7  these notices occurred, you, Mr. Luchian, would be
8  involved in the receipt of those notices, for me, human
9  nature would be to check your records and see if you
10  received those back in January.  I'm asking did you do
11  that when you received and read the Complaint?
12     A.  I read the Complaint and waited for further
13  instructions from my attorney, and then delivered all of
14  the notices on behalf of Sun Social Media, Inc.
15     Q.  Did you have any concern that you might have
16  done something wrong?
17     A.  No.
18     Q.  Did you have any concern that you failed to
19  fulfill some obligations as a DMAC agent to provide
20  takedown notices to a client?
21     A.  I did not, in reading the Complaint, I read
22  it.  It is hard to read the attorney language, so I read
23  it.  I understand that something was delivered.  The
24  Complaint states that certain things were not done by
25  Sun Social Media, Inc., I waited for further

72

1  instructions from the attorney.  Was I concerned that we
2  didn't provide sufficient service?  Not at the time.
3      Q.  Are you now?
4      A.  If there is the case, there is the case, but I
5  need to double-check the records again to see if we
6  received notices or not.
7      Q.  You are not sure if you need to double-check
8  them?
9      A.  I need to double-check, if we have received
10  any notices back in January or not.
11     Q.  What conversations did you have with Mr.
12  Bolotin about this case?
13     A.  Our conversations with our attorneys and Mr.
14  Bolotin involved.
15     Q.  You have not had a conversation directly with
16  Mr. Bolotin without an attorney present?
17     A.  No.  General conversation, that we have a
18  deposition, for example, or we have to be there at 10
19  o'clock.
20     Q.  Mr. Bolotin never contacted you and asked you
21  about any DMAC notices that were supposed to be
22  delivered to InCorporate Now in January of 2015?
23     A.  From my recollection, no. If there was any
24  information exchanged between us, it was in the presence
25  of our attorneys.

73

1      Q.  Generally speaking, when InCorporate Now
2  incorporates on behalf of a client, is InCorporate Now
3  also become the registered agent for that company?
4      A.  InCorporate Now becomes registered agent
5  instead of Florida for the company.
6      Q.  If it is a Florida company?
7      A.  If it is a Florida company.
8      Q.  And then the Harbor Business Services is it if
9  is a Delaware company?
10     A.  We utilize Harbor Business Services as our
11  registered agent service in the State of Delaware.
12     Q.  What was your connection with Harbor Business
13  Services?
14     A.  They are a vendor of InCorporate Now.
15     Q.  Do you know anyone on a friendly level?
16     A.  No.
17     Q.  How did you get introduced to them?
18     A.  I found them on-line.
19     Q.  Do you incorporate companies outside of the
20  United States?
21     A.  No.
22     Q.  What do you do with the paper documents after
23  you scan them?
24     A.  Store them.
25     Q.  Store them?

Luchian,   Constantin   01-19-2016

---

74

1   A.   Yes.
2   Q.   Where?
3   A.   At my house.
4   Q.   Where?  How big is your house?
5   A.   Irrelevant as to what my house.
6   Q.   How many documents -- how many pages of
7   documents do you think you received in 2015 on behalf of
8   InCorporate Now clients as a DMAC agent?
9   A.   I don't know, I don't want to speculate.  I
10  have to check the records.
11  Q.   You store them all in the same place in your
12  house?
13  A.   Generally speaking, yes.
14  Q.   Where in your house do you store them?
15  A.   At my desk.
16  Q.   At your desk?
17  A.   Yes, next to my desk.
18  Q.   Do you have a room in your house that is
19  dedicated to your office, you use an office?
20  A.   Yes.
21  Q.   Anyone else have access to that on a regular
22  basis?
23  A.   My girlfriend.
24  Q.   You have kids?
25  A.   No.

---

75

1   Q.   You guys have any other roommates?
2   A.   No.
3   Q.   Does your girlfriend also utilize that office
4   for things for herself?
5   A.   No.
6   Q.   Generally your space?
7   A.   Yes.
8   Q.   She has access to it?
9   A.   The door is open, she can walk in.
10  Q.   The approximate size of the room?
11  A.   I don't want to --
12  Q.   Bigger or smaller than the room we are in now?
13  A.   About the same size.
14  Q.   How many documents do you think you have
15  stored in there right now?
16  A.   I need to double-check, I'm not sure, as to
17  the number of documents.
18  Q.   Approximately?
19  A.   Several box of documents.
20  Q.   Banker boxes of documents?
21  A.   Yes.
22  Q.   How do you have them filed, do you have an
23  organization system you use?
24  A.   No.
25  Q.   You just shove them into a box?

---

76

1   A.   Yes.
2   Q.   You think you have three banker boxes or more?
3   A.   I would say about 3 to 4 banker boxes.
4   Q.   Has InCorporate Now ever been fired from being
5   a DMAC agent?
6   A.   No.
7   Q.   Has anybody not retained you further after a
8   contractual period has expired?
9   A.   Yes.  Some clients have not continued using
10  our services.
11  Q.   Have they said why?
12  A.   No.
13  Q.   I have noticed on a number of websites that
14  the Copyright agent lists this address, 6750 North
15  Andrews, Suite 200 address, but on the website lists the
16  name Copyright agent.  If I was to send takedown notices
17  Copyright agent at 6450 North Andrews Avenue, would that
18  be delivered to you?
19  A.   Yes.
20  Q.   The Regis people are made aware that you are
21  Copyright agent?
22  A.   Yes.
23  Q.   Do you ever send packages back to their center
24  from the Regis address?
25  A.   I do not recall doing that.

---

77

1   Q.   What is your role with Sun Social Media?
2   A.   I don't have a role with Sun Social Media.
3   Q.   Are you aware that there are several websites
4   that list you as a director of Sun Social Media?
5   A.   No, I'm not.
6   Q.   Do you know why websites would list you as a
7   director of Sun Social Media?
8   A.   No.
9   Q.   Have you ever done any work for Sun Social
10  Media besides incorporation and DMAC agent?
11  A.   Yes.
12  Q.   What else?
13  A.   Bookkeeping.
14  Q.   Bookkeeping?
15  A.   Yes.  I think now provides a service of
16  bookkeeping to Sun Social Media.
17  Q.   Does InCorporate Now provide bookkeeping
18  services to anybody else?
19  A.   Yes.
20  Q.   To how many entities?
21  A.   Several.
22  Q.   Several, three?  Can you give me more of an
23  approximation other than "several"?
24  A.   Up to ten clients.
25  Q.   I want to make sure I have a full

---



78

1  understanding of the services InCorporate Now provides
2  to clients; one, is to do incorporation; two, would be
3  to maintain corporation documents at least within the
4  State of Florida, act as a -- act as a registered agent
5  for the State of Florida, act as a DMCA agent and
6  bookkeeping; those are all accurate services?
7     A.  Yes.
8     Q.  Are there any other services?
9     A.  We also provide, offer trademark services,
10  trademark registration services.
11     Q.  Any other services?
12     A.  No.
13     Q.  Bookkeeping services; what experience do you
14  have just with bookkeeping?
15     A.  Can you be more specific, please?
16     Q.  Do you have any education with bookkeeping?
17     A.  Not with bookkeeping directly.  I have an
18  educational finance degree, but not bookkeeping.
19     Q.  You have a finance degree?
20     A.  Yes.
21     Q.  When did you get a finance degree?
22     A.  Same time I got my other degree.
23     Q.  You have more than one degree?
24     A.  Yes.
25     Q.  Both Bachelors?

79

1     A.  Yes.
2     Q.  Double-major?
3     A.  Yes.
4     Q.  Any other degrees I need to know about?
5     A.  No, there is no other degree.
6     Q.  Is there a reason why you didn't tell me about
7  the finance degree before when I asked you about what
8  degrees you earned?
9     A.  The finance degree, during my pursuit of the
10  BS degree, I have not taken any volunteer classes, I
11  don't remember the exact term.
12     Q.  "Elective classes"?
13     A.  "Elective class."  My advisor told me that I
14  could take any of the elective classes, I decided with
15  the advisor, instead of wasting time on electives, I
16  will take another degree, so I took classes for the
17  finance major and finished that requirement, as well.
18     Q.  It was not your main interest, it was just
19  what you did to fulfill graduating requirements?
20     A.  Yes.
21     Q.  Prior to providing bookkeeping services for
22  InCorporate Now clients, did you have any experience in
23  bookkeeping?
24     A.  Bookkeeping for InCorporate Now itself and
25  personal bookkeeping.

80

1     Q.  What range of services is considered
2  bookkeeping?  If I was going to look to hire you, what
3  could you provide my office?
4     A.  Classification of the transactions received or
5  sent on behalf of the client, so...
6     Q.  You would go through their books and determine
7  how to classify certain expenses?
8     A.  Yes.
9     Q.  And monies received?
10     A.  Yes.  So the proper classification of any
11  transaction provided by the client.
12     Q.  You manage the money?
13     A.  No.
14     Q.  You just go through and once the money has
15  already been either spent or received, you classify it?
16     A.  Yes.
17     Q.  Balance books?
18     A.  Doing the reconciliation of the bank account
19  is involved in the process, as well, if that is what you
20  are referring to.
21     Q.  You don't have any signing authority on bank
22  accounts?
23     A.  No.
24     Q.  Do you use certain software for that?
25     A.  Yes.

81

1     Q.  What software do you use?
2     A.  QuickBooks.
3     Q.  QuickBooks.
4        Do you have an active role in any other
5  company, besides Webzilla or InCorporate Now?
6     A.  No.
7     Q.  What is your knowledge of a company called
8  Dedicated Servers, Inc.?
9     A.  It is a part of Webzilla Group.
10     Q.  It is a part of Webzilla?
11     A.  It is a part of the group that Webzilla is a
12  part of.
13     Q.  What group is it a part of that Webzilla is a
14  part of?
15     A.  A group of companies.
16     Q.  XPT Holdings?
17     A.  I believe that the company that controls other
18  entities is XPT Holdings, LTD.
19     Q.  That is with Alexy Goubarev, also?
20     A.  I'm not sure.  I have not seen any type.
21     Q.  You are listed as a director for Dedicated
22  Servers, Inc.?
23     A.  Yes, that is correct.
24     Q.  So Dedicated Services Group is part of a group
25  that Webzilla is also a part of, meaning that they are



Luchian,  Constantin  01-19-2016

82

1  not the same company?
2      A.  I would like to clarify, that I could have
3  been listed as a director, but from my recollection, I'm
4  not listed as a director anymore.
5      Q.  You know, all I can tell you is what Lexus
6  said this morning, what the computer says, I'm telling
7  you what the computer says, why it says it, I don't
8  know.
9          It has an address in Dallas, Texas, is that
10  where the company is headquartered?
11      A.  Yes.
12      Q.  Did you ever have to go to Dallas?
13      A.  I have been to Dallas, but no, I didn't have
14  to go to Dallas.
15      Q.  Did you go to Dallas for pleasure or work?
16  Don't you dare say Dallas is always a pleasure.  You are
17  also listed currently as manager for Dedicated Servers,
18  LLC?
19      A.  From apply recollection, that company
20  dissolved.
21      Q.  Dissolved?
22      A.  Yes.
23      Q.  Again, as of this morning, according to Lexus
24  search, it says it is active.
25          What services is provided by Dedicated

83

1  Servers, Inc.?
2      A.  Equipment, purchasing service.
3      Q.  Those are different than the services of
4  Webzilla's hosting services?
5      A.  Yes.
6      Q.  So dedicated servers sells the actual
7  hardware?
8      A.  From my knowledge, it purchases hardware.
9      Q.  It purchases hardware?
10      A.  Yes.
11      Q.  How does it make its money?
12      A.  I'm not sure.  I think it is part of a group,
13  you are part of a group.  I don't know what the actual
14  income of Dedicated Servers, Inc., is or revenue.
15      Q.  What was your role with them while you were
16  there?
17      A.  I facilitated the purchase of the equipment, I
18  would communicate with the vendor regarding the
19  purchase.
20      Q.  The vendor from which the purchase was made?
21      A.  Yes.
22      Q.  How long did you do that?
23      A.  For several years.
24      Q.  Were you asked to do that pursuant to your
25  initial role at Webzilla?

84

1      A.  Yes.
2      Q.  And Alexy Goubarev asked to you do that?
3      A.  I don't recall who made the decision.
4      Q.  Who else would be involved in the decision
5  besides Alexy Goubarev?
6      A.  The company CFO.
7      Q.  Who is that?
8      A.  Rogers.
9      Q.  Did you get paid separately from Dedicated
10  Servers, Inc.?
11      A.  No.
12      Q.  How about International Solutions Group, Inc.,
13  are you familiar with that?
14      A.  Yes.
15      Q.  What is that?
16      A.  It is the company incorporated by InCorporate
17  Now, Inc., and it is held or maintained by InCorporate
18  Now, Inc., but it doesn't do any business.
19      Q.  Right now, it is listing you as the active
20  president of the company?
21      A.  I believe that was amended, InCorporate Now,
22  Inc., listed as the president of the company, but I have
23  incorporated the company, as well.
24      Q.  Anyone else involved in that company?
25      A.  No, it is not doing any business.

85

1      Q.  Does it have a business purpose yet?
2      A.  No.
3      Q.  How about Link Shop, Inc.?
4      A.  If I recall correctly, it is a client of
5  InCorporate Now.
6      Q.  You are listed as their current
7  vice-president?
8      A.  I'm not sure.  I have to double-check.
9      Q.  What would be your duties as their
10  vice-president?
11      A.  Not sure what Link Shop is currently, if it
12  was ever in business, so, if I'm not sure what duties, I
13  don't want to speculate on the duties of the business.
14      Q.  You don't want to speculate?
15      A.  I don't want to speculate on what duties the
16  vice-president has for the business.
17      Q.  You don't recall being named the
18  vice-president?
19      A.  I might have recalled, but I don't recall what
20  the company did in business.
21      Q.  How about Neocran, N-E-O-C-R-E-N, Inc.?
22      A.  That company was incorporated, including me
23  and several friends, which also did not do any business
24  and was dissolved.
25      Q.  Who were your several friends?



Luchian,  Constantin  01-19-2016

86

1    A.  They are listed, I believe, in the
2  incorporation documents.
3        Q.  All I'm seeing is something specific to you,
4  so I don't know.  I don't see the other documents right
5  now?
6    A.  Who the friends are?
7    Q.  Yes.
8    A.  He have Eugene, and I believe Sergey, I don't
9  recall exactly.
10    Q.  What was the purpose of that company?
11    A.  Product development, which never took place.
12    Q.  What kind of product?
13    A.  It wasn't the specific purpose of the company,
14  it was a side business, but it never took ground.
15    Q.  Have you ever been in the operation of an
16  adult website?
17    A.  No.
18    Q.  Would you describe your relationship with
19  Constantine Bolotin as "friends"?
20    A.  Yes.
21    Q.  Do you guys socialize?
22    A.  Specify.  What do you mean by "socialize"?
23    Q.  Do things to get that are not business
24  related?
25    A.  Yes.

87

1    Q.  Such as?
2    A.  Having dinner.
3    Q.  With each other's families?
4    A.  Yes.
5    Q.  What is your understanding of the purpose of
6  Sun Social Media?
7    A.  It is a service provider providing several
8  websites.
9        Can you be more specific?
10    Q.  Can I be more specific about what your
11  understanding is?
12    A.  Sun Social Media is a social media provider
13  that provides several websites.
14    Q.  Are you aware of the type of websites?
15    A.  Yes.
16    Q.  Are you aware that they are adult websites?
17    A.  I'm aware that they are adult-oriented
18  websites.
19    Q.  Have you been to them?
20    A.  I have not used the website, but I have taken
21  a look at the website at one point.
22    Q.  You are aware what the websites are, the four
23  websites?
24    A.  I might make a mistake saying the names, but
25  I'm aware from yesterday's discussion, as well.

88

1    Q.  When somebody hires InCorporate Now as their
2  DMAC agent, do you expect them to let you know what
3  websites may be receiving notices?
4    A.  Yes, we expect to provide all relevant
5  information from the client.
6    Q.  If you look at the notice that has been
7  subject to Exhibit 5, I think is in front of you, yes,
8  on that is the one website, Playvid.com, correct?
9    A.  Yes, according to Exhibit 5, yes.
10    Q.  January 2014, according to that document?
11    A.  According to this document, it appears to be a
12  stamp received January 23, 2014.
13    Q.  When you do corporation filings or other
14  filings in a Copyright office, do you record that
15  anywhere on behalf of InCorporate Now?
16    A.  Can you specify or rephrase the question?
17    Q.  Would you have sent an invoice to Sun Social
18  Media for the act of filing this Copyright document?
19    A.  Yes.
20    Q.  So you would be able to go back and track when
21  certain tasks were accomplished for Sun Social Media?
22    A.  I can pull up a history of invoices for Sun
23  Social Media.
24    Q.  Do you also have anywhere, a place where you
25  record information given to you by Sun Social Media?

89

1    A.  Like communication with the client usually
2  happens via e-mail and it is stored there.
3    Q.  So there's other sites other than those that
4  you are aware of that are operated by Sun Social Media;
5  is that right, other than listed on the document in
6  Exhibit 5?
7    A.  Repeat the question.
8    Q.  You are aware that there are other websites
9  operated by Sun Social Media that are not listed on
10  Exhibit 5?
11    A.  I'm aware, at this time, I'm aware that Sun
12  Social Media operates four websites.
13    Q.  Playvid.com, Playvids, Peekvid, Peekvids?
14    A.  I have double-check, but yes.
15    Q.  They are not on the document in front of you,
16  Exhibit 5, correct?
17    A.  Exhibit 5, Findandtry.com and Playvid.com.
18    Q.  The other ones are not there, correct?
19    A.  Nothing else is stated on the document.
20    Q.  Is that because Sun Social Media had not
21  advised you to list them?
22    A.  I'm not sure.
23    Q.  If Sun Social Media advised you to list them,
24  would you have listed them?
25    A.  Yes, most likely.



Luchian,  Constantin  01-19-2016

90

1    Q.  You have switched your office address,
2  InCorporate Now, on several occasions, correct?
3    A.  On two occasions, on one occasion.
4    Q.  But the address is switched two occasions,
5  because Regis moved?
6    A.  Correct.
7    Q.  You were the reason and Regis was the reason?
8    A.  Correct.
9    Q.  So a total of two address changes?
10   A.  I believe so, I have to double-check.
11   Q.  When there's an address change, how do you
12  notify the clients of InCorporate Now so they can update
13  their records and on their websites for the DMCA agent?
14   A.  Our standard process is to notify the clients
15  via e-mail.
16   Q.  Have you ever been threatened to be sued by a
17  client for lack of performance as a DMAC agent?
18   A.  Not to my knowledge.
19   Q.  Since being served in this lawsuit, have you
20  made any changes in the manner that InCorporate Now does
21  business in tracking DMAC notices?
22   A.  No.
23   Q.  You are in the process of making some changes?
24   A.  We have been before the lawsuit was filed, as
25  well.

91

1    Q.  What changes were in process before the
2  lawsuit was filed?
3    A.  We are working on the internal system to
4  receive and track the notices and other business
5  activity.
6    Q.  Do you have a form that your clients fill out
7  for InCorporate Now with pertinent information that
8  would be related to the contact information or what the
9  websites are, how the scanned notices should be
10  delivered to the client, things like that?
11   A.  Can you be more specific?  You asked too many
12  specific parts.
13   Q.  How about I be less specific?
14     MR. COBB:  Or break it down.
15  BY MR. FREEMAN:
16   Q.  Do you have a form that you have your clients
17  fill out when they are retained, when they retain you?
18   A.  We have a form that is filled out and filed to
19  the corporate office.
20   Q.  The form you have filled out is similar to the
21  one in front of you, Exhibit 5?
22   A.  Correct.
23   Q.  My question is:  Is there a form made and
24  filled out for specifically InCorporate Now's business
25  purposes?

92

1    A.  Can you rephrase the question?
2    Q.  Do you have your clients fill out any sort of
3  form besides this Copyright agent form when they retain
4  you?
5    A.  We have a form on our website that the clients
6  can access, fill out, which we receive the information,
7  and process it further.
8    Q.  What information is requested on that form?
9    A.  I have to double-check.  From what I remember,
10  at least the company name, alternative names, contact
11  information for the person who fills out the form, and I
12  believe that is it or the signatory of the form, as
13  well.
14   Q.  Where do you keep that information, once the
15  client has provided it?
16   A.  When the client fills out the form, it is
17  delivered to our e-mail address.
18   Q.  Then what do you do with it?
19   A.  Look at the information and then communicate
20  with the client further.
21   Q.  Do you save the form anywhere?
22   A.  It is saved as an e-mail.
23   Q.  You mentioned a folder in the Google Drive
24  that is specific to the client?
25   A.  Yes.

93

1    Q.  What all is held in that folder?
2    A.  Similar notices as to Exhibit 5, sorry, not
3  notices, but similar forms as to Exhibit 5, processed on
4  behalf of the client.
5    Q.  And then takedown notices as received?
6    A.  Yes.
7    Q.  Any other mail that is received?
8    A.  Yes.
9    Q.  How do you break down the documents, do you
10  break them down by the content or date of receipt by
11  InCorporate Now?
12   A.  Our standard operations at the InCorporate Now
13  is to have two folders; one folder will house the
14  documents such as documents filed with the Copyright
15  office; another folder will house the mail received on
16  behalf of the client.
17   Q.  All right.  Let's take a quick break.
18     (Discussion held off the record.)
19     (Recess taken.)
20  BY MR. FREEMAN:
21   Q.  You look like you had something you wanted to
22  say?
23   A.  No, I had to check on something, parking.
24   Q.  To your knowledge, have you had any past
25  clients sued for DMCA violations?



Luchian,  Constantin  01-19-2016

94

1   A.  Yes.
2   Q.  And who?
3   A.  During the Hotfile case.
4   Q.  Anybody else?
5   A.  Not to my knowledge.  I don't remember.
6   Q.  Throughout your testimony this morning, you
7   talked about some documents that you may have to go back
8   and check, that would provide you some information, some
9   of those were e-mail communications with the client; is
10  that right?
11  A.  I said I need to check documents pertaining to
12  the documents, some of them from the notices received.
13  Q.  Which would be contained in the Google Drive
14  folders?
15  A.  Yes.
16  Q.  And then some e-mail communications
17  potentially?
18  A.  Most likely, yes.
19  Q.  Any other documents that would be relevant to
20  the questions we have been over this morning?
21  A.  No other documents that I can think of.
22  Q.  Is it part of the practice of InCorporate Now
23  to ever destroy paper documents after some period of
24  time?
25  A.  We don't have a set practice to destroy the

95

1   documents.
2   Q.  Have you destroyed any paper documents?
3   A.  Might have, but not for a while.
4   Q.  Not since this lawsuit was started?
5   A.  Not since last year, for sure, and the year
6   before, probably.
7   Q.  How about deleting files out of the Google
8   drives?
9   A.  No, we don't have a practice of deleting
10  files.
11  Q.  Have you done that?
12  A.  No.
13  Q.  How about deleting client e-mails?
14  A.  No.
15  Q.  Both.  Is it part of the practice of
16  InCorporate Now?
17  A.  We utilize Google App services, we do not have
18  a practice or a standard or procedure to delete
19  communications.
20  Q.  So I'm good for right now.  Actually, I say we
21  take a lunch break, I may or may not have anything for
22  him after lunch.  If we do, it will be short.
23  (Lunch recess was taken at 12:57 p.m.)
24  MR. FREEMAN:  Back on.
25  BY MR. FREEMAN:

96

1   Q.  I just have a little bit left for you.  Your
2   contact with Constantin Bolotin regarding business
3   stuff, how frequent is that contact?
4   A.  Can you specify, please?  What do you mean by
5   "business stuff"?
6   Q.  Anything that is not personal.
7   A.  I don't want to stipulate, or guess.
8   Q.  "Speculate," you mean?
9   A.  "Speculate," yes.
10  Q.  You don't have an estimate of how frequent
11  contact would be with regard to services provided by
12  InCorporate Now?
13  A.  No.
14  Q.  Over the course of the last year, have you had
15  contact with Mr. Bolotin regarding services provided by
16  InCorporate Now?
17  A.  Over the course of 2015?
18  Q.  Yes.
19  A.  I have, yes, I have contact.
20  Q.  Do you know how many times?
21  A.  No, I do not recall.
22  Q.  More than five?
23  A.  I do not recall.  I don't think it was too
24  many, but I have to check my records.
25  Q.  Those records would be, what?

97

1   A.  E-mails.
2   Q.  Would most of your contacts with Mr. Bolotin
3   related to services related to InCorporate Now be over
4   e-mail?
5   A.  Yes.
6   Q.  Would you have any phone conversations with
7   regard to those services?
8   A.  Yes, there could be phone conversations.
9   Q.  How about in-person contact with regard to
10  those services?
11  A.  Highly improbable, but possible, as well.
12  Q.  Are you aware of -- do you have any system
13  administrative contact with any of the Sun Social Media
14  websites?
15  A.  Can you explain, please?
16  Q.  We have heard testimony about a system Admin
17  access to those sites, I'm wondering if you have access
18  to any system admin to the site?
19  A.  No.
20  Q.  Do you have a password for any of the Sun
21  Social Media sites?
22  A.  No, I do not.  I don't recall any.  Not that I
23  recall any.
24  Q.  When you changed your address for InCorporate
25  Now, you sent that to Mr. Bolotin correctly via e-mail?



877.291.3376
www.UCRinc.com

98

1    A.  Our standard practice at InCorporate Now to
2    notify the DMAC, the e-mail used to receive the notices
3    on file regarding any notifications or changes within
4    the service.
5        Q.  Your contact over e-mail with Mr. Bolotin
6    regarding services by InCorporate Now, are they always
7    through the e-mail reserved for DMAC notices?
8    A.  No.
9        Q.  Or did you have his direct?
10       MR. COBB:  Mail address?
11       THE WITNESS:  Yes, I have the direct e-mail
12   address for Mr. Bolotin.
13   BY MR. FREEMAN:
14       Q.  But you would not have e-mailed change of
15   address to his personal e-mail address?
16   A.  It is not a standard practice to e-mail
17   directly to a client's representative, try to contact
18   that address provided.  First of all, if there are any
19   problems with that e-mail, let's say, it was not
20   deliverable, we'll try to contact the customer via any
21   other means.
22       Q.  Specific to the Sun Social Media sites, which
23   e-mail address did you use to show change of addresses?
24   A.  From my recollection, I think it is
25   LEGALSUNSOCIALMEDIA.COM, but there could be other

99

1    addresses stored in this.
2        Q.  You don't remember what other e-mail addresses
3    you used?
4    A.  No.
5        Q.  You presume you followed protocol DMAC
6    e-mails?
7    A.  Yes, we did.
8        Q.  When you say "we," you are talking about
9    InCorporate Now?
10   A.  InCorporate Now, yes.
11       Q.  Nobody else works for InCorporate Now?
12   A.  We have contractors that do various types of
13   services.
14       Q.  What do you use contractors for?
15   A.  Developing of the internal systems, software
16   development.
17       Q.  What else?
18   A.  That is pretty much it.
19       Q.  So, the software systems, what do you utilize
20   software for?
21   A.  As I explained before, if I recollect
22   correctly, by the end of 2014, maybe mid-2014, I have
23   decided to build a better service to the customer,
24   therefore it is custom software that we need to build
25   and it has been in development since then.  It was never

100

1    released yet to the customers, it is not used for
2    business operations.
3        Q.  Since approximately the middle of 2014, you
4    have been in the process of developing custom software
5    to increase the efficiency or improve InCorporate Now to
6    its clients?
7    A.  Yes.
8        Q.  That is still going on, the software
9    development?
10   A.  Yes.
11       Q.  How are you funding that development?
12   A.  From the funds that InCorporate Now generates.
13       Q.  Are you receiving funds from any other
14   sources?
15   A.  No.
16       Q.  For that?
17   A.  No.
18       Q.  Receiving any funds from Anton Titov for that?
19   A.  Excuse me.
20       Q.  Do you receive from Anton Titov for that?
21   A.  InCorporate Now did not receive any funds from
22   outside.
23       Q.  Do you have contact information for him?
24   A.  I'm not sure who you are referring to.
25       Q.  Anton Titov?

101

1    A.  You mentioned the name, I'm not sure who the
2    name is.
3        Q.  Your contractors, do you use them for anything
4    other than the software systems?
5    A.  No.
6        Q.  You don't use contractors to track received
7    takedown notices?
8    A.  Can you explain, please?
9        Q.  You don't use contractors to track any
10   received takedown notices?
11   A.  No.
12       Q.  That would be strictly you?
13   A.  Yes.
14       Q.  So if you -- if a DMCA agent fails to provide
15   its client with received DMCA takedown notices, do you
16   think the DMCA agent has done anything wrong?
17   A.  The DMAC agent does not provide sufficient
18   service to its clients.
19       Q.  Do you think that they have done something
20   wrong?
21   A.  I think the term "wrong" is very broad and, if
22   sufficient services were not provided.
23       Q.  Do you think there should be consequences to
24   the DMAC agent for failing to provide sufficient
25   services?



Luchian,  Constantin  01-19-2016

102

1   A.  I don't want to speculate whether there should
2  or should not be something.  If it is stated by the law,
3  then it is.  I'm not familiar with the actual law for
4  this question.
5      **Q.  Would you view the failure to provide a client**
6  **with delivered DMCA takedown notices to be a significant**
7  **problem?**
8      A.  If InCorporate Now fails to provide all of the
9  received or not received takedown mail to the client,
10  then that would be a significant problem.  That would
11  mean that InCorporate Now did not provide sufficient
12  service to its client.
13      **Q.  The contract that you have with Sun Social**
14  **Media, would you have provided Sun Social Media with a**
15  **copy of that contract?**
16      A.  I do not recall.  I have to check the records.
17      **Q.  Would it be normal protocol to give the client**
18  **a copy of the contract?**
19      A.  Yes.
20      **Q.  That would be a contract signed by both you**
21  **and the client?**
22      A.  Yes.
23      **Q.  Does your girlfriend ever assist with the**
24  **scanning of documents?**
25      A.  No.

104

1      **Q.  That involved Anton Titov?**
2      A.  I don't remember if that name was involved in
3  the case specifically.
4      **Q.  All right.  We are done.**
5      MR. COBB:  We didn't do it yesterday, but...
6      MR. FREEMAN:  Waive or sign?
7      MR. COBB:  We will waive with him.  I want to
8  read with him (indicating).
9      MR. FREEMAN:  Reserve, okay.
10      MR. COBB:  I forgot that yesterday.
11      (Concluded:  2:11 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

103

1      **Q.  Have clients ever complained to you about the**
2  **failure to be provided with DMCA takedown notices?**
3      A.  Not to my knowledge.
4      **Q.  Is it your testimony that you don't know who**
5  **Anton Titov is?**
6      A.  Can you repeat, please?
7      **Q.  Is it your testimony that you don't know who**
8  **Anton Titov is?**
9      A.  Is that a name?  You mentioned the name?
10      **Q.  Yes, it is a name.**
11      A.  The name can could be familiar to me, but I'm
12  not sure who you are referring to, exactly.
13      **Q.  You know that my interest gets more and more**
14  **peaked when I think you are playing games.**
15      MR. COBB:  Is that a question?
16      MR. FREEMAN:  It will be.
17  BY MR. FREEMAN:
18      **Q.  Anton Titov is a client of yours?**
19      A.  No.
20      **Q.  He is not?**
21      A.  No.
22      **Q.  Nor is any of his businesses clients of yours?**
23      A.  Not that I know of.
24      **Q.  You were deposed in the Hotfile case?**
25      A.  Yes.

105

1              CERTIFICATE OF OATH
2  STATE OF FLORIDA
3  COUNTY OF MIAMI-DADE
4
5      I, MELISSA KALLAS, the undersigned authority,
6  certify that CONSTANTIN LUCHIAN, personally appeared
7  before me and was duly sworn.
8      Witness my hand and official seal this 19th day of
9  January, 2016.
10
11
12
13
14
   _____
15  MELISSA KALLAS
   NOTARY PUBLIC, STATE OF FLORIDA
16  Commission No.:  EE 206253
   Commission Exp:  6/10/2017
17
18
19
20
21
22
23
24
25



Luchian, Constantin 01-19-2016

106

1         CERTIFICATE OF REPORTER
2  STATE OF FLORIDA
3  COUNTY OF BROWARD
4
5      I, MELISSA KALLAS, Court Reporter and Notary Public
6  for the State of Florida, do hereby certify that I was
7  authorized to and did stenographically report the
8  deposition of CONSTANTIN LUCHIAN;  the foregoing
9  testimony was taken before me; that a review of the
10  transcript was requested; and that the transcript is a
11  true and correct record of my stenographic notes.
12      I further certify that I am not a relative,
13  employee, attorney or counsel of any of the parties, nor
14  am I a relative or employee of any of the parties'
15  attorney or counsel connected with the action, nor am I
16  financially interested in the action.
17      Dated this 26th day of January, 2016.
18
19
20
21
   _____
22  MELISSA KALLAS, COURT REPORTER
    NOTARY PUBLIC, STATE OF FLORIDA
23
24
25



877.291.3376
www.UCRinc.com

---

**$**

**$2,000** 29:7

**$200** 29:6,7

**$300** 30:3

**$4,000** 17:18

**$500** 29:6 31:2

---

**1**

**1/17/15** 45:21,24

**1/2** 2:8

**10** 14:15 31:17,18 72:18

**100** 42:5,7

**1007** 36:10

**110** 35:2,17

**1107** 2:8

**12** 12:10

**12:57** 95:23

**1-20** 1:12

**13** 7:13

**15** 31:17,18

**15-cv-22134-UU** 1:3

**17** 7:21 8:25 46:5

**1700** 35:3,18

**1840** 2:4

**19** 1:18

**1-954-928-2800** 52:9

**1986** 7:13

**19th** 105:8

---

**2**

**2** 1:21

**2:11** 104:11

**2:15** 1:19

**20** 14:16 42:1 55:4

67:24

**200** 31:23 45:15,19 54:14 76:15

**2003** 7:19

**2009** 19:14

**2014** 40:15,17 88:10,12 99:22 100:3

**2015** 28:10,14,20 45:3 46:5 48:14 52:21 53:9,23 54:9 55:4 67:25 69:17 70:18 72:22 74:7 96:17

**2016** 1:18 105:9 106:17

**206253** 105:16

**20th** 54:20

**22nd** 55:6

**23** 40:17 88:12

**24** 6:16 34:11 50:12

**240** 8:10 36:11

**253** 2:9

**2680** 1:22

**26th** 106:17

**29** 10:7

**2-and-a-half** 8:24

---

**3**

**3** 8:24 50:14 76:3

**30** 14:19 17:22 27:22

**33131** 1:22

**33304** 2:13

**33309** 45:19

**33326** 2:5

**383-4500** 2:9

**3RD** 2:12

---

**4**

**4** 76:3

**4:02** 1:19

**40** 14:15,19 17:22 27:22

**45** 4:3

**47** 4:4

**48** 34:11 50:12 55:1

---

**5**

**5** 3:3 38:1 40:8 50:14 88:7,9 89:6,10,16,17 91:21 93:2,3

**50** 42:3

**500** 31:12

**5365** 48:6,10

---

**6**

**6** 39:14

**6/10/2017** 105:16

**642** 2:12

**6450** 76:17

**6715** 31:21

**675** 45:14

**6750** 31:22 45:18 54:13 76:14

**688-7642** 2:5

---

**7**

**7** 4:3 45:9,12 47:17,18,22,24 48:4 54:11

---

**8**

**8** 4:4 47:10,13 48:9 54:11

**80** 28:1

---

**9**

**954** 2:5

**954.527.4111** 2:13

**98402** 2:8

---

**A**

**AARON** 2:3

**AB@BEHARBEH AR.COM** 2:6

**ability** 6:16

**able** 88:20

**access** 16:4,16,25 18:7 33:7,11 40:4 65:15 67:7,13 74:21 75:8 92:6 97:17

**accomplished** 88:21

**accord** 34:1

**according** 29:21 39:21 40:11,14,16 43:20 45:17,23 46:11 47:15,24 48:9,18 49:3 54:10 67:16 82:23 88:9,10,11

**accordingly** 33:23 63:20 65:2,3

**account** 15:22 52:16 59:8 80:18

**accounts** 14:8 15:12,15,18,23,24 16:4 80:22

**accurate** 40:15 57:9,10 78:6

**acquaintance** 21:22

**acquire** 34:18

**acquired** 34:17

**across** 29:24

**act** 61:3 63:20,23

---



78:4,5 88:18

**acting** 43:25 44:21

**action** 5:14
106:15,16

**actions** 29:14 61:4

**active** 81:4 82:24
84:19

**activity** 55:20 91:5

**actual** 83:6,13
102:3

**actually** 70:1 95:20

**addition** 27:22

**address** 8:9 31:20
32:4,5,8,22,23
33:21 34:24
35:6,8,10,17,19,2
0 36:11,13,19,24
37:4,5 39:22,23
43:19 45:25
46:4,6 48:13
49:11 50:11 54:15
56:8,21 57:18
59:12,13,14,25
67:14,16
68:2,12,14,16
69:10 76:14,15,24
82:9 90:1,4,9,11
92:17 97:24
98:10,12,15,18,23

**addressed** 59:1

**addresses** 36:22
98:23 99:1,2

**admin** 97:16,18

**administrative** 40:5
97:13

**adult** 86:16 87:16

**adult-
entertainment**
42:9

**adult-oriented**
87:17

**advertise** 42:13

**advised** 89:21,23

**advisor** 79:13,15

**affect** 6:16 30:12

**against** 6:9

**agent** 20:8 25:1
26:18
27:3,5,6,7,10 29:1
37:19,22
39:1,5,9,20 41:23
43:25 44:21
46:24,25 57:12,17
58:19 61:21
62:5,15,20
64:19,24 65:14
71:19 73:3,4,11
74:8
76:5,14,16,17,21
77:10 78:4,5 88:2
90:13,17 92:3
101:14,16,17,24

**ago** 5:21 10:5
11:24,25 12:1
13:10,11 15:3
16:10,20 22:23,24
34:19

**ahead** 29:12

**alcohol** 6:15

**Alex** 12:15

**Alexy** 13:18 22:11
81:19 84:2,5

**A-L-I-N-A** 8:19

**allegation** 69:25
70:7 71:6

**alleges** 69:15

**already** 80:15

**Alternate** 40:9

**alternative** 40:12
41:17 92:10

**am** 18:16 20:25
21:1 38:6

106:12,14,15

**amended** 84:21

**amount** 29:10,15,18
33:13 56:21

**Andrews** 31:22
37:2 45:15,18
46:17 48:13 49:11
50:11,20 54:14
76:15,17

**answer** 8:18
19:20,24
20:5,20,21,24
21:1,2,3 25:20
44:9,10 48:17
57:3 70:4,9

**answers** 7:3

**Anton** 100:18,20,25
103:5,8,18 104:1

**anybody** 30:23
41:21 43:3 76:7
77:18 94:4

**anybody's** 47:7

**anymore** 36:8 82:4

**anyone** 52:13 73:15
74:21 84:24

**anything** 20:10
26:14 28:17 33:4
40:1,5 55:24
95:21 96:6
101:3,16

**anywhere** 28:5,7
49:15 88:15,24
92:21

**apologize** 46:14

**App** 95:17

**APPEARANCES**
2:1

**appeared** 105:6

**appears** 88:11

**application** 66:16

**applies** 29:20

**apply** 82:19

**approximate** 11:23
13:10 17:22 31:2
42:7 75:10

**approximately** 13:7
15:2 75:18 100:3

**approximation**
10:4 31:16 41:24
77:23

**Apps** 66:3,5,9
67:19,23 68:8,9

**arise** 63:6

**arts** 9:25

**assertion** 57:16

**assist** 25:2 102:23

**associated** 27:1
42:11

**ASSOCIATES**
1:20

**assume** 45:1 65:1

**assumptions** 53:1

**Atlantic** 9:14

**attachment** 66:22
67:6,8,9

**attention** 45:13,20
46:8

**attorney** 25:17
26:11,14,17 40:25
42:19 45:11 69:3
71:13,22 72:1,16
106:13,15

**attorneys** 26:1,4,7
38:21 53:25 70:23
72:13,25

**attorney's** 40:24

**authority** 80:21
105:5

**authorized** 41:23



61:11 106:7

**automatic** 67:3

**available** 70:21

**Avenue** 2:8,12
31:22 45:15,18
54:14 76:17

**average** 14:16

**aware** 58:9
60:14,18
61:6,10,15
62:13,17,23
69:15,19,20,21
76:20 77:3
87:14,16,17,22,25
89:4,8,11 97:12

—————
**B**

**bachelor** 9:25

**Bachelors** 78:25

**Balance** 80:17

**bank** 16:4 80:18,21

**banker** 75:20
76:2,3

**banking** 16:25

**based** 39:11

**basis** 29:11 47:9
74:22

**BCOBB@COBBE
DDY.COM** 2:14

**become** 73:3

**becomes** 73:4

**behalf** 1:18 2:2,10
27:9,13 31:14
36:5 40:23 41:1
43:21,24 51:6
56:2,3 57:13,23
62:4 64:9 65:20
66:23 68:6 69:16
70:3,13,15 71:14
73:2 74:7 80:5
88:15 93:4,16

**BEHAR** 2:3

**belief** 50:7

**believe** 9:10 14:13
17:9 36:16 38:11
50:4 54:25 61:18
69:3 81:17 84:21
86:1,8 90:10
92:12

**believed** 20:7 39:4

**besides** 41:10,21
43:3 77:10 81:5
84:5 92:3

**best** 63:4

**better**
49:19,21,22,25
50:1,4,5 59:11
99:23

**Bigger** 75:12

**bin** 47:3

**birth** 7:12

**BISCAYNE** 1:21

**bit** 96:1

**BLVD** 1:21

**board** 29:24

**Bol** 13:12,18

**Bolotin** 1:8
12:19,20 13:22
14:1 22:14,17
30:15,17,21
37:7,10
41:10,19,22 52:19
53:21
72:12,14,16,20
86:19 96:2,15
97:2,25 98:5,12

**Bolotin's** 17:7 39:3
41:6

**bookkeeping**
77:13,14,16,17
78:6,13,14,16,17,
18 79:21,23,24,25

80:2

**books** 80:6,17

**Borachenko** 24:5

**born** 7:14

**Boulevard** 35:2,18

**Bowl** 13:8

**box** 75:19,25

**boxes** 75:20 76:2,3

**BRADY** 2:11

**break** 20:4 51:23,24
52:3 67:11 91:14
93:9,10,17 95:21

**bring** 47:6

**broad** 101:21

**Broward** 35:2,17
106:3

**BRYN** 1:20

**BS** 79:10

**build** 99:23,24

**building** 47:2

**business** 9:16,17
11:6,8 17:14
18:20
19:6,7,8,21,22
20:11 21:14
22:7,11,15,18
23:2,3,7,9,22,25
24:5,7,11,12,13
25:13 26:5
27:15,19 50:14
55:2 59:23 62:15
63:8,14
73:8,10,12
84:18,25
85:1,12,13,16,20,
23 86:14,23 90:21
91:4,24 96:2,5
100:2

**businesses** 11:9,10
32:14 103:22

**buy** 18:3

—————
**C**

**cable** 11:2

**calculate** 28:2

**car** 55:23

**careful** 56:1

**carte** 33:12

**case** 1:3 6:9 56:19
68:19 72:4,12
94:3 103:24 104:3

**category** 40:9

**cause** 60:11 64:9

**caused** 62:18,24

**causes** 59:5

**center** 62:9 76:23

**certain** 33:13 71:24
80:7,24 88:21

**CERTIFICATE**
105:1 106:1

**certify** 105:6
106:6,12

**CFO** 84:6

**change** 15:9 22:20
23:5 90:11
98:14,23

**changed** 16:7,9,15
97:24

**changes** 40:5 47:8
90:9,20,23 91:1
98:3

**charge** 29:1,15

**charged** 31:1

**chart** 49:16

**check** 14:22 31:15
33:15,18 34:10
50:15 51:11,12
52:3 53:2 55:1
57:25 58:15 71:9



74:10 93:23
94:8,11 96:24
102:16

**checked** 55:5

**checks** 14:21 16:5

**circumstance**
26:12,13,16

**circumstances**
26:10

**CL@INCORPOR
ATENOW.COM**
68:18

**claims** 64:25 65:1

**clarify** 31:8 82:2

**class** 12:7 79:13

**classes** 12:6,9
79:10,12,14,16

**classification**
80:4,10

**classify** 80:7,15

**clause** 58:23

**clauses** 58:10,12

**clear** 37:21

**click** 47:18

**client** 26:8
27:2,6,9,13
29:17,21 38:19
42:10,16,19
43:6,8,21,22
44:14,16 49:3
50:1,5 55:15 56:8
57:13,14 59:12
60:11,12,17,19,20
62:10
63:11,12,14,19
64:6,10
66:17,19,21,23
67:15 68:6,9,11
71:20 73:2
80:5,11 85:4 88:5
89:1 90:17 91:10

92:15,16,20,24
93:4,16 94:9
95:13 101:15
102:5,9,12,17,21
103:18

**clients** 6:13 24:14
26:2,22 42:23
43:12,17 44:19,23
45:3 50:3 56:3,21
58:18,20 59:6
60:1,5,8,15
62:4,25 74:8 76:9
77:24 78:2 79:22
90:12,14 91:6,16
92:2,5 93:25
100:6 101:18
103:1,22

**client's** 29:11 49:6
64:9 68:8 98:17

**Clients** 41:18

**close** 5:10,11

**Cloud** 66:4,6

**COBB** 2:11,12 7:7
19:23
20:3,9,15,25
21:19 28:23
38:3,6 44:5,10
48:2,16 51:24
57:1 69:11 70:8
91:14 98:10
103:15 104:5,7,10

**coffee** 55:17

**college** 9:12,13
10:9,13,16 11:19
15:2,5

**COM** 1:11,12

**COMMERCE** 2:4

**commercial** 23:17

**Commission** 105:16

**communicate** 83:18
92:19

**communication**

44:14 89:1

**communications**
44:15 94:9,16
95:19

**companies** 25:3
35:16 61:23 73:19
81:15

**company** 10:22
11:5,7,14 16:23
21:25 24:9,17
28:25 32:23 33:1
35:15 53:8 56:3
59:21 62:14
73:3,5,6,7,9
81:5,7,17
82:1,10,19
84:6,16,20,22,23,
24 85:20,22
86:10,13 92:10

**compare** 47:21

**compared** 59:12

**compel** 21:5

**compensation**
17:16

**complained** 103:1

**complaint**
68:19,21,23,25
69:2,6,13,15,21,2
3 70:11
71:3,5,11,12,21,2
4

**complications**
60:18 64:9,11

**computer** 18:1,3
65:24 82:6,7

**concern** 59:19,21
71:15,18

**concerned** 72:1

**concerns** 59:25
60:5,8

**Concluded** 104:11

**Conference** 33:10

**confidential** 19:18
44:13,18,25

**confidentiality**
20:18 43:6,10,23
44:4

**Confirm** 48:1

**confirmation** 54:12

**conjunction** 37:6

**connected** 106:15

**connection** 73:12

**consequences**
101:23

**considered** 80:1

**consistent** 12:9,11
39:23

**consistently** 12:6

**Constan** 24:4

**constant** 47:9

**Constantin** 1:7,17
3:2 5:1,7 96:2
105:6 106:8

**C-O-N-S-T-A-N-T-
I-N** 5:7

**Constantine**
12:19,20,23,24
22:14,17 34:13
37:7,10 38:25
39:22 45:14,18
86:19

**Constantine's** 13:3

**contact** 51:8,9
65:16 91:8 92:10
96:2,3,11,15,19
97:9,13 98:5,20
100:23

**contacted** 69:3
70:23 72:20

**contacts** 97:2



contained 94:13
contemplate 59:2
contemplated 58:25
content 61:16 93:10
contesting 69:11
context 5:25
continue 15:11 38:4
continued 76:9
contract 33:14
  43:12,14 44:7
  57:24
  58:9,10,12,16,22
  102:13,15,18,20
contractors
  99:12,14
  101:3,6,9
contracts 58:16,18
contractual 43:16
  76:8
contractually 59:1
controls 81:17
conversation 60:4
  72:15,17
conversations 60:7
  72:11,13 97:6,8
convert 68:7
conviction 7:9,11
copies 57:15
copy 68:25
  102:15,18
Copyright 26:23
  37:17,18,19,23
  38:15
  39:1,5,9,20,24
  44:21
  61:3,12,15,17
  64:18,19,24,25
  65:14
  76:14,16,17,21
  88:14,18 92:3

93:14
copyrighted 61:13
copyrights 61:12,23
corner 45:20
corporate 24:13,19
  26:20,22 27:9,11
  39:4 65:18 91:19
corporation 1:4,8
  24:20 61:20 78:3
  88:13
correct 13:19 15:14
  19:12 25:13 36:2
  38:16 39:1,6 40:2
  43:25 44:24 45:25
  46:4,6 47:22
  49:14 54:9,12
  55:3 70:7 81:23
  88:8 89:16,18
  90:2,6,8 91:22
  106:11
CORRECTED
  1:16
correction 29:6,7
correctly 21:23
  41:5 62:15 85:4
  97:25 99:22
cost 29:13,16 33:18
counsel 2:1
  106:13,15
count 17:21
COUNTY 1:2
  105:3 106:3
couple 13:24 16:10
  22:23,24
course 12:12
  96:14,17
court 1:1 5:3 6:21
  7:8 8:10 106:5,22
crawl 20:16
created 60:15

cubby 47:3
current 17:16
  50:7,8 85:6
currently 8:5 24:7
  82:17 85:11
custom 99:24 100:4
customer 11:6,8
  27:7 67:13 98:20
  99:23
customers 15:21
  21:25 100:1
cut 30:15

_____
D
d/b/a 1:4,9
Dallas
  82:9,12,13,14,15,
  16
damages 58:3,7
dare 82:16
date 7:12 21:18
  40:20 45:21,24
  46:1,9 49:17
  69:18 93:10
Dated 106:17
day 19:11 105:8
  106:17
days 50:14
deal 14:8 15:21
  16:14 61:24
dealing 15:11,12,19
dealings 15:15
dealt 62:10
decided 79:14
  99:23
decision 84:3,4
dedicated 74:19
  81:8,21,24
  82:17,25 83:6,14

84:9
deemed 44:13,18
Defendants 1:13
  2:10
degree 9:21,23
  10:2,12 15:8
  78:18,19,21,22,23
  79:5,7,9,10,16
degrees 79:4,8
Delaware 25:6,19
  73:9,11
delete 95:18
deleting 95:7,9,13
deliver 55:15
  57:14,18 60:11,17
  64:5,8 65:17
  66:19
deliverable 98:20
delivered 32:25
  48:12 50:20 58:21
  62:19 69:19,20,22
  70:1,3,12,13
  71:13,23 72:22
  76:18 91:10 92:17
  102:6
deliveries 51:6
delivering 66:16
delivery 45:21,24
  46:22,24
  54:7,11,13 59:24
  67:25 69:16 71:6
deposed 103:24
deposition 1:17
  5:15,17,20,22,25
  20:6 38:2 72:18
  106:8
describe 32:10,11
  86:18
DESCRIPTION
  4:2



**desk** 33:8 47:5
66:10 74:15,16,17

**destroy** 94:23,25

**destroyed** 95:2

**details** 14:3

**determine** 29:21
70:6 80:6

**determines** 29:8

**determining** 29:18

**developing** 99:15
100:4

**development** 86:11
99:16,25 100:9,11

**device** 66:12

**different** 35:15
37:3,4 83:3

**differently** 62:2

**digitalize** 57:14

**digitize** 43:21 55:14

**digits** 48:6,10

**dinner** 87:2

**direct** 3:3 5:4
26:12,13 45:13,20
46:8 98:9,11

**direction** 41:6

**directly** 55:9 72:15
78:17 98:17

**director** 17:3,5,9,20
18:16,18 19:1
20:9 22:25 27:23
77:4,7 81:21
82:3,4

**disagree** 57:16

**disagreeing** 69:7

**disclose** 19:19
20:18

**discount** 29:5,22,23
30:18,25

**discounts** 29:25

**discriminate** 27:14

**discrimination**
62:11

**discussion** 51:25
87:25 93:18

**dissolved** 82:20,21
85:24

**DISTRICT** 1:1

**DMAC** 25:1
27:5,6,10 30:6,8
37:22 43:18,25
46:1,5 57:12,17
58:18,21 62:15,19
63:1 67:17 71:19
72:21 74:8 76:5
77:10 88:2
90:17,21 98:2,7
99:5 101:17,24

**DMAC@INCORP
ORATENOW.C
OM** 67:17
68:3,12

**DMCA** 26:18 29:1
57:20 62:5 78:5
90:13 93:25
101:14,15,16
102:6 103:2

**doc** 24:19,20

**document**
38:8,9,10,18,20
39:1,11,16,21
40:11,14,16,19,21
41:3,14,15 43:25
44:20 45:23 46:11
47:15 48:18
56:13,15 63:5
69:5,9
88:10,11,18
89:5,15,19

**documents** 24:22
38:15,22 47:1,4
49:12,16,17

50:10,19
54:10,12,17,22
55:9,13,23
56:4,10 70:13
73:22 74:6,7
75:14,17,19,20
78:3 86:2,4
93:9,14
94:7,11,12,19,21,
23 95:1,2 102:24

**dollars** 29:7

**D-O-M-B-R-V-S-
K-Y-A** 8:21

**done** 40:23,24
41:1,3 53:17
54:17 55:10
71:16,24 77:9
95:11 101:16,19
104:4

**door** 75:9

**double** 53:1

**double-check** 22:4
24:3 28:15 36:21
42:21,24 43:1
45:5 49:2 53:14
54:4 58:22
72:5,7,9 75:16
85:8 89:14 90:10
92:9

**Double-major** 79:2

**drafted** 39:12 40:21

**drafting** 40:19

**Drive** 66:3,16,20
67:4,7 68:1
70:17,20 92:23
94:13

**drives** 95:8

**drop** 55:23

**drugs** 6:15

**Dub** 12:15,18

**duly** 5:2 105:7

**during** 13:3 53:16
79:9 94:3

**duties** 15:9,11
16:13,14,15 17:20
18:18 27:23 28:5
85:9,12,13,15

----
E
----

**earn** 28:20,21

**earned** 15:8 79:8

**East** 35:2,17

**Eastern** 7:17

**EDDY** 2:12

**education** 78:16

**educational** 78:18

**EE** 105:16

**efficiency** 100:5

**eight** 13:10

**either** 34:3 53:3
80:15

**elective** 79:12,13,14

**electives** 79:15

**Electronic** 49:7,8

**else** 10:15 11:4,18
16:23 20:19
28:5,7 30:23
34:20 35:14 36:3
41:9,21 44:18
49:15 74:21
77:12,18 84:4,24
89:19 94:4
99:11,17

**e-mail** 2:9 34:6
66:21,24
67:4,14,16,20,22
68:9,14,15 89:2
90:15 92:17,22
94:9,16 97:4,25
98:2,5,7,11,15,16,
17,19,23 99:2



877.291.3376
www.UCRinc.com

e-mailed 68:2,3
98:14

e-mails 95:13 97:1
99:6

employee 46:24,25
106:13,14

enforce 61:12,23

English 8:22

entities 15:16 61:7
77:20 81:18

entity 35:25

Eporner 42:23

equally 62:8

equipment 83:2,17

error 55:25 56:5,22

ESQ 2:7

ESQUIRE 2:3,11
3:3

establishes 48:12

estimate 22:22
96:10

Eugene 86:8

Europe 7:17

exact 8:22 9:6 10:3
13:10 14:3 26:16
34:24 37:4 40:20
52:23 58:23 60:18
65:9,25 69:18
79:11

exactly 11:22 22:21
38:24 59:2 62:2
63:16 86:9 103:12

EXAMINATION
3:1,3 5:4

example 30:1 65:17
72:18

exchange 67:18

exchanged 72:24

Excuse 100:19

Exhibit 38:1 39:14
45:9,12
47:10,13,17,18,22
,24 48:4,5,9 54:10
88:7,9
89:6,10,16,17
91:21 93:2,3

exhibits 4:1,2
48:19,23,25

Exp 105:16

expect 88:2,4

Expected 45:21,24

expecting 65:10

expenses 80:7

experience 78:13
79:22

expired 76:8

explain 6:1 25:11
97:15 101:8

explained 99:21

explore 20:12

express 62:6

extent 11:3
25:17,21,22

---

F

facilitated 83:17

facility 37:1,3

fact 50:15

failed 71:18

failing 63:10,14
101:24

fails 101:14 102:8

failure 60:10
62:14,18 64:4,7
102:5 103:2

fair 6:22 7:6 31:11
39:8

fall 29:9

familiar 84:13
102:3 103:11

families 87:3

family 7:23 12:24
13:3

FAU 9:15

fax 43:19

feasible 57:18

Federal 36:10

FEEDVID.COM
1:9,11

feel 59:10

feels 59:11

field 40:13 47:16
48:10

figure 56:11

figured 38:3

file 39:24 44:20
66:22 67:13 98:3

filed 40:14 75:22
90:24 91:2,18
93:14

files 41:13,14 68:7,9
95:7,10

filing 37:23 38:14
43:24 88:18

filings 88:13,14

fill 41:16 91:6,17
92:2,6

filled 38:22 49:16
91:18,20,24

filling 40:1

fills 92:11,16

filter 42:10

finance 78:18,19,21
79:7,9,17

financial 17:3,5,20

27:23 28:15

financially 106:16

findandtry.com
40:10,12 89:17

fine 21:8

finished 79:17

fired 76:4

FIRM 2:7

first 7:25 17:4
42:16,19,22 98:18

firsthand 34:4

five 10:5 15:3 96:22

fixed 29:16,18

flat 14:25

Florida 1:1,2,22,25
2:5,13 8:1,2,6,12
9:14 13:4
25:4,10,16 35:1
45:16,19 54:14
73:5,6,7 78:4,5
105:2,15
106:2,6,22

focus 63:11

fodder 21:4

folder 49:6,7,8 68:8
92:23 93:1,13,15

folders 93:13 94:14

folks 57:7

foregoing 106:8

foreign 1:4

forget 42:19 46:14

forgot 104:10

form 28:23 44:5
48:16 49:16 57:1
70:8
91:6,16,18,20,23
92:3,5,8,11,12,16,
21



formal 70:10

format 66:2

formerly 5:12

forms 93:3

Fort 31:23 45:15,19
54:14

forward 43:22

four-year 9:23,24
10:12

free 19:3,10

Freeman 2:7 3:3
5:5,13 7:10
20:1,5,12,23
21:8,12,20 28:24
38:5,7 44:8,12
48:3,7,20 51:23
52:1,2 57:6 69:12
91:15 93:20
95:24,25 98:13
103:16,17 104:6,9

frequent 96:3,10

Friday 57:8

friendly 73:15

friends 85:23,25
86:6,19

front 47:5 54:7,13
88:7 89:15 91:21

FT 2:13

fulfill 71:19 79:19

full 12:9 77:25

full-time
14:10,12,14 27:21

function 67:3

fund 14:21 23:24

funded 23:22

funding 100:11

funds
100:12,13,18,21

**G**

gain 25:23

games 31:7 53:3
103:14

general 11:9,10
17:12 18:20 27:10
60:24 61:1,2
63:15,18
65:8,11,12,15
72:17

generally 52:24
53:4,5,6 73:1
74:13 75:6

generate 28:13

generates 100:12

Gervitz 24:9 38:18
41:6,13

gets 103:13

getting 48:14 49:1

girlfriend 8:14
74:23 75:3 102:23

girlfriend's 8:15,16

given 14:24 50:21
88:25

gives 41:16

Gmail 67:22

goal 63:3

gone 55:9,10 67:25

Google
66:3,5,9,16,20
67:4,7,10,19,22,2
3 68:1,8,9
70:17,20 92:23
94:13 95:7,17

gotten 30:25

Goubarev 13:18,22
14:1,5 22:11
81:19 84:2,5

graduate 9:5,7

graduated 15:2,5

graduating 79:19

ground 86:14

group 32:4
81:9,11,13,15,24
83:12,13 84:12

guess 13:9 45:7
52:25 57:4 62:1
96:7

guys 8:23 75:1
86:21

**H**

hand 45:11 69:9
105:8

handed 47:12 68:24

Handing 38:2

handles 47:4

hand-record 49:18

happen 56:6 59:20
63:22

happens 33:21 89:2

Harbor 61:18
64:2,15,21 65:6
73:8,10,12

Harbors 64:6

hard 71:22

hardware 83:7,8,9

hashtag 46:12

haven't 48:24

having 21:6
59:21,22 87:2

head 7:4

headquartered
82:10

hear 7:8

heard 52:18 97:16

held 47:2 51:25

84:17 93:1,18

help 59:23

hereby 106:6

herself 75:4

he's 20:9,20,21

high 9:4,11 10:8

Highly 97:11

Highway 36:10

hire 28:25 80:2

hired 12:14 13:12
14:7 51:2 59:9

hires 88:1

history 15:21 50:6
88:22

HLP 1:4

Hold 58:6

holder 61:3

holders 61:12

holding 42:8

Holdings 81:16,18

hole 56:11

home 17:24 18:1,7
49:13 55:9,14
67:25

hopes 19:11

hosting 17:15 83:4

Hotfile 6:11,13 94:3
103:24

hours 6:16
14:15,16,17,18,19
17:19,21,22 27:22
28:1,2 33:13
34:11 50:12
55:1,2 59:23

house
74:3,4,5,12,14,18
93:13,15

human 55:25



56:5,22 71:5,8
**hundred** 45:6,8
**Hydentra** 1:4 52:20 53:9 69:16

——————————
I
——————————
**identification** 39:15 45:10,12 47:11
**I'm** 5:12 6:11 8:18 10:1 13:23 20:19 22:4 25:17 26:16 28:17 31:7 35:5 38:1 47:4 48:24 53:3 56:11 58:9 60:18 61:15 62:8,22 65:10,25 68:23 69:18,21,22 71:10 75:16 77:5 81:20 82:3,6 83:12 85:8,12 86:3 87:17,25 89:11,22 95:20 97:17 100:24 101:1 102:3 103:11
**image** 65:24,25
**images** 66:1
**importance** 62:7,11
**important** 6:20 24:4 61:23 62:3
**importantly** 7:7
**improbable** 97:11
**improve** 100:5
**inaccurate** 57:9
**Inc** 1:8 2:7 18:16,17,19 19:13 20:7 25:2 46:7 54:15 57:23 70:14 71:14,25 81:8,22 83:1,14 84:10,12,17,18,22 85:3,21

**inception** 23:2
**include** 20:19
**included** 21:23 37:25 54:2
**including** 63:25 64:13 85:22
**income** 83:14
**incoming** 14:9
**incorporate** 18:16,17,19 19:1,13 20:7,15 21:13,24 24:11 25:2,25 26:10,13,17 27:20 28:9,13,22 30:2 31:1,20 34:13,20 36:11,13,23 37:6,9,13 38:14 39:5 40:23 41:2,14 42:10,14 43:17 46:6 53:8 54:15 57:23 59:10 60:1,15,16 62:7,18,24,25 63:10 64:5,8 66:25 67:15 70:2 72:22 73:1,2,4,14,19 74:8 76:4 77:17 78:1 79:22,24 81:5 84:16,17,21 85:5 88:1,15 90:2,12,20 91:7,24 93:11,12 94:22 95:16 96:12,16 97:3,24 98:1,6 99:9,10,11 100:5,12,21 102:8,11
**incorporated** 19:21 37:15 84:16,23 85:22
**incorporates** 73:2
**incorporating**

25:3,13 26:2
**incorporation** 24:17,23 25:10 77:10 78:2 86:2
**increase** 100:5
**indemnification** 58:2,19
**indemnify** 58:3,5
**INDEX** 3:1 4:1
**indicate** 57:7
**indicated** 20:6
**indicating** 104:8
**individual** 1:7,8 40:4
**individually** 1:9
**individuals** 32:14
**industry** 42:11,12
**information** 9:16,17,18,19 19:18 21:17 36:4 41:16,18 44:13 45:14,17 58:23 65:15 72:24 88:5,25 91:7,8 92:6,8,11,14,19 94:8 100:23
**infringed** 61:14
**infringement** 26:24 64:25
**initial** 83:25
**in-person** 97:9
**installation** 10:23,24
**installations** 11:2
**instead** 73:5 79:15
**instructed** 38:19
**instructing** 20:20,23,25 44:8

**instruction** 41:11
**instructions** 71:13 72:1
**insufficiency** 60:21
**insuring** 26:1
**INT** 1:4
**intellectual** 61:7
**intended** 19:7
**intent** 65:17
**intention** 55:11,18
**interacting** 6:19
**interest** 79:18 103:13
**interested** 106:16
**internal** 91:3 99:15
**International** 84:12
**Internet** 18:7 56:9
**interrupt** 6:20
**interview** 14:4
**introduced** 5:12 12:18 13:18 73:17
**investigation** 69:24 70:6,11
**invoice** 88:17
**invoices** 14:9 15:12,20 88:22
**involved** 22:7,11,14,17 23:3 71:8 72:14 80:19 84:4,24 104:1,2
**Irrelevant** 74:5
**issue** 21:7
**it's** 21:9

——————————
J
——————————
**January** 1:18 40:15,16 45:3


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

46:5 48:13 53:23
54:2,8,20 55:4
67:24 69:17 70:18
71:10 72:10,22
88:10,12 105:9
106:17

**job** 14:4,10
16:13,14,15 17:24
18:21,22,23
28:5,7

**jobs** 18:11

**John** 1:12

**join** 11:21

**joined** 11:20 13:14

**July** 7:13

**Jupiter** 8:6,7,12

---

K

**Kallas** 1:24 21:21
22:4 105:5,15
106:5,22

**key** 7:11

**kidding** 21:1

**kids** 74:24

**knew** 12:20 13:22
23:18

**knowledge**
25:9,15,23 44:2
49:24 50:9,22,23
65:5 81:7 83:8
90:18 93:24 94:5
103:3

**Konstanin** 1:8
36:7

---

L

**la** 33:12

**label** 47:18 54:11

**lack** 90:17

**language** 46:9

71:22

**large** 67:9,11

**larger** 59:21

**last** 5:7,9,20 6:15
7:11 8:20 12:3
22:3 30:2
48:2,5,10 95:5
96:14

**later** 21:18 29:25
42:22 55:11 69:10

**Lauderdale** 2:13
31:23 45:15,19
54:14

**law** 2:7 6:9 20:13
25:18 61:7,11
65:9 102:2,3

**laws** 25:9

**lawsuit** 53:21 64:14
90:19,24 91:2
95:4

**least** 20:12 50:17,18
78:3 92:10

**leave** 55:22

**legal** 25:12

**LEGALSUNSOCI
ALMEDIA.CO
M** 98:25

**less** 12:2 91:13

**let's** 29:25 31:12
51:23 67:24 93:17
98:19

**level** 62:6 73:15

**Lexus** 82:5,23

**liability** 58:13

**life** 23:18

**likely** 41:4 55:5,7
89:25 94:18

**LIMITED** 1:4

**link** 67:7,10,12

85:3,11

**list** 18:22 63:2,6
77:4,6 89:21,23

**listed** 39:1,8 40:9
48:5 81:21
82:3,4,17 84:22
85:6 86:1
89:5,9,24

**listing** 44:22 64:19
65:13 84:19

**lists** 39:19,21
76:14,15

**literally** 32:10

**litigation** 6:2,6

**little** 96:1

**live** 8:5,13

**lived** 8:2

**LLC** 82:18

**loan** 23:12

**loans** 23:13,17,24

**located** 34:20

**location**
32:3,11,12,22
33:22 35:16 36:18
37:4 46:15,16
54:8,18,21 55:21
56:20 57:7 59:23
66:8

**logistical** 38:3

**long** 8:23 19:13
36:19 83:22

**lose** 59:16 63:11

**loss** 58:8

**lost** 49:23 50:21
58:14,20

**lot** 28:3

**LTD** 81:18

**Luchian** 1:7,17 3:2
5:1,7,10 34:13

38:25 39:22
45:11,14,18 71:7
105:6 106:8

**L-U-C-H-I-A-N** 5:8

**lunch** 95:21,22,23

---

M

**mail** 27:1,8,12,13
31:9 33:22,24
34:2,4,12
43:20,21
50:13,15,16 53:16
55:20
56:2,21,23,25
57:8,13,14,15,22
58:2,4,8,14,20
59:5,16,24 60:2
62:7,9,12 65:19
66:22 67:22 68:6
93:7,15 98:10
102:9

**mailbox** 32:2
36:16,17 47:3
59:14

**mailing** 31:12,14
33:20

**mailings** 31:11

**main** 63:9 79:18

**maintain** 78:3

**maintained** 84:17

**Maintaining** 24:22

**maintenance**
24:18,19,21

**major** 79:17

**manage** 14:8 80:12

**Management**
9:16,17,18

**manager** 82:17

**manages** 52:16

**manner** 90:20



Mariner 9:4

marked 38:1 39:14
45:10 47:11,12

marking 38:4

match 48:19

matter 30:9

may 30:13 38:22
39:11 88:3 94:7
95:21

maybe 12:2 99:22

mean 15:23,24
24:20
26:12,18,23,24
31:6,8 32:21
53:5,10 56:4 58:5
62:2 68:23 86:22
96:4,8 102:11

meaning 11:1 81:25

means 60:20 98:21

meant 18:23

mechanism 61:6

media 1:8 20:7
30:1,2,8,17 31:1,4
37:7,10,14,15,20
38:19 41:9,21
43:3,7 52:19
53:24 68:4
70:3,14,15,16,22
71:14,25
77:1,2,4,7,10,16
87:6,12
88:18,21,23,25
89:4,9,12,20,23
97:13,21 98:22
102:14

Media's 39:18

meet 12:23

meeting 69:8

MELISSA 1:24
105:5,15 106:5,22

memorable 42:20

mentioned 36:25
64:2,14,16 65:7
92:23 101:1 103:9

message 34:6

met 12:24 13:3,8
14:1,2

METART 1:4

MIAMI 1:22

MIAMI-DADE 1:2
105:3

mid-2014 99:22

middle 100:3

mind 56:18

mine 22:25

MIS 9:18 15:8

misplace 56:23 58:2
59:5

misplaced 56:19
58:4 60:2,5

misplacing
56:24,25

missed 65:19

mistake 87:24

Moldova 7:15

moment 42:18

money 15:17 18:25
19:2,11 23:8,11
28:9 80:12,14
83:11

monies 80:9

month 17:18,19
29:6 33:13

morning 82:6,23
94:6,20

motion 20:19 21:4

mouth 42:15

move 7:25

moved 8:25 36:25
37:5 90:5

myself 23:19

―――――――――

N

nature 58:24 71:5,9

necessarily 29:12

necessary 24:22

Neocran 85:21

N-E-O-C-R-E-N
85:21

net 28:18

nice 70:4

nine 13:10

Nobody 99:11

nods 7:4

nor 103:22
106:13,15

normal 102:17

North 2:4 31:22
36:10 45:15,18
48:13 49:11 54:13
76:14,17

NORTHEAST
2:12

Notary 1:25 105:15
106:5,22

notes 106:11

Nothing 89:19

notice 27:9 31:5
53:9,25 60:10
61:4,5,11 62:12
63:23 64:12 65:18
88:6

noticed 76:13

notices
26:21,23,24,25
27:11 30:13
31:3,9,12 46:1,5

49:3,6 52:20
53:13,15,23
54:2,5,13 55:19
56:8 57:18,21
58:21 60:6,16,23
62:4,19 63:1,19
64:5,8 65:3,22
66:2 67:15
69:16,19,25
70:2,17,19,21
71:7,8,14,20
72:6,10,21 76:16
88:3 90:21 91:4,9
93:2,3,5 94:12
98:2,7
101:7,10,15 102:6
103:2

notifications 98:3

notified 58:20

notify 90:12,14
98:2

Now's 62:18,24
91:24

numerically 38:4

―――――――――

O

OATH 105:1

Object 28:23 44:5
48:16 57:1 70:8

objection 19:23
20:3 21:2

obligations 71:19

obviously 62:9

occasion 50:19 90:3

occasions 90:2,3,4

occurred 71:7

o'clock 72:19

offer 78:9

offered 24:16

office
32:3,13,15,18,19



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

33:7,11 35:20,22
36:14 37:18,24
38:15 39:24 40:24
44:21 61:15,17
64:18 74:19 75:3
80:3 88:14 90:1
91:19 93:15

**offices** 26:22

**official** 105:8

**offsite** 66:7

**Oh** 47:20

**okay** 7:1,2 8:19
10:20 24:4 47:7
52:1,13 69:10
104:9

**old** 7:20,22 10:6

**older** 36:13

**ones** 89:18

**on-line** 14:2 73:18

**open** 75:9

**operated** 35:18
89:4,9

**operates** 89:12

**operation** 86:15

**operations** 17:9,12
18:20 20:9,11
68:5,10 93:12
100:2

**opinion** 61:22,25

**option** 67:10

**order** 21:7,19
44:6,7 61:17

**organization** 75:23

**original** 21:23

**originally** 16:6
22:9,12,15

**others** 25:5,7 32:7

**other's** 87:3

**ours** 21:22

**outgoing** 67:16

**outside** 73:19
100:22

**owed** 15:16

**owned** 19:13 35:18
66:12

**owns** 46:14

---

**P**

**P.A** 1:20

**p.m** 1:19 95:23
104:11

**package** 48:12,15
49:1

**packages** 76:23

**packing** 4:3 45:9,13

**page** 3:2 4:2 40:2

**pages** 74:6

**paid** 14:20,24 24:2
28:17 84:9

**Palmetto** 8:10

**P-A-L-M-E-T-T-O**
8:12

**paper** 6:21 73:22
94:23 95:2

**parents** 13:3

**parking** 93:23

**PARKWAY** 2:4

**particular** 38:9
43:7 51:9 58:9
67:12

**parties** 6:10
106:13,14

**partner** 23:2

**partners** 19:22 20:2
21:14,16

**part-time**

14:10,12,13

**party** 6:2,11 20:16
65:16

**pass** 62:19,25

**password** 97:20

**past** 93:24

**pay** 11:15 14:24
15:17 16:5,16
18:9 30:2
33:12,16 58:7

**payable** 15:22

**payables** 14:8
15:12,16,24

**paycheck** 18:23

**paying** 15:23 16:1,2

**payment** 16:24

**payments** 16:17
17:1

**PDF** 66:2,22
67:6,8,9 68:1,6,7

**peaked** 103:14

**Peekvid** 89:13

**Peekvids** 1:11
89:13

**PEEKVIDS.COM**
1:12

**pending** 53:22

**people** 23:17 32:5
36:5 46:19 59:22
76:20

**per** 29:5

**perfect** 50:7

**perform** 29:10 61:4

**performance** 90:17

**performed**
70:11,20

**perhaps** 38:11 42:6
64:1

**period** 35:5 53:16
76:8 94:23

**person** 23:1,8 51:8
52:16 69:8 92:11

**personal** 23:12,13
40:18 50:7 68:16
79:25 96:6 98:15

**personally** 28:21
39:9,19 50:4
59:10 68:21,22
69:6 105:6

**persons** 23:1

**pertaining** 27:5
94:11

**pertinent** 91:7

**phone** 10:22,24
11:2 33:3 43:19
51:10,18,20,21,22
52:4 97:6,8

**phrases** 7:4

**physical** 31:9 33:7
35:16,21,23 43:19
49:7,12 50:10,13
57:14 66:12 69:9

**physically** 32:10
59:22

**pick** 33:22 34:5
50:10,13,16
55:13,20 57:8

**picked** 54:22 55:8

**piece** 27:12,13
62:7,9

**pieces** 31:9 34:4
53:16 56:2 57:15
62:12 67:11

**places** 10:19,21

**plaintiff** 1:5,18 5:13
52:20

**Plaintiff's** 45:9
47:10



**PLAINTIFFS** 2:2

**plan** 55:19

**play** 31:7 40:4 53:3

**playing** 103:14

**Playvid.com** 1:9,11
39:19 40:10,12
46:10,12 48:14
49:1 54:8,23 88:8
89:13,17

**Playvids** 1:12 89:13

**PLAYVIDS.COM**
1:9

**please** 6:25 21:11
25:11 28:11 43:15
54:19 60:13 78:15
96:4 97:15 101:8
103:6

**pleasure** 82:15,16

**PLLC** 2:12

**PM** 11:13

**point** 16:7 26:13,15
50:3 53:21 70:16
87:21

**point-of-sale**
11:16,17

**police** 61:7

**policy** 27:12

**position** 52:19
53:7,11,12 54:3

**possibility** 54:6
56:6,12,14,18,22

**possible**
55:19,22,25
56:17,24 97:11

**postage** 54:11

**postal** 45:13

**potential** 59:5 60:1
62:17,23
63:2,6,16 64:9

**potentially** 30:12
94:17

**practice** 94:22,25
95:9,15,18
98:1,16

**preparation** 38:14

**prepare** 38:10

**presence** 72:24

**present** 52:21,22
72:16

**president** 84:20,22

**presume** 99:5

**pretty** 99:18

**prevent** 50:25

**prevents** 20:13
43:10

**printout** 39:18

**prior** 13:22,23
30:16,20 66:16
79:21

**privacy** 8:17

**probably** 13:23
45:7 95:6

**problem** 21:6 59:6
102:7,10

**problems** 50:8
60:12,14 62:18,24
63:2,6 98:19

**procedure** 95:18

**process** 16:22
25:12,15 33:20,23
43:21 46:22 55:18
65:1,3 80:19
90:14,23 91:1
92:7 100:4

**processed** 93:3

**processes** 50:24

**product** 11:11,12
86:11,12

**products** 67:19

**profit** 19:7
28:18,20,21

**program** 65:22
68:1

**programmed** 67:3

**programming** 11:3

**Pronounce** 5:9

**proof** 56:7

**proper** 21:18
59:11,24 80:10

**properly** 62:25
63:14

**property** 61:8

**Protect** 58:7

**protective** 21:6,19
44:6,7

**protocol** 99:5
102:17

**provide** 21:17,24
24:13 26:21 27:7
29:5 30:5,6,8
32:16 33:3
37:19,22 38:20
41:18 43:18,19
50:1,4 53:24
57:18 58:19,23
59:11 63:4,10
67:10,12 70:19
71:19 72:2 77:17
78:9 80:3 88:4
94:8 101:14,17,24
102:5,8,11

**provided** 11:5,7
16:3 38:13
54:1,5,10
70:2,12,21 80:11
82:25 92:15
96:11,15 98:18
101:22 102:14
103:2

**provider** 17:15

40:10 41:17 56:9
61:3,19 64:24
65:13,16 87:7,12

**providers** 61:16
64:18

**provides** 55:13
59:22 77:15 78:1
87:13

**providing** 79:21
87:7

**provision** 43:24
58:2 64:16,21
65:6

**Provisions** 61:18

**public** 1:25 43:25
44:2,23 45:1,2
65:15 105:15
106:5,22

**pull** 88:22

**purchase** 32:14,17
33:6 83:17,19,20

**purchased** 35:19,21
36:15 59:9

**purchases** 83:8,9

**purchasing** 83:2

**purpose** 24:11,12
85:1 86:10,13
87:5

**purposes** 5:15
32:25 38:3 39:15
60:22,25 91:25

**pursuant** 44:6
83:24

**pursuit** 79:9

---

**Q**

**question** 6:24 8:18
19:20 20:5,14,22
21:3,7,10 28:12
37:8 44:10,11
46:3 48:25 60:13



61:9 62:1,21 70:5
71:4 88:16 89:7
91:23 92:1 102:4
103:15

**questions** 94:20

**quick** 93:17

**QuickBooks** 81:2,3

———————
R
———————

**raised** 60:8

**ramifications**
62:14,16

**range** 29:8,9 80:1

**rate** 14:24,25
29:3,6,20 30:9,15

**rates** 28:22

**rather** 7:3 29:8 67:9

**reaching** 15:16

**reading** 71:2,21

**really** 42:22

**reason** 63:9 79:6
90:7

**reasons** 20:18

**recall** 8:21 10:3
17:7 21:22 22:21
23:6 33:19
34:19,24,25 36:20
37:4 38:9,11,24
40:20 42:6,17,22
43:2,5,7,9 47:8
48:14,22 49:1
52:22,24 53:4,6
54:20 60:7 68:22
69:8,18 76:25
84:3 85:4,17,19
86:9 96:21,23
97:22,23 102:16

**recalled** 85:19

**receipt** 45:25 49:15
51:6 60:10 71:8
93:10

**receive** 26:25
27:1,12 31:3,8,12
34:12 43:20 46:4
52:20 53:13,15,22
54:6 56:2,14,21
57:13,21,22 60:19
62:4 63:19 64:25
65:17 67:24 68:5
91:4 92:6 98:2
100:20,21

**received** 30:17
31:10,14 34:7
40:16 49:3,17
53:8,25 54:3,17
55:23 56:10,13
62:7 64:8 66:22
70:14 71:10,11
72:6,9 74:7
80:4,9,15 88:12
93:5,7,15 94:12
101:6,10,15 102:9

**receives** 60:16

**receiving** 15:20
26:20 27:8,10
41:15 69:9 88:3
100:13,18

**receptionist** 33:4

**recess** 93:19 95:23

**recognize** 38:8
39:15

**recollect** 33:14
99:21

**recollection** 7:19,21
19:14 35:4
36:12,24 37:13
40:18 41:12 54:16
59:18 72:23
82:3,19 98:24

**reconciliation**
80:18

**record** 14:18 45:1,2
47:18 49:15
51:6,25 52:1

**receive** 88:14,25 93:18
106:11

**recorded** 17:23
67:22,23

**recording** 15:20

**records** 31:15
42:21,24 43:1
45:5 49:2,5,22,25
50:6 51:15
53:2,14 54:4
57:25 71:9 72:5
74:10 90:13
96:24,25 102:16

**refer** 66:6

**Reference** 46:9,11

**referenced** 23:1

**referencing** 48:14
49:1 54:8,22

**referring** 80:20
100:24 103:12

**refuses** 21:3

**regard** 25:3,12 26:8
27:4 46:13 65:6
96:11 97:7,9

**regarding** 25:9
83:18 96:2,15
98:3,6

**regardless** 50:14

**Regis** 32:4,13 33:5
34:14 35:15,18
36:25 37:3
46:14,19,24,25
47:4 49:12
50:11,20 51:8
52:4 54:18,21
55:1,12,20,23
56:19,20
57:7,22,24 59:9
65:19 76:20,24
90:5,7

**Regis's** 57:20

**registered** 20:8

27:3,6 61:21
73:3,4,11 78:4

**registering** 26:21

**registration** 21:23
26:22 37:17 61:16
78:10

**regular** 26:4 74:21

**related** 10:25 11:1
42:9 86:24 91:8
97:3

**relationship** 15:25
30:16,20 43:17
86:18

**relative** 106:12,14

**released** 100:1

**relevance** 19:23
20:15

**relevant** 88:4 94:19

**remember** 6:6,10
9:6 11:22 13:5,7,9
16:9 17:10 24:3
36:3 42:17 51:11
52:25 54:24 58:23
79:11 92:9 94:5
99:2 104:2

**rent** 32:3

**rep** 39:4

**repairs** 11:1,2

**repeat** 21:10 44:11
60:13 62:21 89:7
103:6

**rephrase** 7:1 28:11
37:8 46:2 60:3
61:9 62:1,16 71:4
88:16 92:1

**report** 106:7

**REPORTED** 1:24

**reporter** 6:21 7:8
106:1,5,22

**represent** 5:13



representative 98:17

request 21:18 47:5 70:19

requested 70:20 92:8 106:10

requesting 15:17

requests 61:3

require 26:14,17

requirement 61:19,20 64:20,23 79:17

requirements 25:16 79:19

requires 46:23 61:16 64:18

Research 25:24

Reserve 104:9

reserved 98:7

response 7:5 71:2

responsibilities 17:10 57:12

responsibility 16:19 57:17,20,22

responsible 23:15

result 58:3,8

retail 11:6,8,9,10

retailers 11:15

retain 91:17 92:3

retained 76:7 91:17

revenue 28:13 83:14

review 50:6 61:4 106:9

risks 63:7,13,16,17

Rogers 84:8

role 18:25 22:24 77:1,2 81:4

83:15,25

room 33:10 52:22 74:18 75:10,12

roommates 75:1

rule 20:13

rules 5:16

run 32:13 63:14

rundown 10:20

running 63:13

---

S

Safe 61:17 64:2,6,15,21 65:6

save 49:6 67:20 68:7 92:21

saved 68:1 92:22

saw 48:24

scan 49:9,13 55:9,11 65:22,23 66:2 68:6 73:23

scanned 67:25 91:9

scanner 65:24,25

scanning 68:1 102:24

school 9:3,4,11 10:8

schools 9:1

Science 9:25

seal 105:8

search 82:24

secretary 55:13

section 41:17

secure 66:8

seeing 48:22 86:3

seems 54:11

seen 81:20

sells 83:6

send 67:4,6,7 68:15

76:16,23

sender 63:23 64:12

sent 33:20 41:6 54:22 56:8,10 62:9 66:21 67:20 80:5 88:17 97:25

separately 84:9

Sergey 86:8

served 68:19,21,22 69:6 90:19

server 67:18

servers 81:8,22 82:17 83:1,6,14 84:10

service 25:1 26:7,20,21 32:15,17,18,19 33:6 34:9 36:16 37:25 40:9 41:17 43:18 50:5 56:9 59:11 61:3,19 62:10 63:4 64:17,18,24 65:12,13,16 66:3 67:17,23 69:11 72:2 73:11 77:15 83:2 87:7 98:4 99:23 101:18 102:12

services 10:25 11:1 16:3 24:13,14,15 25:25 26:1,11,19 27:5,8 29:1 30:5,6,8 32:14 33:17 34:17,18 35:19,21 36:14 37:19,22 38:13 41:23 42:13 50:1,2 51:3 59:10,22 60:19,21 63:11 68:8,10 73:8,10,13 76:10 77:18 78:1,6,8,9,10,11,1

3 79:21 80:1 81:24 82:25 83:3,4 95:17 96:11,15 97:3,7,10 98:6 99:13 101:22,25

seven 10:14 11:25 12:1,3,7,12

several 5:21 34:19 37:21 67:11 75:19 77:3,21,22,23 83:23 85:23,25 87:7,13 90:2

SFREEMAN@FR EEMANLAWFI RM.ORG 2:9

shakes 7:4

share 21:25

shareholders 20:10

ship 45:14 47:18

shipped 45:17

shop 55:17 85:3,11

short 35:5 95:22

shortly 54:20

shove 75:25

showed 57:8

sign 46:23 104:6

signatory 92:12

signature 38:20 41:7,8,15 46:23

signed 38:18 41:15 102:20

significant 102:6,10

signing 80:21

signs 41:13

similar 16:14 32:12 61:20 91:20 93:2,3

sir 41:4



sit 43:2

site 97:18

sites 89:3 97:17,21
98:22

situation 18:24
56:7,9 59:1

six 11:24 12:1

size 75:10,13

slip 4:3,4 45:9,13
47:11,13,14

smaller 75:12

social 1:8 20:6
30:1,2,8,17 31:1,4
37:7,10,14,15,20
38:19 39:18
41:9,21 43:3,7
52:19 53:24 68:4
70:3,14,15,16,21
71:14,25
77:1,2,4,7,9,16
87:6,12
88:17,21,23,25
89:4,9,12,20,23
97:13,21 98:22
102:13,14

socialize 86:21,22

Socially 13:2

software
11:6,8,11,12 68:7
80:24 81:1
99:15,19,20,24
100:4,8 101:4

sold 11:11

solution 11:6,8

Solutions 84:12

somebody 16:23
41:9 68:24 88:1

somehow 50:20

somewhere 34:20
56:4 67:21

sorry 8:18 15:19
29:6 31:21 32:22
59:15 70:14 93:2

sort 32:2 49:16 92:2

sources 100:14

SOUTH 1:21 2:8

SOUTHERN 1:1

space 32:13 33:7
47:16 75:6

Spankbank 42:25

speak 7:7

speaking 52:24
73:1 74:13

specific 24:15 29:15
42:8 43:15 47:3
52:14 59:3 61:25
78:15 86:3,13
87:9,10
91:11,12,13 92:24
98:22

specifically 38:25
44:22 91:24 104:3

specified 53:16

specify 28:11 31:5
46:2 53:10 54:19
64:24 71:4 86:22
88:16 96:4

specifying 58:10

speculate 57:5 74:9
85:13,14,15
96:8,9 102:1

speculation 57:2

spell 5:6 8:11

spelling 8:22

Spencer 2:7 3:3
5:13

spend 10:12 17:21
27:23

spending 17:19

spent 27:19 80:15

sporadic 28:2

stamp 1:16 88:12

standard
29:5,20,24
68:5,10 90:14
93:12 95:18
98:1,16

start 19:15,17
37:6,9,12

started 13:20 17:4
21:13 23:7
37:7,10,13 95:4

state 1:25 5:6 25:16
27:4 73:11 78:4,5
105:2,15
106:2,6,22

stated 52:23 65:7,8
69:21,23 89:19
102:2

statement 63:5

statements 28:16

states 1:1 7:18,25
8:3 12:16,25 25:2
37:18 38:15 44:21
45:12,23 48:19
71:24 73:20

stating 44:22 63:5
70:12

status 24:23

stenographer 5:3

stenographic
106:11

stenographically
106:7

stipulate 34:16 96:7

stipulated 34:14

stock 70:4

stop 34:1,3 49:11
50:14 55:12,17

stopped 54:18,21
55:8

store 31:25 36:18
59:14,17
66:1,2,15
73:24,25 74:11,14

stored
66:4,5,7,8,10,12,1
5 75:15 89:2 99:1

straight 10:8

strictly 101:12

student 12:11

stuff 70:24 96:3,5

subcontractor
11:14 14:11

subcontractors
14:13

subject 61:17 88:7

sued 90:16 93:25

suffer 60:20

sufficient 56:20
60:20 63:10 72:2
101:17,22,24
102:11

suing 63:25

Suite 2:4 31:23
35:3,18 36:10
45:15,18 54:14
76:15

summary 43:18

Sun 1:8 20:6 29:25
30:1,8,17 31:1,4
37:7,10,14,15,20
38:19 39:18
41:9,21 43:3,7
52:19 53:24 68:3
70:3,14,15,16,21
71:14,25
77:1,2,4,7,9,16
87:6,12
88:17,21,22,25



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

89:4,9,11,20,23
97:13,20 98:22
102:13,14

**support** 33:4

**supposed** 21:24
72:21

**sure** 6:12 10:1
13:23 22:4 26:16
35:5 47:4 48:24
53:15 57:21 61:13
62:8 65:25 68:23
69:22 72:7 75:16
77:25 81:20 83:12
85:8,11,12 89:22
95:5 100:24 101:1
103:12

**switched** 90:1,4

**sworn** 5:2 105:7

**system**
11:3,15,16,17
49:20,21 50:7,8
75:23 91:3
97:12,16,18

**systems** 9:18,19,20
10:22,24 11:13
99:15,19 101:4

———————
T
———————
**TACOMA** 2:8

**takedown** 26:23,24
31:3,5 46:1,5
52:20 53:8,23
58:21
60:5,10,16,22
61:11 62:3,19
64:5 69:16 71:20
76:16 93:5
101:7,10,15
102:6,9 103:2

**taking** 12:6 63:7

**talk** 29:23,24 31:9

**talked** 43:23 94:7

**talking** 99:8

**tasks** 88:21

**TELEPHONE**
2:5,9

**temporary** 67:12

**ten** 77:24

**term** 61:18 79:11
101:21

**terms** 33:14
43:14,16 58:16

**testified** 5:3 54:25

**testify** 6:16

**testimony** 39:4 41:5
52:18,21 53:4,6
94:6 97:16
103:4,7 106:9

**Texas** 82:9

**text** 34:6

**themselves** 47:1
51:5

**thereafter** 54:21

**therefore** 63:5
99:24

**there's** 6:24
20:13,15 25:12
26:12 29:16 44:4
50:13,16 52:16
56:14 58:1 62:11
71:6 89:3 90:11

**threatened** 90:16

**throughout** 12:7
29:14 94:6

**Thursday** 55:5

**title** 17:2,5,7

**titles** 18:13,15 28:7

**Titov** 100:18,20,25
103:5,8,18 104:1

**today** 6:17 16:11,13

**today's** 5:15

**tool** 61:10,11

**top** 66:10

**total** 90:9

**towards** 7:7

**TOWER** 1:21

**track** 50:5 88:20
91:4 101:6,9

**tracking** 4:4
47:10,13,14,15,19
,24 48:4,9 90:21

**trademark** 78:9,10

**transaction** 80:11

**transactions** 80:4

**transcript** 1:16
106:10

**transfers** 14:21

**treated** 62:8

**tree** 20:17

**true** 106:11

**try** 56:1 98:17,20

**trying** 53:3 56:11

**Tuesday** 55:4

**turn** 70:24

**two-and-a-half**
9:10

**two-year** 9:23

**type** 7:9 27:9 34:9
36:18 42:11 43:20
62:11 63:16 81:20
87:14

**types** 99:12

———————
U
———————
**uh-huh** 7:5

**um-huh** 7:4

**underneath** 46:9

**undersigned** 105:5

**understand** 6:25
14:2 33:5 34:8
41:5 42:7 56:20
71:23

**understanding**
13:17,25 17:13
57:11 60:9,24
61:1,2
63:9,15,18,21
64:4,7,13,15,17,2
3 65:6,8,11,12
78:1 87:5,11

**United** 1:1 7:18,25
8:3 12:16,25
37:18 38:15 44:20
45:12 73:20

**University** 9:14

**unlawfully** 61:13

**update** 90:12

**UPS** 31:25 36:18
47:13 59:14,16

**USPS** 47:10

**usually** 17:21 27:8
29:20 50:12,18
55:14,16,25 89:1

**utilize** 25:25 35:19
73:10 75:3 95:17
99:19

———————
V
———————
**vacation** 13:4

**Val** 24:9 38:18

**variables** 29:4

**varies** 29:3

**various** 10:19,21
63:23 64:13 99:12

**Vasilis** 21:21 22:1

**vendor** 15:21 73:14
83:18,20



877.291.3376
www.UCRinc.com

vendors 14:9
    15:13,19,20,23,25
    16:1,2,5,14,16,18
verbal 7:5
via 68:6 89:2 90:15
    97:25 98:20
vice-president
    85:7,10,16,18
VIDEOTAPED
    1:17
view 102:5
violations 93:25
virtual 32:18,19
    35:20 36:14
volunteer 79:10
vs 1:6

—————— W ——————
W2 18:24
waited 71:12,25
waive 58:13 104:6,7
walk 75:9
walked 68:24
WASHINGTON
    2:8
wasn't 86:13
wasting 79:15
ways 63:24
web 17:15 40:2
website 30:7 39:19
    64:19 65:14 76:15
    86:16 87:20,21
    88:8 92:5
websites 30:4,10
    40:5,8 76:13
    77:3,6
    87:8,13,14,16,18,
    22,23 88:3
    89:8,12 90:13

91:9 97:14
Webzilla 11:20,21
    12:4,14,21 13:12
    15:3,6,9,23,25
    16:2,4,11,25
    17:2,4,8,12,17,20
    18:3,9 27:24
    35:10,11,12,19,21
    36:6
    81:5,9,10,11,13,2
    5 83:25
Webzilla's 14:22
    17:13 83:4
week 14:15,16,19
    17:22 27:22 28:1
    50:17,18
weeks 13:24
we'll 98:20
WESTON 2:5
whereby 58:12
whether 51:5 53:7
    54:17,21 58:1
    60:9,11,14 61:22
    69:25 70:6 102:1
wide 29:8
witness 3:2 5:2 6:4
    19:25 21:10 44:11
    48:4,18 57:4
    70:10 98:11 105:8
wondering 97:17
work 16:11,22
    27:20 28:2,3
    29:10 35:6,8 36:8
    46:19,22 61:13
    77:9 82:15
workable 57:18
worked 11:5,7
    14:18 36:5
working 10:17,18
    12:3,20 13:13,20
    14:15,17 15:3,6
    28:1 49:19,21

91:3
works 27:15 99:11
worried 59:20
worry 59:19
write 16:5
written 43:12 57:24
wrong 71:16
    101:16,20,21

—————— X ——————
XPT 81:16,18

—————— Y ——————
yearly 33:18
yesterday 5:14 20:6
    39:3 52:18
    104:5,10
yesterday's 38:2
    87:25
yet 24:2 44:16 85:1
    100:1
yours 18:5
    103:18,22
yourself 19:17
    23:20 24:2 38:23
    62:13,17,23



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com