UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 1:15-cv-22134-UU

HYDENTRA HLP INT. LIMITED,
a foreign corporation d/b/a METART,

       Plaintiff,

vs.

CONSTANTIN LUCHIAN, an individual,
KONSTANTIN BOLOTIN, an individual,
SUN SOCIAL MEDIA, INC., a corporation,
individually and d/b/a PLAYVID.COM,
FEEDVID.COM, PLAYVIDS.COM, and
PEEKVIDS. COM; PLAYVID.COM;
FEEDVID.COM; PLAYVIDS. COM;
PEEKVIDS.COM and;
and John Does 1-20,

       Defendants.

_____/

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

    Pursuant Fed.R.Civ.P. 56, 17 U.S.C. §502, and 15 U.S.C. §1114, PLAINTIFF,

HYDENTRA HLP INT. LIMITED ("Plaintiff" or "Hydentra") moves this Court for Partial

Summary Judgment, finding that Defendants Sun Social Media, Inc. ("SSM") and Konstantin

Bolotin ("Bolotin") (collectively "Defendants") are liable for violating Hydentra's copyrights

and trademarks on the web sites Playvid.com, Playvids.com, Peekvids.com and Feedvid.com.

    1.    Plaintiff filed its Complaint on June 4, 2015. [D.E. #1]. Since then, Defendants

failed to conduct any discovery other than to serve a set of interrogatories and requests for

production outside of the Court's time limitations for doing so. Defendant filed a Motion for

Protective Order as to the interrogatories but produced documents it intends to use at trial. Notably, Defendants failed to take any depositions whatsoever, and accordingly its record evidence is rather limited.

2.     Plaintiff took the deposition of SSM's corporate representative on January 18 and 19, 2016, which relevant testimony is summarized in the accompanying Statement of Undisputed Material Fact (hereinafter referred to and cited as "*SOF*").

3.     The undisputed facts and record evidence establish that SSM and Bolotin violated Plaintiff's rights and therefore are liable for copyright infringement, contributory copyright infringement, vicarious copyright infringement, inducement of copyright infringement, the unauthorized publication of name and likeness in violation of Fla. Stat. 540.08, trademark infringement, contributory trademark infringement, and false designation of origin under the Lanham Act.

**WHEREFORE**, in accordance with this Motion and the following Memorandum of Law, Plaintiff respectfully requests this Court enter Summary Judgment in its favor and against SSM and Bolotin.

## MEMORANDUM OF LAW

### I.     INTRODUCTION

Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act, is intended to provide protection for truly innocent Internet Service Providers (ISPs) whose services may result in the unintended display of another's copyright without license or authority. The Act provides for certain and specific conditions to be met by the ISP precedent to any protections against copyright liability, each intended to assist a copyright holder in policing its copyrights. Unfortunately, the Act is often utilized as cover for Internet piracy. Persons and

entities cloak themselves with the term "Internet Service Provider" yet provide nothing more that a posting board ripe for undetected infringement of adult entertainment content. Such sites earn revenue through advertising dollars contingent upon the quality of posted adult content. Therefore, the better quality content posted on the sites, the more money earned by the ISP. Importantly, some sites, like the ones at issue herein, foster, contribute to, and induce piracy by presenting an environment of ease in posting infringing activity without risk of its posters getting caught. Given the true and sole purpose of these sites, it is of the upmost importance that when these sites do not adhere to the requirements of the DMCA, they be held accountable.

Three of the four web sites at issue herein (peekvids, feedvid, and playvids) were not registered as ISPs with the United States Copyright Office. Further, after the receipt of 70 DMCA compliant take-down notices for infringements on playvid.com, Defendants admittedly failed to disable the videos until this lawsuit was filed 5 months later. *SOF* ¶¶11, 41. Additionally, Defendants operate a system that provides member access under strict anonymity and prevents Defendants from being able to communicate with their members about infringement issues. *SOF* ¶¶26, 27, 29.

## II.    ARGUMENT

The "plain language of Rule 56(c)[1] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Beard v. Banks*, 548 U.S. 521, 529, 126 S. Ct. 2572 (2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986)). A party seeking summary judgment always bears the initial responsibility of informing the court of

---

[1] Providing, "The court shall grant summary judgment if the movant shows that there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

the basis for his motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Summary judgment will be granted unless there exists *a genuine* dispute about a fact from which a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In considering a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party, but only where there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769 (2007).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some "metaphysical doubt" as to the material facts. *Id.* (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986)). In other words, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247- 48, 106 S. Ct. 2505 (1986)). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott*, 550 U.S. at 380.

### A.    Direct Copyright Infringement

To establish a claim of copyright infringement, Hydentra must first establish its ownership of the copyrights allegedly infringed. *See Univ. Furniture Int'l, Inc. v. Collezione Europa USA*, 618 F.3d 417, 428 (4th Cir. 2010). The Copyright Act provides that "[i]n any

4

judicial proceedings the certificate of a registration made before or within five years after the first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Included in the facts entitled to the presumption of validity is ownership. *Univ. Furniture Int'l, Inc.,* 618 F.3d at 428. Hydentra produced the certificates of registration for each movie alleged herein to be infringed on SSM's sites and has therefore met the initial burden. The burden then shifts to Defendants to "prove that the claimed copyrights are invalid." *Id.* Defendants will not and cannot meet this burden.

Second, Hydentra must next establish the copyright was copied. Copying is established when any of the exclusive rights listed in 17 U.S.C. §106 are violated. 17 U.S.C. §501(a) ("Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright. . . ."). Section 17 U.S.C. §106(1) grants the copyright holder the exclusive right to reproduce copies of its works.

Hydentra documented each videos displayed on the SSM web sites as alleged in the Complaint. Hydentra documented the following number of movies: 37 on playvid.com, 28 on playvids.com, 5 on peekvids.com, and 2 on feedvid.com. *SOF ¶¶8,15,17,19.* Hydentra produced, copyrighted and currently owns the copyrights to each of these movies. *SOF ¶¶9,16,18,20.* For each movie documented as displayed on the SSM web sites, Defendants reproduced Hydentra's works in violation of Hydentra's exclusive rights.

There is no material issue of fact regarding the ownership or copying of the copyrights infringed on the SSM web sites. Accordingly, Hydentra established both the ownership of a valid copyright regarding each movie *and* a violation of §106, and has therefore conclusively established direct infringement for each of its movies displayed on the SSM web sites.

### B.   Contributory Copyright Infringement

Hydentra further establishes secondary infringement, including contributory infringement and vicarious infringement. As the Supreme Court explained, "When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious liability." *MGM Studios Inc. v. Grokster*, 545 U.S. 913, 929-30 (2005); see also *In re Aimster Copyright Litigation,* 334 F.3d 634, 645 (7th Cir. 2003). "One infringes contributorily by inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930.

A contributory infringer is one who, (1) "with knowledge of the infringing activity," (2) "induces, causes or materially contributes to the infringing conduct of another." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004). The knowledge requirement is met by a showing of actual or constructive knowledge or by evidence that a defendant took deliberate actions to willfully blind itself to specific infringing activity. *See Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, No. 1:10cv651, 2010 U.S. Dist. LEXIS 119122, 2010 WL 4645791, at 3 (E.D. Va. Nov. 8, 2010); *Seoul Broad. Sys. Int'l, Inc. v. Young Min Ro*, No. 1:09cv433, 2011 U.S. Dist. LEXIS 82377, 2011 WL 3207024, at *9 (E.D. Va. July 27, 2011). DMCA-compliant notices are evidence of knowledge. *See Capitol Records, LLC*, 2015 U.S. Dist. LEXIS 38007, 2015 WL 1402049, at 43; *Giganews, Inc.*, 2014 U.S. Dist. LEXIS 183590, 2014 WL 8628031, at 7; *see also Corbis Corp.*, 351 F. Supp. 2d at 1107 (stating that notices are "the most powerful evidence of a service provider's knowledge").

Willful blindness is the equivalent of knowledge in copyright law. See *Aimster*, 334 F.3d at 650. "A person is 'willfully blind' or engages in 'conscious avoidance' amounting to knowledge where the person was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Viacom Int'l, Inc. v. Youtube, Inc.*, 676 F.3d 19, 35 (2nd Cir. 2012) (internal quotation marks omitted). There must be evidence that the defendant took "deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 131 S. Ct. 2060, 2070, 179 L. Ed. 2d 1167 (2011).

SSM knew, had reason to know, or was willfully blind to its users' infringement and materially contributed to that infringement. SSM knew of the specific infringements of Hydentra's works on playvid.com as Hydentra delivered to the registered DMCA Agent notices of each specific instance of infringement. *SOF ¶11.* Even with this knowledge, SSM failed to disable the movies, permitting their continued display until *after* this lawsuit was served. *SOF ¶41.* SSM had actual knowledge of the 37 movies displaying on playvid.com.

Further, SSM had reason to know, or was willfully blind to its users' infringement on playvid.com prior to the take-down notices and on playvids.com, peekids.com, and feedvid.com. SSM admittedly avoids confirming the high probability of infringement on its sites. *SOF ¶26-27.* SSM operates its websites in a fashion where the users are anonymous to even SSM, the users are not required to provide real and accurate contact information, and SSM fails to ensure communication capability with its members. *SOF ¶26-27,29.* Most troubling is that SSM intentionally refrains from email verification because of a fear of losing members and viewers to its sites. *SOF ¶27.* SSM creates the perfect scenario for infringers to post copyrighted materials

7

without license or authority and get away with it. Such is knowledge or willful blindness to the activities *and* is material contribution to the infringements.

### C. Vicarious Copyright Infringement

A variant on respondeat superior, vicarious liability holds a defendant accountable for third-party infringement if he "(1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials." *Nelson—Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002). Unlike contributory infringement, vicarious liability is not based on the knowledge or intent of the defendant, but rather is entirely dependent on the existence of a financial benefit and the defendant's relationship to the infringement. *See Arista Records, LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009); *see also EMI Apr. Music, Inc. v. White*, 618 F. Supp. 2d 497, 507 (E.D. Va. 2009).

The first element requires that SSM "declin[ed] a right to stop or limit" the direct infringement. *Grokster*, 545 U.S. at 930. Retaining the right to terminate is evidence of the right and ability to supervise. See *Viacom Int'l, Inc.*, 676 F.3d at 37 (Under the common law vicarious liability standard, the ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise).

It is undisputed that SSM had the ability to block infringing members from posting *and* disable infringing videos. *SOF ¶13,28*. SSM reviews each and every video before it is displayed to the public on the web sites, at which point SSM has the ability to stop it from being displayed publically. *SOF ¶28*. SSM also demonstrates the ability to block videos once they are displayed. *SOF ¶41*.

The second element requires a "causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (emphasis omitted). Financial benefit can be shown by evidence that "users are attracted to a defendant's product because it enables infringement, and that use of the product for infringement financially benefits the defendant." *Arista Records, LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011). To show users' attraction, a plaintiff must only establish that "the availability of infringing material acts as a 'draw' for customers." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir 2001). "[T]he law is clear that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant, draw – rather, it only need be 'a' draw." *Usenet.com, Inc.*, 633 F. Supp. 2d at 157. While the draw need not be significant, the requisite causal connection must be between "the infringing activities at issue in th[e] case and a direct financial benefit" to the defendant. *Giganews, Inc.*, 2014 U.S. Dist. LEXIS 183590, 2014 WL 8628031, at 4.

The entirety of SSM's revenue comes from advertising on its web sites – SSM is compensated by advertisers based upon the number of Internet users directed to the advertisers' sites from the SSM web sites. *SOF ¶25*. Therefore, the attractiveness of the content on the web sites will directly influence the number of users that respond to the advertisements. Each of Hydentra's videos posted on SSM's web sites contain "view count" data reporting the number of times that the video was viewed on SSM's web site. *SOF ¶25*. Because advertising monies are based upon the draw of videos, the sites themselves report the draw of each infringing video. *SOF ¶25*. Therefore, the existence of infringing work on the web sites benefits the defendants financially.

### D.     DMCA Safe-Harbor Provisions

Defendants will claim protection from the DMCA Safe-Harbor provisions for any copyright liability. Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act, was Congress's answer to the potentially enormous liability that ISPs faced for the materials being transmitted over their networks. *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 27 (2d Cir. 2013). To that end, Congress created four safe harbors that protect ISPs from liability for copyright infringement when their involvement is limited to certain activities – transitory digital networking communications, system caching, information residing on systems or networks at the direction of users, and information location tools.[2] See 17 U.S.C. §§ 512(a) – (d).

Applicable to the instant matter is protection from liability for information residing on systems or networks at the direction of users. 17 U.S.C. §512(c). In order to qualify for such protection, the service provider, upon notification of claimed infringement, must respond expeditiously to remove or disable access to the claimed material. 17 U.S.C. § 512(c)(1)(C).

Pursuant to 17 USCS §512, the notices are required to contain the following information:

(i)  A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(ii)  Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii)  Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

---

[2]  Generally speaking, an operator of a web site registered with the U.S. Copyright Office may shield themselves from liability for copyright infringement if certain conditions are met: they do not directly benefit financially from infringing work, they implement reasonable repeat infringer policies, and they take down infringing material upon receipt of take-down notices. Defendants here failed to comply with these stringent obligations, and therefore cannot enjoy the immunity available to them.

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

Hydentra mailed and delivered to SSM's designated agent proper notifications of claimed infringement, each of which contained the requisite information. *SOF ¶11*. SSM nevertheless failed to remove or disable Hydentra's copyrighted works from Playvid.com. *SOF ¶21*. SSM's suggestion that the notifications were never received must fail given the irrefutable proof of delivery to the agent, thus placing SSM on notice of the infringements. The law on mailing is well settled: when an item is properly mailed, a rebuttable presumption exists that the addressee received the item.

> Where an item is properly mailed, there exists a rebuttable presumption that the item is received by the addressee. *In re Farris*, 365 F. App'x 198, 199 (11th Cir. 2010). This "'presumption of receipt' arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail." *Id.* at 199-200 (quoting *Konst v. Fla. E. Coast Ry. Co.*, 71 F.3d 850, 851 (11th Cir. 1996)); *see also Rivera v. AT & T Corp.*, 420 F. Supp. 2d 1312, 1320 (S.D. Fla. 2006) (citing *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1239 (11th Cir. 2002) ("[T]he common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee.")). ***Mere denial is insufficient to rebut the presumption.*** *Farris*, 365 F. App'x at 200 (citation omitted). "The presumption so arising is not a conclusive presumption of law, but a mere inference of fact[.]" *Konst*, 71 F.3d at 852 n.1.

*Anderson v. Branch Banking & Trust Co.*, 2015 U.S. Dist. LEXIS 98235, *26-27 (S.D. Fla. 2015).

To benefit from any one of the safe harbors, Congress imposed certain threshold requirements on all ISPs, including a service provider must demonstrate that it has "adopted and reasonably implemented, and informed subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. §512(i)(1)(A). The requirement that service providers implement a repeat-infringer policy is a "fundamental safeguard for copyright owners" and "essential to maintain[ing] the strong incentives for service providers to prevent their services from becoming safe havens or conduits for known repeat copyright infringers." *Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F. Supp. 2d 627, 637 (S.D.N.Y. 2011). A repeat-infringer policy *must have a working notification system* and a procedure for dealing with DMCA-compliant notifications. *CCBill LLC*, 488 F.3d at 1109.

DMCA safe harbor protections are not available for the web sites Feedvid.com, Peeksvids.com, and Playvids.com. These web sites were not registered with the U.S. Copyright Office as ISPs. *SOF ¶16,18,20*. Defendants claim such registration requirement is irrelevant as SSM was registered. This argument fails. In order to qualify for DMCA Safe-Harbor provisions, the service provider must provide the Copyright Office with a designated agent for that service. 17 U.S.C. § 512(c)(2). The web site itself must have been registered in order to qualify for DMCA Safe-Harbor provisions. The only infringements that may qualify for safe-harbor protections are on Playvid.com, which designated Luchian to receive take-down notices. *SOF ¶11,30.*

Such protections are also not available for the infringements on playvid.com. Hydentra delivered DMCA compliant take-down notices to the registered DMCA Agent, Contantin

Luchian, for each of the 37 movies over 70 URLs. *SOF ¶¶8,9,11*. SSM failed to disable or block these videos from public display for 5 months, when the Defendants were served with this lawsuit. *SOF ¶41*.

In addition, should it be deemed that SSM satisfied the initial conditions precedent to benefit from the DMCA protections, SSM failed to implement a reasonable repeat infringer policy. First, SSM does not have a working notification system. *SOF ¶¶26,27,31*. The undisputed record evidence is that Hydentra delivered DMCA compliant take-down notices to SSM's designated agent. *SOF ¶11*. However, SSM failed to process these notices and failed to disable the infringing videos. *SOF ¶21,41*. The simple explanation is that the notification system SSM implemented did not work. Second, SSM admittedly did not have systems in place to permit it to communicate with its members. *SOF ¶¶26,27*. Not only did SSM fail to ensure that emails submitted by members were valid, but it admittedly suffered from technical issues and failed to even try to communicate with its members. *SOF ¶29*. It is a practical impossibility to implement a reasonable repeat infringer policy if there is no communication with members. SSM's corporate representative readily admitted to these communication deficiencies in his deposition. *SOF ¶26,27,29,31*. Having acknowledged such material problems, SSM claims to be in the process of developing new systems to resolve these issues, which notable have not been completed. [3] *SOF ¶29, fn.3*. Thus, SSM's failure in communicating continues.

It is important to acknowledge the motivation behind SSM's wholly insufficient repeat infringer policy. SSM permits its users to register a single fake email to activate all four of its websites; however, upon receipt of a take-down notice and rather than notify the user, SSM takes no action whatsoever until the third take-down notice is received for one of the four websites.

---

[3] Thus, it is evident that the necessary systems *can* in fact be designed and in fact do exist in the marketplace, only SSM consciously elected not to implement them until now.

*SOF ¶31.* At that time, SSM only deactivates the user's access to the single website to which the take-down notice was directed. *SOF ¶31.* SSM condones the user's activities on the remaining websites. *SOF ¶31.* What this means is that each user can register on four websites with a single fake email address and continue posting infringing content up to three times before they will be taken down. SSM financially benefits from this scheme given that each user is permitted to post infringing content up to 12 times (3 notices x 4 websites = 12) before the associated email and login credentials are deactivated. Only then that user can simply re-register on all four sites under another fake email address, thus perpetuating the problem indefinitely. This is the principal drawback with SSM's failure to verify email addresses and the fundamental problem with its repeat infringer policy. Another problem posed by SSM's policies is that on the one hand it treated its four websites as a single one in that it permitted users to register one set of credentials (username / password) to activate all four sites; yet on the other hand did not deactivate the user from all four sites upon receipt of a take-down notice, and instead limited deactivation to a single website. SSM's own practice is contradictory. For all practical purposes, this does not constitute a repeat infringer policy.

## E. Trademark Infringement

Accompanying each of Hydentra's videos unlawfully displayed on SSM's websites are Hydentra's trademarks, either "MetArt" or "SexArt," in the meta tags of the web page containing the video. *SOF ¶8,12.* A meta tag is an HTML (hypertext markup language) code embedded on a Web page that is used by the website owner to identify the site content.[4] Meta tags are powerful tools because they have a direct effect on the frequency with which many search engines will

---

[4] For an explanation of meta tags, please refer to the Declaration of Jason Tucker, attached as Exhibit 2, ¶10 to the Statement of Facts.

find a website. Meta tags and/or meta descriptions are used by Internet search engines as an indexing tool to determine which web sites correspond to search terms provided by a user.

Meta tags do not affect the appearance of a website and are not visible when you look at a Web page, but they provide information regarding the content of the site. Some websites use meta tags in a deceptive manner to lure Web surfers. Instead of using terms that properly describe the site, some programmers substitute the names of competing companies.[5]

By using Plaintiff's trademarks in Defendants' meta tags and/or meta descriptions, Defendants use Plaintiff's trademarks in commerce and in connection with their promotions, sales, and advertising.

The "Lanham Act bars [a defendant] from including in its metatags any term confusingly similar with [a plaintiff's] mark." *Brookfield Communs, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1065 (9th Cir. 1999). "Initial interest confusion can occur where a defendant includes a plaintiff's mark in 'metatags' found on the defendant's website, after which some of those consumers will select defendant's website from the list." *Storus Corp.*, 2008 U.S. Dist. LEXIS 11698 at 4 (concluding that, "in the internet context, the wrongful act is the defendant's use of the plaintiff's mark to 'divert' consumers to a website that 'consumers know' is not [the plaintiff's] website.").

SSM violated Hydentra's trademarks by including Hydentra's trademarks in the meta tags of SSM's web sites. SSM will argue that it was the member/viewer that posted the respective videos on the sites that entered the trademark into the video description. However, intent is not an element to trademark infringement. There is no DMCA defense to trademark

---

[5] For example, a rival shoe manufacturer may bury the meta tag "Nike" in its Web page to lure Web surfers searching for Nike products. In the case of the website selling handmade watches, the meta tag might include "Rolex, Swatch, Bulova, Cartier."

infringement. For each of the 114 URLs containing Hydentra's movies, the meta tags for the URL included Hydentra's trademarks. *SOF ¶12,15,17,19.*

### F. Florida Statute 540.08, Unauthorized Publication of Name and Likeness

Plaintiff alleges in its Complaint that its photographs and videos depict models who performed for Plaintiff under a contract, which contained a release of the models' rights and interest for their appearance in the video and an assignment in ownership to Plaintiff. [D.E. 1, ¶156–157]. Defendants published, printed and displayed those works publically on its websites, which commercially exploited Plaintiff's images without its consent. [D.E. 1, ¶158–159]. As a result, Defendants gained a pecuniary benefit from such use, which was not part of a news report, nor did it have a legitimate public interest, but rather was used by Defendants for their own commercial benefit. [D.E. 1, ¶160–161]. Plaintiff never consented to Defendants' use of its content. There is no record evidence to suggest Defendants either did not commit the acts of which Plaintiff complains or to indicate that Plaintiff consented to the use. On the other hand, Plaintiff established that SSM earns revenue through its advertisers where the number of page views has a direct correlation to the revenues generated. *SOF ¶25.*

### G. Defendants' Cannot Satisfy Their Burden of Proof As To Their Affirmative Defenses

Defendants bear the burden of proof on their affirmative defenses. *Office of Thrift Supervision v. Paul*, 985 F. Supp. 1465, 1470 (S.D. Fla. 1997), citing *Thornstein v. M/V Drangur*, 891 F. 2d 1547, 1550-51 (11th Cir. 1990). In support of their Affirmative Defenses, SSM and Bolotin provide only vague and non-responsive deposition testimony (most of which includes "I don't know" answers) that in turn relies upon non-descript interrogatory answers and irrelevant documents produced, none of which substantiate their Affirmative Defenses. Based on

16

the record evidence available, Defendants cannot meet their burden and thus Summary Judgment is appropriate.

**AFFIRMATIVE DEFENSE #1, #9 and #10: Copyright Misuse, Failure to Comply with DMCA, and DMCA Safe Harbor.** Defendant relies upon the number of lawsuits Plaintiff has filed and labels it a "copyright troll". Prior lawsuits are wholly irrelevant to the current lawsuit. *Intellectual Ventures I LLC v. Symantec Corporation, C.A.* 10-1067-LPS, Memorandum Order dated January 6, 2015 *(A copy of the Order is attached as Exhibit A to this Motion).*

Defendants also refer to its 10th Affirmative Defense to suggest that Plaintiff somehow did not comply with the DMCA because SSM did not receive the take-down notices. On January 20, 2015, Plaintiff delivered via U.S. Mail to Defendants' registered DMCA agent (Constantin Luchian) take-down notices for each of the infringing URL's listed in Plaintiff's Complaint. *SOF ¶11.* As demonstrated above, the law is clear that when an item is properly mailed, a rebuttable presumption exists that the addressee received the item. Defendants failed to rebut that presumption during their depositions when the issue was specifically raised, and instead only denied receipt. *SOF ¶37.* Such is legally insufficient.

Defendants suggest that delivery of the take-down notices was done by U.S. Mail rather than by email. The DMCA does not require one method over the other, nor does it require multiple notices to be provided. 17 USC 512(c). The fact remains that whether delivery was effectuated by mail or email, Defendants permitted the infringing content to remain on its websites for an entire *5 months* after being noticed. *SOF ¶41.*

Finally, Defendants suggest they are subject to the protections granted by the DMCA safe-harbor provisions. Plaintiff refers to Section II(D) above concerning the DMCA Safe Harbor. Simply stated, Defendants received the take-down notices and failed to act on them.

Defendants have no reasonable policy in place to prevent copyright infringement. There is no other record evidence in favor of Defendants' position.

**AFFIRMATIVE DEFENSE #2: Unclean Hands.** Defendants actually suggest that Plaintiff posted its own videos on SSM's sites. SSM readily admits that it has absolutely no evidence to substantiate this allegation, other than the fact Plaintiff filed its lawsuit. *SOF ¶38*. To the contrary, absolutely none of Defendant's discovery production even remotely suggests that Plaintiff participated in damaging its own business.

**AFFIRMATIVE DEFENSE #3: Fair Use.** The first fair use factor is the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes. 17 U.S.C.S. §107(1). The court's initial inquiry under the first factor asks whether defendants' use is transformative, i.e., whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message. A non-transformative use, on the other hand, is one that serves the same "overall function" as the original work. *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1261 (11th Cir. 2014).

The second fair use factor, the nature of the copyrighted work, calls for recognition that some works are closer to the core of intended copyright protection than others. 17 U.S.C.S. §107(2). The inquiry under the second factor generally focuses on two criteria. Works that are highly creative are closer to the core of copyright – that is, such works contain the most originality and inventiveness are afforded maximum protection. *Id*. at 1268. The third fair use factor is the amount and substantiality of the portion used in relation to the copyrighted work as a whole. 17 U.S.C.S. § 107(3). *Id*. at 1271. The fourth fair use factor is the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C.S. § 107(4). The court must

consider two inquiries: (1) the extent of the market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market. *Id.* at 1275.

There is absolutely no record evidence as to the issue of fair use, and therefore all of the factors weight in favor of Plaintiff. First, Defendants' use is not for educational purposes, but rather to generate traffic on its websites. Second, Plaintiff's work is highly creative, as it develops the themes and stages for the videos, and produces, records and edits its content. Third, entire videos were posted on Defendants' websites rather than short clips. Fourth, consumers are given free access to Plaintiff's videos rather than paying Plaintiff for its works.

**AFFIRMATIVE DEFENSE #4: Lack of Scienter.** SSM relies only upon its answers to interrogatories and documents produced to support this Affirmative Defense. *SOF ¶40.* SSM's Interrogatory answers provide that the infringement was unintentional and without knowledge because SSM's users (rather than SSM) uploaded the infringing materials. SSM also argues that it has no knowledge of any infringement until after take-down notices are received, and that it relies on the representations and warranties of the users not to infringe. Contrary to its position, Plaintiff delivered take-down notices to SSM on January 20, 2015. *SOF ¶11.* Yet, SSM admittedly failed to remove the infringing content until after they were served with this lawsuit, 5 months later. *SOF ¶41.* Again, Defendants fail to establish their burden as to this Defense.

**AFFIRMATIVE DEFENSE #5: Plaintiff's Damages Not The Proximate Result of Defendant's Actions.** Again, SSM relies entirely upon its answers to written discovery in support of this defense and suggests there is no evidence that users who upload or view Plaintiff's videos would have purchased such content from Plaintiff. *SOF ¶40.* Other than Defendants own self serving statements, there is absolutely no record evidence that even

addresses this defense. Again, Defendants have taken no depositions nor designated any experts on this or any other issue or defense. The rational conclusion must also not be overlooked – if a user cannot watch infringing videos for free, they are more likely to purchase the content from the legitimate content producer.

**AFFIRMATIVE DEFENSE #8: Failure to Mitigate Damages.** Again, SSM relies exclusively on its answers to written discovery. *SOF ¶40.* Yet again, Defendant cites to absolutely no record evidence, other than its own conclusory and unsupported allegations, that Plaintiff delayed in notifying SSM of the infringing content in order to inflate its own damages. Defendant has not taken a single deposition to establish this or any other defense. Contrary to Defendants' position, the evidence demonstrates Plaintiff delivered take-down notices on January 20, 2015, in response to which SSM took no action for 5 months. *SOF ¶11,41.*

**AFFIRMATIVE DEFENSE #13: Lack of Volition.** As its only support for this affirmative defense, SSM relies upon its interrogatory responses with respect to Affirmative Defenses 4 and 5. Plaintiff therefore incorporates its discussion on Affirmative Defenses 4 and 5 above. Defendants failed to meet their burden as there is no record evidence to support these defenses.

### III.   CONCLUSION

As set forth herein, Plaintiff has conclusively established its burden of proof as to each of the claims raised in its Complaint. Defendants' deposition testimony and admissions, together with the irrefutable record evidence submitted in support of this Motion demonstrates that there are no issues of disputed material facts, and therefore Plaintiff is entitled to judgment as a matter of law. Defendants failed to take any depositions or seek timely discovery of any facts necessary to establish their Affirmative Defenses. As a result, they cannot produce any admissible evidence that will refute Plaintiff's position set forth herein.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of February, 2016 we served the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:  Brady J. Cobb, Esq.

Respectfully submitted,

By:     */s/Aaron Behar, Esq.*
        Aaron Behar, Esq.
        Florida Bar No.: 166286
        E-mail: AB@BeharBehar.com
        */s/Jaclyn Behar, Esq.*
        Jaclyn Behar, Esq.
        Florida Bar No.: 63833
        E-mail: JB@BeharBehar.com
        BeharBehar
        1840 North Commerce Parkway
        Suite 1
        Weston, Florida 33326
        Telephone:  (954) 688-7642
        Facsimile: (954) 332-9260
        E-mail: ab@beharbehar.com
        *Counsel for Plaintiff*


        */s/Spencer D. Freeman, Esq.*
        Spencer D. Freeman, Esq.
        Freeman Law Firm, Inc.
        1107 ½ Tacoma Avenue South
        Tacoma, WA 98402
        Telephone:  (253) 383-4500
        Facsimile:  (253) 383-4501
        E-mail: sfreeman@freemanlawfirm.org
        *Counsel forPlaintiff (Pro Hac Vice)*

# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 10-1067-LPS |
| | : | |
| SYMANTEC CORPORATION, | : | |
| | : | |
| Defendant. | : | |

---

### MEMORANDUM ORDER

At Wilmington this 6th day of January, 2015, having reviewed the parties' proposed pretrial order including briefing on various motions *in limine* ("MIL") (D.I. 608 Exs. 11, 12),

**IT IS HEREBY ORDERED** that:

1.      Plaintiff Intellectual Ventures I LLC's ("IV") MIL 1, to preclude argument and evidence disparaging IV's business model and practices, is **GRANTED** to the extent that Defendant Symantec Corporation ("Symantec") may not disparage (e.g., refer to IV as a "patent troll" or reference purported "woodshedding"), as such disparagement is irrelevant, but the motion is **DENIED** to the extent that Symantec is permitted to present argument and evidence that IV does not practice the patents-in-suit, which is relevant to damages – and with respect to damages, the concerns of Federal Rule of Evidence 403 ("Rule 403") do not substantially outweigh the probative value of this evidence. Additionally, Symantec may seek leave to modify this Order depending on what argument and evidence IV makes regarding itself at trial.

2.      IV's MIL 2, to preclude references to reexamination proceedings of the '050 patent-in-suit, is **GRANTED**. The '050 patent is presumed valid as a matter of law. Any probative value of the reexamination is substantially outweighed by the risks of unfair prejudice

to IV, confusing the jury, and wasting time, and therefore such evidence is excluded under Rule 403. Symantec is not precluded, solely by virtue of this Order, from seeking to introduce portions of the reexamination history or using same for impeachment, provided, however, that such evidence or use must be done in such a way as not to reference any reexamination.

      3.      IV's MIL 3, to preclude argument and evidence regarding Symantec's patents and patent applications (other than the benchmark patents), is **GRANTED**. Symantec may introduce evidence and make argument as to the value added to its products that is not in any way attributable to IV's patents, but the incremental probative value of the fact that some of the value added by Symantec relates to components that Symantec has patented (or is attempting to patent) is substantially outweighed by the risks of unfair prejudice, confusion, and waste of time under Rule 403.

      4.      IV's MIL 4, to preclude argument and evidence disparaging or criticizing the PTO, is **GRANTED** to the extent that Symantec may not do any of the 8 things identified in IV's reply (including making generalized indictments of the PTO), and **DENIED** to the extent that Symantec may (as it requests) argue and attempt to prove that the PTO is not perfect, sometimes makes mistakes, did not review certain prior art, did not consider certain invalidity arguments, and should not have issued some or all of the patents-in-suit.

      5.      Symantec's MIL 2, to preclude reliance on evidence of Symantec's alleged pre-suit knowledge of the patents-in-suit, is **GRANTED**. No claims of willful infringement, indirect infringement, or copying will be the subject of the forthcoming trial. Evidence of whether Symantec had actual knowledge of the patents-in-suit is at most minimally probative of damages, as the pertinent analysis is a hypothetical negotiation in which the existence, validity, and infringement of the patents-in-suit is assumed to be known to both parties, and any probative

value is substantially outweighed by the risks of unfair prejudice, confusion, and waste of time. The Court's conclusions are bolstered by the facts that: the evidence to which IV points shows Symantec did not meaningfully respond to the pre-suit e-mail suggesting Symantec license one or more of the patents-in-suit; and allowing this evidence nonetheless would, in fairness, require allowing evidence of the reexamination, so as to permit Symantec to put in full context for the jury the reasons it did not respond differently to the pre-suit e-mail.

The parties shall be prepared to argue the remaining MILs at the pretrial conference on Friday, January 9.

**IT IS FURTHER ORDERED,** with respect to additional matters raised in the proposed pretrial order (*see* D.I. 608 at 17-19 & Exs. 13, 14):

1.     IV's position with respect to how the Court will proceed to resolve whether the asserted claims are patent eligible under § 101 is **ADOPTED.** That is, the Court will resolve any § 101 issues in connection with post-trial motions and briefing, including hearing any testimony that must be presented only *after* the conclusion of the forthcoming trial. For avoidance of any doubt, this means that testimony or evidence that relates *solely* to § 101 *will not* be presented during the forthcoming trial (either in the presence of the jury or outside of the jury's presence) but will be presented, if at all, in connection with post-trial motions.

2.     The Trend Micro Defendants, who are defendants in a related case, have requested permission to attend the pretrial conference in this matter on January 9, and they are welcome to attend. (*See* C.A. No. 12-1581-LPS D.I. 164) However, given the Court's decision above, it is not anticipated that any significant portion of the pretrial conference will be devoted to addressing how the Court will proceed to handle § 101 issues.

3.     IV's request that the Court further order Symantec to limit the number of prior art

references and obviousness combinations it will use at trial, and to limit the number of witnesses Symantec may call to testify at trial, and Symantec's request that the Court order IV to limit the number of accused products, are **DENIED**.  The parties will be permitted to make their own decisions as to how to make the best and most effective use of the limited, albeit sufficient, amount of time they will be given for their presentations at trial, which they are reminded will be no more than 20-24 hours per side.

The parties shall be prepared to discuss any other matters presented in the pretrial order at the forthcoming pretrial conference.

UNITED STATES DISTRICT COURT