**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

| | |
|---|---|
| HYDENTRA HLP INT. LIMITED, a foreign corporation d/b/a METART,<br><br>   Plaintiff,<br><br>v.<br><br>CONSTANTIN LUCHIAN, an individual, KONSTANTIN BOLOTIN, an individual, SUN SOCIAL MEDIA, INC., a corporation, individually and d/b/a PLAYVID.COM, FEEDVID.COM, PLAYVIDS.COM and PEEKVIDS.COM; PLAYVID.COM; FEEDVID.COM; PLAYVIDS.COM; PEEKVIDS.COM; and John Does 1-20,<br><br>   Defendants. | **Case No.**<br>**1:15-cv-22134-UU** |

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS AGAINST SUN SOCIAL MEDIA, INC. FOR FAILURE TO COMPLAY WITH RULE 30(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE</u>**

In its continuing attempt to bully Defendants into submission, particularly now that Plaintiff has shown its hand in its Motion for Summary Judgment whereby it has no cognizable case against Defendants, Plaintiff has filed four different procedural motions within as many days, in two of which asking this court for the nuclear option that would effectively give it the win that Plaintiff could never acquire otherwise.  In the instant motion, Plaintiff has filed for sanctions almost entirely claiming that Defendant Sun Social Media, Inc.'s ("SSM") representative at its Fed. R. Civ. P. 30(b)(6) deposition, Konstantin Bolotin, was allegedly "unprepared," despite providing nearly 300 deposition pages of information.   To the extent that

1

Mr. Bolotin did not answer a limited number of questions, it was because the Plaintiff asked questions on topics that were either (1) not properly noticed or had had nothing to do with the topics noticed, (2) were specifically proscribed by the Magistrate Judge Otazo-Reyes previously, (3) relate to matters to which SSM actually has no knowledge or (4) do not constitute a failure to be adequately prepared for deposition.

**I.      Relevant Facts**

This dispute arises from Plaintiff's allegations that users uploaded Plaintiff's copyrighted works onto SSM's websites without authorization from Plaintiff. *See*, *generally*, Complaint. As part of its early discovery in this matter, Plaintiff served on SSM Requests for Production of Documents relating, *inter alia*, to SSM's programmers, independent contractors, and debt. SSM objected to these requests for production and Plaintiff filed a Motion to Compel production of documents relating to those persons. Docket No. 51 ["MtC I"]. In that Motion to Compel, Plaintiff argued that documents and information about those subjects were relevant to the lawsuit because Plaintiff needed to investigate "whether Defendant retained and/or paid any independent contractors to place infringing content on their websites," (MtC I, pp. 7, 11, 12, 13), or because investigation of the programmers "could lead to discovery of evidence that Defendant was knowingly involved in copyright infringement," (MtC I, pp. 14, 15, 16, 18), or because investigation of promises/representations SSM made in securing debt "may support Defendant's knowledge and/or direct involvement in the copyright and trademark infringement of Plaintiff's works on Defendant's websites," (MtC I, p. 20). SSM opposed that Motion to Compel, setting forth the absolute irrelevance of the matters and that the discovery requests were frivolous fishing expeditions. *See* Opposition to Motion to Compel, Docket No. 56.

The Court held a hearing on the Motion to Compel before Magistrate Judge Otazo-Reyes on December 16, 2015.  Docket No. 54.  At that hearing, in denying most of Plaintiff's Motion to Compel, the Magistrate Judge agreed with SSM's objections to Plaintiff's discovery into these matters, indicating that no such discovery could be conducted into the topics unless a foundation could be set substantiating that there was any evidence regarding independent contractors, programmers or holders of debt that had any relevance to SSM's knowledge of infringement.  Specifically, the Magistrate Judge asked why Plaintiff believed the requested documents were relevant, and Plaintiff's counsel stated that these people may have knowledge of SSM's intention to infringe, or may somehow control SSM.  The Magistrate Judge then stated that Plaintiff could ask about those matters at deposition, clearly intending for Plaintiff's to first set a foundation for their beliefs before they could inquire further.

In support of that instruction in Court, the Magistrate Judge issued a written order on December 17, 2015, denying the Motion to Compel as to Requests for Production Nos. 6-8 and 10-16 (the requests for production covering, *inter alia*, independent contractors, programmers and holders of debt), indicating that "Plaintiff may inquire further into these matters at deposition." Docket No. 58.  Clearly, the Magistrate Judge's intention in denying the Plaintiff's Motion to Compel but allowing further inquiry at a deposition was that, if any evidence emerged at deposition supporting Plaintiff's contention that these independent contractors or programmers and holders of debt may have information relevant to SSM's knowledge of infringement or that any of these persons controlled SSM, then and only then could Plaintiff ask specific questions about the identity of these individuals.

However, instead of asking first the relevant foundational questions required by the Magistrate Judge, and only then asking for information already denied by the Magistrate Judge,

3

Plaintiff simply relisted those very same objectionable topics in its 30(b)(6) notice of deposition of SSM.  This was a clear attempt by Plaintiff to circumvent the Magistrate Judge's order and to gain access to information that is not relevant, access to which the Magistrate Judge already denied, and to which Plaintiff has no right.  Because the Magistrate Judge did not permit discovery into these issues absent the proper laying of foundation (which could not be shown), the corporate representative for SSM, Mr. Bolotin, had no obligation to respond to questions on these topics nor to prepare for them.

With respect to most of the other topics about which Plaintiff alleges SSM was not prepared for, a cursory glance at the topic as compared to the deposition transcript will show that the questions asked were simply not a part of the topic noticed.  Each such instance is responded to individually below.

Finally, to the extent that SSM's representative could not answer certain questions that he was required to answer, it is not because he was not prepared.  SSM's corporate representative, Mr. Bolotin, was deposed over a period of two days.  On the first day he was deposed from 10:01am until 6:24pm.[1]  On the second day he was deposed from approximately 2:15pm until 4:02pm.  Over those many hours, Mr. Bolotin provided nearly 300 pages of deposition transcripts worth of information.  This is clearly not the behavior of someone who is unprepared.  The sheer volume of information provided shows that he was well prepared for the deposition. *See Transcript of Deposition of Konstantin Bolotin*, January 18, 2016, Vol I, attached hereto as Exhibit 1; *Transcript of Deposition of Konstantin Bolotin*, January 18, 2016, Vol II, attached hereto as Exhibit 2; *Transcript of Deposition of Konstantin Bolotin*, January 19, 2016, attached hereto as Exhibit 3.

---

[1] Although Mr. Bolotin's deposition as 30(b)(6) witness for SSM went over the 1 day of 7 hours allotted by Federal Rule of Civil Procedure 30(d)(1), Defendants have, in good faith, not raised any complaints.

***Mr. Bolotin spent approximately 35-38 hours preparing for the deposition***. Declaration of Konstantin Bolotin in Support of Opposition to Motion for Sanctions ["Bolotin Decl."], filed herewith, ¶ 5. Mr. Bolotin spent specific time on each of the topics in the notice of deposition, reviewing documents, reviewing source code and discussing with SSM personnel. *See*, *generally*, Bolotin Decl., ¶¶ 5(a)-(m). The details of the extent to which Mr. Bolotin went to prepare for the deposition are set forth in his Declaration filed herewith, but to give the court an idea, for just the first topic, Mr. Bolotin did the following to prepare: "I spent approximately 15 hours researching and learning with Vladimir Konovalov (SSM's head of development) the what, how and where of the information that SSM collects from uploaders when they upload videos. I also analyzed the MySQL data tables and created a MySQL data scheme sheet which I took with me to the deposition."[2] Bolotin Decl., ¶ 5(a). As another example, for Topic # 3, Mr. Bolotin states: "I spent approximately 4 hours with Vladimir Konovalov (SSM's head of development) and Alex Tykhonov (SSM's system administrator) reviewing all software that SSM utilizes for the uploading process, including reviewing in-house built scripts and 3rd party software like the nginx servers, ffmpeg video converter and more. I also reviewed the code for the custom built scripts for uploading and converting videos." Bolotin Decl., ¶ 5(c). Mr. Bolotin further spent another two hours the day before the deposition consulting with SSM's general counsel. Bolotin Decl., ¶ 6. It's strains credulity therefore to claim that Mr. Bolotin failed to reasonably prepare for the deposition.

Finally, Mr. Bolotin is the sole shareholder, director and executive of SSM. Bolotin Decl., ¶ 2. In many cases, to the extent that he could not provide an answer to a specific

---

[2] To the extent that Mr. Bolotin did not explain the depths to which he went to prepare for the deposition at the deposition itself, Mr. Bolotin explains that, *inter alia*, he was "nervous and didn't realize that I should explain to him everything in detail as I have done so" in the enclosed declaration. Bolotin Decl., ¶ 7.

question, it was not because he was not appropriately prepared,[3] it was because SSM does not have the knowledge requested. In such cases there is nothing that Mr. Bolotin could have done to be more prepared.

## II.     Argument

There is no dispute but that a corporation in receipt of a 30(b)(6) deposition subpoena "must make a conscientious good-faith endeavor" to produce a witness who is prepared and ready to fully and completely testify as to those subjects which the deposing part has identified "with reasonable particularity." *Shaker Vill. Condo. Ass'n v. Certain Underwriters at Lloyd's, London Subscribing to Certificate of Ins. No. CRC-14411*, 2010 U.S. Dist. LEXIS 11826 (S.D. Fla. Feb. 2, 2010).

At the same time, "absolute perfection is not required of a 30(b)(6) witness. The mere fact that a designee could not answer every question on a certain topic does not necessarily mean that the corporation failed to comply with its obligation." *QBE Ins. Corp. v. Jorda Enters.,* 277 F.R.D. 676, 691 (S.D. Fla. 2012). "[T]he corporation's obligation under Rule 30(b)(6) does not mean that the witness can never answer that the corporation lacks knowledge of a certain fact. The absence of knowledge is, by itself, a fact that may be relevant to the issues in a given case." *Chick-Fil-A v. ExxonMobil Corp*., 2009 U.S. Dist. LEXIS 109588, 37-38 (S.D. Fla. Nov. 10, 2009) (*citing Fraser Yachts Florida, Inc. v. Milne*, No. 05-21168-Civ-Jordon, 2007 U.S. Dist. LEXIS 27546, 2007 WL 1113251, at *2 (S.D. Fla. Apr. 13, 2007) (Torres, Mag. J.)). "Simply because defendant's witness could not answer every question posed to him does not equate to the fact that defendant did not satisfy its obligation to prepare its 30(b)(6) witness." *Costa v. County of Burlington*, 254 F.R.D. 187, 190 (D.N.J. 2008).

---

[3] Except in the circumstances detailed below were Mr. Bolotin was not required to be prepared for the questions asked.

6

In the present case, there is no reasonable argument that Sun Social Media failed in its obligation to produce a reasonably prepared 30(b)(6) witness. Sun Social Media produced as its 30(b)(6) witness Mr. Konstantin Bolotin, Sun Social Media's sole shareholder, director and executive. In preparation for his deposition, Mr. Bolotin spent 35-38 hours reviewing documents, consulting with SSM personnel and consulting with SSM counsel. In a deposition that stretched over two days, lasting longer than ordinarily permitted by the Rules of Civil Procedure, Mr. Bolotin answered fully almost every question posed to him, resulting in nearly three hundred pages of deposition transcripts. To the extent that Mr. Bolotin was unable to answer an incredibly small percentage of the questions posed, as the Court will see from the analysis below, the questions either: (a) were unrelated to the topics actually listed in the 30(b)(6) deposition notice, (b) were specifically rejected by this Court in an earlier hearing (absent the laying of a proper foundation for relevance, which never occurred), or (c) simply exceeded the bounds of the company's actual knowledge.

As the point-by-point response, below, demonstrates, the Plaintiff is again involved in litigation make-work, hoping to force the Defendants to settle a frivolous lawsuit rather than expend resources fighting baseless motion after motion.

### III.     Point by Point Response

Plaintiff has put forth a table of each instance in which it alleges that Mr. Bolotin was not appropriately prepared to answer questions that were in the 30(b)(6) deposition notice for SSM. Defendants herewith respond to each instance point by point:

| **Notice of Taking Deposition Duces Tecum** | **Deposition Testimony** | **Response** |
|---|---|---|
| #2 – Pertaining to videos uploaded on Playvid.com, feedvid.com, playvids.com and peekvids.com, the entire process that a potential uploader must go through in order to upload a video on the web site(s). | Q. Any other functionality that is utilized by all projects from that one location besides login credentials?<br>A. I can't say right now, because I'm not so prepared for that question.<br><br>SSM Depo., pp 40-41. | The deposition topic asked for the process a potential uploader must go through in order to upload a video.  The question asked was regarding shared functionality in the backend database of the websites.  The topic has nothing to do with the question. |
| #2 – Pertaining to videos uploaded on Playvid.com, feedvid.com, playvids.com and peekvids.com, the entire process that a potential uploader must go through in order to upload a video on the web site(s). | Q: Speaking about, just focusing specifically on the login credential.  The login credentials, is that something you had put on your workflow process?<br>A.  One of the parts.<br>Q. One of the parts, right. And then in the mockup, there was an aspect of the mockup that was specific to login credentials?<br>A.  I can't answer that question, because I don't remember.<br>Q.  Fair enough, but it would make sense that that would be part of it?<br>A.  it makes sense, but I can't answer it "yes" or "no".  I don't remember.<br><br>SSM. Depo., pp. 41-42. | The deposition topic asked for the process a potential uploader must go through in order to upload a video.  The questions asked were regarding a mockup Mr. Bolotin used when he was first developing the website.  The topic has nothing to do with the question. |
| #8 – Identification of programmers utilized by Sun Social Media, Inc. for any aspect of Playvid.com, feedvid.com, playvids.com and peekvids.com | Q. Do you remember who wrote that aspect of the program?<br>A. Who did – who built my idea?<br>Q. Yes.<br>A. I can – I don't remember, because that built a lot of people.  We hired a lot of people.  You know, like I said | 1) This was specifically a topic that Magistrate Judge Otazo-Reyes denied discovery on in Docket No. 58, indicating that it would only be relevant if Plaintiff could lay the proper foundation for discovery into the identity of SSM's programmers.  Plaintiff did not and has |

| | | |
|---|---|---|
| | before it's an ongoing process. Some people come – we improve our system everyday pretty much. We – every week, we try to making the updates. So during those updates on the websites, all of our websites, working different people. I can't say who was implemented that particular feature, because the whole team working on it.<br>Q. Okay.<br>A. It's not one people working on this, because all software we have, is custom built system.<br>Q. And – so you ultimately could not pin down which programmer that had done work for Sun Social Media may have done certain aspects of work on the functionality of the login process?<br>A. No.<br><br>SSM Depo., pp. 42-43. | not since laid any foundation for why it should have discovery into SSM's programmers.<br><br>2) Mr. Bolotin specifically indicated that it was not possible to identify the specific programmers that worked on any particular part of the programming for SSM's websites. SSM cannot provide information that does not exist. |
| #5 – Pertaining to videos uploaded on Playvid.com, feedvid.com, playvids.com and peekvids.com, all software used to keep track of videos posted by each user, the full functionality of the software, who authored the software, when the software was first ulitized by Sun Social Media on the web sites. | Q: In order to utilize the share function on one of Sun Social Media's video hosting sites, would I have to be a member?<br>A. I can't say – I can't say – I can't answer this question for sure, because I'm not prepared. I'm not too sure how the process – we try to. You know, we try to play, like I said, with the – in the e-mails, because it's very – it's very hard topic for us.<br><br>SSM Depo., Page 54. | 1) Plaintiff noticed an extraordinarily broad topic under which it would be complete unreasonable for any representative to be able to speak in detail about every single feature of the software for a large suite of products.<br><br>2) Plaintiff seeks to read this topic as to cover every single possibly relevant matter to the websites, as everything in this lawsuit is directly related to "the full functionality of the software." This is the opposite of a topic "with reasonable particularity."<br><br>3) In any case, the answer to this question is a simple "yes" or "no" and sanctions should not be imposed when the answer could be so easily |

9

| | | provided outside deposition (or could be confirmed by Plaintiff itself by visiting the websites). |
|---|---|---|
| #2 – Pertaining to videos uploaded on Playvid.com, feedvid.com, playvids.com and peekvids.com, the entire process that a potential uploader must go through in order to upload a video on the web site(s). | Q. All right. So what other sort of notifications are sent? I understand the different ones for each website, but outline them for me.<br>A. I don't remember more.<br>Q. You don't remember any other types of notifications?<br>A. No, I wasn't prepared for that.<br>Q. Yeah.<br>A. I just want to add, we try to add and remove different kind of notification during that problem of delivery e-mails, because value is very depends on what kind of notification it is. So you understand that, right?<br>Q. I do.<br>How many -- approximately how many new members do the video hosting -- Sun Social Media video hosting sites get on a daily basis?<br>A. I can't say exactly. I can't answer you, because I'm not prepared. I'm not watching that statistics closely.<br><br>SSM Depo., pp. 61-62. | The questions asked here are completely irrelevant to the topic referenced. Plaintiff asked questions about types of notifications SSM sends to users and the number of users that sign up for SSM's websites. The topic only required that SSM's representative be prepared to answer questions about the process a user must go through in order to upload a video – these are two completely different topics. SSM had no obligation to be prepared to answer questions on topics that were not in the deposition notice. |
| #2 – Pertaining to videos uploaded on Playvid.com, feedvid.com, playvids.com and peekvids.com, the entire process that a potential uploader must go through in order to upload a video on the web site(s). | Q. I'm going to ask you about the benefits of becoming a member. What functionality is available to a member that's not available to a non member viewer of the Sun Social Media video hosting sites?<br>A. I can't answer this expression, because it's not very specific a lot. I didn't, you know, prepare for that question.<br>Q. But as director of operations and owner of Sun Social Media, you don't know?<br>A. We have so much websites, I can't know any and everything. | Plaintiff asked questions not part of the topic noticed. The topic required SSM to be prepared to talk about the process a user must go through in order to upload a video to SSM's websites. Plaintiff asked questions about differences in functionality between a member and a non-member viewer of SSM's websites. SSM was not required to be prepared to talk about any topics not in the deposition notice. |

| | | |
|---|---|---|
| | SSM Depo., pp. 63-64. | |
| #5 – Pertaining to videos uploaded on Playvid.com, feedvid.com, playvids.com and peekvids.com, all software used to keep track of videos posted by each user, the full functionality of the software, who authored the software, when the software was first ulitized by Sun Social Media on the web sites. | Q. How about the ability to share the video, is that something specifically to members?<br>A. I can't answer this question.<br>Q. You can't, because you don't know?<br>A. Because I don't remember and I didn't prepare for that question.<br>Q. Can you think of any other functions that are available to --<br>A. I'm not thinking. I'm just answering your questions.<br>Q. Well, I hope on some level you're thinking. I'm asking you to think and try to remember if there are any other functions available to a member that is not available to a non member viewer by the Sun Social Media video hosing sites?<br>A. I don't remember.<br><br>SSM Depo., p. 66. | 1) Plaintiff noticed an extraordinarily broad topic under which it would be complete unreasonable for any representative to be able to speak in detail about every single feature of the software for a large suite of products.<br><br>2) Plaintiff seeks to read this topic as to cover every single possibly relevant matter to the websites, as everything in this lawsuit is directly related to "the full functionality of the software." This is the opposite of a topic "with reasonable particularity."<br><br>3) This question relates to whether a non-member of the website can use the "share" functionality on the website. To the extent that this question is relevant to anything, the answer to this question is a simple "yes" or "no" and sanctions should not be imposed when the answer could be so easily provided outside deposition (or could be confirmed by Plaintiff itself by visiting the websites). |
| #2 – Pertaining to videos uploaded on Playvid.com, feedvid.com, playvids.com and peekvids.com, the entire process that a potential uploader must go through in order to upload a video on the web site(s). | Q. So if I am a member of, let's say, FeedVid and I want to send you, who is also a member of FeedVid, a message, I can do that?<br>A. I can't confirm that.<br>Q. Why not?<br>A. I don't remember. I'm not prepared for that question.<br>Q. Same question as it -- as it relates to PeekVids?<br>A. I can't confirm that. | The topic is about the process a user must go through in order to upload a video to SSM's website. The question asked is about whether members can send messages to each other. The question has nothing to do with the topic and so SSM was not required to be prepared for it. |

| | | |
|---|---|---|
| | SSM Depo., pp. 67-68 | |
| #2 – Pertaining to videos uploaded on Playvid.com, feedvid.com, playvids.com and peekvids.com, the entire process that a potential uploader must go through in order to upload a video on the web site(s). | Q. Have you given him previous instructions about when those circumstances exist or he can make such decisions or does he just have full discretion?<br>A. I don't remember.<br>Q. Have you ever been in any arguments with him when he turned off the mail server and you think he should not have?<br>A. I don't know what you say your question is.<br>Q. Let's say -- have you ever had a situation where he turned off the mail server and you think he should not have?<br>A. I don't remember.<br>Q. Since -- over the past, let's say two years, do you have any way to estimate how often the mail server has been shut down?<br>A. I don't remember. I can't estimate or give you approximately. You asking the questions, very good questions. It can't be explained in few words. And how many times? I don't know.<br>Q. Is there anywhere within any of the databases, Sun Social Media databases, that it is recorded that the mail servers are shutdown?<br>A. I don't know. I don't remember.<br><br>SSM Depo., pp. 78-79. | The referenced topic is about the process a user must go through in order to upload a video to SSM's website. The question asked is about shutting down SSM's mail servers. The question has nothing to do with the topic and so SSM was not required to be prepared for it. |
| #11 – Identification of all debt incurred by Sun Social Media, Inc., both current and from the inception of the company, including to whom the debt is owed, for what the debt was | Q. From the inception of when you started Sun Social Media until currently, on how many occasions has there -- has Sun Social Media borrowed money?<br>A. How many times?<br>Q. Yes.<br>A. I don't know. I don't know. | 1) This was specifically a topic that Magistrate Judge Otazo-Reyes denied discovery on in Docket No. 58, indicating that it would only be relevant if Plaintiff could lay the proper foundation for discovery into the debts of SSM. Plaintiff did not and has not since laid any |

| | | |
|---|---|---|
| incurred, and the terms of the debt. | Q. So this was one of the specific topics on the Notice of Deposition today, right?<br>A. Specifically to No. 11?<br>Q. Yes.<br>THE WITNESS: Should I answer it?<br>MR. COBB: Yes.<br>THE WITNESS: I don't know. I don't know.<br>BY MR. FREEMAN:<br>Q. More than once?<br>A. More than once, I don't know. I don't know how many times. Really.<br>Q. So just so you know, when we issue a notice of dep of corporate representative, the representative is here to find the corporation to talk -- answer questions on topics specifically listed in the Notice of Deposition. So today it is my chance to ask these questions, not withstanding some of your attorneys objections and the instructions not to answer, he and I will deal with that at a later time. It's for you to answer "I don't know," finds the corporation to an answer of "I don't know," and it prohibits me from gaining information that we noticed. Is it that -- is it an answer that you could make a couple phone calls or do some research on the Internet or tap into something --<br>MR. COBB: Let's go off the record and let him check.<br><br>***<br>Q. How about the last dispersement, when was that?<br>A. I can't say, maybe in 2012, or 2013.<br>Q. Okay. But as far as you can remember, there was not a dispersement in 2014 or 2015?<br>A. I don't want to give you wrong information. I don't remember. And it's -- it's very hard to say right now. | foundation for why it should have discovery into SSM's debts.<br><br>2) Plaintiff also leaves out approximately two pages of deposition testimony in which Mr. Bolotin answers the questions asked, including the following responses:<br><br>THE REPORTER: We're back on the record.<br>THE WITNESS: I'm sorry. I was a little bit confused.<br>BY MR. FREEMAN:<br>Q. It's okay.<br>A. Because it's not so clear a question, because you guys had the objections, you know, back and forth. So outside lenders, we have just one lender, one loan. So -- but we got this loan in portions. So it's -- that's why I'm confused, too.<br>* * *<br>Q. With regard to this one loan, one lender, my understanding is that there was multiple disbursements overtime; is that right?<br>A. Multiple receivers for this have loan, multiple portions receiving of this loan.<br>Q. Do you know over what time periods?<br>A. That's a very good question. Let me think about it. I don't want to give you the wrong information. That was for like two years or three years.<br>* * *<br>Q. Okay. So, do you remember when the loan, first payment on the loan was received by Sun Social Media? First dispersement of the loan. |

13

| | | A. In 2010. I don't remember exact date. |
| --- | --- | --- |
| | SSM Depo., pp. 90-91, 103. | SSM Depo., pp. 100-03. |
| #12 – Identification of advertisers for Playvid.com, feedvid.com, playvids.com and peekvids.com, including the contractual obligations of Sun Social Media, Inc. and the advertisers. | Q. How do I say this. Who writes the ad or who designs the ad? A. I don't know. The broker knows. Q. The broker does, it takes care of that. A. I don't know. Q. Would he come to Sun Social Media from the broker? A. We -- we don't know. Nobody comes through Sun Social Media and -- we don't know who designed those ads. SSM Depo., p. 142. | 1) This was specifically a topic that Magistrate Judge Otazo-Reyes denied discovery on in Docket No. 58, indicating that it would only be relevant if Plaintiff could lay the proper foundation for discovery into the debts of SSM. Plaintiff did not and has not since laid any foundation for why it should have discovery into SSM's debts. 2) This was not a case of SSM not being prepared to answer the topic. This is very explicitly a case in which SSM simply does not have the information requested in its possession, custody or control. To explain further: All of SSM's advertisements come from brokers – and SSM has no direct connection with the creation of the advertisements. SSM could not know the answers to the questions asked. |
| #6 – All persons and processes involved in implementing repeat infringer policy, including but not limited to who reviews take down notices to determine whether discipline necessary, who determines discipline, who implements discipline, the procedure for implementing discipline, and if the discipline is | Q. If I were to post a video on, let's say, FeedVid, would Sun Social Media or one of those independent contractors, take that video and place it on any of the other Sun Social Media video hosting sites? A. We don't copy any videos from one to the other. If the user uploads on the PlayVid account and uploads over there, we're not take this video and copy it. It's horrible. It's not ours. Q. It's not yours, but according to the terms of service, when a user uploads a video, the terms of service says that user automatically grants Sun Social Media a non exclusive irrevocable license to display it, correct? | 1) The referenced topic does not cover the question asked. The topic asks about implementation of a repeat infringer policy. The question asks about the terms of service for SSM's websites, specifically about the licenses that users grant to SSM. The question has nothing to do with the topic and so SSM was not required to be prepared for it. 2) The question impermissibly asks SSM to answer a question of law. |

| | | |
|---|---|---|
| implemented electronically the software used to implement the discipline and all data associated with the implementation of discipline. | A. I'm not an attorney to, you know, spoke about how the terms works and all of that stuff. If you would like to address this question, you can address that to our lawyers. So I can't say specifically what -- what exactly it means, some terms, you know, in our terms and conditions.<br><br>SSM Depo., p. 152. | |
| #2 – Pertaining to videos uploaded on Playvid.com, feedvid.com, playvids.com and peekvids.com, the entire process that a potential uploader must go through in order to upload a video on the web site(s).<br><br>And:<br><br>#8 – Identification of programmers utilized by Sun Social Media, Inc. for any aspect of Playvid.com, feedvid.com, playvids.com and peekvids.com. | Q. When the -- when was this script authored, I take the position they custom-drafted the script for Sun Social Media?<br>A. Yes.<br>Q. And it's a script that runs on all four video hosting sites?<br>A. For the video hosting sites, yes.<br>Q. And when was it authored?<br>A. I can't tell you exactly, because I don't remember.<br>Q. Can you give me an approximation of when?<br>A. No. Maybe this year -- I mean, maybe the top of '16 or '14. I can't tell you exactly.<br>Q. Is there a way for you -- it's actually a really important piece of this puzzle. Is there a way for you to make this determination?<br>A. We have to find -- we have to check this, but, you know, for now, in this -- in this room, I can't tell.<br>Q. I understand. If you were going to go check and find out that information, how would you do that?<br>A. I would have to ask our programers and -- when we implement that feature. It's just because we try to improve our e-mail delivery system, you know, in order for our, you know, e-mails come to the inbox.<br><br>SSM Depo., pp. 162-63. | 1) Topic #2 has nothing to do with the questions asked. Topic #2 is about the process a user must go through in order to upload a video to SSM's website. The question asked is about when an internal programming script was created that checks email addresses, a matter that is irrelevant to the process a user goes through to upload a video. The question has nothing to do with the topic and so SSM was not required to be prepared for it.<br><br>2) Topic #8 was specifically a topic that Magistrate Judge Otazo-Reyes denied discovery on in Docket No. 58, indicating that it would only be relevant if Plaintiff could lay the proper foundation for discovery into the identity of SSM's programmers. Plaintiff did not and has not since laid any foundation for why it should have discovery into SSM's programmers.<br><br>3) The question asked is not related to Topic #8 in that Topic #8 asks about identities of programmers utilized whereas the question in the deposition is about when a particular programming script was implemented. |

15

| | | |
|---|---|---|
| | | 4) The deponent gave an approximate and reasonable answer to the question asked. |
| #4 – Pertaining to videos uploaded on Playvid.com, feedvid.com, playvids.com and peekvids.com, the process for a video to be reviewed by Sun Social media, or any agent therefore, before being displayed on the web site(s). | Q. So when a video is marked as pending, it can be viewed by the general public?<br>A. I can't tell you 100 percent, but for the user who uploaded that video, he can -- he watch it.<br>Q. But I mean, like the general viewer who is not a member?<br>A. A general user are not able to see on the home page, for sure, or in the search results.<br><br>SSM Depo., pp. 189-90. | Deponent provided the best answer possible under the circumstances in regards to an extremely detailed question and his answer was reasonable in relationship to the broadness of the topic posed.  Mr. Bolotin answered that users in general would not be able to find the video on the home page or in search results.  This is not a failure to be appropriately prepared for the broad topic noticed. |
| #7 – Identification of independent contractors used by Sun Social Media, Inc. for any tasks on Playvid.com, feedvid.com, playvids.com and peekvids.com.<br>And:<br>#9 – All persons and processes involved in receipt of take down notices and responding to take down notices. | Q. You have a written contract with Incorporate Now as far as a DMCA agent services?<br>A. I can't recall now, probably yes, because we pay for that service to Incorporate Now.<br>Q. How long have you been paying that service to Incorporate Now?<br>A. I can't remember, but a long, long time.<br>Q. More than a year?<br>A. More than a year, more than two years.<br><br>SSM Depo., p. 207. | The noticed topics are not relevant to the questions posed.  Questions about the contract between SSM and Incorporate Now (SSM's DMCA agent), including when that relationship began, are irrelevant to identification of Incorporate Now (which was obviously done) or the persons and processes involved in the receipt of DMCA takedown notices and responses thereto.  The questions have nothing to do with the topic and so SSM was not required to be prepared for it. |
| #9 – All persons and processes involved in receipt of take down notices and responding to take down notices. | Q. Did you receive an e-mail from Incorporate Now in January of 2015 with regard to takedown notices from Hydentra?<br>A. You probably know my answer. I don't know. I can't -- I can't recall that information. I can't confirm anything like that, because I have to check first.<br>Q. You didn't check before you came today?<br>A. Legal@sunsocial? No, I didn't check this e-mail. | The answers to the questions posed here go to a centrally disputed fact between the parties: whether SSM ever received any sort of knowledge about takedown notices sent by Hydentra in January of 2015.<br><br>Prior to this deposition, SSM had no reason to believe that Hydentra had ever sent SSM any |

| | | |
|---|---|---|
| | Q. So you don't know whether or not as you sit here right now --<br>A. I only --<br>Q. Let me finish.<br>You don't know as you sit here today whether or not Mr. Luchian had e-mailed you takedown notices for Sun Social Media's video hosting site sent in January of 2015?<br>A. I can't confirm that.<br><br>SSM Depo., p. 211. | sort of takedown notices in January of 2015 – as it contends it never received such notices.<br><br>At the deposition, Hydentra's counsel produced documents purporting to show that Hydentra had actually sent such notices. This was the first time Defendants had seen this document. At this time, SSM believes that the notices were lost by SSM's DMCA Agent's landlord.<br><br>This does not constitute a failure to be prepared. It constitutes an absence of knowledge. |
| #16 – The factual basis for each affirmative defense that Sun Social Media, Inc. intends to/has assert(ed). | Q. Have you done any research or investigations with regard to affirmative defenses asserted by Sun Social Media in this case?<br>MR. COBB: Objection, as it pertains to any attorney/client work product or communications with your attorneys. Otherwise, you can answer it.<br>THE WITNESS: If I did some research on the Affirmative Defense?<br>BY MR. FREEMAN: Q. Yeah. Do you know what the Affirmative Defenses in this case are?<br>A. Yes, I know.<br>Q. What are they?<br>A. What?<br>Q. What's your understanding of them?<br>A. That we do not agree with any of your allegations, you know, anything from your complaint, we disagree with everything.<br>Q. You disagree with all of the allegations in the Complaint?<br>A. You can refer to the Affirmative Defense. | 1) This deposition topic is inappropriately broad. SSM set forth fifteen "affirmative defenses" (some of which this court has deemed denials rather than affirmative defenses), therefore this topic is not "describe with reasonable particularity the matters for examination," and therefore is improper.  SSM had no obligation to prepare for this topic.<br><br>2) The questions asked necessarily required SSM's representative to interpret questions of law, rather than answer simple questions of fact. Plaintiff did not ask questions that were possible or appropriate for Mr. Bolotin to answer.<br><br>3) In the deposition of Mr. Bolotin in his personal capacity on the next day, Plaintiff continued to ask question of Mr. Bolotin as SSM's 30(b)(6) representative.  At that deposition, counsel entered into a stipulation that the detailed answers set forth in SSM's |

17

|  | Q. Well, that's fine. I'm following your understanding, that it was alleged in the Complaint that the Plaintiff has registered the copyrights and the works at issue in this case. Do you disagree with that?<br>A. You know, I can't answer this question. This is attorney language, you know, so -- and I don't want to give you anymore information than this. I'm confused and also, I'm not a 100 percent your question.<br>Q. Okay. Are you aware of the Affirmative Defense of Copyright misuse?<br>A. Same answer.<br>Q. You don't know?<br>A. I don't know.<br>Q. You don't know what that is?<br>A. I can't -- I can't answer this question, because I don't understand very clearly.<br><br>SSM Depo. pp. 234-35. | responses to Plaintiff's interrogatories would be deemed SSM's deposition responses to questions regarding affirmative defenses. That stipulation is also set forth in Plaintiff's Motion. |

## IV.     Conclusion

Plaintiff's Motion to Compel should be denied as it complains only about matters that (1) where not properly noticed, (2) were specifically proscribed by the Magistrate Judge Otazo-Reyes, (3) relate to matters to which SSM actually has no knowledge, or (4) do not constitute a failure to be adequately prepared for deposition.


**Respectfully submitted:**

/s/ Brady J. Cobb
Brady J. Cobb, Esquire
Florida Bar No. 031018
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone (954) 527-4111
Facsimile (954) 900-5507
bcobb@cobbeddy.com

*Attorney for Defendants*
*Constantin Luchian,*
*Konstantin Bolotin and*
*Sun Social Media Inc.*

Dated: February 21, 2016

**CERTIFICATE OF SERVICE**

  **I hereby certify** that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record on the service list below this 21st day of February, 2016.

                /s/ Brady J. Cobb
                Brady J. Cobb

**SERVICE LIST**

Aaron Behar, Esquire
Jaclyn Behar, Esquire
BEHARBEHAR
1840 North Commerce Parkway
Suite One
Weston, Florida 33326
Telephone: (954) 688-7642
Facsimile: (954) 332-9260
AB@BeharBehar.com
JB@BeharBehar.com

Spencer D. Freeman
Freeman Law Firm, Inc.
1107 1/2 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (206) 516-3800
Facsimile: (206) 516-3888
sfreeman@freemanlawfirm.org