UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 1:15-cv-22134-UU

HYDENTRA HLP INT. LIMITED,
a foreign corporation d/b/a METART,

       Plaintiff,

vs.

CONSTANTIN LUCHIAN, an individual,
KONSTANTIN BOLOTIN, an individual,
SUN SOCIAL MEDIA, INC., a corporation,
individually and d/b/a PLAYVID.COM,
FEEDVID.COM, PLAYVIDS.COM, and
PEEKVIDS. COM; PLAYVID.COM;
FEEDVID.COM; PLAYVIDS. COM;
PEEKVIDS.COM and;
and John Does 1-20,

       Defendants.

_____/

### PLAINTIFF'S OPPOSITION TO DEFENDANT SUN SOCIAL MEDIA, INC. AND KONSTANTIN BOLOTIN'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Pursuant Fed.R.Civ.P. 56, Local Rule 56.1, 17 U.S.C. §502, and 15 U.S.C. § 1114, PLAINTIFF, HYDENTRA HLP INT. LIMITED ("Plaintiff" or "Hydentra") filed this Opposition to Defendant Sun Social Media, Inc. ("SSM") and Konstantin Bolotin's ("Bolotin") (collectively "Defendants") Motion for Summary Judgment

1.     Plaintiff filed its Complaint on June 4, 2015. [D.E. #1]. Since then, Defendants failed to conduct any discovery other than to serve a set of interrogatories and requests for production outside of the Court's time limitations for doing so. Defendant filed a Motion for Protective Order as to the interrogatories but produced documents it intends to use at trial.

Notably, Defendants failed to take any depositions whatsoever, and accordingly its record evidence is rather limited.

2.      Plaintiff took the deposition of SSM's corporate representative on January 18 and 19, 2016, as well as served interrogatories and requests for production during the discovery period.

3.      The facts and record evidence establish that, at a minimum, there exists a genuine issue of material fact as to whether SSM and Bolotin violated Plaintiff's rights and therefore are liable for copyright infringement, contributory copyright infringement, vicarious copyright infringement, inducement of copyright infringement, the unauthorized publication of name and likeness in violation of Fla. Stat. 540.08, trademark infringement, contributory trademark infringement, and false designation of origin under the Lanham Act.

## MEMORANDUM OF LAW

### I.      INTRODUCTION

Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act, is intended to provide protection for truly innocent Internet Service Providers (ISPs) whose services may result in the unintended display of another's copyright without license or authority. The Act provides for certain and specific conditions to be met by the ISP precedent to any protections against copyright liability, each intended to assist a copyright holder in policing its copyrights. Defendants are attempting to cloak themselves with the term Internet Service Provider yet provide nothing more that a posting board ripe for unfettered infringement of adult entertainment content, earning revenue through advertising dollars contingent upon the quality of posted adult content. Defendants' sites foster, contribute to, and induce piracy by presenting an environment of ease in posting infringing activity without risk of its posters getting caught.

Given the true and sole purpose of these sites, it is of the upmost importance that when these sites do not adhere to the requirements of the DMCA, they be held accountable. Defendants fail to adhere to the requirements of the DMCA and, therefore, should be held accountable for their infringing activity.

## II.    ARGUMENT

A motion for summary judgment pursuant to Fed.R.Civ.P. 56(c) may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for his motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Summary judgment will not lie if there exists *any* genuine dispute about a fact from which a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In resolving a motion for summary judgment, the Court must view any evidence submitted in the light most favorable to the opposing party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).

### A.    Evidence Exists that Establishes Defendants are liable for Direct Copyright Infringement.

To establish a claim of copyright infringement, Hydentra must first establish its ownership of the copyrights allegedly infringed. *See Univ. Furniture Int'l, Inc. v. Collezione Europa USA*, 618 F.3d 417, 428 (4th Cir. 2010). The Copyright Act provides that "[i]n any

judicial proceedings the certificate of a registration made before or within five years after the first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Included in the facts entitled to the presumption of validity is ownership. *Univ. Furniture Int'l, Inc.,* 618 F.3d at 428. Hydentra produced the certificates of registration for each movie alleged herein to be infringed on SSM's sites and has therefore met the initial burden. The burden then shifts to Defendants to "prove that the claimed copyrights are invalid." *Id*. Defendants will not and cannot meet this burden.

Second, Hydentra must next establish the copyright was copied. Copying is established when any of the exclusive rights listed in 17 U.S.C. §106 are violated. 17 U.S.C. §501(a) ("Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright. . . ."). Section 17 U.S.C. §106(1) grants the copyright holder the exclusive right to reproduce and publically display copies of its works.

Hydentra documented each video displayed on the SSM web sites as alleged in the Complaint. Hydentra documented the following number of movies: 37 on playvid.com, 28 on playvids.com, 5 on peekvids.com, and 2 on feedvid.com.  *DSOF ¶¶ 56,63,65,67*. There is no question that Defendants have reproduced and publically displayed these videos.  Whether members of Defendants' sites uploaded the videos to Defendants' servers is of no matter. Defendants reviewed each video and thereafter actively published them on the sites for free public viewing.[1]  *DSOF ¶ 78*.  It is disingenuous for Defendants to alleged otherwise.  Hydentra produced, copyrighted and currently owns the copyrights to each of these movies. *DSOF ¶¶57,64,66,69*.  For each movie documented as displayed on the SSM web sites, Defendants

---

[1]  Whether the videos were uploaded by members of Defendants' sites may be of consequence whether DMCA safe harbor provisions are available to Defendants, but not whether direct infringement has occurred.

reproduced and publically displayed Hydentra's works in violation of Hydentra's exclusive rights.

Defendants' case law citations and quotes are misleading as applied to instant matter. Defendants supply a direct quote from *Am Broad Companies, Inc. v. Aereo, Inc.* 134 S.Ct. 2498, 2512-13 (2014). *This quote is from Justice Scalia's dissent.* Further, the case involved an action against a business that sold services that allowed subscribers to watch television programs over the Internet at about the same time the programs were broadcast. The United States Supreme Court found that such services performed the works publically when streaming the works to subscribers.

In *Cartoon Network LP, LLLP v. CSC Holdings, Inc.,* 536 F.3d 121 (2nd Cir. 2008), content providers sued a cable company alleging a remote storage digital video recorder system (RS-DVR) directly infringed plaintiff's rights to reproduce and publically display their copyrighted works. The court found that the video buffering operation of the RS-DVR did not create copies in violation of the Copyright Act. The Court also found that each copy produced by the system were made by the customers. Further, the Court determined that each RS-DVR playback transmission was made to a single subscriber and thus did not infringe plaintiffs' exclusive right of public performance under 17 U.S.C.S. § 106(4).

In *CoStar Group, Inc. v. Loopnet,* 373 F.3d 544 (4th Cir. 2004), the court found that a Internet Service Provider operating a real estate web site did not engage in any volitional conduct such as to directly infringe copyrights. This web site permitted listings of commercial real estate, inclusive of photographs. The provider had an absolute passive role in the posting of photographs – without any review or affirmative actions whatsoever. Thus, the court determined

that volitional conduct was not present to establish direct infringement (leaving open the possibility of secondary infringement).

In *Disney Enters. V. Hotfile Corp.,* 798 F.Supp.2d 1303 (S.D. Fl. 2011), the issue before the Court was a Fed.R.Civ.P. 12(b)(6) motion.   The court granted the motion because the complaint did not alleged volitional conduct by the Defendants.

In the instant matter, the Defendants engage in volitional conduct – they review each video that is uploaded to its servers and then, only after such review, they enable the video to be publically displayed for free, and then earn money from advertisers for doing so.  The active role in displaying the video to the public is a direct violation of 17 U.S.C. §106(1).[2]

Further, there is a genuine issue as to whether Hydentra's videos were, in fact, posted by members of the sites or Defendants themselves posted them.  Defendants own data, disclosed during discovery, establishes that 11 of Hydentra's videos were uploaded to Defendants' sites from an IP address of "0.00" Such Internet Protocol addresses do *not* exist.  This reflects files that were uploaded with direct access to the web site servers, and not through the Internet.  Had the videos actually been uploaded by users, they would reflect true IP addresses. *DSOF* ¶ 5.

The undisputed evidence establishes that Defendants have directly infringed Hydentra's copyrights.  Hydentra established both the ownership of a valid copyright regarding each movie *and* a violation of §106, and has therefore conclusively established direct infringement for each of its movies displayed on the SSM web sites.  At a minimum, a genuine issue of material fact exists as to whether Defendants have directly infringed Hydentra's copyrights.

## B.    DMCA Safe-Harbor Provisions

---

[2]  In fact, if such conduct did not violate 17 U.S.C. § 106, there would have been no reason for Congress to adopt Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act, which provides safe harbor protection for Internet Service Providers.  Defendants' argument leaves the DMCA safe harbors meaningless.

Defendants claim protection from the DMCA Safe-Harbor provisions for any copyright liability. Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act, was Congress's answer to the potentially enormous liability that ISPs faced for the materials being transmitted over their networks. *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 27 (2d Cir. 2013).   To that end, Congress created four safe harbors that protect ISPs from liability for copyright infringement when their involvement is limited to certain activities—transitory digital networking communications, system caching, information residing on systems or networks at the direction of users, and information location tools.  See 17 U.S.C. §§ 512(a)—(d).

 As a prerequisite to eligibility for any of the four safe harbor categories, a defendant must first establish that it satisfies certain criteria, including, as relevant here, demonstrating "the adoption and reasonable implementation of a 'repeat infringer' policy that 'provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network.'"  *Viacom Int.'l, Inc. v. YouTube, Inc.,* 676 F.3d 19, 27 (2nd Cir. 2012.

If the defendant establishes that it meets the threshold criteria of § 512(i), the defendant must then show that it satisfies the requirements of a particular safe harbor category. #*Id.*   Here, Defendants seeks protection under § 512(c) (1), "which covers infringement claims that arise 'by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  In order to obtain protection pursuant to § 512(c)(1), Defendants *must* comply with the following requirements:

- Designate an agent to received notifications of claimed infringements and provide
  contact information (name, address, phone number, and electronic mail address of

the agent, known to the public through its service *and* the Copyright Office.  17 U.S.C. § 512(c)(2).

- Have no actual knowledge that the material is infringing, is not aware of facts or circumstances from which infringing activity is apparent, and upon obtaining such knowledge of awareness acts expeditiously to remove or disable access to the material.  17 U.S.C. § 512(c)(1)(A)(i)-(iii).

- Remove or disable access to infringing material upon receipt of notification of claimed infringement.  17 U.S.C. § 512(c)(1)(C).

In the instant matter, Defendants cannot establish implementation of a reasonable repeat infringer policy.   Defendants also cannot establish proper DMCA Agent notification to the Copyright Office, a lack of knowledge of infringing material on their sites, and that they expeditiously remove or disable access to infringing material upon receipt of notification of claimed infringement.

### 1.    Defendants Do Not Implement A Reasonable Repeat Infringer Policy.

A service provider must demonstrate that it has "adopted and reasonably implemented, and informed subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. §512(i)(1)(A).  The requirement that service providers implement a repeat-infringer policy is a "fundamental safeguard for copyright owners" and "essential to maintain[ing] the strong incentives for service providers to prevent their services from becoming safe havens or conduits for known repeat copyright infringers." *Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F. Supp.

2d 627, 637 (S.D.N.Y. 2011). A repeat-infringer policy *must have a working notification system* and a procedure for dealing with DMCA-compliant notifications. *CCBill LLC*, 488 F.3d at 1109.

In addition, "service providers that purposefully fail to keep adequate records of the identity and activities of their users and fail to terminate users despite their persistent and flagrant infringement are not eligible for protection under the safe harbor." *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-06646 (AJN)(SN), 2014 U.S. Dist. LEXIS 183098, at *85 (S.D.N.Y. May 28, 2014).

SSM failed to implement a reasonable repeat infringer policy. First, SSM does not have a working notification system. *DSOF ¶¶72,73,77*. The undisputed record evidence is that Hydentra delivered DMCA compliant take-down notices to SSM's designated agent. *DSOF ¶59*. However, SSM failed to process these notices and failed to disable the infringing videos. *DSOF ¶76*. The simple explanation is that the notification system SSM implemented did not work. Second, SSM admittedly did not have systems in place to permit it to communicate with its members. *DSOF ¶¶72,73*. Not only did SSM fail to ensure that emails submitted by members were valid, but it admittedly suffered from technical issues and failed to even try to communicate with its members. *DSOF ¶75*. It is a practical impossibility to implement a reasonable repeat infringer policy if there is no communication with members. SSM's corporate representative readily admitted to these communication deficiencies in his deposition. *DSOF ¶72,73,75,77*. Having acknowledged such material problems, SSM claims to be in the process of developing new systems to resolve these issues, which notable have not been completed.[3] *DSOF ¶75, fn.1*. Thus, SSM's failure in communicating continues.

---

[3] Thus, it is evident that the necessary systems *can* in fact be designed and in fact do exist in the marketplace, only SSM consciously elected not to implement them until now.

It is important to acknowledge the motivation behind SSM's wholly insufficient repeat infringer policy. SSM permits its users to register a single fake email to activate all four of its websites; however, upon receipt of a take-down notice and rather than notify the user, SSM takes no action whatsoever until the third take-down notice is received for one of the four websites. *DSOF ¶77.* At that time, SSM only deactivates the user's access to the single website to which the take-down notice was directed. *DSOF ¶77.* SSM condones the user's activities on the remaining websites. *DSOF ¶77.* What this means is that each user can register on four websites with a single fake email address and continue posting infringing content up to three times before they will be taken down. SSM financially benefits from this scheme given that each user is permitted to post infringing content up to 12 times (3 notices x 4 websites = 12) before the associated email and log in credentials are deactivated. Only then that user can simply re-register on all four sites under another fake email address, thus perpetuating the problem indefinitely. This is the principal drawback with SSM's failure to verify email addresses and the fundamental problem with its repeat infringer policy. Another problem posed by SSM's policies is that on the one hand it treated its four websites as a single one in that it permitted users to register one set of credentials (username / password) to activate all four sites; yet on the other hand did not deactivate the user from all four sites upon receipt of a take-down notice, and instead limited deactivation to a single website. SSM's own practice is contradictory. For all practical purposes, this does not constitute a repeat infringer policy.

The most problematic, however, is that fact that Defendants do not even implement its own stated policy. Simply, once members are allegedly terminated for having violated the policy, their ability to post videos on the site continues. *DSOF ¶12.* In fact, nearly half of Hydentra's videos posted on Defendants' sites that are the subject to this lawsuit were posted by

members that were allegedly already terminated. *DSOF ¶12.* Defendants **do not** implement a reasonable repeat infringer policy when members are able to post videos *after* termination.

At a minimum, a genuine issue of material fact exists as to whether Defendants implement a reasonable repeat infringer policy.


2.      **Defendants Failed to Designate DMCA Agent with Copyright Office for Feedvid.com, Peekvids.com, and Playvids.com.**

DMCA safe harbor protections are not available for the web sites Feedvid.com, Peeksvids.com, and Playvids.com. These web sites were not registered with the U.S. Copyright Office as Internet Service Providers. *DSOF ¶64,66,68.* Defendants claim such registration requirement is irrelevant as SSM was registered. This argument fails. In order to qualify for DMCA Safe-Harbor provisions, the service provider must provide the Copyright Office with a designated agent for that service. 17 U.S.C. § 512(c)(2). The web site itself must have been registered in order to qualify for DMCA Safe-Harbor provisions. The only infringements that may qualify for safe-harbor protections are on Playvid.com, which designated Luchian to receive take-down notices. *DSOF ¶59,76.*

At a minimum, a genuine issue of material fact exists as to whether Defendants properly registered feedvid.com, peekvids.com, and playvids.com as Internet Service Providers and a DMCA Agent.

3.      **Defendants Had Actual Knowledge of Infringement of Hydentra's Material.**

As outlined in the following section, Defendants were specifically made aware of Hydentra's material on playvid.com displayed in violation of Hydentra's copyrights. Nonetheless, until the lawsuit was filed, these videos remained displayed to the public for free.

4.      **Defendants Fail to Expeditiously Remove or Disable Access To Infringing Material Upon Receipt of Claimed Notification.**

In order to qualify for such protection, the service provider, upon notification of claimed infringement, must respond expeditiously to remove or disable access to the claimed material. 17 U.S.C. § 512(c)(1)(C).

Pursuant to 17 USCS §512, the notices are required to contain the following information:

(i)  A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(ii)  Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii)  Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

(iv)  Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v)  A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

(vi)  A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

Hydentra mailed and delivered to SSM's designated agent proper notifications of claimed infringement, each of which contained the requisite information. *DSOF ¶59*.  SSM nevertheless failed to remove or disable Hydentra's copyrighted works from Playvid.com. *DSOF ¶69*.  SSM's suggestion that the notifications were never received must fail given the irrefutable proof of delivery to the agent, thus placing SSM on notice of the infringements. The law on mailing is

well settled: when an item is properly mailed, a rebuttable presumption exists that the addressee received the item.

> Where an item is properly mailed, there exists a rebuttable presumption that the item is received by the addressee. *In re Farris*, 365 F. App'x 198, 199 (11th Cir. 2010). This "'presumption of receipt' arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail." *Id.* at 199-200 (quoting *Konst v. Fla. E. Coast Ry. Co.*, 71 F.3d 850, 851 (11th Cir. 1996)); *see also Rivera v. AT & T Corp.*, 420 F. Supp. 2d 1312, 1320 (S.D. Fla. 2006) (citing *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1239 (11th Cir. 2002) ("[T]he common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee.")). ***Mere denial is insufficient to rebut the presumption***. *Farris*, 365 F. App'x at 200 (citation omitted). "The presumption so arising is not a conclusive presumption of law, but a mere inference of fact[.]" *Konst*, 71 F.3d at 852 n.1.

*Anderson v. Branch Banking & Trust Co.*, 2015 U.S. Dist. LEXIS 98235, *26-27 (S.D. Fla. 2015).

Hydentra delivered DMCA compliant take-down notices to the registered DMCA Agent, Contantin Luchian, for each of the 37 movies over 70 URLs. SSM failed to disable or block these videos from public display for 5 months, when the Defendants were served with this lawsuit. *DSOF ¶¶56,57,59,79.*

In addition, contrary to Defendants' assertions, Defendants do not expeditiously remove or disable claimed infringements upon receipt of a notification.  Nate Glass at TakeDown Piracy has had to resort to sending notification for infringements found on Defendants' sites to the hosting company due to problems with Defendants failing to act on notifications.  *DSOF ¶13.*

At a minimum, a genuine issue of material fact exists as to whether Defendants expeditiously respond to DMCA compliant take down notices.

### C.    Contributory Copyright Infringement

Hydentra further establishes secondary infringement, including contributory infringement and vicarious infringement. As the Supreme Court explained, "When a widely shared service or

product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious liability." *MGM Studios Inc. v. Grokster*, 545 U.S. 913, 929-30 (2005); *see also In re Aimster Copyright Litigation*, 334 F.3d 634, 645 (7th Cir. 2003). "One infringes contributorily by inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930.

A contributory infringer is one who, (1) "with knowledge of the infringing activity," (2) "induces, causes or materially contributes to the infringing conduct of another." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004). The knowledge requirement is met by a showing of actual or constructive knowledge or by evidence that a defendant took deliberate actions to willfully blind itself to specific infringing activity. *See DSOFtech Worldwide, LLC v. Internet Tech. Broad. Corp.*, No. 1:10cv651, 2010 U.S. Dist. LEXIS 119122, 2010 WL 4645791, at 3 (E.D. Va. Nov. 8, 2010); *Seoul Broad. Sys. Int'l, Inc. v. Young Min Ro*, No. 1:09cv433, 2011 U.S. Dist. LEXIS 82377, 2011 WL 3207024, at *9 (E.D. Va. July 27, 2011). DMCA-compliant notices are evidence of knowledge. *See Capitol Records, LLC*, 2015 U.S. Dist. LEXIS 38007, 2015 WL 1402049, at 43; *Giganews, Inc.*, 2014 U.S. Dist. LEXIS 183590, 2014 WL 8628031, at 7; *see also Corbis Corp.*, 351 F. Supp. 2d at 1107 (stating that notices are "the most powerful evidence of a service provider's knowledge").

Willful blindness is the equivalent of knowledge in copyright law. See *Aimster*, 334 F.3d at 650. "A person is 'willfully blind' or engages in 'conscious avoidance' amounting to knowledge where the person was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Viacom Int'l, Inc. v. Youtube, Inc.*, 676 F.3d 19, 35

(2nd Cir. 2012) (internal quotation marks omitted). There must be evidence that the defendant took "deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 131 S. Ct. 2060, 2070, 179 L. Ed. 2d 1167 (2011).

SSM knew, had reason to know, or was willfully blind to its users' infringement and materially contributed to that infringement. Sun Social knew of the specific infringements of Hydentra's works on playvid.com as Hydentra delivered to the registered DMCA Agent notices of each specific instance of infringement. *DSOF ¶59*. Even with this knowledge, SSM failed to disable the movies, permitting their continued display until months after this lawsuit was served. *DSOF ¶79*. SSM had actual knowledge of the 37 movies displaying on playvid.com.

Further, SSM had reason to know, or was willfully blind to its users' infringement on playvid.com prior to the take-down notices and on playvids.com, peekids.com, and feedvid.com. SSM admittedly avoids confirming the high probability of infringement on its sites. *DSOF ¶72, 73*. Sun Social operates its web sites in a fashion where the users are anonymous to even SSM, the users are not required to provide real and accurate contact information, and SSM fails to ensure communication capability with its members. *DSOF ¶72, 73, 75*. Most troubling is that SSM intentionally refrains from email verification because of a fear of losing members and viewers to its sites. *DSOF ¶73*. SSM creates the perfect scenario for infringers to post copyrighted materials without license or authority and get away with it. Such is knowledge or willful blindness to the activities *and* is material contribution to the infringements.

### D. Vicarious Copyright Infringement

Defendants summarily state that vicarious copyright infringement is virtually the same analysis of 15 U.S.C. 512 (c)(1)(B) and compliance with 512(c)(1)(B) establishes that there is no

vicarious infringement. Defendant is quite simply wrong. There are no cases that equate 512(c)(1)(B) analysis with vicarious infringement.  The law of vicarious copyright infringement is well developed and quite separate from 512(c)(1)(B).

In fact, case law has specifically recognized the difference between vicarious liability and 512(c)(1)(B), whereas the vicarious liability standard applied in *Napster* can be met by merely having the general ability to locate infringing material and terminate users' access, § 512(c) requires "something more," *Cybernet Ventures*, 213 F. Supp. 2d at 1181 (internal quotation marks omitted); see *Napster*, 239 F.3d at 1024.  *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1030 (9th Cir. 2013)[4]

A variant on respondeat superior, vicarious liability holds a defendant accountable for third-party infringement if he "(1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials." *Nelson—Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002). Unlike contributory infringement, vicarious liability is not based on the knowledge or intent of the defendant, but rather is entirely dependent on the existence of a financial benefit and the defendant's relationship to the infringement. *See Arista Records, LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009); *see also EMI Apr. Music, Inc. v. White*, 618 F. Supp. 2d 497, 507 (E.D. Va. 2009).

The first element requires that SSM "declin[ed] a right to stop or limit" the direct infringement. *Grokster*, 545 U.S. at 930.  Retaining the right to terminate is evidence of the right and ability to supervise. See *Viacom Int'l, Inc.*, 676 F.3d at 37 (Under the common law vicarious

---

[4]  It is important to note that a service provider may be in compliance with 512(c)(1)(B) but not be afforded safe harbor protections because the other requisite conditions not be met (for instance a reasonable repeat infringer policy not be in place).  Thus, the more stringent 512(c)(1)(B) maybe met by a provider, but liability for vicarious copyright infringement may still apply.

liability standard, the ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise).

It is undisputed that SSM had the ability to block infringing members from posting *and* disable infringing videos. *DSOF ¶61,74.* SSM reviews each and every video before it is displayed to the public on the web sites, at which point SSM has the ability to stop it from being displayed publically. *DSOF ¶74.* SSM also demonstrates the ability to block videos once they are displayed. *DSOF ¶76.*

The second element requires a "causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (emphasis omitted). Financial benefit can be shown by evidence that "users are attracted to a defendant's product because it enables infringement, and that use of the product for infringement financially benefits the defendant." *Arista Records, LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011). To show users' attraction, a plaintiff must only establish that "the availability of infringing material acts as a 'draw' for customers." *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1023 (9th Cir 2001). "[T]he law is clear that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant, draw – rather, it only need be 'a' draw." *Usenet.com, Inc.*, 633 F. Supp. 2d at 157. While the draw need not be significant, the requisite causal connection must be between "the infringing activities at issue in th[e] case and a direct financial benefit" to the defendant. *Giganews, Inc.*, 2014 U.S. Dist. LEXIS 183590, 2014 WL 8628031, at 4.

The entirety of SSM's revenue comes from advertising on its web sites – SSM is compensated by advertisers based upon the number of Internet users directed to the advertisers'

sites from the SSM web sites. *DSOF ¶71*. Therefore, the attractiveness of the content on the web sites will directly influence the number of users that respond to the advertisements. Each of Hydentra's videos posted on SSM's web sites contain "view count" data reporting the number of times that the video was viewed on SSM's web site. *DSOF ¶71*.  Because advertising monies are based upon the draw of videos, the sites themselves report the draw of each infringing video. *DSOF ¶71*.  Therefore, the existence of infringing work on the web sites benefits the defendants financially.

### E.  Trademark Infringement

Defendants fail to address Hydentra's trademark claims specifically, but rather merely summarily include these claims in their request for summary judgment on the copyright claims. Importantly, DMCA safe harbor protections specifically apply to copyright infringement.  There is simply no connection between these safe harbors and trademark infringement.  Defendants have failed to specifically address the trademark claims.  Accordingly, to the extent that Defendants' summary judgment motion applies to Hydentra' trademark claims, it should be denied.

Moreover, undisputed evidence establishes that Defendants have violated Hydentra's trademarks.  Accompanying each of Hydentra's videos unlawfully displayed on SSM's websites are Hydentra's trademarks, either "MetArt" or "SexArt," in the meta tags of the web page containing the video. *DSOF ¶56,60*.  A meta tag is an HTML (hypertext markup language) code embedded on a Web page that is used by the website owner to identify the site content. Meta tags are powerful tools because they have a direct effect on the frequency with which many search engines will find a website. Meta tags and/or meta descriptions are used by Internet search

engines as an indexing tool to determine which web sites correspond to search terms provided by a user.[5]

Meta tags do not affect the appearance of a website and are not visible when you look at a Web page, but they provide information regarding the content of the site. Some websites use meta tags in a deceptive manner to lure Web surfers. Instead of using terms that properly describe the site, some programmers substitute the names of competing companies.[6]

By using Plaintiff's trademarks in Defendants' meta tags and/or meta descriptions, Defendants use Plaintiff's trademarks in commerce and in connection with their promotions, sales, and advertising.

The "Lanham Act bars [a defendant] from including in its metatags any term confusingly similar with [a plaintiff's] mark." *Brookfield Communs, Inc. v. W. Coast Entm't Corp.,* 174 F.3d 1036, 1065 (9th Cir. 1999). "Initial interest confusion can occur where a defendant includes a plaintiff's mark in 'metatags' found on the defendant's website, after which some of those consumers will select defendant's website from the list." *Storus Corp.*, 2008 U.S. Dist. LEXIS 11698 at 4 (concluding that, "in the internet context, the wrongful act is the defendant's use of the plaintiff's mark to 'divert' consumers to a website that 'consumers know' is not [the plaintiff's] website.").

SSM violated Hydentra's trademarks by including Hydentra's trademarks in the meta tags of Sun Social's web sites. Sun Social will argue that it was the member/viewer posting the respective videos on the sites who entered the trademark into the video description. However,

---

[5]  For an explanation of meta tags, please refer to the Declaration of Jason Tucker, D.E. 76 , Exhibit 2, ¶10.
[6]  For example, a rival shoe manufacturer may bury the meta tag "Nike" in its Web page to lure Web surfers searching for Nike products.  In the case of the website selling handmade watches, the meta tag might include "Rolex, Swatch, Bulova, Cartier."

intent is not an element to trademark infringement. There is no DMCA defense to trademark infringement. For each of the 114 URLs containing Hydentra's movies, the meta tags for the URL included Hydentra's trademarks. *DSOF ¶60,63,65,67.*

### III.    CONCLUSION

As set forth herein, Plaintiff has conclusively established its burden of proof as to each of the claims raised in its Complaint. At a minimum, a genuine issue of material facts exists regarding each of Plaintiff's claims and whether Defendants are entitled to DMCA safe harbor protections.  Accordingly, Defendants motion for summary judgment should be denied.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 29th day of February, 2016 we served the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:   Brady J. Cobb, Esq., and Valentin Gurvits, Esq. (*admitted Pro Hac Vice*).

Respectfully submitted,

By:     */s/Aaron Behar, Esq.*
Aaron Behar, Esq.
Florida Bar No.: 166286
E-mail: AB@BeharBehar.com
*/s/Jaclyn Behar, Esq.*
Jaclyn Behar, Esq.
Florida Bar No.: 63833
E-mail: JB@BeharBehar.com
BeharBehar
1840 North Commerce Parkway
Suite 1
Weston, Florida 33326
Telephone:  (954) 688-7642
Facsimile: (954) 332-9260
E-mail: ab@beharbehar.com
**Counsel for Plaintiff**

*/s/Spencer D. Freeman, Esq.*
Spencer D. Freeman, Esq.
Freeman Law Firm, Inc.
1107 ½ Tacoma Avenue South
Tacoma, WA 98402
Telephone:  (253) 383-4500
Facsimile:  (253) 383-4501
E-mail: sfreeman@freemanlawfirm.org
**Counsel forPlaintiff (Pro Hac Vice)**