# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### MIAMI DIVISION

|  |  |
|---|---|
| HYDENTRA HLP INT. LIMITED,<br>a foreign corporation d/b/a METART,<br><br>    Plaintiff,<br><br>v.<br><br>CONSTANTIN LUCHIAN, an individual,<br>KONSTANTIN BOLOTIN, an individual,<br>SUN SOCIAL MEDIA, INC., a corporation,<br>individually and d/b/a PLAYVID.COM,<br>FEEDVID.COM, PLAYVIDS.COM and<br>PEEKVIDS.COM; PLAYVID.COM;<br>FEEDVID.COM; PLAYVIDS.COM;<br>PEEKVIDS.COM; and<br>John Does 1-20,<br><br>    Defendants. | Case No.<br>**1:15-cv-22134-UU** |

### DEFENDANTS KONSTANTIN BOLOTIN AND SUN SOCIAL MEDIA, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................... 1

**FACTS** ............................................................................................................................ 1

**LEGAL ARGUMENTS** .................................................................................................. 3

**I.**      **Defendants Cannot Be Liable for Direct Copyright Infringement** ............ 3

**II.**     **Plaintiff Cannot Succeed on its Claim of Contributory Copyright Infringement** ........ 4

**III.**    **Plaintiff Cannot Succeed on its Claim of Vicarious Copyright Infringement** ........ 5

**IV.**     **Defendants are Entitled to the Protections of the Digital Millennium Copyright Act** ........ 6

      **A.**      **The January Notices and the Rebuttable Presumption of Receipt** ........ 6

      **B.**      **Plaintiff Misunderstands the Notification System** ........ 7

      **C.**      **Plaintiff Misunderstands the Difference Between an Internet Service and an Internet Service Provider** ........ 9

      **D.**      **Defendant has a Reasonable Repeat Infringer Policy** ........ 10

**V.**      **Plaintiff Cannot Succeed on its Claims of Trademark Infringement (And Not Only Because it Does Not Own the Trademarks-in-Suit)** ........ 11

**VI.**     **Plaintiff Cannot Succeed on its Florida Statutory Claim** ........ 13

**VII.**    **Defendant's Affirmative Defenses Should Not Be Dismissed** ........ 14

      **A.**      **Copyright Misuse and Unclean Hands Affirmative Defenses** ........ 14

      **B.**      **DMCA Affirmative Defense** ........ 15

      **C.**      **Fair Use Affirmative Defense** ........ 15

      **D.**      **Lack of Scienter and Lack of Volition Affirmative Defenses** ........ 16

      **E.**      **Affirmative Defense that Damages Not Proximately Caused by Defendants** ........ 16

**F.**     **Failure to Mitigate Affirmative Defense**                                   17

**CONCLUSION**                                                                          17

## INTRODUCTION

The bulk of Plaintiff's Motion for Summary Judgement ("Motion") is based on Plaintiff's misunderstanding of a single truth: the DMCA does not require every website to independently register with the Copyright Office – it only requires the website's *provider* to register.  The DMCA is so clear on this matter that one must wonder if Plaintiff really misunderstands the statute, or if it is attempting to mislead this court.  Unfortunately, the remainder of the Motion is so replete with unsupported allegations and arguments as to suggest that the latter is much more likely.  Plaintiff has moved for summary judgment on direct infringement claims against Defendants Konstantin Bolotin and Sun Social Media, Inc. ("Defendants")[1] despite knowing full well that they did not themselves upload the allegedly infringing content.  Plaintiff has moved for summary judgment on a Florida state statute which not only explicitly excludes liability for Defendants, but which Plaintiff does not even attempt to support with a single fact.  And, most concerning, Plaintiff has moved for summary judgment for the alleged infringement of trademarks *that it does not even own*.

For these reasons, and as detailed below and set forth in Defendants' own Motion for Summary Judgment, Plaintiff's Motion for Summary Judgment should be denied and judgment should be entered for Defendants.

## FACTS

This Court is already well-aware of the general facts of this case, and Defendants will not burden the Court with a recitation of all facts once again.  However, Defendants make reference to, and incorporate by reference, their facts as set forth in Defendants' Motion for Summary Judgment (Docket No. 73), the accompanying Statement of Facts (Docket No. 73-1), and Defendants' Denials to Plaintiff's Statement of Facts filed herewith.  In addition, Defendants respond to certain discrete allegations made in the Motion as follows.

Throughout the Motion, Plaintiff makes reference to certain notifications of claimed infringement that it claims it sent to Defendant Sun Social Media, Inc. ("SSM") in January of

---

[1] Having filed suit against Defendant Constantin Luchian alleging all sorts of wrongs by Mr. Luchian, Plaintiff has apparently at this time finally admitted that it never had any cause of action against Mr. Luchian, passing on making any sort of claim against him in summary judgment, showing that he was dragged into this litigation without any basis whatsoever.  Mr. Luchian has never been involved in the activities on SSM's websites and has been an unfortunate casualty of Plaintiff's vexatious and baseless reign of terror.  *See* Motion and Memorandum of Law of Defendants Constantin Luchian for Summary Judgment, Docket No. 72.

1

2015 (the "January Notices").  Plaintiff states that these notices correlate to 37 of the works in suit that were displayed on SSM's website Playvid.com.  *See* Plaintiff's Statement of Facts ["*Plaintiff SoF*"], ¶¶ 8-11.  SSM denies that it ever received the January Notices.  *See* Declaration of Konstantin Bolotin in Support of Motions for Summary Judgment ["*Bolotin Decl. I*"], Docket No. 73-2, ¶ 35.  Plaintiffs claim that the January Notices were delivered to Mr. Luchian (*Plaintiff SoF*, ¶ 11), but that is not the case.  The USPS Tracking information provided by Plaintiff regarding the January Notices indicates that the package was signed by "C Jusino" – not Constantin Luchian.  *See* Declaration of Jason Tucker ["*Tucker Decl.*"], Docket No. 109, Exhibit D-1.  Ms. Jusino is an employee of Regus where Mr. Luchian's company Incorporate Now, Inc. has purchased "virtual" office space services.  *See* Declaration of Constantin Luchian ["*Luchian Decl.*"], Docket No. 72-2, ¶¶ 18-23.  It appears that the package was lost after Ms. Jusino signed for the package as Mr. Luchian never received the package.  *Id.*

Plaintiff has also made numerous allegations throughout the Motion that SSM does not and cannot communicate with its users – which is similarly false.  SSM can and does communicate with its members, both through email and through its websites.  For example, SSM sends users emails in appropriate circumstances when the user gets a notification on the websites that another user tried to contact that user on the website.  Also, SSM notifies users when his video has been removed for claims of copyright infringement on the website.  When a user logs into his account on the website, the user is shown that his videos have been removed on the basis of a copyright claim.  Furthermore, SSM notifies users when they have been terminated pursuant to the repeat infringer policy.  When a user tries to log into his account after termination, he is shown a notification popup that states that the user's account was terminated.  *See* Declaration of Konstantin Bolotin filed herewith ["*Bolotin Decl. II*"], ¶¶ 15.

And most concernedly, Plaintiff has alleged that Defendants have infringed Plaintiff's trademarks in the marks METART and SEXART.  As support therefore, Plaintiff has put forth registration information from the United States Patent and Trademark Office.  *See* Exhibits A and B to Declaration of Jason Krogman, Docket No. 76-1.  However, in that documentation, Plaintiff Hydentra HLP Int. Limited is ***not*** listed as the registrant and owner of the trademarks; another entity by the name of Hydentra, L.P. HLP General Partner, Inc. is listed as the registrant and owner.  Therefore, Plaintiff has filed causes of action for the infringement of trademarks which it does not own and knows it cannot prevail.

2

## LEGAL ARGUMENTS

### I.    Defendants Cannot Be Liable for Direct Copyright Infringement

Plaintiff has moved for summary judgment on its count for direct copyright infringement on the basis that Plaintiff's works were found on SSM's websites, and stating (without any support whatsoever, factual or legal) that "Defendants reproduced Hydentra's works in violation of Hydentra's exclusive rights." This unsupported statement fails to satisfy the standard required for finding summary judgment in favor of Plaintiff, and is contrary to the existing evidence, which requires that the direct infringement claim be dismissed.

Plaintiff's reasoning is that, because Plaintiff's works were reproduced on SSM's websites, Defendants are themselves liable for direct infringement. Every court that has considered this issue, however, including the United States Supreme Court, has disagreed. "A defendant may be held directly liable only if it has engaged in volitional conduct that violates the [Copyright] Act… Every Court of Appeals to have considered an automated-service provider's direct liability for copyright infringement has adopted that rule." Am. Broad. Companies, Inc. v. Aereo, Inc., 134 S. Ct. 2498, 2512-13 (2014). See, also, Disney Enters. v. Hotfile Corp., 798 F. Supp. 2d 1303, 1307-08 (S.D. Fla. 2011) (dismissing direct infringement claims) ("To establish direct liability for copyright infringement something more must be shown than mere ownership of a machine used by others to make illegal copies. There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner. The *Netcom* court described this nexus as requiring some aspect of volition." (*quoting* CoStar Group v. Loopnet Inc., 373 F.3d 544, 550 (4th Cir. 2004) and *citing* Religious Tech. Center v. Netcom On-Line Comm. Services, 907 F.Supp. 1361, 1370 (N.D.Cal. 1995))).[2] Plaintiff has not put forth any evidence that SSM (or Mr. Bolotin) did anything more than own the websites which were used by SSM's users to upload allegedly infringing material, nor could Plaintiff ever hope to show otherwise. Therefore, Plaintiff's Motion must be denied in connection with the direct copyright infringement claim and Plaintiff's direct copyright infringement claim should be dismissed.

---

[2] For even more legal support and argument on this issue, see Defendants' Motion for Summary Judgment, pp. 6-8.

## II.        Plaintiff Cannot Succeed on its Claim of Contributory Copyright Infringement

Plaintiff's claim for contributory copyright infringement depends on its false and unsupported assertion that Defendants knew about the allegedly infringing works-in-suit on the Websites.  However, Defendants deny that they had any such knowledge, whether actual or constructive, of the alleged infringements.  *Bolotin Decl. I*, ¶¶ 27-28, 33.  Defendants also deny that they ever received the January Notices, as they appear to have been lost by the party that signed for it, who was not SSM's agent.  *Bolotin Decl. I*, ¶ 35; *Luchian Decl.*, ¶¶ 18-23.  To be liable for contributory copyright infringement, the defendant must, with ***knowledge*** of the infringing activity, cause or materially contribute to the infringing conduct of another.  Cable/Home Comm. Corp. v. Network Prod., Inc., 902 F.2d 829, 845-46 (11th Cir. 1990).  Because Defendants had no knowledge (or at least there is a dispute regarding knowledge), Plaintiff cannot succeed at Summary Judgment on its claim for contributory copyright infringement.

However, even if there was a dispute as to Defendants' knowledge, Plaintiff cannot succeed on its contributory infringement claim because contributory infringement cannot be found if the products in question (in this case, the Websites) are capable of "substantial noninfringing uses." Cable/Home Comm. Corp., 902 F.2d at 845-46 (*citing* Sony Corp. of Am. V. Universal City Studios, Inc., 464 U.S. 417, 442 (1984)).  Because the Websites are "widely used for legitimate, nonobjectional purposes" and are more than merely capable of substantial noninfringing use, Defendants cannot be liable for contributory infringement.  Sony Corp., 464 U.S. at 442.  Defendants have put forth sufficient evidence to conclude that the Websites are widely used for legitimate, nonobjectional purposes and are more than merely capable of substantial noninfringing use.  SSM started its business operating an online dating website and only later started video hosting websites to satisfy the desire of some of its users to share their videos. *Bolotin Decl. I*, ¶¶ 3-4.  Since starting the websites, Defendants have gone to extraordinary efforts to limit use of the websites to only legitimate uses.  *See*, *generally*, *Bolotin Decl. I*, ¶¶ 3-32, 38-40.  Recently, SSM entered into an affiliate arrangement with one of the largest producers of pornographic material in the world, Mindgeek, and has created a curated page of material from Mindgeek's "Brazzers" brand.  *Bolotin Decl. I*, ¶ 6; Defendants' Responses to Interrogatories, Docket No. 73-1, pp. 7-8.

### III.   Plaintiff Cannot Succeed on its Claim of Vicarious Copyright Infringement

The appropriate test for vicarious liability for copyright infringement in in the common law[3] sphere is "profiting from direct infringement while declining to exercise the right to stop or limit it." Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 914 (2005). Plaintiff has not proved that SSM profits from direct infringement, or that SSM has declined to exercise its right to limit infringement.

SSM's revenues from the Websites comes solely from advertisements on its websites.[4] SSM Int. Resp., p. 12. SSM does not charge users to upload any content onto the Websites nor does it charge users to view any content on the Websites. *Id.* Except with certain irrelevant situations, advertisers do not get to select which content on the Websites their ads appear alongside. *Id.* SSM does not solicit any advertisers with any statements that the content on the Websites are infringing. *Id.* In fact, SSM does not directly solicit advertisers at all – all of the advertisements on its websites are through advertising brokers or by advertisers who approach SSM on their own. *Id.* SSM does not solicit brokers with any statements that its websites' content is infringing. *Id.*

Cases examining what constitutes a direct financial benefit have stressed the difference between a service provider that receives a financial benefit as a result of providing services generally and one that receives a financial benefit directly attributable to infringing activity. "[W]here there is no evidence in the record that the service provider 'attracted or retained subscriptions because of the infringement or lost subscriptions because of its eventual obstruction of the infringement,' no reasonable jury could conclude that the service provider received a direct financial benefit from providing access to the infringing material." Wolk, 840 F.Supp.2d 724, 748 (S.D.N.Y. 2012). *See*, *also*, Capital Records, Inc. v. MP3tunes, LLC, 821

---

[3] When the DMCA is implicated, as it is in this case, the vicarious liability standard is heightened, requiring not only the legal right to stop or limit the direct infringement, but "the practical ability to do so." Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1173 (9th Cir. 2007). *See*, *also*, Viacom Intern., Inc. v. YouTube, Inc., 676 F.3d 19, 36-38 (2d Cir. 2012) ("[W]e conclude that the 'right and ability to control' infringing activity under § 512(c)(1)(B) 'requires something more than the ability to remove or block access to materials posted on a service provider's website.'" (*quoting* Capital Records, Inc. v. MP3tunes, LLC, 821 F.Supp.2d 627, 645 (S.D.N.Y. 2011))). Defendants contend that SSM is subject to the safe-harbor provisions of the DMCA and it is therefore this standard that must be applied. *See* Defendants' Motion for Summary Judgment, pp. 13-15. However, to the extent that the DMCA standard does not apply, Defendants herein show that the lower standard is also not satisfied.
[4] The only exception is a small amount of revenue that that SSM has recently received as part of its affiliate relationship with Mindgeek's affiliate program. *Bolotin Decl. I*, ¶ 19.

F.Supp.2d 627, 645 (S.D.N.Y. 2011) ("[T]he financial benefit must be attributable to the infringing activity."). Given that SSM receives no revenue from its users, but only from advertisers that have no choice as to where their advertisements appear, there is no direct financial benefit to SSM from any allegedly infringing files, including the files-in-suit. Moreover, Plaintiff has taken no discovery and provided no evidence upon which the Court could conclude that SSM received a direct financial benefit as a result of infringement of its works.

With regards to the second prong, to the extent that SSM has any right and ability to control infringing use, which Defendants deny,[5] SSM did not "*declin[e]* to exercise the right to stop or limit it." To the contrary, all evidence on record supports that SSM has taken all action to stop and limit infringement whenever it knew about it. *Bolotin Decl. I*, ¶¶ 27-28, 35, 39-40.

## IV.     Defendants are Entitled to the Protections of the Digital Millennium Copyright Act

As detailed in Defendants' Motion for Summary Judgment, pages 4-6 and 8-16, incorporated by reference herein, Defendants qualify for the safe-harbors set forth in in the DMCA, and therefore Defendants do not restate all matters contained therein, but instead only respond to specific points raised in Plaintiff's Motion but not covered in Defendants' Motion.

### A.     The January Notices and the Rebuttable Presumption of Receipt

Plaintiff contends that SSM failed to remove or disable the works on Playvid.com referenced in the January Notices after Plaintiff mailed them to SSM's designated agent. Motion, p. 11. However, the notice was never received by SSM's agent, nor was it received by SSM. The USPS Tracking information provided by Plaintiff regarding the January Notices indicates that the package was signed by "C Jusino" – not Constantin Luchian. *See Tucker Decl.*, Exhibit D-1. Ms. Jusino is an employee of Regus where Mr. Luchian's company Incorporate Now, Inc. has purchased "virtual" office space services. *Luchian Decl.*, ¶¶ 18-23. It appears that the package was lost after Ms. Jusino signed for the package as Mr. Luchian never received it. *Id.* Because Mr. Luchian never received the notices, SSM did not receive them either and had no knowledge of the alleged infringements. *Bolotin Decl. I*, ¶¶ 33-35.

Although Plaintiff has put forth evidence that it sent the January Notices, which creates a presumption of receipt, that presumption is rebuttable. "[T]he presumption of receipt is 'not a conclusive presumption of law, but a mere inference of fact … and, when it is opposed by

---

[5] *See* Defendants' Motion for Summary Judgment, p. 15.

evidence that the letters were never received, must be weighed with all the other circumstances of the case … in determining the question whether the letters were actually received or not.'" Barnett v. Okeechobee Hosp., 283 F.3d 1232, 1240 (11th Cir. 2002) (quoting Rosenthal v. Walker, 111 U.S. 185, 193-94 (1884)).

In addition to the denials of receipt of Defendants and Mr. Luchian, the circumstances of this case support that Defendants did not receive the January Notices.  Specifically, SSM has an otherwise unblemished record of properly responding to every DMCA notice that it has received since it started in 2010, processing well over 15,000 pages of DMCA notices for the Websites in that time.  *Bolotin Decl. I*, ¶ 32.  Included in those 15,000 pages of DMCA notices are multiple notices from Plaintiff both before and after January of 2015, where SSM promptly responded by disabling access to the complained-of files and terminating users in accordance with its repeat infringer policy.  *Bolotin Decl. I*, ¶ 37.  SSM has terminated well over a thousand users pursuant to its repeat infringer policy.  *Bolotin Decl. II*, ¶ 38.  On the basis of the foregoing, it simply is unreasonable to conclude that Defendants received the January Notices and chose to ignore them rather than process them as they have with every other notice SSM has received.  At a bare minimum, the Court would have to find the existence of a genuine issue of material fact, precluding an award of summary judgment for the Plaintiff.

**B.      Plaintiff Misunderstands the Notification System**

Plaintiff states that SSM does not have a working notification system with its users and therefore it does not implement a reasonable repeat infringer policy.  Motion, pp. 12-13.  First, Plaintiff is incorrect that SSM does not communicate with its users.  SSM does communicate with its members, both through email and through its websites.  SSM sends users emails in appropriate circumstances when the user gets a notification on the websites, for instance, if another user tried to contact that user on the website.  Also, SSM does notify users when his video has been removed for claims of copyright infringement on the website.  When a user logs into his account on the website, the user is shown that his videos have been removed on the basis of a copyright claim.  Furthermore, SSM does notify users when they have been terminated pursuant to the repeat infringer policy.  When a user tries to log into his account after termination, he is shown a notification popup that states that the user's account was terminated.  *See Bolotin Decl. II*, ¶¶ 15.

In any event, the DMCA does not require that a provider keep information about its users beyond information reasonably necessary to terminate such users if they are found to be repeatedly infringing. *See*, *generally*, 17 U.S.C. § 512. To the contrary, the DMCA actively recognizes that an online service provider might in fact not possess *any* identifying information about its users in Section 512(g)(3). In Subsection (g)(3), the DMCA provides a mechanism for a user to reinstate material that was removed pursuant to a DMCA notice if that user provides a "counter notification" including such user's "name, address, and telephone number." If a provider was expected to have such information in its possession for all of its users, then the user would not be required to provide such information when submitting a counter notification.

Despite Plaintiff's misreading of the statute and the law,[6] the requirements for a working notification system to qualify for the DMCA safe-harbor is a system that permits notifications to be sent to SSM – not to users. *See*, *generally*, 17 U.S.C. § 512.[7] That a single package of notices out of fifteen thousand pages of notices delivered to SSM over a half-decade was lost before it could reach SSM does not mean that SSM did not have a working notification system, and certainly does not operate to strip SSM of its DMCA Safe Harbor. This is particularly so where, as here, Plaintiff had an existing working relationship with SSM and knew that SSM would remove upon notification all content that Plaintiff alleged to be infringing. When Congress passed the DMCA, it explicitly indicated that online service providers would not lose their protections under the act for technical errors, stating, for example, that even if some of the information listed for an online service provider is out of date, that service provider would not lose the safe harbor if the other information remains valid.[8] "[T]he statute focuses on whether

---

[6] The case cited by Plaintiff, Perfect 10, Inc. v. CCBill LLC, mentions a "working notification system" in connection with the DMCA notifications by copyright owners, and supports that holding with a citation to another case where the court found that the online service provider did not have a working notification system for copyright owners to send notices. 488 F.3d 1102, 1109 (9th Cir. 2007) (citing Ellison v. Robertson, 357 F.3d 1072, 1080 (9th Cir. 2004)).

[7] The only provision in the DMCA that relates to notifications to users is Section 512(g)(2)(A), which set forth a safe-harbor for online service providers against claims put forth by users, *not* copyright owners.

[8] The legislative history for the DMCA (S.Rep. No. 105-190 (1998)) includes the following committee statement:
> The Committee intends that the substantial compliance standard in subsections (c)(2) and (c)(3) be applied so that technical errors (such as misspelling a name, supplying an outdated area code if the phone number is accompanied by an accurate address, or supplying an outdated name if accompanied by an e-mail address that remains valid for the successor of the prior designated agent or agent of a copyright owner) do not disqualify service providers and copyright owners from the protections afforded under subsection (c). The Committee expects that the parties will comply with the functional requirements of the notification provisions—such as providing sufficient information so that a designated agent or the complaining party submitting a notification may be contacted

8

someone with an infringement complaint would be able to contact the company." Hotfile MSJ, *supra* at *26. The Defendants have consistently provided the ability for content producers to contact SSM for the removal of allegedly infringing materials and a single instance in which such notices were waylaid does not change that fact.

C.   **Plaintiff Misunderstands the Difference Between an Internet Service and an Internet Service Provider**

Plaintiff repeatedly contends that "DMCA safe harbor protections are not available for the web sites Feedvid.com, Peeksvids.com [sic], and Playvids.com. These web sites were not registered with the U.S. Copyright Office as ISPs." Motion, p.12. Plaintiff goes on to state, without any legal support, that "The web site itself must have been registered in order to qualify for the DMCA Safe-Harbor provisions." In making this statement, Plaintiff either intentionally omits an entire word from throughout the DMCA, or simply does not understand the difference between an Internet service and an Internet service provider. There is no wonder then that Plaintiff could not provide any legal support for its assertion.

SSM is an Internet service provider. *Bolotin Decl. II*, ¶ 2. SSM's Websites are the Internet service that SSM provides to its users. *Id.* The DMCA provides safe harbors to service providers. *See*, 17 U.S.C. § 512 (c)(1) ("A service *provider* shall not be liable for monetary relief … if the service *provider* …."); (c)(2) ("The limitations on liability established in this subsection apply to a service *provider* only if the service *provider* has designated an agent to receive notifications of claimed infringement …"); (i)(1) ("The limitations on liability established by this section shall apply to a service *provider* …"); (k)(1)(A) ("As used in this section, other than subsection (a), the term 'service provider' means a *provider* of online services or network access, or the operator of facilities therefor …").

Feedvid.com, Peekvids.com and Playvids.com are not entities – they are domain names and websites. They are not providers or legal entities in any fashion – they are a service that is being provided by SSM. Therefore, the Websites did not have to be individually registered with the U.S. Copyright Offices – only the service *provider*, SSM, was required to be registered, which Plaintiff admits it was. *See* Plaintiff's Statement of Fact, ¶ 10 ("Investigation established that Playvid.com was registered with the U.S. Copyright Office as an ISP, listing its owner to be

---

efficiently—in order to ensure that the notification and take down procedures set forth in this subsection operate smoothly.

Defendant, Sun Social Media, Inc."). Plaintiff cannot ignore the clear language of the DMCA and pretend that the word "provider" does not exist. The word does exist and the word is important. Only a provider needs to be registered with the Copyright Office, not every service that the provider provides.

> ### D.   Defendant has a Reasonable Repeat Infringer Policy

Aside from Plaintiff's doubly erroneous assertion: (1) that a reasonable repeat infringer policy requires an online service provider to provide notifications to its users (which it is not) and (2) that SSM did not in actuality communicate with its users (which it did), Plaintiff contends that SSM did not have a reasonably implemented repeat infringer policy only because SSM's three-strikes policy related to each of the websites separately – such that strikes on one website did not count to termination of the same user's account on another website. Motion, pp. 13-14. This contention is unsupported by fact, by law, or by the realities of the world.

First, the DMCA states that a repeat infringer policy should "provide[] for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). When a user repeatedly infringed on Playvid.com, then that user should be terminated on that "system," which is Playvid.com – not on Feedvid.com. This is reasonable and appropriate because a user (who has not been found guilty of infringement – but only alleged infringement) has only been alleged to be using one of those systems in an infringing manner repeatedly – it is unreasonable to terminate that user's account on other systems when he has not even been alleged to infringe on those other systems.

The DMCA itself suggests that because strikes are mere allegations, blindly counting them (and then terminating a user's use of another system entirely) would be a mistake. As Professor Nimmer explains: "When Congress wished to refer to individuals who were proven infringers, it knew how to do so. It routinely prefaced references to others are 'alleged infringers' or 'claimed infringers.' *See*, *e.g.*, 17 U.S.C. 512(c)(2)(e), 512(c)(3)(A)(i). In the current context [of § 512(i)], by contrast, Congress used the term 'repeat infringers' without any such qualification. The meaning unmistakenly denoted is those against who infringement has been established, not against whom it is merely alleged." Nimmer on Copyright at 12B-109.

Moreover, Congress and the DMCA purposefully left the determination of what constitutes a reasonable infringement policy in the hands of the service provider, and that

determination should not be discounted, leaving room for online service providers to appropriately operate their services.  *See*, *e.g.*, Corbis Corp. v. Amazon.com, Inc., 351 F.Supp.2d 1090, 1100-01 (W.D. Wash. 2004) ("The key term, 'repeat infringer,' is not defined and the subsection never elaborates on what circumstances merit terminating a repeat infringer's access…. The fact that Congress chose not to adopt such specific provisions when defining a user policy indicates its intent to leave the policy requirements, and the subsequent obligations of the service providers, loosely defined."); Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1111 (9th Cir. 2007) ("To identify and terminate repeat infringers, a service provider need not affirmatively police its users for evidence of repeat infringement."); UMG Recordings, Inc. v. Veoh Networks Inc., 665 F.Supp.2d 1099, 1118 (C.D. Cal. 2009) (holding that Veoh's three-strikes policy satisfied DMCA requirements); Io Group, Inc. v. Veoh Networks, Inc., 586 F.Supp.2d 1132, 1144 (N.D. Cal. 2008) ("[T]he hypothetical possibility that a rogue user might reappear under a different user name and identity does not raise a genuine fact issue as to the implementation of Veoh's policy."); Arista Records LLC v. Myxer Inc., 2011 WL 11660773 (C.D. Cal. 2011) ("[B]ecause § 512(i)'s language emphasizes that a service provider's repeat infringer policy must be implemented in a reasonable manner in appropriate circumstances, it is incorrect that Myxer must have an exhaustive and perfectly-crafted policy."); Disney Enters., Inc. v. Hotfile Corp., 2013 WL 6336286, at *19 (S.D. Fla. Sept. 20, 2013) ("[C]ourts have counseled that the advantages of the DMCA should be viewed capaciously…. Although an affirmative defense, the DMCA has often been construed in favor of service providers, requiring relatively little effort by their operations to maintain immunity.").  On the basis of all of the foregoing, there is no question that SSM adopted and reasonably implemented a repeat infringer policy.[9]

## V.    Plaintiff Cannot Succeed on its Claims of Trademark Infringement (And Not Only Because it Does Not Own the Trademarks-in-Suit)

Plaintiff has set forth three counts under the Lanham Act, all stemming from its allegations that Defendants have infringed its purported registered trademarks METART and SEXART.  *See* Motion, pp. 14-16; Complaint, pp. 29-38.  Under the relevant statutes and case

---

[9] It is in fact Plaintiff's contention that would lead to an unreasonable result.  If Google, for instance, had to terminate a user from all of its services because that user was repeatedly infringing content on only its YouTube service, then Google would have to terminate that user from using Google's Gmail service, using Google's Android telephone operating system, and using Google's search engine.  This sounds absurd because it is absurd.

law (and common sense), the registrant or owner of a trademark or service mark is the only party given a cause of action against those parties infringing upon the trademark or service mark.  *See* 15 U.S.C. § 1114 ("Any person who shall, without consent of the *registrant* ... shall be liable in a civil action by the *registrant* …."); Custom Mfg. and Engineering, Inc. v. Midway Services, Inc., 508 F.3d 641, 647 (11th Cir. 2007) ("To establish a prima facie case under § 1125(a), a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it such that consumers were likely to confuse the two.").  Plaintiff cannot make a prima facie case under either Section 1114 or Section 1125, much less satisfy the requirements for summary judgment, because Plaintiff has not shown any trademark rights whatsoever in METART and SEXART.  Quite to the contrary, the only evidence regarding trademark rights that Plaintiff *has* put forth demonstrates conclusively that the METART and SEXART trademark registrations are owed by a third party, Hydentra, L.P. HLP General Partner, Inc.  *See* Exhibits A and B to Declaration of Jason Krogman, Docket No. 76-1.  That Plaintiff has filed suit against Defendants for alleged infringements of trademarks that are owed by another party is quite simply an abuse of the legal system.  At a bare minimum, the Plaintiff seems to hope that the Court is not sufficiently sophisticated to differentiate between various legal entities with similar names.

In any case, even if Plaintiff did have any rights to the trademarks, which it obviously does not, Plaintiff could not succeed on its claims of trademark infringement for (at least) ***five*** other reasons.

First, as for its count for direct infringement, Defendants did not select the meta tags that Plaintiff alleges constitute infringement – SSM's users did so.  *Bolotin Decl. II*, ¶¶ 4-6. Moreover, Plaintiff's allegations that the meta tags have any relevance to search engine rankings or anything else in this matter are wrong – meta tags are irrelevant to search engine rankings. *Bolotin Decl. II*, ¶ 3.

Second, with respect to Defendants' potential secondary liability, Defendants cannot be liable because they did not have the necessary knowledge of the alleged infringement by its users – and when it gained knowledge SSM promptly removed the allegedly infringing content.  *See Bolotin Decl. I*, ¶¶15-16; Inwood Labs., Inc., v. Ives Labs., Inc., 456 U.S. 844, 854 (1982) (distributor can be liable if it "continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement").

Third, with regards to any of its trademark related claims, Plaintiff would have to show likelihood of confusion, a complex seven factor analysis which Plaintiff has not even come close to satisfying. *See, e.g.,* Frehling Enterprises, Inc. v. International Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1999) (setting fourth seven factors in assessing likelihood of consumer confusion).

Fourth, to the extent that the SEXART and METART marks (which, again, are not owned by Plaintiff) were used in connection with works that are actually produced by the owner of the SEXART and METART marks, such use constitutes nominative fair use. *See* New Kids on the Block v. News America Pub., Inc., 971 F.2d 302, 306 (9th Cir. 1992) ("[T]rademark law recognizes a defense where the mark is used only 'to describe the goods or services of [a] party, or their geographic origin.'" (quoting 15 U.S.C. § 1115(b)(4))).

Fifth, Plaintiff's trademark claims are based on the theory of "initial interest confusion" (Motion, p. 15), which rests on a user potentially being initially confused by the use of a mark, even though the user is not ultimately confused about the source of the product (in this case, the videos in question). However, initial interest confusion is ***not*** actionable in the Eleventh Circuit. *See* USA Nutraceuticals Group, Inc. v. BPI Sports, LLC, Case No. 15-civ-80352-Bloom/Valle, 2016 WL 695596 (S.D. Fla. Feb. 22, 2016) (providing voluminous citations that initial interest confusion is not actionable in the Eleventh Circuit and finding that defendant's use of competitor's marks in meta-tags did not create a likelihood of confusion); Suntree Technologies, Inc. v. EcoSense Intern., Inc., 802 F.Supp.2d 1273, 1283 (M.D. Fla. 2011) ("In sum, Suntree alleges initial interest confusion, which is not actionable confusion in the Eleventh Circuit.").

## VI.     Plaintiff Cannot Succeed on its Florida Statutory Claim

Plaintiff simply cannot succeed on its claim under Florida Statute § 540.08 for numerous reasons, but most directly because Plaintiff's Motion fails to provide ANY factual support for the claim whatsoever. The only factual references in Plaintiff's Motion relating to this Count are to its own (unverified) Complaint, and a single reference stating that SSM earns revenue through its advertisers. Motion, p. 16. Plaintiff has not provided any admissible evidence whatsoever to support the factual basis necessary to succeed on this claim, including the names of the individuals whose names and/or likenesses were published without authorization or how Plaintiff has any right to bring a cause of action on their behalf. To the contrary, for the reasons set forth in Defendants' Motion for Summary Judgment, pp. 19-20, this count of the Complaint should be

dismissed because, *inter alia*, Section 540.08(4)(b) explicitly excludes liability in cases where the person has consented to the use of her or his name in the initial distribution.  So, unless Plaintiff is alleging that it produced pornographic videos of individuals without their consent, Plaintiff's claim under Florida State § 540.08 must fail.

**VII.   Defendant's Affirmative Defenses Should Not Be Dismissed**

Defendants have put forth in their answers to interrogatories (Docket No. 73-1), and through their declarations filed herewith and with their Motion for Summary Judgment, sufficient evidence to permit them to proceed with their affirmative defenses.

**A.     Copyright Misuse and Unclean Hands Affirmative Defenses**

Defendants have sufficient evidence to move forward on its affirmative defenses of copyright misuse and unclean hands – evidence almost entirely admitted by Plaintiff in its Motion.  The doctrine of copyright misuse prohibits a copyright holder from using a copyright to secure exclusive rights or limited monopoly not granted by the Copyright office and which is contrary to public policy to grant, and functions as an absolute bar on recovery for copyright plaintiffs who have attempted to extend their limited rights to property not covered by the copyright.  *See* Home Design Servs., Inc. v. Park Square Enters., Inc., 2005 WL 1027370, at *11 (M.D. Fla. May 2, 2005).  Most clearly, Plaintiff has tried to extend its purported copyrights in the works at issue beyond the copyrights themselves into the scope of Florida's Unauthorized Publication of Name and Likeness statute referenced above.  Despite having no legitimate basis for bringing that cause of action, as detailed above, Plaintiff is attempting to use its copyrights in a manner that is not permitted by the Copyright Act.

Plaintiff has further engaged in copyright misuse and unclean hands by way of its failure to mitigate damages (detailed below) as it knew that the copyrighted files could be removed promptly upon notice by email, but it simply decided not to do so, instead choosing to file this litigation.  Moreover, Plaintiff appears to have intentionally sent paper takedown notices to SSM instead of email notices (which it had previously done on multiple occasions) in hopes that SSM would somehow make a mistake in processing the paper notices.  *Bolotin Decl. I*, ¶ 36-37; Defendants' Motion to Dismiss, pp. 12-13.  These are not the actions of a rights holder that is looking to legitimately protect its rights.   This constitutes copyright misuse because Plaintiff is misusing its copyrights in order to extract damages from Defendants where it would not otherwise be entitled to damages.  It also constitutes unclean hands because Plaintiff has

purposefully created a situation where it could file suit against Defendants and Defendants have been damaged by having to defend against a baseless and vexatious lawsuit.  *See*, e.g., <u>Calloway v. Partners Nat. Health Plans</u>, 986 F.2d 446, 450-51 (11th Cir. 1993) (doctrine of unclean hands available where plaintiff's wrongdoing is directly related to the claim against which it is asserted and defendant was personally injured by plaintiff's conduct.").

### B.     DMCA Affirmative Defense

Defendants have provided the Court with voluminous evidence and case law supporting their argument that they are entitled to the safe-harbor provisions of the Digital Millennium Copyright Act.  Defendants make reference to the pertinent sections above and to pages 4 through 6 and 8 through 16 of their Motion for Summary Judgement (Docket No. 73), incorporated herein by reference.

### C.     Fair Use Affirmative Defense

Plaintiff completely misunderstands Defendants' Fair Use affirmative defense, thinking that Defendants are setting forth a fair use argument under the Copyright Act.  As set forth in their Amended Answer (Docket No. 38-1, p. 20), and SSM's Responses to Interrogatories (Docket No. 73-1, pp. 6-7) Defendants' Fair Use argument is two-fold.  First, Defendants argue that the use of Plaintiff's trademarks (which, as discussed above, are not even Plaintiff's trademarks) constituted fair use.  To the extent that the SEXART and METART marks (which, again, are not owned by Plaintiff) were used in connection with works that are actually produced by the owner of the SEXART and METART marks, such use constitutes nominative fair use. *See* <u>New Kids on the Block v. News America Pub., Inc.</u>, 971 F.2d 302, 306 (9th Cir. 1992) ("[T]rademark law recognizes a defense where the mark is used only 'to describe the goods or services of [a] party, or their geographic origin.'" (quoting 15 U.S.C. § 1115(b)(4))).  Second, prior to sending a DMCA take-down notice, a copyright-owner is obligated to consider whether the content subject to the notice is non-infringing by nature of it being fair use.  *See*, *e.g.*, <u>Disney Enters. v. Hotfile Corp.</u>, 2013 U.S. Dist. LEXIS 172339, 152-53 (S.D. Fla. Aug. 28, 2013) ("[P]rior to submitting a takedown notice, the copyright holder must consider not only whether the material actually belongs to it, but whether the use of the material lacks an obviously lawful purpose like fair use.").  There is no evidence on record that Plaintiff has complied with this requirement, precluding a finding of summary judgment in its favor.

**D.      Lack of Scienter and Lack of Volition Affirmative Defenses**

It is undisputed that Defendants did not upload the videos in suit or select the titles, descriptions and tags associated with those videos. *Bolotin Decl. I*, ¶¶ 6, 16, 18; *Bolotin Decl. II*, ¶¶ 4. Plaintiff has not even argued otherwise in its Motion – alleging only that SSM's Websites displayed the allegedly infringing materials. As such, the lack of volition is not only viable, but already established. Where there is no volition by the defendant, there cannot be direct infringement. *See* Am. Broad. Comps., Inc. v. Aereo, Inc., 134 S. Ct. 2498, 2512-13 (2014) ("A defendant may be held directly liable only if it has engaged in volitional conduct that violates the Act"). Furthermore, to the extent that Plaintiffs can prove at trial that Defendants are liable for any form of infringement (which Defendants submit they cannot do), Defendants have submitted ample evidence that they did not intentionally or knowingly commit infringement – making any such potential infringement, innocent infringement. *See Bolotin Decl. I*, ¶¶ 27-40.

**E.      Affirmative Defense that Damages Not Proximately Caused by Defendants**

Defendants have provided ample factual and legal support for their affirmative defense of lack of proximate cause. First, because Defendants were not the parties that posted the allegedly infringing content on the Websites - and it was that action which caused damage (if any) to Plaintiff - and second, Defendants (who maintain a rigorous takedown process for allegedly infringing materials) could not have foreseen that a small number of takedown notices would be lost – Plaintiff's damages (if any) were not proximately caused by any action or inaction on part of the Defendants. *See* Palma v. BP Products North America, Inc., 347 Fed.Appx. 526, 527-28 (11th Cir. 2009) ("[H]arm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question"). Defendants' specific act in this instance was operating a website where it took all reasonable steps in order to comply with the DMCA and otherwise remove infringing materials from its websites – websites that have significant legitimate and non-infringing uses. *See* SSM's Responses to Interrogatories, Docket No. 73-1, p. 8. Given Defendants' extraordinary efforts to limit infringement, it could not have foreseen that SSM's operation of its websites would cause damage to Plaintiff. Moreover, Plaintiff has failed to present evidence that it has suffered ***any*** damages whatsoever from the alleged infringements. Even where Plaintiff is seeking statutory damages, the statutory damages must bear some relation to the amount of any actual damages

16

suffered as a result of the infringement.  *See*, *e.g.*, <u>Clever Covers, Inc. v. Sw. Florida Storm Def.,</u>
<u>LLC</u>, 554 F. Supp. 2d 1303, 1313 (M.D. Fla. 2008).

> **F.      Failure to Mitigate Affirmative Defense**

Plaintiff's own submissions demonstrate the validity of Defendants' affirmative defense
that Plaintiff failed to mitigate its own damages.  Preliminarily, it is uncontested that on
numerous occasions prior to the January Notices, Plaintiff sent takedown notices to SSM by
email and they were promptly processed.  *Bolotin Decl. I*, ¶ 37.  Plaintiff therefore knew that its
content could – and would – be removed promptly if it simply asked SSM by email as it had
done in the past.  Despite this knowledge, Plaintiff contends that it sent the January Notices in
hard copy form only by USPS regarding the files on Playvid.com and that it did ***nothing***
thereafter except wait ***five months*** to file this lawsuit.  *Tucker Decl.*, ¶¶ 7-8.  With respect to the
videos on the other websites, Plaintiff admits that it knew about most of them as far back as in
February of 2015, and knew that SSM operated the websites, but did nothing to have the files
taken down except file this lawsuit in June of 2015, five months later.  *Plaintiff's SoF*, ¶¶ 15-20.
*See*, *also*, <u>Malibu Media, LLC v. Zumbo</u>, 2014 WL 2742830, at *4 (M.D. Fla. 2014) ("[C]ourts
have indeed recognized that knowing failure to stop ongoing copyright infringement amounts to
a failure to mitigate.").  Indeed – Plaintiff makes the very point that – as soon as it filed the
present action, SSM removed from its websites the complained-of content.  Far from proving
liability (as Plaintiff seems to think it does), this proves only that Plaintiff (intentionally) failed to
mitigate its damages, hoping to gain some advantage in the present litigation by virtue of this
strategic choice.

<u>**CONCLUSION**</u>

For the reasons set forth above, and for the reasons set forth in Defendants' Motion for
Summary Judgment, Defendants request that this honorable court deny Plaintiff's Motion and to
instead grant judgment in favor of Defendants on all counts of the Complaint.

17

**Respectfully submitted:**

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, MA 02459
Telephone: (617) 928-1804
Facsimile: (617) 928-1802
vgurvits@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb, Esquire
Florida Bar No. 031018
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone (954) 527-4111
Facsimile (954) 900-5507
bcobb@cobbeddy.com

*Attorney for Defendants*
*Constantin Luchian,*
*Konstantin Bolotin and*
*Sun Social Media Inc.*

Dated: February 29, 2016

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record on the service list below this 29th day of February, 2016.

/s/ Brady J. Cobb
Brady J. Cobb

## SERVICE LIST

Aaron Behar, Esquire
Jaclyn Behar, Esquire
BEHARBEHAR
1840 North Commerce Parkway
Suite One
Weston, Florida 33326
Telephone: (954) 688-7642
Facsimile: (954) 332-9260
AB@BeharBehar.com
JB@BeharBehar.com

Spencer D. Freeman
Freeman Law Firm, Inc.
1107 1/2 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (206) 516-3800
Facsimile: (206) 516-3888
sfreeman@freemanlawfirm.org

19