UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

| | |
|---|---|
| HYDENTRA HLP INT. LIMITED, a foreign corporation d/b/a METART,<br><br>　　Plaintiff,<br><br>v.<br><br>CONSTANTIN LUCHIAN, an individual, KONSTANTIN BOLOTIN, an individual, SUN SOCIAL MEDIA, INC., a corporation, individually and d/b/a PLAYVID.COM, FEEDVID.COM, PLAYVIDS.COM and PEEKVIDS.COM; PLAYVID.COM; FEEDVID.COM; PLAYVIDS.COM; PEEKVIDS.COM; and John Does 1-20,<br><br>　　Defendants. | Case No.<br>1:15-cv-22134-UU |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S OMNIBUS MOTION IN LIMINE**

Defendants Sun Social Media, Inc. ("SSM"), Konstantin Bolotin ("Mr. Bolotin") and Constantin Luchian ("Mr. Luchian"), by and through their undersigned counsel, hereby oppose Plaintiff's Omnibus Motion in Limine. In support of this Opposition, Defendants state the following:

**I.　"Copyright Troll" is a Legitimate and Descriptive Term for Plaintiff and Should Not Be Excluded**

Wikipedia defines a "copyright troll" as a party "that enforces copyrights it owns for the purposes of making money through litigation, in a manner considered unduly aggressive or opportunistic, generally without producing or licensing the works it owns for paid distribution."[1]

---

[1] https://en.wikipedia.org/wiki/Copyright_troll (accessed March 4, 2016).

1

Similar definitions of "copyright troll" have been recognized by courts around the country, who have used the term in their written opinions.  *See*, *e.g.*, Malibu Media, LLC v. Doe, No. 15 CIV. 4369 AKH, 2015 WL 4092417, at *2 (S.D.N.Y. July 6, 2015) ("Recent empirical studies show that the field of copyright litigation is increasingly being overtaken by 'copyright trolls,' roughly defined as plaintiffs who are more focused on the business of litigation than on selling a product or service or licensing their copyrights to third parties to sell a product or service…. In 2012, judge in the Southern district and across the country began awakening to the danger of copyright trolls, especially in the context of pornography…. The largest copyright trolls were increasingly unscrupulous in abusing the litigation process…" (internal quotes and citations omitted)).  Third Degree Films v. Does 1-47, 286 F.R.D. 188, 189 n.1 (D. Mass. 2012) ("A copyright troll is an owner of a valid copyright who brings an infringement action not to be made whole, but rather as a primary or supplemental revenue stream." (citation omitted)); Brownmark Films, LLC v. Comedy Partners, 682 F.3d 687, 691 (7th Cir. 2012) (copyright plaintiff that sought expensive and over-broad discovery gave the appearance of being a "copyright troll").  *See*, *also*, *generally*, James DeBriyn, *Shedding Light on Copyright Trolls: An Analysis of Mass Copyright Litigation in the Age of Statutory Damages*, 18 UCL Ent. L.Rev. 79 (2012); Matthew Sag, *Copyright Trolling, An Empirical Study*, 100 Iowa L.Rev. 1105, 1108 (2015).

Plaintiff has itself stated that it "engages in extremely limited licensing of its content to other entities or websites for viewing."  Declaration of Jon Krogman, D.E. 76-1, ¶ 8.  Defendant has itself admitted that it found instances of alleged infringement on SSM's websites five months before it took any action to get them removed, and the only action it took was to file suit (when it knew that it could have them removed in days by sending a simple email).  Plaintiff's Statement of Fact, D.E. 76, ¶¶ 15-20.  It is undisputed that Plaintiff has filed at least eighteen almost

identical lawsuits around the country since the beginning of last year.  And a simple review of the docket in this matter will show that Plaintiff has attempted to abuse the legal process by filing one vexatious motion after another, seeking sanctions and punishments where it was simply not entitled to receive them.

All of these actions fall directly in line with what courts have defined above as "copyright trolling."  That term is an accurate description of what Plaintiff does and moreover it is a relevant part of this case.  Defendants have put forth the affirmative defenses of copyright misuse, unclean hands and failure to mitigate damages, all of which center on Plaintiff's copyright trolling activities.  *See* Defendants' Opposition to Plaintiff's Motion for Summary Judgment, D.E. 123, pp. 14-15, 17.  The term is used by courts, academics and the general public to define and describe the activities of Plaintiff – and the language of Defendants should not be circumscribed from using the most appropriate words to define Plaintiff's activities.

Plaintiff, knowing that *the conduct* referenced by the term "copyright troll" is opprobrious, wants to block Defendants from using the *words* that denote such conduct.  However, it would be unreasonable to prohibit Defendants from using commonplace, well defined and well applicable words to describe wrongful conduct simply because the conduct it describes is unsavory.  Any prejudice to Plaintiff that might result from the use of such a term, assuming that such prejudice even exists, would not be "unfair" within the meaning of Rule 403.  The Court should not exclude the use of the term "copyright troll."

**II.     The Number of Plaintiff's Previous Lawsuits is Directly, Substantially and Materially Relevant to Defendants' Affirmative Defenses and Statutory Damages**

It is a matter of public record that Plaintiff has filed at least eighteen lawsuits around the country since last year, all of them almost identical to the instant lawsuit.  This fact is both relevant and admissible because it is directly related to Defendants' affirmative defenses of

copyright misuse and unclean hands and is recognized as a factor in determining statutory damages (if awarded).

In its clear actions constituting copyright trolling (as defined and explained above), Plaintiff has set forth the basis for Defendants' affirmative defenses as Plaintiff has purposely taken action to cause this dispute and Plaintiff is using its copyrights not in a manner granted or intended by the Copyright Act.  Specifically, and without limitation, Plaintiff is using its copyrights and its many lawsuits not as a means of being made whole for damages it suffered, but as a primary or supplemental revenue stream.  See Third Degree Films v. Does 1-47, 286 F.R.D. 188, 189 n.1 (D. Mass. 2012); Malibu Media, LLC v. Brenneman, 2013 WL 6560387 (N.D. Ind. Dec. 13, 2013) (court "troubled … by the rise of so-called 'copyright-trolls' … who seek copyright infringement damages not to be made whole, but rather as a primary or secondary revenue stream" and lowering statutory damages on default judgment from the requested $24,750 to $16,500"); Malibu Media, LLC v. Funderburg, 2015 WL 1887754 (N.D. Ill. Apr. 24, 2015) (after stating concerns over copyright trolling, and stating that "[t]he Court is aware of Plaintiff's extensive history of litigation in the last three years alone," court granted minimum statutory damages of $750 on default judgment).

Statutory damages must further be based on the circumstances not only of the infringement, but "other relevant circumstances."  See IO Group, Inc. v. Jordon, 708 F.Supp.2d 989, 1002 (N.D. Cal. 2010) ("A district court has wide discretion in determining the amount of statutory damages to be awarded and should consider what is just in the particular case in light of the nature of the copyright, the circumstances of the infringement, and other relevant circumstances.").  That Plaintiff has filed nearly a score of identical lawsuits around the country is certainly a relevant circumstance, and helps the jury determine what is just.  Therefore, the

4

number of lawsuits that Plaintiff has filed is not unfairly prejudicial, but is instead directly and importantly relevant to Defendants' affirmative defenses and also the evaluation of statutory damages.

Finally, Rule 403 does not prohibit the introduction of evidence regarding the number of lawsuits because this evidence is not being provided in order to prove Plaintiff's character – it is being provided in order to evidence Plaintiff's motivations and Plaintiff's business practices. The Court should not exclude the proffering of evidence regarding to the number of lawsuits filed by Plaintiff.

### III. Defendants Do Not Intend to Use the Phrase "Hired Gun," However Evidence Regarding Mr. Tucker's Ability, Credibility, Reputation and Competence Should Not Be Excluded

Defendants have not and do not intend to mention or elicit the use of the phrase "hired gun" at trial to describe Mr. Jason Tucker. However, to the extent that such a phrase is used, Defendants believe that the evidence will clearly show that Mr. Tucker's business is to obtain engagements from copyright owners in order to run their copyright trolling (see above).

More concerning, and totally baseless, however, is that Plaintiff has attempted to squeeze under the heading of its "hired gun" motion a separate motion in limine preventing Defendants from questioning and attacking Mr. Tucker's "ability, credibility, reputation and competence" of Mr. Tucker. Plaintiff does not provide any legal basis for this request, because not only does it not exist, the rules of evidence explicitly permit such questioning and attacks, particularly in relation to a witness's motivations and credibility (including asking about such witness's compensation), and especially when that witness is an expert witness (like Mr. Tucker). *See*, *e.g.*, 11th Cir. Pattern Jury Instruction 3.6.2 (alt) ("When a witness is being paid for reviewing and testifying concerning the evidence, you may consider the possibility of bias and should view

5

with caution the testimony of such witness where court testimony is given with regularity and represents a significant portion of the witness's income."); Fed. R. Ev. 608 ("A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character."); Fed. R. Ev. 702 (expert witness's testimony must be "the product of reliable principles and method" and must be "reliably applied to the principles and methods to the facts of the case").

A party's right to attack the ability, credibility and competence of a witness is a basic purpose of cross-examination and trial, and Plaintiff's attempt to limit it is absurd. *See*, *e.g.*, United States v. Mayer, 556 F.2d 245, 248 (5th Cir. 1977) ("[C]ross-examination of a witness in matters pertaining to his credibility ought to be given the largest possible scope."); Wasko v. Dugger, 761 F.Supp. 1560, 1567 (S.D. Fla. 1991) ("[T]he Eleventh Circuit and the former Fifth Circuit have on several occasions explicitly set forth the requirement that, in addition to permitting cross-examination so that jurors may receive sufficient information to assess generally the credibility of the witness, defense counsel must be permitted, through examination of the witness, 'to make a record from which he could argue why the witness might have been biased.'" (quoting United States v. Calle, 822 F.2d 1016, 1020 (11th Cir. 1987))). *See*, *also*, Fla Stat. 90.604 ("[A] witness may not testify to a matter unless evidence is introduced which is sufficient to support a finding that the witness has personal knowledge of the matter."); Fed. R. Ev. 607 ("Any party … may attack the witness's credibility."); Fla. Stat. 90.608 ("Any party … may attack the credibility of a witness by … Showing that the witness is biased … [or] Showing a defect of capacity, ability, or opportunity in the witness to observe, remember, or recount the matters about which the witness testified."). Mr. Tucker's abilities, reputation and competence

go straight to the heart of his credibility and must be allowed.  See Fed. R. Evi. 611(b) (permitting examination of matters affecting the witness's credibility).

The Court should not limit the Defendants' abilities to examine the credibility of Mr. Tucker or to accurately describe his position and motivations.

### IV.     Mr. Tucker's Business Relationship With Plaintiff and Other Copyright Owners Go To Bias and Credibility

Plaintiff seeks to limit evidence regarding Mr. Tucker's business relationship with Plaintiff is highly relevant to his bias and credibility in this matter.  If Mr. Tucker has a financial interest in the outcome of this case, it effects his bias and credibility.  If Mr. Tucker has a long time business relationship with Plaintiff, it effects his bias and credibility.  If Mr. Tucker has made it a life-goal to represent copyright owners in addition to Plaintiff in litigation around the country in an attempt to "hurt" parties like Defendants,[2] it effects his bias and credibility.

Plaintiff tries to paint Mr. Tucker's business relationships and personal vendettas as beyond a matter affecting Mr. Tucker's credibility – but the opposite is true.  Mr. Tucker's business relationship with Plaintiff and other copyright producers (and what he does for Plaintiff and other copyright producers) is perhaps the most important piece of evidence regarding his credibility.  See, e.g., 11th Cir. Pattern Jury Instruction 3.6.2 (alt) ("When a witness is being paid for reviewing and testifying concerning the evidence, you may consider the possibility of bias and should view with caution the testimony of such witness where court testimony is given with regularity and represents a significant portion of the witness's income."); United States v. Mayer, 556 F.2d 245, 248 (5th Cir. 1977) ("[C]ross-examination of a witness in matters pertaining to his

---

[2] Mr. Tucker has stated previously in public statements that he intended to use the legal process to "hurt" persons or entities that he believed to be engaged in copyright infringement.  See http://cogentbenger.com/porndemic/interviews/interview-with-jason-tucker (accessed March 4, 2016) ("So, we formed this organization and we're going to go hurt some people with the legal system, and it's going to be costly for them.  And we've got the money to go fight them and fight them to the death.").

7

credibility ought to be given the largest possible scope."); Wasko v. Dugger, 761 F.Supp. 1560, 1567 (S.D. Fla. 1991) ("[T]he Eleventh Circuit and the former Fifth Circuit have on several occasions explicitly set forth the requirement that, in addition to permitting cross-examination so that jurors may receive sufficient information to assess generally the credibility of the witness, defense counsel must be permitted, through examination of the witness, 'to make a record from which he could argue why the witness might have been biased.'" (quoting United States v. Calle, 822 F.2d 1016, 1020 (11th Cir. 1987))); Fla. Stat. 90.608 ("Any party … may attack the credibility of a witness by … Showing that the witness is biased … [or] Showing a defect of capacity, ability, or opportunity in the witness to observe, remember, or recount the matters about which the witness testified.").

The Court should not limit inquiries into Mr. Tucker's business relationships, which are directly relevant to his bias and credibility.

### V.     Plaintiff's Status as a Foreign Corporation is Not Prejudicial and Is Highly Probative of Whether Plaintiff Owns the Trademarks-in-Suit

Plaintiff seeks to exclude any mention of the foreign incorporation of Plaintiff as somehow being unfair prejudicial or misleading, without providing any material way in which a jury could actually be prejudiced by what is simply a fact of the identity of Plaintiff.  Plaintiff *is* a foreign corporation.  The identity of a party to litigation is axiomatically a relevant and necessary fact in any litigation.  Even Plaintiff's proposed Special Verdict Form for the Jury describes Plaintiff as a foreign corporation in the caption.  Plaintiff has alleged in its own Complaint that it's a foreign corporation – how is it therefore possible that facts that Plaintiff has alleged are prejudicial to Plaintiff?

Moreover, the identity of Plaintiff is particularly important in this matter because, contrary to Plaintiff's statements in multiple places, Plaintiff is *not* the owner of the METART

8

and SEXART trademarks.  The registrations for those marks list the following party as the registrant: "Hydentra, L.P. HLP General Partner, Inc., its sole general partner, a Texas corporation LIMITED PARTNERSHIP DELAWARE 1717 Fourth Street, 3rd Floor Santa Monica CALIFORNIA 90401."  Plaintiff is neither a Texas corporation or a Delaware Limited Partnership.  The entity type and jurisdiction of formation of Plaintiff is therefore incredibly relevant to the fact that Plaintiff does not own the trademarks at issue.  Far from confusing the jury, explaining to the jury that Plaintiff is a Cyprus entity is necessary to show that Plaintiff does not own the trademarks asserted by Plaintiff.  Therefore, to the extent that there is any unfair prejudice or confusion that could arise from explaining to the jury that Plaintiff is a Cyprus entity (which there is not), it is completely outweighed by the probative value of this fact in determining whether Plaintiff owns the trademarks-in-suit.

### VI.     Defendants Do Not Intend to Raise Arguments Concerning Personal Jurisdiction

Defendants do not intend, nor have they ever alluded in any documents or otherwise that they intend, to argue or raise a personal jurisdiction defense at trial.

### VII.    The Plaintiff's Business is "Pornography" and Should Be Permitted to Be Described as Such

Throughout its motions in limine, Plaintiff has tried to limit the language that Defendants can use in an attempt to cut out every word in the dictionary that doesn't help its cause, culminating in its attempt to exclude the word "pornography" from a case that is about pornography.

Merriam-Webster defines "pornography" as "the depiction of erotic behavior (as in pictures or writing) intended to cause sexual excitement."  The Cambridge Dictionary defines it as "pictures, movies, or writing that show or describe sexual behavior for the purpose of exciting people sexually."  Dictionary.com defines it as "sexually explicit videos, photographs, writings,

or the like, whose purpose is to elicit sexual arousal." Wikipedia defines it as "the portrayal of sexual subject matter for the purpose of sexual arousal." "Pornography" and its iterations "pornographic," "pornographer," and "porn" are used every day by most Americans to define and describe the product that Plaintiff produces.

Even Plaintiff uses the word "porn" to describe its product. A Google search for "porn" on metart.com returned 2,520 results. *See* <u>Exhibit 1</u> hereto. There are 1,170 results for "porn" on the website sexart.com. *See* <u>Exhibit 2</u> hereto.

There is no word other than pornography to properly describe Plaintiff's business, the general type of content on SSM's websites and the files-in-suit. Plaintiff's Complaint and Motion in Limine attempts to paint the materials as "adult oriented content" or "adult content," but that language is imprecise and cumbersome. It is imprecise because anything from voting, to driving a car, to becoming a foster parent, to geopolitics can be considered "adult" or "adult oriented." It is cumbersome because the words to accurately describe the content at issue in this case is actually "pornography," "pornography" or "porn." If Plaintiff doesn't want to be described as producing pornography, then it shouldn't have produced pornography. However, it did chose to produce pornography and to describe the content-in-suit as pornographic is clearly probative to the matters at hand.

The use of the accurate term used by American and people around the world every day to describe what Plaintiff does and produces is not unfairly prejudicial and should not be excluded.

## VIII. Evidence of Plaintiff's Method of Delivering Take-Down Notices is Relevant to Defendants' Affirmative Defenses and Should be Admitted

Defendants have put forth the affirmative defenses of Copyright Misuse and Unclean hands, alleging that Plaintiff has used its copyrights in a manner not intended by the Copyright Act and by taking actions purposefully meant to create a situation by which it could file suit

against Defendants. Plaintiff's actions clearly constitute "copyright trolling" as defined and recognized by many courts (see above).

A material aspect of Defendants' affirmative defenses is that Plaintiff sent DMCA take-down notices by mail instead of by the standard email method it had previously employed, in order to create the potential for a mistake which would permit Plaintiff to file suit. Defendants' Motion for Summary Judgment, Docket No. 73, pp. 12-13; Defendants' Opposition to Plaintiff's Motion for Summary Judgment, Docket No. 123, pp. 6-7, 14-15. Defendants also state the sending of paper notices and not following up in any manner is a material and relevant issue regarding Defendants' affirmative defense that Plaintiff failed to mitigate its damages. Docket No. 123, p. 17.

So, far from this evidence being irrelevant in this case, it is highly relevant and probative to Defendants' affirmative defenses.

## IX. Defendants Must Be Permitted to Rebut Contention that they Received DMCA Take-Down Notices

Plaintiff seeks, by way of motion in limine, of precluding testimony on perhaps the most important factual matter in this litigation: whether Defendants received DMCA take-down notices sent by Plaintiff in January of 2015. Defendants deny that they received these documents. *See* Docket Entry 72-2, ¶¶ 18-23; Docket Entry 73-2, ¶ 35. This is a matter that has been discussed in Defendants' Summary Judgment papers already filed. *See* Docket Entry 123, pp. 1-2, 6-7; Docket Entry 73, pp. 12-13.

Plaintiff seeks to improperly exclude testimony regarding whether Defendants received the notices on two bases: (1) that Mr. Luchian did not provide relevant information about the denial at his deposition, and (2) that it should be excluded under the *rebuttable* mailbox rule.

11

With relation to the first matter, Mr. Luchian did not know any specifics about the January take-down notices, particularly with regards to when they were alleged to be received and who they were signed for by, until the date of his deposition on January 19. Quite simply, he was ambushed with that evidence at the deposition and at that time had no further details about it other than set forth in the deposition transcript pasted in Plaintiff's Motion. It was only after Mr. Luchian was alerted to this issue, particularly with the tracking slip which shows that the take-down notices were purportedly signed by a "C. Jusino" that he further investigated the matter and provided additional information in his declaration supporting Defendants' Motions for Summary Judgment. But even if that was not the case, the deposition transcript pasted into Plaintiff's Motion (pp. 12-13) makes it clear that Plaintiff did not even try to get further information out of Mr. Luchian, and Mr. Luchian was under no obligation to provide any information other than to answer the questions that were asked. At the deposition, Mr. Luchian answered all the questions to the best of his ability at the time, and nothing he said in his declaration contradicts what he said at deposition – it only adds additional information.

With relation to the second matter, Plaintiff attempts to turn the rebuttable mailbox rule into the irrebuttable mailbox rule. As discussed in Defendant's Opposition to Plaintiff's Motion for Summary Judgment, "[T]he presumption of receipt is 'not a conclusive presumption of law, but a mere inference of fact ... and, when it is opposed by evidence that the letters were never received, must be weighted with all the other circumstances of the case … in determining the question whether the letters were actually received or not." Barnett v. Okeechobee Hosp., 283 F.3d 1232, 1240 (11th Cir. 2002) (quoting Rosenthal v. Walker, 111 U.S. 185, 193-94 (1884)). Defendants have ample evidence, even beyond their denials, that they did not receive the DMCA take-down notices (See, Docket Entry No. 123, p. 7). Defendants not only should, but must be

permitted to introduce this evidence at trial, or else the rebuttable mailbox rule would not actually be rebuttable.

## X.     All Witnesses and Documents Were Timely Disclosed and Should Not Be Excluded

Defendants timely produce its documents even before Plaintiff served its initial disclosures, and all Plaintiff's witnesses were timely disclosed.

Specifically, Defendants served tens of thousands of pages of document responses on or about November 11, 2015, and timely supplemented those documents when necessary.  Plaintiff, on the other hand, served its (first) initial disclosures on December 23, 2015 (which was well after the time period set forth in F.R.C.P. 26).  Just two weeks after that, on January 6, 2016, Defendants served their responses to Plaintiff's interrogatories, listing all individuals who could be potential witnesses that they knew of at the time.  Therefore, not only did Defendants not fail to disclose the information required under Rule 26, Plaintiff could not have been prejudiced by the timing of those disclosures as they were proximate to or earlier than Plaintiff's own disclosures.

Plaintiff only raises an issue with regards to *one* witness listed on Defendant's trial witness list, Ms. Carmen Jusino.  Ms. Carmen Jusino was an unknown entity to this litigation until Mr. Constantin Luchian's Deposition on January 19, 2016, where Plaintiff handed to Mr. Luchian a USPS tracking slip for a document purportedly sent to Mr. Luchian, but which was signed by a "C. Jusino."  Ms. Jusino is an employee of Regus, where Mr. Luchian's company leases "virtual" office space.  Up until Defendants saw that document, they had no reason to know that Ms. Jusino was in any way relevant to this litigation.  Therefore, Plaintiff knew about the relevance of Ms. Jusino to this litigation before Defendants – and Plaintiff cannot claim prejudice because it could not serve discover or depose her.  To the contrary, Defendants are the

ones who are prejudiced because Plaintiff did not disclose Ms. Jusino in its own initial disclosures.[3]

## CONCLUSION

The Court must favor determinations on the merits of the case, not sly litigation technicalities which seek to deny the factfinder the evidence necessary to properly decide the matter. For the reasons set forth above, Defendants request that this honorable Court deny Plaintiff's Omnibus Motion in Limine in its entirety.

**Respectfully submitted:**

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, MA 02459
Telephone: (617) 928-1804
Facsimile: (617) 928-1802
vgurvits@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb, Esquire
Florida Bar No. 031018
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone (954) 527-4111
Facsimile (954) 900-5507
bcobb@cobbeddy.com

*Attorney for Defendants
Constantin Luchian,
Konstantin Bolotin and
Sun Social Media Inc.*

Dated: March 4, 2016

---

[3] Plaintiff's Motion with regards to Ms. Jusino is particularly hypocritical given that on February 17, 2016, after the end of discovery in this case, Plaintiff supplemented its initial disclosures to add Mr. Nate Glass as a potential witness in this matter for the very first time.

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record on the service list below this 4th day of March, 2016.

/s/ Brady J. Cobb
Brady J. Cobb

## SERVICE LIST

Aaron Behar, Esquire
Jaclyn Behar, Esquire
BEHARBEHAR
1840 North Commerce Parkway
Suite One
Weston, Florida 33326
Telephone: (954) 688-7642
Facsimile: (954) 332-9260
AB@BeharBehar.com
JB@BeharBehar.com

Spencer D. Freeman
Freeman Law Firm, Inc.
1107 1/2 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (206) 516-3800
Facsimile: (206) 516-3888
sfreeman@freemanlawfirm.org