UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

HYDENTRA HLP INT. LIMITED,
a foreign corporation d/b/a METART,

    Plaintiff,

v.

CONSTANTIN LUCHIAN, an individual,
KONSTANTIN BOLOTIN, an individual,
SUN SOCIAL MEDIA, INC., a corporation,
individually and d/b/a PLAYVID.COM,
FEEDVID.COM, PLAYVIDS.COM and
PEEKVIDS.COM; PLAYVID.COM;
FEEDVID.COM; PLAYVIDS.COM;
PEEKVIDS.COM; and
John Does 1-20,

    Defendants.

Case No.
1:15-cv-22134-UU

**DEFENDANT KONSTANTIN BOLOTIN AND SUN SOCIAL MEDIA, INC,'S
REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

1

# INTRODUCTION

Defendants Sun Social Media, Inc. ("SSM") and Konstantin Bolotin, through undersigned counsel, hereby reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Docket No. 120 ["*Plaintiff's Opposition*"]). Defendants herein rely upon their Motion for Summary Judgment (Docket No. 73 ["*Defendants' Motion*"]), their Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 123 ["*Defendants' Opposition*"]), the Declaration of Konstantin Bolotin in Support of Defendants' Motion (Docket No. 73-2 ["*Bolotin Decl. I*"]), the Declaration of Constantin Luchian in Support of Defendants' Motion (Docket No. 72-2 ["*Luchian Decl. I*"]), the Declaration of Konstantin Bolotin in Support of Defendants' Opposition (Docket No. 123-2 ["*Bolotin Decl. II*"]), and the Declaration of Konstantin Bolotin in Support of this Reply filed herewith ["*Bolotin Decl. III*"].

# ARGUMENT

## I.   Defendants Are Not and Cannot Be Liable for Direct Copyright Infringement

Defendants cannot be liable for direct copyright infringement arising from the files on SSM's websites uploaded by its users because it qualifies for the safe harbors of the DMCA, as explained in Defendants' Motion and further detailed below. *See*, *e.g.*, UMG Recordings, Inc. v. Shelter Capital Partners LLC, 718 F.3d 1006 (9th Cir. 2013) (affirming summary judgment that service provider not liable for direct infringement because it qualified for DMCA safe-harbor). But even if the DMCA did not apply, Defendants could not be liable for direct infringement.

### A.   Reviewing Content Does Not Create Direct Liability

Defendants have argued that they cannot be liable for direct infringement because they did not engage in any volitional conduct with a nexus sufficiently close and causal to the alleged infringement – a requirement for direct copyright infringement. *See Defendants' Motion*, pp. 5-7; CoStar Group, Inc. v. LoopNet, Inc., 373 F.3d 544, 550 (4th Cir. 2004) ("There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying…."). Plaintiff disputes Defendants' argument by stating that Defendants have engaged in volitional conduct because SSM briefly reviews user uploaded videos for obviously abusive content like child pornography before it allows them to be made public on its websites. *Plaintiff's Opposition*, 4; *Bolotin Decl. II*, ¶ 5 ("While SSM does briefly review videos … SSM can only practically screen out content which is on its face illegal or inappropriate….").

2

Plaintiff cites no case law supporting its conclusion that a brief review of content before making it available makes an online service provider liable for direct infringement, but instead tries (and fails) to distinguish this case from the many cases cited by Defendants. In doing so, Plaintiff clearly shows that it has not even read the cases cited by Defendants, or looked at the dozens of other cases that support Defendants' position. For instance, Plaintiff claims that the case of CoStar Group, Inc. does not support Defendants' position because the defendant in that case "had an absolute passive role in the posting of photographs – without any review or affirmative actions whatsoever." Quite to the contrary, that defendant *did* review uploads, and the Fourth Circuit explicitly found that it did not constitute direct infringement:

> Although LoopNet engages in volitional conduct to block photographs measured by two grossly defined criteria, this conduct, which takes only seconds, does not amount to "copying," nor does it add volition to LoopNet's involvement in storing the copy. The employee's look is so cursory as to be insignificant, and if it has any significance, it tends only to lessen the possibility that LoopNet's automatic electronic responses will inadvertently enable others to trespass on a copyright owner's rights…. LoopNet has not by this screening process become engaged as a "copier" of copyrighted works who can be held liable under §§ 501 and 106 of the Copyright Act.

CoStar Group, Inc., 373 F.3d at 556.

Disney Enters. v. Hotfile Corp., 798 F.Supp.2d 1303 (S.D. Fla. 2011), which Plaintiff tries to hastily throw out because it was a decision on a motion to dismiss, is also highly relevant. In that case, Judge Adalberto Jordon, now an 11th Circuit Judge, held that the conduct alleged by Plaintiffs here that amounts only to supervision of the files before they were uploaded, could only constitute secondary infringement. 798 F.Supp.2d at 1309 ("As the Fourth Circuit put it, 'knowledge coupled with inducement' or 'supervision coupled with a financial interest in the illegal copying' gives rise to secondary liability, not direct-infringement liability."). Judge Jordan also noted that he believed that any case where volitional action was found because there was simply human review without additional action, was "not correctly decided." *Id.*[1]

The case of Fox Broad. Co. v. Dish Network L.L.C., 747 F.3d 1060 (9th Cir. 2014), is also directly on point. In that case, the Ninth Circuit found that even though the defendant, Dish,

---

[1] *See, also*, Perfect 10, Inc. v. Giganews, Inc., 2013 WL 2109963 at *9 (C.D. Cal. March 8, 2013) ("The Court disagrees with the application of the volitional act requirement in *Usenet*…. By Focusing on the defendant's awareness or state of mind—rather than on *who* actually caused the infringement—these cases effectively hold defendants liable for copyright infringement committed by third parties without requiring a full assessment of the additional elements of secondary copyright infringement claims.").

3

was engaged in volitional conduct by choosing what types of programs users could record with Dish's hardware, it did not rise to the level of direct infringement:

> …Dish decides how long copies are available for viewing, Dish maintains the authority to modify the start and end times of the primetime block, and a user cannot stop a copy from being made once the recording has started. Yet the court held that "at this stage of the proceedings," it was "not satisfied" that PrimeTime Anytime had "crossed over the line that leads to direct liability." The court held that the "user, not Dish, must take the initial step of enabling" PrimeTime Anytime. "The user, then, and not Dish, is 'the most significant and important cause' of the copy."
> 
> The district court did not abuse its discretion in concluding that Fox had not established a likelihood of success on this claim. Infringement of the reproduction right requires "copying *by* the defendant," which comprises a requirement that the defendant cause the copying.

*Id.* at 1067 (multiple citations omitted).

In any case, there are many more cases around the country that make it clear that the question for direct infringement is *who* caused the actual infringement, not whether another party reviewed what was done. Cartoon Network LP, LLLP v. CSC Holdings, Inc., 536 F.3d 121, 130, 133 (2d Cir. 2008) ("The question is *who* made this copy.… The *Sony* Court did deem it 'just' to impose liability on a party in a 'position to control' the infringing uses of another, but as a contributory, not direct, infringer." (citing Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 437 (1984))); Perfect 10, Inc. v. Giganews, Inc., 2013 WL 2109963, at *8 (C.D. Cal. Mar. 8, 2013) ("All owners of internet servers presumably can determine the content on their servers. To hold that such control gives rise to a direct infringement claim would create 'unreasonable liability.'" (quoting Religious Tech. Cen. v. Netcom On-Line Commun. Servs., Inc., 907 F.Supp. 1361 (N.D. Cal 1995))); In re AutoHop Litig, 2013 WL 5477495, at *6 (S.D.N.Y. Oct. 1, 2013) ("Although the record is not conclusive as to whether the primetime programming is identified through the operation of software (as DISH contends) or through human review of program schedules (as ABC asserts), it is unnecessary for the Court to determine the selection methodology at this juncture because the Second Circuit's *Cartoon Network* decision makes it clear that the pivotal factor in this Circuit for direct liability is initiation of the act of copying….").

**B.     The Files-In-Suit Were Not Uploaded by Defendants or From SSM's Servers**

Defendants have stated unequivocally that they did not upload the files-in-suit, and there is no legitimate evidence to contradict that (because they in fact did not upload the files-in-suit). *Bolotin Decl. I*, ¶¶ 17-18; *Luchian Decl. I*, ¶ 14-15.  However, Plaintiff has tried to dispute this

4

fact with Mr. Jason Tucker's opinion that some of the videos were uploaded from unusual looking IP addresses, which Plaintiffs contends means that Defendants *may* have uploaded them. The evidence however only shows Mr. Tucker and Plaintiff's failure to understand SSM's network architecture and internet technology in general.

As it is a complicated technical matter, Mr. Bolotin declaration filed herewith describes in detail why Mr. Tucker is wrong. *See Bolotin Decl. III*, ¶¶ 7-18. In short though, SSM's servers do not use the type of network architecture assumed by Mr. Tucker in his opinion - SSM's servers are *not* on a private or local network. *Id.*, ¶ 11. Each server is connected directly to the world-wide-web through a switch and gets an IP address ranging from 199.101.134.2 to 199.101.134.62. *Id.*, ¶¶ 11-12. SSM does not have any private or local IP addresses and SSM does not use any machines with IP addresses that start with 0.0. *Id.*, ¶ 13. The unusual IP addresses result from the actions of users around the world and methods of determining IP addresses. *Id.*, ¶¶ 9-10. Furthermore, incontrovertible evidence shows that those users with unusual upload IP addresses signed up with regular IP addresses. *Id.*, ¶¶ 15-18.

Mr. Tucker's incorrect and baseless allegations do not create a genuine dispute about a fact. Plaintiff could never satisfy its burden of proof on this basis and no rational jury could ever find in favor of Plaintiff on this issue. Plaintiff has at best shown a "metaphysical doubt," which is easily contradicted. See Matusushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" (citations omitted)).

**II.     SSM Qualifies for the DMCA Safe-Harbor**

   **A.     SSM Has Reasonably Implemented a Repeat Infringer Policy**

Plaintiff puts forth three purported reasons why SSM has not reasonably implemented its repeat infringer policy. The first, already raised in Plaintiff's Motion (pp. 12-13), is that SSM did not have a working notification system, including detailed information about users. The second, also raised in Plaintiff's Motion (pp.12-13), is that SSM's repeat infringer policy was not "reasonable." In Defendants' Opposition (pp. 7-11), both of these positions were shown as incorrect. In short, however, SSM does have a working notification, both with copyright owners and its users, *Bolotin Decl. II*, ¶ 15, the DMCA does not require that providers keep information

5

about its users, but instead recognizes that a provider will *not* have information about its users, 17 U.S.C. § 512(g)(3),[2] and SSM's "three-strikes" policy for each of its websites is reasonable. *See Defendants' Opposition*, p. 11 (citing many cases).

However, for the first time in its Opposition, Plaintiff makes reference to situations it claims to have found where users who were purportedly terminated in accordance with SSM's repeat infringer policy continued to upload files. Plaintiff's references however are (1) mostly incorrect and (2) the few cases where SSM's repeat infringer policy did not work as intended do not deprive SSM of the DMCA safe-harbor.

As described in detail in Mr. Bolotin's Declaration filed herewith, Plaintiff's declarant, Mr. Tucker, used the wrong documents and information to determine when a video was uploaded. *See Bolotin Decl. III*, ¶¶ 19-31. The date that Mr. Tucker relies on to determine his "upload date" of a video is not the actual upload date of the video, but instead the day that the conversion and processing of the video was complete. *Id.*, ¶ 25. In most cases, the date shown on the website for a video is actually days after it was actually uploaded by the user, and in some cases months later. *Id.* Plaintiff had the actual upload dates for each of the files referenced by Mr. Tucker, but chose to ignore them. *Id.*, ¶ 26. Moreover, Mr. Tucker's declaration is otherwise rife with mistakes and information. *Id.*, ¶¶ 28-31. When the proper upload date is used, 60% of the cases referenced by Mr. Tucker are incorrect. *Id.*, ¶ 32 and Exhibit 3 thereto.

In the remaining instances, there was an unintentional technical glitch in SSM's databases which meant that some repeat infringers were not terminated until a week after the processing of their third strike, and in a few unfortunate cases a or so month after that.[3] *Bolotin Decl. III*, ¶¶ 33-38 and Exhibit 3 thereto. In 2015, SSM updated its software so that it could catch these glitches. *Id.*, ¶ 35. However, even before that upgrade, SSM would periodically run

---

[2] With regards to the information that a service provider must keep in relation to a user to satisfy the repeat infringer policy, it must simply be enough information that a service provider can track infringers, that is, "design a system so as to be able to ascertain the identity of the users responsible for those files." Disney Enters. Inc. v. Hotfile Corp., 2013 WL 6336286 (S.D. Fla. 2013) (citing Ellison v. Robertson, 357 F.3d 1072 (9th Cir. 2004) and In re Aimster Copyright Litigation, 334 F.3d 643 (7th Cir. 2003)). Given that users must sign up for accounts before they can upload videos, there is no reasonable contention that SSM has satisfied this requirement.

[3] The late terminations were as a result of an unintentional error in SSM's database. Specifically, when SSM's repeat infringer policy software tried to access the user database to terminate the user, the database would "deadlock" and no changes would be made to the database. Deadlocks are relatively common in databases and are required in order to maintain the integrity of the database. Unfortunately, early versions of SSM's backend software did not notify the personnel processing the notice of the deadlock so that the personnel could reattempt the termination. *Bolotin Decl. III*, ¶ 34.

a script to check for instances in which users were not terminated because of the glitch to make sure that all users that should be terminated were actually terminated. *Id.*, ¶ 36. Out of the well over 1,000 users that SSM has terminated in accordance with its repeat infringer policy, the five remaining users referenced by Mr. Tucker are among just a handful of users who were mistakenly not immediately terminated after their third notice. *Id.*, ¶ 37. This software has otherwise worked perfectly for over 1,000 other repeat infringers and the thousands of other DMCA notices that SSM has received. *Id.*

However, the DMCA recognizes that a repeat infringer policy need not be perfect, stating that the safe-harbor is satisfied if the service provider "has adopted and *reasonably* implemented" a repeat infringer policy. 17 U.S.C. § 512(i)(1)(A). *See*, *also*, Disney Enterprises, Inc. v. Hotfile Corp., 2013 WL 6336286 (S.D. Fla. 2013) ("[T]he statute does not require [a service provider] to maintain a perfect policy (or even anything as stringent as [a] three-strikes policy…)"); Arista Records LLC v. Myxer Inc., 2011 WL 11660773 (C.D. Cal. 2011) ("[B]ecause § 512(i)'s language emphasizes that a service provider's repeat infringer policy must be implemented in a reasonable manner in appropriate circumstances, it is incorrect that Myxer must have an exhaustive and perfectly-crafted policy."); Ventura Content, Ltd. v. Motherless, Inc., 2013 WL 11237204 (C.D. Cal. 2013) ("Even assuming that Defendants should have terminated these nine users, Defendants' failure to do so does not raise a triable issue of fact as to whether Defendants failed to 'reasonably implement' their termination policy. The DMCA requires only that the policy be 'reasonably' – not 'perfectly' – implemented, and thus 'occasional lapses are not fatal to the service provider's immunity.'"); Corbis Corp. v. Amazon.com, Inc., 351 F.Supp.2d 1090, 1103 (W.D. Wash. 2004) ("An infringement policy need not be perfect; it need only be reasonably implemented."); Perfect 10 v. CCBill, 340 F. Supp. 2d 1077, 1089 (C.D. Cal. 2004) ("Congress requires reasonable implementation of a repeat infringer policy rather than perfect implementation.").

      **B.**    **SSM Has Appropriately Designated an Agent with the Copyright Office**

Plaintiff claims that because SSM did not list Feedvid.com, Peeksvids.com and Playvids.com on its form it filed with the U.S. Copyright Office, that SSM cannot qualify for the DMCA safe harbor for those websites. As already detailed in Defendants' Opposition, pp. 9-10, Plaintiff's claims are without basis in any law or reason because Plaintiff misunderstands the difference between an internet service and an internet service *provider*. Without restating the

7

entirety of Defendants' argument set forth in their Opposition, which is incorporated herein by reference, the DMCA provides safe harbors to service providers – not services. *See* 17 U.S.C. § 512(c)(1), (c)(2), (i)(1), (k)(1)(A). Specifically, with regards to registering with the Copyright Office, Section 512(c)(2) states that "[t]he limitations on liability established in this subsection apply to a service *provider* only if the service *provider* has designated an agent…." It is also clear that Plaintiff knew that these websites were operated by SSM, and so it had no excuse not to contact SSM's designated agent. *See* Plaintiff's Statement of Fact, ¶ 10.

### C. SSM Had No Actual Knowledge of Infringement of Hydentra's Materials and Removed Any Allegedly Infringing Material Upon Notice

Plaintiff contends that SSM does not qualify for the DMCA because Plaintiff purportedly sent takedown notices in January of 2015 that SSM did not respond to. However, the only evidence that Plaintiff has presented for this allegation is that a package of documents purportedly containing the notices was signed for by an individual named "C. Jusino." *See* Declaration of Jason Tucker in Support of Plaintiff's Motion, Exhibit D-1. Although apparently addressed to Mr. Luchian, Mr. Luchian never received these notices and therefore could not forward it to SSM. *See Luchian Decl. I*, ¶¶ 18-23; *Bolotin Decl. I*, ¶¶ 33-35. Moreover, the "presumption of receipt" of the package, which shouldn't even be applicable because the only presumption is that someone else received the notice, is rebutted by the evidence put forward by Defendants which makes it clear, in context, that Defendants never gained knowledge about the alleged infringements. *See* Defendants' Opposition, pp. 6-7.

In a last ditch effort to insert a dispute as to fact, Plaintiff presents the declaration of Nate Glass for the nebulous and unsupported allegation that SSM does not expeditiously remove claimed infringements. Plaintiff's Opposition, p. 13. First, Mr. Glass's unsupported statements are nothing more than a "metaphysical doubt," which do not create a genuine issue for trial. Matusushita Elec., 475 U.S. at 586-87. In any case, SSM has always promptly responded to Mr. Glass's requests (and provides documentary evidence to back it up) and Mr. Glass has never previously made any complaints about SSM. *See Bolotin Decl. III*, ¶¶ 39-42.

More importantly however, Mr. Glass's nebulous allegations about works that are not a part of this lawsuit are simply irrelevant to this matter, and don't constitute a material fact. *See, e.g.*, Viacom Intern., Inc. v. YouTube, Inc., 676 F.3d 19, 34 (2d Cir. 2012) ("We hasten to note, however, that although the foregoing e-mails were annexed as exhibits to the summary judgment

8

papers, it is unclear whether the clips referenced therein are among the current clips-in-suit. By definition, only the current clips-in-suit are at issue in this litigation. Accordingly, we vacate the order granting summary judgment and instruct the District Court to determine on remand whether any specific infringements of which YouTube had knowledge or awareness correspond to the clips-in-suit in these actions."); Ventura Content, Ltd., 2013 WL 11237204 *7 n.5 ("Even assuming that such third party notices can be considered in evaluating whether a service provider had red flag knowledge … these occasional lapses do not alter the Court's conclusion that Defendants are entitled to Section 512(c)'s safe harbor. The undisputed facts demonstrate that Defendants expeditiously removed the vast majority of infringing material upon receiving DMCA-compliant (and non-DMCA-compliant) notices.").[4]

### III.     SSM Is Not and Cannot Be Liable for Contributory Copyright Infringement

Plaintiff's Opposition regarding contributory copyright infringement (pp. 13-15), is a direct copy and paste from Plaintiff's Motion (pp. 6-8). Defendants have already substantively responded to every argument and allegation made in Plaintiff's arguments regarding contributory copyright infringement in Defendants' Opposition (p. 4) and therefore incorporate herein that argument. In short, however, Defendants never had any knowledge of infringement of the works-in-suit prior to the filing of the Complaint in this matter – a necessary requirement to succeed on a claim for contributory infringement. *See Bolotin Decl. I*, ¶¶ 27-28, 33, 35; *Luchian Decl. I*, 18-23; Cable/Home Comm. Corp. v. Network Prod., Inc., 902 F.3d 829, 845-46 (11th Cir. 1990). And even if there was a dispute as to Defendants' knowledge of the infringement, Plaintiff cannot succeed on its contributory infringement claim because SSM's websites are capable of substantial non-infringing uses and Defendants have gone to extraordinary lengths to limit use of SSM's websites to only legitimate uses. Cable/Home Comm. Corp., 902 F.2d at 845-46; *Bolotin Decl. I*, 2-32; 38-40. Therefore, even if SSM does not qualify for the DMCA, no rational jury could find that Defendants are liable for contributory copyright infringement.

---

[4] Mr. Glass's testimony regarding other files not in suit should not even be permitted to reach the jury. *See*, Capital Records, Inc. v. MP3tunes, LLC, 2014 WL 503959 *5 (S.D.N.Y. 2014) ("Evidence pertaining to the infringement of copyrights Plaintiffs do not own is of questionable relevance…. Even if the evidence were relevant, its probative value would be substantially outweighed by the danger of unfair prejudice to Defendants. And it would confuse and mislead a jury already grappling with application of a difficult legal standard."). Had Mr. Glass's declaration been provided prior to the deadline for Motions in Limine, Defendants would have moved to exclude it at that time.

### IV. SSM Is Not and Cannot Be Liable for Vicarious Copyright Infringement

Other than pointing out the potential difference in the analysis of common law vicarious infringement from Section 512(c)(1)(B),[5] Plaintiff's Opposition regarding vicarious copyright infringement (pp. 16-18) is a direct copy and paste from Plaintiff's Motion (pp. 8-9). Defendants have already responded to every argument made in Plaintiff's arguments regarding vicarious copyright infringement in Defendants' Opposition (pp. 5-6) and therefore make reference to and incorporate herein their argument set forth in Defendants' Opposition. In short, however, Defendants are not and cannot be liable for vicarious copyright infringement because they have neither profited directly from the alleged direct infringement, nor have they declined to exercise their rights to stop or limit infringement. Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 914 (2005). Because SSM's revenues come from advertisements only, and those advertisers are not solicited with infringing content and do not select what content they appear alongside, SSM's financial benefit is not attributable to any infringement. See Capital Records, Inc. v. MP3Tunes, LLC, 821 F.Supp.2d 627, 645 (S.D.N.Y. 2011) ("[T]he financial benefit must be attributable to the infringing activity."); Defendants' Responses to Interrogatories, Docket No. 73-1, p. 12. Furthermore, to the extent that Defendants had any right and ability to control infringing use, which they deny, they did not "declin[e] to exercise the right to stop or limit it," given the extraordinary lengths SSM has gone to stop and limit infringement. See Bolotin Decl. I., ¶¶ 27-28, 35, 39-40.

### V. SSM Cannot Be Liable for Trademark Infringement Because, *inter alia*, Plaintiff Does Not Own the Allegedly Infringed Trademarks

Plaintiff's Opposition relating to trademark infringement (pp. 18-20) is yet again substantially a copy and paste of Plaintiff's Motion on the same topic (pp. 14-16), which Defendants have thoroughly responded to in Defendants' Opposition (pp. 11-13), which Defendants hereby make reference to and incorporate herein.

In short, however, Plaintiff could never succeed on its trademark claims for the simple reason that it does not own the trademarks it is alleging Defendants infringed. The trademarks, METART and SEXART, are owned by a third party, Hydentra, L.P., HLP General Partner, Inc. See Exhibits A and B to Declaration of Jason Krogman, Docket No. 76-1.

---

[5] A difference that Defendants acknowledge some courts have distinguished. See, also, Defendants' Opposition to Plaintiff's Motion for Summary Judgment, Docket No. 123, p. 5 n. 3.

However, even if Plaintiff did have any rights in the trademark (which it obviously does not), Plaintiff could never succeed on its trademark infringement claims for at least five other reasons: (1) Defendants did not select the meta tags that Plaintiff alleges constitutes infringement. *Bolotin Decl. II*, ¶¶ 4-6.  (2) Defendants did not have knowledge of the alleged infringements and promptly removed them upon notice. *Bolotin Decl. I*, ¶¶ 15-16; Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 854 (1982).  (3) There is no likelihood of confusion, nor has there been any discovery into the likelihood of confusion.  (4) The use of the METART and SEXART trademarks by SSM's users constitute nominative fair use.  *See* New Kids on the Block v. News America Pub., Inc., 371 F.2d 302, 306 (9th Cir. 1992).  And (5) Plaintiff's trademark claims sound entirely upon a theory of "initial interest confusion," which is ***not*** actionable in the Eleventh Circuit.  *See*, *e.g.*, USA Nutraceuticals Group, Inc. v. BPI Sports, LLC, Case No. 15-cv-80352-Bloom/Valle, 2016 WL 695596 (S.D. Fla. Feb. 22, 2016).

**VI.    Plaintiff Has Failed to Oppose SSM's Motion on the Florida State Statute**

Plaintiff has failed to respond in any fashion to Defendants' Motion relating to Plaintiff's claim under Florida Statute 540.08, alleging unauthorized publication of name or likeness, and therefore Plaintiff must be deemed to consent to the dismissal of this claim.  Furthermore, given the complete failure of Plaintiff to present any form of admissible evidence, argument or basis for bringing this claim,[6] it is clear that this cause of action was vexatious and brought in bad faith in order to harass Defendants.

## CONCLUSION

For the reasons set forth herein and Defendants' Motion for Summary Judgment and Defendants' Opposition to Plaintiff's Motion for Summary Judgment, Defendants request that this honorable court grant Defendant's Motion, dismiss the entirety of the Complaint and issue a ruling that SSM qualifies for the safe-harbor provisions of the DMCA.

---

[6] See also *Defendants' Opposition*, pp. 13-14.

**Respectfully submitted:**

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, MA 02459
Telephone: (617) 928-1804
Facsimile: (617) 928-1802
vgurvits@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb, Esquire
Florida Bar No. 031018
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone (954) 527-4111
Facsimile (954) 900-5507
bcobb@cobbeddy.com

*Attorneys for Defendants
Constantin Luchian,
Konstantin Bolotin and
Sun Social Media Inc.*

Dated: March 10, 2016

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record on the service list below this 10th day of March, 2016.

/s/ Brady J. Cobb
Brady J. Cobb

## SERVICE LIST

Aaron Behar, Esquire
Jaclyn Behar, Esquire
BEHARBEHAR
1840 North Commerce Parkway
Suite One
Weston, Florida 33326
Telephone: (954) 688-7642
Facsimile: (954) 332-9260
AB@BeharBehar.com
JB@BeharBehar.com

Spencer D. Freeman
Freeman Law Firm, Inc.
1107 1/2 Tacoma Avenue South
Tacoma, Washington 98402
Telephone: (206) 516-3800
Facsimile: (206) 516-3888
sfreeman@freemanlawfirm.org