UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 1:15-cv-22134-UU

HYDENTRA HLP INT. LIMITED,
a foreign corporation d/b/a METART,

       Plaintiff,

vs.

CONSTANTIN LUCHIAN, an individual,
KONSTANTIN BOLOTIN, an individual,
SUN SOCIAL MEDIA, INC., a corporation,
individually and d/b/a PLAYVID.COM,
FEEDVID.COM, PLAYVIDS.COM, and
PEEKVIDS. COM; PLAYVID.COM;
FEEDVID.COM; PLAYVIDS. COM;
PEEKVIDS.COM and;
and John Does 1-20,

       Defendants.
_____/

### PLAINTIFF'S REPLY IN SUPPORT OF ITS OMNIBUS MOTION IN LIMINE (D.E. #98)

       Plaintiff, HYDENTRA HLP INT. LIMITED, a foreign corporation d/b/a METART (hereinafter, "Plaintiff"), by and through the undersigned counsel, files this Reply in Support of its Omnibus Motion in Limine, and states as follows:

### I.     *Defendants Should Be Barred from Using the Term "Copyright Troll"*

Defendants assert that the term "copyright troll" is commonplace and describes Plaintiff's conduct. In order to justify this position, Defendants cite the cases of *Malibu Media, LLC v. Doe*, 2015 U.S. Dist. LEXIS 87751 (S.D.N.Y. July 6, 2015), *Third Degree Films v. Does 1-47*, 286 F.R.D. 188, 189 n.1 (D. Mass. 2012), and *Brownmark Films LLC v. Comedy Partners*, 682 F. 2d 687, 691 (7th Cir. 2012). These cases are easily distinguishable, and in so doing, it is important to again examine just what a "copyright troll" really is –a company (or individual) who files a single lawsuit against non-commercial end users (the individuals who visit websites), typically naming one or thousands of John Doe's whose IP addresses were identified as having downloaded infringing content. Typically, the plaintiff in those situations has no real intent to see the case through to fruition, but rather files the suit as a means to shame the users by threat of being identified. Hydentra does just the opposite – it filed (and has filed) suit against identified commercial entities, or a group of entities/individuals who are all interrelated, and has every intention of seeing the cases through trial. Hydentra sued the websites and those with ownership and/or control over the sites. Hydentra did not sue the end users who downloaded infringed content from the websites at issue.

*Malibu Media* involved a lawsuit against a John Doe who subscribed to an identified IP address. As the court stated, "[t]he case appears to be part of the latest iteration of 'a nationwide blizzard of civil actions brought by purveyors of pornographic films alleging copyright infringement by individuals using a computer protocol known as BitTorrent'". *Malibu Media*, 2015 U.S. Dist. LEXIS 87751 at 1. The opinion further provides that the "paradigmatic troll plays a numbers game in which it targets hundreds or thousands of defendants, seeking quick settlement process just low enough that it is less expensive for the defendant to pay the troll

1

rather than defend the claim" and that these lawsuits frequently target anonymous John Does for alleged infringement related to the use of BitTorrent[1]. *Id.* at 5 (citing 100 Iowa L. Rev. 1104, 1108-9 (2015). Specifically, the plaintiff in Malibu Media was described as a prolific litigant, filing *38% of all copyright cases in the United States* between January and May 2014, and filed more copyright actions against John Doe defendants than any plaintiff in the previous 3 years. *Id.* at *9-*10.

*Third Degree Films* involved an action where the plaintiff sued 47 John Doe defendants, identified only by their IP addresses, who used BitTorrent to infringe on Plaintiff's videos. *Third Degree Films* ,286 F.R.D at 191-92. Again, the court warned of "copyright trolling", where plaintiffs misused the subpoena powers of the court in seeking the identities of John Doe defendants solely to facilitate demand letters and coerce settlement on a potentially embarrassing reputational issue. *Id.* at. 190. Additionally, the case involved permissive joinder of the parties, where the court severed Does 2-47, allowing plaintiff to file individual complaints against each.

*Brownmark Films LLC* involved a case where the defendant raised an affirmative defense of fair use. *Brownmark Films*, 682 F. 2d at 689. The plaintiff sought discovery related to the intent of South Park Digital Studios (SPDS) at the time a particular South Park television episode was created, all relevant videos and clips and the pre-airing licensing information of the episode. *Id.* at 691-92. The court noted that such broad discovery gave plaintiff the appearance of a "copyright troll". No other discussion was provided on the issue of "copyright troll", and the court affirmed the dismissal of the action pursuant to fair use. *Id.*

---

[1] BitTorrent is defined as "a peer-to-peer file transfer protocol for sharing large amounts of data over the Internet, in which each part of a file downloaded by a user is transferred to other users." http://www.oxforddictionaries.com/us/definition/american_english/bittorrent. That is not the case with SSM's websites, as the videos are posted directly onto Defendants' websites and made available for viewing on the world wide web.

Hydentra sues SSM, its websites, and individuals who controlled each. Plaintiff is not suing the individual users or downloaders of content. Instead, Plaintiff's Complaint makes abundantly clear that "Does 1-20 are individual or entities that *own* playvid.com and/or *act in concert* with playvid.com". Plaintiff does not dispute that *Malibu Media* and *Third Degree Films* indeed acted as "copyright trolls," yet these cases are remarkably different than this lawsuit. Both involved suits against John Does only and were filed with malicious motives to embarrass the end user. What's more, Malibu Media alone accounted for 38% of all copyright cases filed in the United States over a 5-month period. Again, this is significantly different than Hydentra's lawsuits against "tube" companies operating websites over a timespan of more than 1 year. Moreover, absolutely none of the cases Defendants rely upon expressly permit the term "copyright troll" be presented to a jury. Presentation of the term "copyright troll" is incendiary and insulting.[2]

## II. *The Number of Lawsuits Plaintiff Filed is Irrelevant*

Defendants argue that the number of lawsuits Plaintiff filed is relevant to statutory damages, and relies upon the same three cases cited above. Plaintiff has already demonstrated it is not a "copyright troll."

In addition to the three cases above, Defendants' also rely on *IO Group, Inc. v. Jordan*, 708 F. Supp. 2d 989, 1002 (N.D. Cal. 2010), which states that a court "should consider what is just in the particular case in light of the nature of the copyright, the circumstances of the infringement, and other relevant circumstances." *Id. (citing* <u>Los Angeles News Service v. Reuters Television International, Ltd.</u>, 149 F.3d 987, 996 (9th Cir. 1998)). To be clear, the "relevant

---

[2] Defendant additionally claims that Plaintiff had itself admitted to finding instances of infringement on Defendants' websites 5 months before taking any action on the same. This is wrong. Plaintiff has already demonstrated that it sent DMCA take-down notices in January 2015, *5 months before it filed suit*. The take-down notices represented Plaintiff's attempt to limit the infringement of Plaintiff's materials on SSM's website.

circumstances" must be materially relevant to the amount of damages to be awarded. Whether Plaintiff has filed other suits across the country in order to protect its copyrights from a pattern of infringing conduct against commercial entities is irrelevant to whether Plaintiff is entitled to the maximum award of statutory damages for these particular Defendants' illegal conduct.

Defendants' rely only on *Malibu Media v. Funderburg*, 2015 U.S. Dist. LEXIS 53783 (N.D. Ill, April 23, 2015), as an example of a court that awarded the minimum statutory damages. *Funderburg* is materially distinct from the present case. First, and as described above, Hydentra's business operates entirely differently than Malibu Media. In *Funderburg*, Malibu Media had again filed suit against John Doe, after which it learned of John Doe's identity and amended its suit to name Funderburg, who failed to respond and the court entered a default judgment against him. As a result, the court awarded minimum damages and stated:

> As an enforcer of pornographic copyrights, however, Plaintiff is among the entities that courts are concerned may be "inappropriately using the judicial system to extract quick and quiet settlements from possibly innocent defendants paying only to avoid embarrassment." *Malibu Media, LLC v. Doe*, 2014 U.S. Dist. LEXIS 79595, 2014 WL 2530872, at *1 (M.D. Fla. Apr. 10, 2014). The Court is aware of Plaintiff's extensive history of litigation in the last three years alone. **Without drawing any conclusions as to this Plaintiff's business model, the Court considers the concerns that other courts have expressed in evaluating requests to enter large damage awards with no relationship to actual damages sustained by a plaintiff. To the extent that these concerns reflect industry-wide trends, they counsel against awards that are triple the statutory minimum, as a default judgment imposing significant statutory damages may overcompensate plaintiffs in these circumstances.**
>
> Like other courts, this Court also hesitates to find willful infringement "based solely on a default judgment, without additional, independent evidence of egregious conduct." *PHE*, 2014 U.S. Dist. LEXIS 62895, 2014 WL 1856755, at *3 (citing Pamela Samuelson, Tara Wheatland, *Statutory Damages in Copyright Law: A Remedy in Need of Reform*, 51 Wm. & Mary L. Rev. 439, 505—506 (2009)). Although Plaintiff has offered circumstantial evidence going to Defendant's willfulness, it has offered little direct evidence. It has also provided little information going to actual lost profits or the number of other users Defendant aided in violating Plaintiff's copyrights.

4

*Malibu Media*, 2015 U.S. Dist. LEXIS 53783 at *9-10. As expressly stated, the award of minimum damages was not a result of Malibu Media's business practices, but rather because the court could not determine willful infringement had occurred based solely on the default judgment. While the court admonished Malibu Media, its award was notably not the result of its history of filing lawsuits.

### III.   *Mr. Tucker's Credibility is Not at Issue*

Defendants agree they will not refer to Mr. Tucker as a "hired gun" or similar characterization. What Defendants fail to do, however, is provide any kind of specificity as to how they intend to attack Mr. Tucker's credibility, other than to generally say that they will do so. Given Defendants' attempts to hide information until trial, Plaintiff cannot reply, other than to preserve all objections for trial in the event Defendants' attack on Mr. Tucker's credibility crosses the line. Defendants' legal authority is misplaced as each case is premised on the confrontation clause in criminal matters.

### IV.   *Mr. Tucker's Relationship with Other Copyright Owners is not at Issue*

Defendants again go out of their way to dig up a dated article (from approximately 2008) for a one-liner, without context, to suggest this must be how Mr. Tucker *always* behaves. This tactic violates Federal Rule of Evidence 404(b). Defendants fail to address with any persuasiveness Plaintiff's position that Mr. Tucker's work for Hydentra on *other* matters, or work for *other* adult companies on *unrelated* matters, is immaterial to his work on this case (involving factual analysis of website data). While Defendants may (if done properly) attack Mr. Tucker's credibility, they cannot do so by inquiring into matters that are irrelevant, such as his work on other cases unrelated to this lawsuit for either Hydentra or other companies. To permit such form of impeachment would be akin to attacking this Court by suggesting Your Honor has

presided over too many other lawsuits, or by attacking the undersigned by suggesting it has represented too many other parties in litigation. It would be absurd.

### V. *Plaintiff's Status as a Foreign Defendant should not be Admissible*

Plaintiff has never disputed its status as a foreign entity. However, Plaintiff objects to Defendant eliciting testimony on the same because the probative value of such outweighs the benefit due to political and national sensitivities, especially given the political nature of this election year.

Defendants argue that Plaintiff's nationality is relevant because of confusion over the issue of trademark ownership. Plaintiff owns the trademarks at issue, and Defendants incorrectly claim otherwise in their Opposition to Plaintiff's Motion for Summary Judgment. Rather than conducting *any* discovery on the issue of Plaintiff's trademarks, Defendants instead ignorantly allege that Plaintiff does not own the asserted trademarks. Simple discovery would have revealed the Plaintiff's corporate structure. On May 2, 2015, prior to the filing of this lawsuit, Hydentra L.P HLP General Partner, Inc. assigned the two trademarks to Plaintiff. [D.E. #126, Pg. 49]. If for whatever reason Defendants feel it necessary to elicit testimony on the ownership or assignment of the marks, they can do so without eliciting testimony on Plaintiff's nationality.

### VI. *Defendants Should Not be Able to Use or Elicit the Term "Pornography"*

Defendants argue that "pornography" accurately and properly describes Plaintiff's business. It additionally argues that the terms "adult oriented content" or "adult content" do not accurately describe Plaintiff's business as it is imprecise and cumbersome as it could describe anything, including driving a car, geopolitics and becoming a foster parent. Defendants have no legal authority for their position.

6

First, the term "pornography" is not precise. Simply put, "the meaning of the term *pornographic* constantly shifts along a vast continuum moving between two equally slippery concepts, the erotic and the obscene".[3] Plaintiff describes its material:

> Hydentra is the producer, distributor, and exclusive licensor of its own motion pictures that explore and deliver sensuality and sexuality through artistic photography, video, and erotic stories. Hydentra is well known in the industry for producing high quality content. In fact, SexArt.com was just won 2016 XBiz Adult Site of the Year and 2016 AVN Best Director & Film. Plaintiff prides itself on high quality movies, often spending six times more than industry standards in production costs. [D.E. 76-1, Par. 3].

The XBIZ Awards is viewed as the most prestigious symbol of industry success in the adult entertainment industry. The Awards are decided by industry votes. In 2016, Plaintiff was the winner in the following categories: Adult Site of the Year – Photography - MetArt.com; Glamcore Site of the Year - SexArt.com; and Adult Site of the Year — Erotic - SexArt.com. None of these awards use the term "porn" or "pornography. Adult content and adult oriented content accurately describe the material. No term is perfect, but these terms are readily understood to include the type of content Plaintiff produces. Additionally, it may become necessary for Plaintiff to show the jury clips of videos of its content on Defendants' websites to prove its case; there will be zero misunderstanding of what Plaintiff produces and Plaintiff's business in the eyes of the jury. The term "pornography" is incendiary and is not needed to prove any allegation or defense in this matter.

### VII.    *Method of Delivery of DMCA Take-Down Notices is Irrelevant*

Defendants attempt to state that the method of delivery of DMCA take-down notices is relevant in order to show that Plaintiff intentionally tried to cause SSM to commit a mistake. Again, Defendants failed to conduct any discovery on this (or any other) issue, and therefore has no factual basis for its argument. Moreover, Defendants' position is irrelevant. Both paper and

---

[3]    http://www.pbs.org/wgbh/pages/frontline/shows/porn/etc/definition.html *(Accessed March 14, 2016)(quoting Pornography in America: A Reference Handbook* by Joseph W. Slade (abc-clio, 2000)).

7

email delivery of take-down notices are permitted under the DMCA, which requires the notices be only in "writing," and it would be impossible for Defendants to show any bad faith by Plaintiff for having delivered take-down notices in a manner expressly authorized by the DMCA. The DMCA does *not* obligate Plaintiff to follow the envelope from receptionist, to mail room, to mail cart, to ultimately someone's desk. Plaintiff delivered the notices to the address provided for SSM's DMCA agent (as registered with the U.S. Copyright Office and as displayed on Defendants' website), and nothing more is legally required.

### *VIII.    Defendants have not Rebutted the Presumption of Delivery As a Matter of Law*

Defendants claim that Mr. Luchian was "ambushed" with the specifics of the take-down notices at his deposition. This is a ludicrous position as delivery of the take-down notices has always been a key issue: (1) paragraph 64 of Plaintiff's Complaint provides that on or about January 20, 2015, Plaintiff delivered to Defendants' Registered Agent take-down notices for the infringing URL's [D.E. 1, Pg. 9]; (2) IncorporateNow, Inc. is the registered DMCA Agent for SSM and is owned by Mr. Luchian; (3) SSM's affirmative defense #9 provides that Plaintiff failed to comply with the requirement of the DMCA, and affirmative defense #10 provides that Defendants are entitled to the safe harbor provision of the DMCA; and (4) SSM's interrogatory responses indicated that SSM never received the take-down notices. Mr. Luchian conducted no discovery and should not have been surprised by Plaintiff's deposition questions concerning his role as DMCA agent for SSM and SSM's defense that it did not receive the take-down notices.

Following his deposition, Mr. Luchian then attempted to modify his testimony by affidavit, which is prohibited. *See Kernel Records Oy v. Mosley, 694 F. 3d 1294, 1299-1300, F.N 6 (11th Cir. 2012)*.. Nevertheless, the Declaration is premised upon multiple layers of hearsay and inadmissible "evidence." As an example only, in paragraph 1, Mr. Luchian testifies the

declaration is based on his review of INI's business records. At no time does Mr. Luchian identify the business records or satisfy the business record exception to hearsay, thus the declaration is based on inadmissible evidence. Paragraphs 20, 21 and 22 (related to discussions between Mr. Luchian and Carmen Jusino) are likewise all premised on hearsay. Here, Mr. Luchian acknowledges that his testimony is based on his "discussions with staff at the Regus, particularly . . . Carmen Jusino." What is incredulous is Mr. Luchian's suggestion that it is *possible* someone may have stolen Plaintiff's DMCA take-down notices. Without any further "evidence" the *strong presumption* of receipt is not overcome. *Lupyan v. Corinthian Colleges, Inc.*, 761 F. 3d 314, 319-20 (3d Cir. 2013).

To this day, the only evidence Defendants have offered to suggest Mr. Luchian did not receive the DMCA take-down notices is a Declaration from a party that contradicts his deposition testimony and which is premised on inadmissible hearsay. As a matter of law, Defendants have not (and cannot) overcome the strong presumption of receipt.

### IX. *The Witness(es) Untimely Disclosed Should be Excluded*

Defendants' argument on this issue is nonsensical. Defendants suggest that because they served responses to Plaintiff's written discovery, they should somehow be excused from their obligations under FRCP 26 to serve initial disclosures. The purpose of these two forms of information are quite different – discovery responses are simply answers to questions posed by the other side, while Rule 26 disclosures are intended to compel a party to voluntarily disclose material information it may have such as to alert the opposing party to its existence, and thus aid in discovery efforts.

Of key importance is that Defendants' violation of Rule 26 hampered Plaintiff's discovery and prevented it from learning that Defendants deemed Carmen Jusino a material

9

witness to present evidence on an important matter – the delivery of the DMCA take-down notices. The first time Plaintiff learned that Defendants' intentions was when they filed Mr. Luchian's Declaration (in support of Defendants' Motion for Summary Judgment), which of course, was filed after the discovery deadline.

What is troubling is that if anyone to these proceedings knew of Ms. Jusino's existence or involvement it was Mr. Luchian, yet he consciously elected not to disclose her when it was required of him. Then, Plaintiff gave Defendants every opportunity during discovery to disclose Ms. Jusino. For example, Plaintiff's interrogatory #5 sought the identity of each witness who supports each affirmative defense raised, including that individuals name and contact information. Not once did any Defendant disclose Ms. Jusino. At his deposition, Mr. Luchian testified that he did not know anyone at Regus by name and did not know how they handled documents. (D.E. #75, Pages 45-47). Again, Defendants failed to disclose Ms. Jusino during the discovery period. Yes, Plaintiff obtained proof of delivery of the DMCA take-down notices reflecting that Ms. Jusino signed for the mail package. However, Plaintiff had absolutely no way to know that Defendants' primary "defense" to this action would be that the package was either "lost or misplaced." In fact, no indication of this had ever been provided either during written discovery or Defendants' two full days of depositions. Defendants architected a prejudicial game of "hide the ball," calculated only to prohibit Plaintiff from investigating facts related to what appears to be Defendants' primary defense to the lawsuit.

## CONCLUSION

Plaintiff requests this Court enter an Order in Limine granting it the relief sought in its Motion.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of March, 2016 we served the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Brady J. Cobb, Esq. and Valentin Gurvits, Esq. (*Pro Hac Vice*)

                      Respectfully submitted,

                      BeharBehar
                      1840 North Commerce Parkway
                      Suite One
                      Weston, Florida 33326
                      Telephone: (954) 688-7642
                      Facsimile: (954) 332-9260
                      E-mail: AB@BeharBehar.com

By:    */s/Aaron Behar, Esquire*
           Aaron Behar, Esquire
           Florida Bar No.: 166286
           */s/Jaclyn Ann Behar, Esquire*
           Jaclyn Ann Behar, Esquire
           Florida Bar No.: 63833
           **Counsel for Plaintiff**

And:   Spencer D. Freeman, Esquire
             Freeman Law Firm, Inc.
1107 ½ Tacoma Avenue South
Tacoma, WA 98402
Telephone: (253) 383-4500
Facsimile: (253) 383-4501
E-mail: sfreeman@freemanlawfirm.org
**Counsel for Plaintiff**
*(Pro Hac Vice)*