# EXHIBIT "A"

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 1:15-cv-22134-UU

HYDENTRA HLP INT. LIMITED,

      Plaintiff,

v.

CONSTANTIN LUCHIAN, *et al.*,

      Defendants.

_____/

## OMNIBUS ORDER

THIS CAUSE is before the Court upon Defendants' Motions for Summary Judgment (D.E. 72, 73), and Plaintiff's Motion for Partial Summary Judgment (D.E. 86).

THE COURT has reviewed the Motions, the pertinent portions of the record and is otherwise fully advised in the premises.

## BACKGROUND

The instant case arises out of the uploading of Plaintiff's protected videos onto Defendants' websites by third-party users. Plaintiff claims that Defendants are liable for copyright and trademark infringement, and unauthorized use of name and likeness in violation of Florida law. The following facts are undisputed unless otherwise noted.

### A. Plaintiff, Hydentra HLP Int. Limited, and its Intellectual Property

Plaintiff is the producer, distributor, and exclusive licensor of adult-content videos. D.E. 76-1, Krogman Decl. ¶ 3. Plaintiff also owns and/or is licensed to operate a group of erotic websites, commonly known as the MetArt Network, which allows the viewing of adult entertainment properties. *Id.* ¶ 5. These websites include: MetArt.com, SexArt.com, Errotica-

1

Archives.com, EroticBeauty.com, TheLifeErotic.com, RylskyArt.com, ALSScan.com, VivThomas.com, EternalDesire.com, Stunning18.com, HollyRandall.com, domai.com, goddessnudes.com, and bbfilms.com. *Id.* Some of these websites include content produced by Plaintiff, while others contain content for which Plaintiff has obtained licensing rights. *Id.*

Plaintiff's websites are paid membership sites. *Id.* ¶ 24. Plaintiff's intent is that its videos can be accessed only through its paid membership sites. *Id.* Plaintiff's business model is simply that a user must be a paid member to Plaintiff's website in order to view Plaintiff's copyrighted videos. *Id.* ¶ 6. Plaintiff also engages in the limited licensing of its original content to other entities or websites for viewing, in addition to supplying a small sample of promotional materials to Plaintiff's affiliates for the sole purpose of promoting Plaintiff's websites. *Id.* ¶ 8.

Defendant, Sun Social Media, Inc. ("SSM"), provides online viewing services for four websites: Playvid.com, Playvids.com, Peekvids.com, and Feedvid.com. D.E. 73-2, Bolotin Decl. ¶ 2. Plaintiff located its copyrighted videos on SSM's four Websites as follows: thirty-seven (37) Plaintiff-produced videos on Playvid.com (D.E. 76, Ex. 2 ¶¶ 4, 14-5), two (2) videos on Feedvid.com (*Id.* ¶¶ 51-54), five (5) videos on Peekvids.com (*Id.* ¶¶ 51-61), and twenty-eight (28) videos on Playvids.com (*Id.* ¶¶ 62-92).

Plaintiff is currently the owner of the trademarks, "Metart" and "Sexart," which are the trademarks at issue in this case. D.E. 126, p. 46-47 ¶ 3. Hydentra, L.P. HLP General Partner Inc. filed trademark registrations for "MetArt" in October 2003 and "Sex Art" in June 2011. D.E. 76-1 ¶ 9; Ex. A-B. On May 2, 2015, prior to the initiation of this lawsuit, Hydentra, L.P. HLP General Partner Inc. assigned the trademarks "Metart" and Sexart" to Hydentra HLP Int. Limited, which is the named Plaintiff in this current lawsuit. D.E. 126, p. 46-47 ¶ 3.

**B.** **Defendant, Sun Social Media, Inc., and Defendants' Websites, Playvid.com, Playvids.com, Peeksvids.com, and Feedvid.com**

In 2010, SSM started as an online social media company and initially operated a dating website called FindandTry.com. Bolotin Decl. ¶ 3. In approximately 2013, SSM developed a video-hosting website, Playvid.com, to allow FindandTry.com users to share their videos. Bolotin Decl. ¶ 4. Since 2013, SSM has created other video-sharing websites in addition to Playvid.com, including PlayVids.com, PeekVids.com, and FeedVid.com. *Id.* ¶ 4. SSM, including its agents and contractors, does not upload any of the videos available on the Websites – the videos are uploaded by SSM's users. *Id.* ¶ 6. On its Websites, SSM hosts more than 475,000 videos that have been uploaded to the Websites by its users. *Id.* ¶ 7.

To post videos on any of SSM's Websites, a user must sign up to become a member of SSM. D.E. 74-1, Bolotin Dep. 65:18-20. The user is only required to submit a user name and an e-mail address in order to become a member of SSM and to log into any of SSM's four Websites. D.E.74-1, Bolotin Dep. 43:11-16. The Websites do not require any e-mail verification to activate a membership with the Websites. D.E. 74-1, Bolotin Dep. 48:10-21. Membership to SSM's Websites provides a user with the ability to upload a video, conduct later playback of the videos, and organize videos on any of the four Websites that are at issue in this case. D.E. 74-1, Bolotin Dep. 62:11-25, 63:1-12.

Pursuant to the Terms of Use/Terms of Service on each of the Websites, SSM requires that its users only upload videos that do not contain the intellectual property of anyone other than the person uploading the file or of a person who has given the uploader appropriate permission to upload the video. D.E. 73-2, Bolotin Decl. ¶ 8. SSM requires that the uploader of a video affirm that s/he owns the intellectual property to the video, and/or has the necessary license to upload

3

the video onto the Websites. *Id.* ¶¶ 9-10. The user must agree to these terms before s/he uploads the video to the Websites. *Id.* ¶ 11.

A moderator reviews every video that is uploaded to the SSM sites before being displayed live on the sites. D.E. 74-1, Bolotin Dep. 190:8-11. The moderator is an independent contractor hired by SSM. D.E. 74-1, Bolotin Dep. 190:22-23. The videos are reviewed for child pornography, animal pornography, spam, and to ensure that the video constitutes adult entertainment. D.E. 74-1, Bolotin Dep. 193:18-25, 194:1-4. The independent contractor has the ability to block videos if the videos do not constitute adult entertainment and/or fall into one of the prohibited categories. *Id.* However, the independent contractor does not review any of the videos by way of content producer, quality, actor, or video length. Bolotin Dep. 193:18-21.

### C. Defendant, Konstantin Bolotin

Defendant, Konstantin Bolotin ("Bolotin"), is the Director of Operations at SSM, which owns and operates Playvid.com, Feedvid.com, Playvids.com, and Peekvids.com. D.E. 1 ¶ 3. Bolotin did not upload any of the files-in-suit in this case. D.E. 73-2 ¶ 17.

### D. Defendant, Constantin Luchian

Defendant, Constantin Luchian ("Luchian") is an owner, employee, and director of IncorporateNow, Inc. D.E. 72-2, Luchian Decl. ¶ 1. IncorporateNow, Inc. is a company that provides administrative and financial services to its clients in the areas of corporate formation and compliance, financial services, Digital Millennium Copyright Act ("DMCA") agent services, and trademark registration services. *Id.* ¶¶ 2-3. SSM utilizes IncorporateNow, Inc.'s services in the following ways: (1) IncorporateNow, Inc. assists SSM in the preparation and filing of SSM's incorporation papers; (2) IncorporateNow, Inc. provides bookkeeping services to SSM, and (3)

IncorporateNow, Inc. serves as the designated DMCA agent for receipt of take-down notices that are sent to SSM. *Id.* ¶ 6.

SSM and IncorporateNow, Inc. do not have common ownership. *Id.* ¶ 7. Luchian is not an employee, director, or owner of SSM. *Id.* ¶ 8. Neither IncorporateNow, Inc. nor Luchian maintain any control over the Websites at issue. *Id.* ¶ 10. In addition, IncorporateNow, Inc. and Luchian do not have access or control over what is posted on the Websites. *Id.* ¶ 11. They can neither remove materials from the Websites nor do they have access to the servers on which the Websites are hosted. *Id.* Neither IncorporateNow, Inc. nor Luchian has any financial interest in the performance of SSM or the Websites. *Id.* ¶ 12. Luchian did not upload any of the files-in-suit in this case. *Id.* ¶ 14. He did not upload any videos onto the Websites, and he did not have any actual knowledge of infringement on the Websites. *Id.* ¶¶ 15-16.

### E. SSM's Digital Millennium Copyright Act Designated Agent

Pursuant to 17 U.S.C. § 512(c)(2), otherwise known as the Digital Millennium Copyright Act ("DMCA"), a service provider[1] is shielded from liability for the acts of third-party users when certain criteria is met, including the designation of an agent to receive notifications of claimed infringement. Since September 2010, SSM has designated a DMCA Agent, Constantin Luchian, and has made that contact information available on each of the Websites. D.E. 73-2,

---

[1] Throughout its briefing, Plaintiff makes the argument that only SSM and Playvid.com should be considered service providers because they are the only two entities that were registered and/or included in the Registration filed with the United States Copyright Office. Plaintiff's representation is untrue because SSM is listed as the service provider, and Playvid.com is listed as an alternative name for SSM on the Registration. Bolotin Dec. ¶ 24; Ex. 2. Regardless, Plaintiff cites no case law for the proposition that an internet service provider must be federally registered as an internet service provider. Section 512(k)(1)(A) defines "service provider" as "an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." Furthermore, the term "service provider" means a provider of online services or network access, or the operator of facilities therefor[.]" *Id.* at (B).

Bolotin Decl. ¶ 20. At all times relevant to this case, every page of the Defendants' Websites contained a link to a copyright notification page listing SSM's DMCA Agent's contact information. *Id.* ¶ 21. On its Websites, SSM provides four ways in which a party may submit claims of copyright infringement: (1) by sending an e-mail to any of the five different e-mail addresses (including the ones listed on SSM's registration with the Copyright Office), (2) by sending physical copies of a notification to SSM's DMCA agent registered with the Copyright Office or at the address disclosed on the websites, (3) by sending a fax of a notification to SSM's DMCA Agent, which is also listed with the Copyright Office and on the websites), or (4) by using the "Contact Us" form on any of the Websites. SSM Int. Resp., p. 10. According to SSM, when SSM receives notices of alleged copyright infringement by e-mail, SSM disables access to the allegedly infringing file within 48 business hours of receipt. D.E. 73-2, Bolotin Decl. ¶ 29.

In September 2010, SSM filed its first "Interim Designation of Agent to Receive Notification of Claimed Infringement" with the United States Copyright Office. *Id.* ¶ 24; Ex. 2. The Designation of Agent lists "Sun Social Media Inc." as the service provider, and SSM's alternative names as "findandtry.com" and "playvid.com." *Id.* At all times relevant to this case, Constantin Luchian was listed as the designated DMCA agent who should receive notification of infringement at 6750 N. Andrews Avenue, Suite 200, Fort Lauderdale, Florida 33309. *Id.*

**F. SSM's Infringement Policies and Procedures**

SSM acts to remove files upon receipt of notification that infringing content may be displayed. D.E. 73-2, Bolotin Decl. ¶ 14. When SSM receives notice that any of the content on its websites infringes a third party's rights, SSM has systems in place to remove such content. *Id.* ¶ 15.

SSM utilizes two back-ended systems to process copyright take-down requests: its custom Ticket System and its customer Blocking Tools Systems ("BTS"). SSM Int. Resp., p. 10. If a notice is delivered to any of SSM's listed e-mail addresses or is sent using any of the Contact Us forms on the Websites, a ticket is created in the Ticket System and reviewed within 48 hours for assignment to the BTS. SSM Int. Resp., p. 10. Notices that are sent to SSM's DMCA Agent via mail, or other physical means, are generally scanned within 48 business hours and e-mailed to SSM, which then manually processes all notices and inserts them into the BTS. SSM Int. Resp., p. 11.

The BTS automatically collects the necessary information about the allegedly infringing file, removes the file from the Websites, and runs the notice through its automated repeat infringer policy code to determine whether the request triggers the termination of the user who uploaded the complained of content. SSM Int. Resp., p. 11; Bolotin Decl. ¶¶ 30-31.

With respect to specific users, SSM has implemented a policy under which it terminates repeat infringers. D.E. 73-2, Bolotin Decl. ¶ 13. The Terms of Use/Terms of Service for each of the Websites and on the Copyright page for each of the Websites states, "As part of our repeat-infringement policy, any user for whose User Submissions or Third Party Content we receive three good-faith and effective complaints within a six-month period will be barred from using the website." SSM Int. Resp., p. 12. SSM has implemented its repeat infringer policy by building it directly into the back-end of its website, which is the BTS discussed above, and automatically runs the repeat infringer test on every single take-down notice received by SSM and terminates any user who has violated SSM's repeat infringer policy. SSM Int. Resp. p. 12-13. Upon receipt of a third take-down notice received within a period of six months, SSM automatically terminates the member. D.E. 74-1, Bolotin Dep. 170:1-3. The notices are site specific, meaning

7

that the three notices must be received on one specific site.  D.E. 74-1, Bolotin Dep. 174:7-11.  A member's status will not change for the other Websites unless three violations are received on that specific site.  D.E. 74-1, Bolotin Dep. 180:1-6.  SSM has terminated over one thousand users pursuant to its repeat infringer policy.  SSM Int. Resp., p. 12-13; Bolotin Decl. ¶ 38.

SSM does not take actions to interfere with any measure copyright owners might use to identify or protect their copyrighted works.  SSM Int. Resp., p. 13.  Consequently, SSM does not alter any of the content uploaded by users onto the Websites other than to format it for proper playback on the Internet.  SSM Int. Resp., p. 13.  SSM does not remove or interfere with any watermarks or logos on the works that its third-party users upload to the Websites.  SSM Int. Resp., p. 13.

### G. SSM's Revenue

With the exception of a small amount of revenue from SSM's affiliate relationship with another adult website, Brazzers, SSM's revenue from the Websites is derived solely from advertisements on its Websites.  SSM Int. Resp., p. 12; Bolotin Decl. ¶ 19.  SSM neither charges its users to upload any content onto the Websites nor does it charge users to view any content on the Websites.  SSM Int. Resp., p. 12.  Revenue is generated from SSM's affiliate relationship with Brazzers when a user of Defendants' websites purchases a subscription from Brazzers after following a link to Brazzers from the Websites. *Id.*

In most cases, advertisers do not select where the advertisements will be placed on the Websites.  SSM Int. Resp., p. 12.  SSM does not solicit advertisers with any statements that the content on its Websites is infringing.  SSM Int. Resp., p. 12.  SSM does not directly solicit advertisers – all of the advertisements on its websites occur as a result of a transaction with advertising brokers or through advertisers who approach SSM on their own.  SSM Int. Resp., p.

8

12. SSM does not solicit those advertising brokers with any statements that the content on its websites is infringing. SSM Int. Resp., p. 12.

### H. Knowledge of the Alleged Copyright Infringement

Plaintiff employs vendors to investigate copyright infringement, send take-down notices for detected infringements of Plaintiff's copyrights, and document infringements when take-down notices are ignored and/or websites do not qualify for DMCA safe harbor protections. D.E. 1 ¶ 11; Ex. 2 ¶ 3. In this case, Plaintiff retained Battleship Stance LLC to investigate copyright and trademark violations. D.E. 76-2, Tucker Decl. ¶ 3. Jason Tucker ("Tucker") is the Director of Battleship Stance LLC, and was hired by Plaintiff to investigate potential infringement. *Id.* Tucker discovered a total of 37 of Plaintiff's copyrighted movies displayed for free on the website, Playvid.com. *Id.* ¶ 4. The website also contained Plaintiff's two registered trademarks, "MetArt" and "SexArt," in the meta tags for the pages that displayed these videos. D.E. 76-2, Tucker Decl. ¶ 10.

Tucker searched the United States Copyright Office Internet Service Provider database and discovered that SSM filed a Designation of Agent to Receive Notification of Claimed Infringement, which listed Playvid.com as an alternative name for SSM. D.E. 76-2, Tucker Decl. ¶ 5. Based on the information he found, Tucker sent over 70 DMCA takedown notices to Luchian, who was listed as SSM's Designated DMCA Agent, at 6750 N. Andrews Avenue, Suite 200, Fort Lauderdale, Florida 33309 on January 15, 2015. *Id.* ¶ 7; Ex. D.[2] Tucker did not send take-down notices to Defendants' Designated Agent as to the videos located on Playvids.com.com, Peekvids.com, and Feedvid.com. Each take-down notice included the

---

[2] Luchian has testified that his company, IncorporateNow, Inc., uses "Regus" at its Regus Cypress Park West #1870 office at 6750 North Andrews Avenue, Second Floor in Fort Lauderdale, Florida for "virtual" office space services. Luchian Decl. ¶ 18. When packages and mail for IncorporateNow, Inc. are delivered to Regus at the Office, they are delivered to a receptionist in the waiting room of the office. *Id.* ¶ 19.

following information:   a signature of the person who was authorized to act on behalf of Hydentra, identification of Hydentra's copyrighted movie infringed, identification of the material on playvid.com that is infringing Hydentra's copyright that is to be removed or disabled, along with the exact URL of the material, contact information for Hydentra's agent, a statement that Plaintiff has a good faith belief that use of the material is not authorized, and a statement, under penalty of perjury, that the information in the notification is accurate and the agent is authorized to act on behalf of Plaintiff.  Tucker Decl. ¶¶ 6-9, 14-50; Ex. 2.

On January 20, 2015, the package sent by Tucker was delivered through the United States Postal Service.  D.E. 76-2, D-1.  A woman named Carmen Jusino signed for the package on behalf of IncorporateNow, Inc., with tracking number 9468 7036 9930 0000 6353 65  *Id.* ¶ 21. Luchian never personally received the package with tracking number 9468 7036 9930 0000 6353 65 and claims that it was lost after Jusino signed for the package.  Luchian Decl. ¶¶ 22-23.  SSM claims that it never received these takedown notices and was unaware of the allegedly infringing files until this lawsuit.  Bolotin Decl. ¶ 35.  In the past, Hydentra has sent copyright notices to SSM, both before and after January 2015, which SSM promptly responded to by disabling access to the complained of files and by terminating appropriate users in accordance with the repeat infringer policy.  Bolotin Decl. ¶ 37.

On June 4, 2015, Plaintiff filed its Complaint against Defendants.  D.E. 1.  Upon receiving a copy of Exhibit A to the Complaint identifying the copyrighted files, SSM disabled access to and/or removed the files from the Websites that were referenced in the Complaint. Bolotin Decl. ¶ 34.

## **LEGAL STANDARD**

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When determining whether the moving party has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the non-moving party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of proving that no genuine issue of material fact exists, the non-moving party must make a showing sufficient to establish the existence of an essential element of that party's case and on which that party will bear the burden of proof at trial." *See Celotex Corp. v. Catrell*, 477 U.S. 317 (1986); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

If the record presents factual issues, the Court must not decide them; it must deny the motion and proceed to trial. *Envntl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment. *Impossible Elec. Techs., Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031

11

(5th Cir. 1982); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160. The moving party must demonstrate that the facts underlying the relevant legal questions raised by the pleadings or are not otherwise in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611-12 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 255.

## ANALYSIS

In this case, the parties have filed Cross-Motions for Summary Judgment on each of Plaintiff's claims. D.E. 73, 86. Defendant, Constantin Luchian ("Luchian"), has filed his own Motion for Summary Judgment. D.E. 72. In its Complaint, Plaintiff alleges the following claims against all Defendants: (1) direct copyright infringement arising under the Copyright Act, 17 U.S.C. §§ 101, *et seq.*, (2) contributory copyright infringement, (3) vicarious copyright infringement, (4) inducement of copyright infringement, (5) unauthorized publication of name and likeness in violation of Florida Statute section 540.08, (6) trademark infringement arising under Section 32 of the Lanham Act, 15 U.S.C. §§ 1114 *et seq.*, (7) contributory trademark infringement, and (8) false designation of origin under the Lanham Act, 15 U.S.C. § 1125. D.E.

1.[3]  Because the parties' Motions address each of Plaintiff's claims, the Court separately

considers the parties' arguments with respect to each claim and the elements required to prove

each claim.[4]

The Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. §§ 101 *et seq.*, is the

congressional implementation of an affirmative constitutional duty under the copyright and

patent clause "[t]o promote the Progress of Science and useful Arts, by securing for limited

Times to Authors and Inventors the exclusive Right to their respective Writings and

Discoveries." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 842 (11th

Cir. 1990) (citing U.S. Const. art. 1 § 8; *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard, Inc.*,

600 F.2d 1184, 1187 (5th Cir. 1979); *Sony Corp of America. v. Universal City Studios, Inc.*, 464

U.S. 417, 428-29, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984)).  The Copyright Act "provides a

fair return to authors and inventors by protecting their works from exploitation by others."

*Cable/Home Cmmc'n*, 902 F.2d at 842 (citing *Harper & Row, Publishes, Inc. v. Nation Enters.*,

471 U.S. 539, 546, 105 S.Ct. 2218, 2223, 85 L.Ed.2d 588 (1985)).

Trademarks are "any word, name, symbol, or device, or any combination thereof [used]

to identify and distinguish [one's] goods . . . from those manufactured or sold by others and to

indicate the source of the goods." 15 U.S.C. § 1127.  Section 43(a) of the Lanham Act creates a

---

[3] In their Motions, the Defendants indicated that they were moving for summary judgment as to all of the claims that Plaintiff alleged; however, there was no analysis whatsoever as to Plaintiff's trademark infringement claims.

[4] The Court is unclear as to why Konstantin Bolotin was named as a Defendant in this action.  In its briefing, Plaintiff does not distinguish between Bolotin and Sun Social Media, Inc. for purposes of liability.  Because Plaintiff has alleged in its Complaint that Bolotin acted within his capacity as Director of Operations at Sun Social Media, Inc. at all times relevant to this action, and Plaintiff's Motion for Summary Judgment does not draw any meaningful legal distinction between the two, the Court will treat Bolotin and Sun Social Media, Inc. as one in the same for this case.  The Court is similarly skeptical as to the legal basis for naming Constantin Luchian as a Defendant; however, because Luchian filed his own Motion for Summary Judgment, the Court will accordingly address any significant legal arguments within this Order.

federal cause of action for unfair competition by prohibiting the use in interstate commerce of any "word, term, name, symbol or device . . . or any false designation of origin . . . which is likely to cause confusion . . . origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1); *see also B&L Sales Assocs. v. H. Daroff & Sons, Inc.*, 421 F.2d 352, 353 (2d Cir. 1970) (noting that "the federal remedy against trademark infringement is not plenary, and is only available when the plaintiff can show a likelihood of confusion, mistake or deception arising in the market as a result of defendant's use of the mark registered to plaintiff").

## 1. **COUNT I: DIRECT COPYRIGHT INFRINGEMENT**

In Count I of Plaintiff's Complaint, Plaintiff alleges that Defendants directly copied, reproduced, and distributed Plaintiff's copyrighted works by and through servers and/or hardware owned, operated and/or controlled by Defendants. D.E. 1 ¶ 102. Plaintiff alleges that Defendants' website, Playvid.com, displayed 37 of Plaintiff's copyright registered videos; the website, Feedvid.com, displayed 2 of Plaintiff's copyright registered videos; the website, Playvids.com, displayed 28 of Plaintiff's videos; and the website, Peekvids.com, displayed 5 of Plaintiff's copyright registered videos. *Id.* ¶¶ 61, 66, 69, 72.

In the context of a copyrighted film, a copyright owner "has the exclusive rights to" reproduce it, make derivative material based on it, distribute it, and display it. *See Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1307 (S.D. Fla. 2011) (citing 17 U.S.C. § 106). "Anyone who violates any of [these] exclusive rights of the copyright owner . . . is an infringer of the copyright." *Id.* (citing 17 U.S.C. § 501).

To prevail on a claim for direct copyright infringement, Plaintiff must prove two elements: (1) that it owns a valid copyright to the videos in question, and (2) that Defendants

14

copied the original elements of the copyrighted materials. *See Oravec v. Sunny Isles Luxury Ventures L.C.*, 469 F. Supp. 2d 1148, 1160 (citing *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Calhoun v. Lillenas Publishing*, 298 F.3d 1228, 1232 (11th Cir. 2002)); *see also Disney Enters.*, 798 F. Supp. 2d at 1307 ("Where a plaintiff shows that he owns a valid copyright and that the other party copied some of the protect elements of that work, he has shown direct infringement of his copyright.").

In this case, Defendants do not contest that Plaintiff owns a valid copyright for each of the videos at issue. The only question before this Court is whether Defendants may be held liable for direct infringement based upon third-party users' uploading of Plaintiff's copyrighted videos onto Defendants' Websites. In their Motion for Summary Judgment, Defendants argue that it cannot be held liable for direct infringement because Defendants never undertook any volitional conduct to cause the videos to be uploaded onto its websites; rather, the third-party users simply used Defendants' system to upload the files. In response, Plaintiff argues that Defendants engaged in volitional conduct by reviewing each video that was uploaded to Defendants' servers before enabling the videos to be publicly displayed for free, thereby allowing Defendants to earn money from advertisers. Plaintiff then argues that there is a genuine issue as to whether Plaintiff's videos were posted by third-party users of the Websites or whether Defendants themselves posted the videos based upon the Declaration of Plaintiff's consultant, Jason Tucker.

## A. Volitional Conduct Requirement

The Eleventh Circuit Court of Appeals has not considered whether volitional conduct is a necessary element for finding an internet company liable for direct copyright infringement. In *Religious Technology Center v. Netcom On-Line Communication Services*, 907 F. Supp. 1361,

1370 (N.D. Cal. 1995), the district court noted that "[a]lthough copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party." *Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1307 (S.D. Fla. 2011) (citing *Religious Tech. Ctr. v. Netcom On-Line Comms. Servs.*, 907 F. Supp. 1361, 1370 (N.D. Cal. 1995)). In reaching its conclusion, the *Netcom* court recognized that "making an internet company liable for direct copyright infringement simply because it gave users access to copyrighted material posted by others 'would create unreasonable liability.'" *Netcom*, 907 F. Supp. at 1372.

Since *Netcom*, many courts have adopted this standard in considering whether an internet company may be held liable for direct copyright infringement that occurs as a result of a website's third-party users. The Fourth Circuit Court of Appeals has stated:

> To establish direct liability for copyright infringement . . . something more must be shown than mere ownership of a machine used by others to make illegal copies. There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner. The *Netcom* court described this nexus as requiring some aspect of volition.

*CoStar Grp. v. LoopNet Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) (emphasis added); *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 130-33 (2d Cir. 2008); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 497-98 (E.D. Pa. 2006); *Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs & Nw. Nexus, Inc.*, 983 F. Supp. 1167, 1178 (N.D. Ill. 1997); *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929-30, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005) ("When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct

16

infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious infringement.").

In addressing a direct infringement claim for purposes of a 12(b)(6) motion to dismiss, a court in the Southern District of Florida relied upon the *Netcom* standard and found that the pleading of a volitional act was necessary, acknowledging that "'[k]nowledge coupled with inducement' or 'supervision coupled with a financial interest in the illegal copying' gives rise to secondary liability, not direct-infringement liability." *Disney Enters.*, 798 F. Supp. 2d at 1309; *see also Perfect 10, Inc. v. Giganews, Inc.*, No. CV-11-07098-AB, 2014 WL 8628034, at *8 (C.D. Cal. Nov. 14, 2014) ("Again, a claim for *direct* liability requires evidence that the defendants directly or actively caused the infringement. Perfect 10's continued insistence that defendants allowed its subscribers to upload, download, and view infringing material is the stuff of indirect or secondary liability, not direct liability."); *BWP Media USA, Inc. v. T&S Software Assocs., Inc.*, No. 3:13-CV-2961-BF, 2016 WL 1248908, at *2 (N.D. Tex. Mar. 25, 2016) (granting summary judgment in favor of defendants as to plaintiff's direct copyright infringement claim because it was undisputed that the images at issue were posted by third-party users of the website).

The Court agrees with Defendants that in imposing liability upon an internet service provider for third-party users' uploading of copyrighted material, Plaintiff must establish that Defendants engaged in a volitional act to cause the illegal copying. To find otherwise would impose liability upon an otherwise passive internet service provider for conduct that is simply out of its control.

Having concluded that Plaintiff must show that Defendants engaged in volitional conduct, the Court must also consider whether Defendants engaged in any conduct that can fairly

17

be described as volitional. In that regard, Plaintiff argues that Defendants engaged in volitional conduct by reviewing each video that is uploaded onto its servers and then, only after such review, by allowing each video to remain publicly displayed for free. In support of this, Plaintiff points to Defendants' Statement of Undisputed Facts, where Defendants state, "[a] moderator reviews every video uploaded to the SSM sites before being displayed live on the sites. The moderator is an independent contractor under the supervision of Defendant, Bolotin. The videos are reviewed for child pornography, animal pornography, spam, and to ensure that the video constitutes adult entertainment." D.E. 76 ¶ 28.

With respect to Plaintiff's contentions, the Court finds particularly persuasive the well-reasoned order in *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004), which is cited by and relied upon by Defendants. In *CoStar*, the plaintiff was a copyright owner of numerous photographs of commercial real estate and filed a copyright infringement action against defendant internet service provider for direct copyright infringement. *Id.* at 546. The basis of the plaintiff's lawsuit was that defendant's third-party subscribers posted plaintiff's copyrighted photographs onto defendant's website. *Id.* The plaintiff argued that the photographs were copied into defendant's computer system, and therefore, defendant was a copier who was strictly liable for direct infringement of plaintiff's copyrights, regardless of the fact that defendant acted in a passive capacity when the photographs were copied into its system. *Id.* at 548.

In affirming the district court's entry of summary judgment in favor of the defendant on the direct infringement claim, the Fourth Circuit found that defendant, as an internet service provider, simply acted as the owner and manager of a system that was utilized by users who were violating the copyrights, and defendant was not, itself, an actual duplicator that could be held

18

strictly liable for copyright infringement. *Id.* at 546. The court found that "although [defendant] engages in volitional conduct to block photographs measured by two grossly defined criteria, this conduct, which takes only seconds, does not amount to 'copying,' nor does it add volition to [defendant's] involvement in storing the copy." *Id.* at 556. The court further held that the defendant's conduct in blocking certain material was "so cursory as to be insignificant, and if it has any significance, it tends only to lessen the possibility that [defendant's] automatic electronic responses will inadvertently enable others to trespass on a copyright owner's rights." *Id.* In performing this gatekeeping function, the court held that the defendant did not attempt to seek out or select photographs for duplication; rather, it merely prevented users from posting certain photographs. *Id.* Contrary to Plaintiff's characterization of the case, the Fourth Circuit found that the defendant internet service provider <u>did</u> engage in affirmative conduct by prohibiting certain photographs, but nevertheless, the provider could not be found liable for direct copyright infringement because it did not directly contribute to the copying of the photographs.

The Court finds that the conduct complained of in this case is similar to the conduct complained of in *CoStar*, where the internet service provider merely acted as a gatekeeper in prohibiting certain material from being posted on its site. It is undisputed that Defendants employ an independent contractor who prohibits certain videos from being posted based upon their content; however, there is no record evidence that Defendants engaged in any affirmative conduct to cause the copying of Plaintiff's copyrighted videos, which would be necessary to allow Plaintiff to meet the volitional conduct prong of the direct infringement claim.

Plaintiff relies upon the case of *Arista Records LLC v. USENET.com*, 633 F. Supp. 2d 124, 148-49 (S.D.N.Y. June 30, 2009) for the proposition that by engaging in certain activity, including automated filtering, an internet service provider was liable for direct copyright

19

infringement. In finding that the internet service provider could be held liable, the court in *Arista* recognized that defendants undertook active measures to create services dedicated to mp3 files and to increase the retention times of newsgroups containing digital music files. *Id.* at 148. The court found that the defendants were aware that their copyrighted music files were the most popular items on their servers, they actively created servers dedicated to storing music files, and they increased the file retention time of newsgroups that shared music. *Id.* The defendants also had control over which newsgroups their servers would accept and store, and which they would reject. *Id.* at 144. In other words, the defendants' service was not merely a "passive conduit" that facilitated the exchange of content between users who uploaded infringing content and users who downloaded such content; rather, they actively engaged in the process so as to satisfy the "volitional-conduct" requirement for direct infringement. *Id.* at 147-48.

Unlike *Arista*, there is no record evidence that Defendants took active measures to create servers dedicated to certain videos and/or attracted traffic to the specific copyrighted files at issue in this case. Contrary to Plaintiff's position, the Court does not find that Defendants' conduct in prohibiting certain material from being posted onto its Websites constitutes the volitional act that is required for purposes of establishing a direct infringement claim. Accordingly, Defendants' Motion for Summary Judgment as to Count I is GRANTED, and Plaintiff's Motion for Summary Judgment as to Count I is DENIED.

## B. **Affidavit of Jason Tucker**

Plaintiff also argues that there is a question of fact as to whether Plaintiff's videos were posted by members of the site, or whether Defendants themselves posted the videos. Plaintiff filed the Declaration of Jason Tucker who testified that 11 of Plaintiff's videos were uploaded to Defendants' sites from an internet protocol ("IP") address of "0.00," and such IP addresses do

not exist, outside Defendants' internal servers. D.E. 119 ¶ 23-24. Plaintiff argues that Tucker's conclusion demonstrates files were uploaded with direct access to Defendants' servers and not through the Internet. In other words, only someone operating from within Defendants' internal servers would have been able to upload these videos with such an IP address. Defendants counter Tucker's conclusion by arguing that SSM's servers do not use the type of network architecture assumed by Mr. Tucker in his opinion because SSM's servers are not on a private or local network. Bolotin Decl. ¶ 11. Defendants argue that the unusual IP addresses result from the actions of users around the world who are able to manipulate their IP addresses to disguise the IP address from where they are operating.

Plaintiff relies upon Tucker's declaration for the purposes of establishing that Defendants themselves uploaded some of the videos in question. According to his Declaration, Mr. Tucker is a director of Battleship Stance LLC, which is an intellectual property and anti-piracy investigation company. D.E. 119 ¶ 2. Plaintiff retained Battleship Stance LLC to "investigate copyright and trademark violations and assist in certain litigation to enforce its intellectual property rights." *Id.* ¶ 8. Mr. Tucker attests that he reviewed the discovery produced in this case, which displayed the information specific to Plaintiff-owned content and was purported to have been uploaded to Defendants' Websites. *Id.* ¶ 20. He states that of the 111 "pieces of Plaintiff's video content" that were uploaded to the database, 11 of the uploaded videos display an internet protocol ("IP") address "from which the video was uploaded" that begins with 0.0, and an IP address the begins with 0.0 means that it is from an internal, local network. D.E. 119. ¶¶ 23-24. Mr. Tucker concludes that "[a] 0.0 IP address cannot come from the outside, it has to be inside, on the server or in the network locally in order to generate or use an IP of this type." *Id.* ¶ 25.

21

Plaintiff has not designated Mr. Tucker to testify as an expert witness in this case. Defendants have not moved to strike Mr. Tucker's Declaration, and neglected to make any argument that Mr. Tucker's purported testimony is improper; however, the Court does not find that Mr. Tucker may testify to the matters contained within his Declaration. A court may not consider inadmissible evidence when deciding a motion for summary judgment; and, "[e]ven if an affidavit does contain some inadmissible material, the court is not required to strike the entire affidavit," but can instead "disregard the inadmissible portions." *Id.*; *Givhan v. Elec. Engineers, Inc.*, 4 F. Supp. 2d 1331, 1334 n.2 (M.D. Ala. 1998) (citing *S. Concrete Co. v. United States Steel Corp.*, 394 F. Supp. 362, 380 (N.D. Ga. 1975), *aff'd*, 535 F.2d 313 (5th Cir. 1976) and *Lee v. Nat'l Life Assurance Co.*, 632 F.2d 524, 529 (5th Cir.1980)).

To be admissible, lay opinion testimony must be: (1) "rationally based on the witness's perception," (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and (3) "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Civ. P. 701; *see Lebron v. Sec. of Fla. Dept. of Children & Families*, 772 F.3d 1352, 1372 (11th Cir. 2014). This rule of evidence is designed to prevent parties from "proffering an expert in lay witness clothing" by ensuring that "testimony that is actually expert" satisfies the requirements of Rule 702. *Lebron*, 772 F.3d at 1372. "While lay witnesses may testify about their own immediate perceptions, testimony that blurs into supposition and extrapolation crosses the line into expertise." *Id.* (citing *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317-18 (11th Cir. 2011) (treating testimony as expert when it "is based on a hypothesis, not the experience of" the witness); *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) ("the ability to answer hypothetical questions is '[t]he essential difference' between the expert and lay witnesses")).

22

In this case, the testimony of Jason Tucker is plainly offered to support the broad claim that Defendants themselves uploaded some of the copyright videos onto their websites based upon his review of the 111 IP addresses. This proposition is an inference well beyond what witnesses perceive in their day-to-day lives; rather, it is a conclusion that would require "specialized knowledge," Fed. R. Civ. P. 701, and must be proved by an appropriately credentialed expert witness to be properly admitted. *See UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 457 (E.D.N.Y. 2008) (admitting expert witness opinion explaining various technologies used to infringe copyrights of record companies over the internet and linking otherwise anonymous internet user with particular internet accounts).

Other than being in the "business of legal adult entertainment production, marketing, and management," and serving as a consultant for "the rollout of several versions of Windows Media," there are no credentials within the Declaration pertaining to Mr. Tucker's "knowledge, skill, experience, training, or education," Fed. R. Civ. P. 702, which would allow him to testify on these grounds. Mr. Tucker's anecdotal observations cannot support the sweeping claim for which they are being offered.

Moreover, in putting aside Defendants' arguments that Mr. Tucker's observations are wrong because SSM does not even have an internal server, even if Mr. Tucker were qualified to attest to this, his opinions are far too speculative to be admissible. Mr. Tucker fails to identify what constitutes an "internal, local network," and there is no evidence to substantiate that Defendants, or their agents or employees, had any involvement in these particular uploads. Therefore, the Court cannot consider Mr. Tucker's testimony as it pertains to the IP addresses at issue. Accordingly, it follows that there is no question of fact that Defendants did not engage in volitional conduct that caused the copying of the videos.

23

2. **COUNTS II-IV: SECONDARY LIABILITY: CONTRIBUTORY INFRINGEMENT, VICARIOUS COPYRIGHT INFRINGEMENT, AND INDUCEMENT OF COPYRIGHT INFRINGEMENT**

In its Complaint, Plaintiff alleges a number of claims against Defendants for secondary liability, including (1) contributory copyright infringement, (2) vicarious copyright infringement, and (3) inducement of copyright infringement.

### A. Count II: Contributory Infringement

The Eleventh Circuit has stated the well-settled test for a contributory infringer as "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990) (citing *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987)); *see also Sony*, 464 U.S. at 437 (recognizing that the Supreme Court has defined a contributory infringer as one who "was in a position to control the use of copyrighted works by others and had authorized the use without permission from the copyright owner."). Furthermore, the Eleventh Circuit has explicated that "[t]he standard of knowledge is objective: 'Know, or have reason to know.'" *Casella*, 820 F.2d at 365 (quoting *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). Nevertheless, contributory infringement will not be found if the product in question is capable of "substantial noninfringing uses," which results in wide use "for legitimate, unobjectionable purposes." *Sony*, 464 U.S. at 442.

Defendant argues that it cannot be liable for contributory infringement because it did not have knowledge of the infringement on the Websites until it was notified in this lawsuit, after which it promptly removed the videos. Bolotin Decl. ¶ 35. Defendants also insist that they did not engage in conduct to induce the third parties into uploading the videos. Bolotin Decl. ¶ 30. In response, Plaintiff argues that Defendant knew, had reason to know, or was willfully blind to

24

its users' infringement and materially contributed to that infringement. Plaintiff contends that Defendant knew of the specific infringements of Plaintiff's works on Playvid.com because Plaintiff delivered notices of each specific instance of infringement to the Defendants' Registered DMCA Agent. Plaintiff further argues that Defendant had reason to know, or was willfully blind, to its users' infringement on Playvid.com prior to the take-down notices and on Playvids.com, Peekvids.com, and Feedvid.com because it operates its websites in a fashion where the users are anonymous to even Defendant, the users are not required to provide real and accurate contact information, and Defendant fails to ensure communication capability with its members.

It is undisputed that Plaintiff delivered a package of DMCA take-down notices pertaining to the 37 allegedly infringing videos listed on Playvid.com addressed to Defendant, Constantin Luchian, at the address listed with the Copyright Office.[5] D.E. 76-2, D-1. This package was signed for by C. Jusino. Luchian ¶¶ 18-21. It is further undisputed that Plaintiff did not send any take-down notices to Feedvid.com, Playvids.com, or Peekvids.com. Defendants dispute that they had knowledge of the infringement because they never received the package and based upon Luchian's testimony, Ms. Jusino lost it. Luchian Decl. ¶¶ 18-23. Plaintiff argues that where an item is properly mailed, there exists a rebuttable presumption that the item was received by the

---

[5] In their briefing, Defendants fail to address the fact that Defendants' three websites, Feedvid.com, Playvids.com, and Peekvids.com did not have actual notice of the infringing material because Plaintiff admittedly did not send DMCA take-notice notices to the sites. *See UMG Recordings, Inc. v. Shelter Capital Partners* LLC, 718 F.3d 1006, 1020 (9th Cir. 2013) (finding that a copyright holder's "decision to forgo the DMCA notice protocol 'strip[s] it of the most powerful evidence of a service provider's knowledge – actual notice of infringement from the copyright holder'"). It is not the role of the Court to raise every possible argument that the parties may have made in their motions for summary judgment. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

addressee. *See In re Farris*, 365 F. App'x 198, 199 (11th Cir. 2010). There is no need for the Court to rely upon the mailbox rule's rebuttable presumption because the record evidence is clear that the package was sent and received at the designated DMCA address.

While there is no dispute as to the package being delivered and received, there is a dispute as to whether Defendants had knowledge of the package's content. Defendants vehemently dispute that they had knowledge of its contents. Neither party has cited cases, nor has the Court been able to locate cases, where a DMCA Designated Agent lost take-down notices, causing an internet service provider to incur liability for copyright infringement based upon constructive knowledge. Whether Defendants had constructive knowledge of the infringement turns on Luchian's credibility, an assessment that cannot be made in resolving a motion for summary judgment. *See Strickland v. Norfolk Southern Ry. Co.*, 692 F.3d 1151, 1160 (11th Cir. 2012) ("Such credibility determinations, based upon the district court's decision to weigh the competing evidence, should have demanded that the defendant's motion for summary judgment be denied.").

Notwithstanding this question of fact, Plaintiff can only succeed on its contributory infringement claim if Plaintiff establishes that the Websites in question are not capable of "substantial noninfringing uses." *See Cable/Home Commc'n*, 902 F.2d at 845-46 (citing *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 422 (1984)). Even "a defendant who distributes a product that materially contributes to copyright infringement will not be liable for contributory infringement if the product is also widely used for legitimate, unobjectionable purposes or is merely capable of substantial noninfringing use." *Arista Records LLC v. Lime Grp., LLC*, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2011). "The [*Sony*] rule requires a court to determine whether a product or service is *capable* of substantial noninfringing uses, not whether

it is currently used in a non-infringing manner." *Smith v. BarnesandNoble.com, LLC*, No. 1:12-cv-04374, 2015 WL 6681145, at *7 (S.D. Fla. Nov. 2, 2015) (citing *ReDigi*, 934 F. Supp. 2d at 659).

Defendants move for summary judgment as to this element and argue that the Websites are capable of substantial noninfringing uses because SSM initially started as an online dating website, and it now hosts videos on its Websites. Bolotin Decl. ¶¶ 3-4. Furthermore, users of Defendants' Websites are able to upload videos, playback videos, and organize videos on any of the four Websites at issue. Bolotin Dep. 48:10-21. In responding, Plaintiff fails to establish that the Websites are incapable of being used for any purpose other than the dissemination and posting of copyrighted videos. Instead, Plaintiff argues that the reasoning in the *Sony* case is inapplicable because it focused on the sale of products, not the use of a website. In a conclusory manner, Plaintiff argues that "there is nothing about the infringing videos that has a non-infringing purpose." While the record is clear that at times, third-party users of Defendants' Websites upload copyrighted material, there is record evidence that the Websites are <u>capable</u> of being used for purposes other than copyright infringement.

The Court acknowledges that *Sony* addressed the sale of products; however, that opinion was written long before the advent of the Internet. In *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 380 F.3d 1154 (9th Cir. 2005), the plaintiffs alleged a claim for contributory infringement against defendants. The defendants argued that the Grokster P2P file-sharing program was capable of supporting substantial noninfringing uses, including the ability to exchange authorized files, including authorized digital recordings, digital files of public domain works, and authorized software files. *Id.* at 1161. Based upon this, the Ninth Circuit found that the defendants' evidence established that Grokster was "capable of substantial noninfringing"

27

uses and granted summary judgment in favor of defendants on the contributory infringement claim. *Id.* In reviewing the Ninth Circuit's opinion, the Supreme Court found that at the time of the lawsuit, Grokster's products were, and had been for some time, overwhelmingly used to infringe, and that this infringement was the overwhelming source of revenue from the products. Because defendants' evidence of some non-infringing uses was insufficient, the Supreme Court vacated the Ninth Circuit's opinion and remanded the case to the district court. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932-33 (2005).

Unlike *Grokster*, there is no record evidence that Defendants derived any revenue from Plaintiff's copyrighted videos. Defendants have demonstrated that their Websites are capable of substantial noninfringing uses, notwithstanding that copyrighted material is, at times, located on their Websites. The Court is satisfied that Defendants have met their burden in establishing that its Websites are capable of substantial, noninfringing purposes, which are legitimate and unobjectionable. Therefore, Plaintiff is unable to succeed on its contributory copyright claim, and Defendants' Motion to Dismiss as to Count II is GRANTED.

### B. Count III: Vicarious Copyright Infringement

To prevail on a claim for vicarious infringement, a plaintiff must allege that the defendant "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *MGM Studios*, 545 U.S. at 930. With regard to federal copyright law, "[a] party infringes vicariously by 'profiting from direct infringement while declining to exercise a right to stop or limit it.'" *Coach, Inc. v. Swap Shop, Inc.*, 916 F. Supp. 2d 1271, 1282 (S.D. Fla. 2012) (citing *Pegasus Imaging Corp. v. Northrop Grumman Corp.*, No. 8:-07-CV-1937-T-27EAJ, 2008 WL 5099691 (M.D. Fla. Nov. 25, 2008)). The defendant must have the right and ability to supervise the infringing activity and must have a direct financial interest. *Id.* (citing *Casella v.*

*Morris*, 316 F.2d 304, 307 (2d Cir. 1963)); *see also Gershwin*, 443 F.2d at 1152 (holding that vicarious liability for copyright infringement occurs when one has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities).

Plaintiff argues that Defendants had the ability to stop the infringement, but declined to do so. Furthermore, Plaintiff argues that the entirety of SSM's revenue comes from advertising on its websites. Plaintiff's position is that because SSM is compensated by advertisers based upon the number of Internet users directed to the advertisers' sites from the SSM websites, the attractiveness of the content on the websites will directly influence the number of users that respond to the advertisements. Because advertising monies are based upon the draw of the videos, the sites themselves report the draw of each infringing video, and therefore, the existence of Plaintiff's infringing work on the websites financially benefits Defendants. In response, Defendant argues that SSM's revenue comes only from advertisements, and the advertisers are not solicited with infringing content and do not select what content they appear alongside. It cannot be said that Defendant's financial benefit is attributable to the infringed videos.

The Court agrees with Defendants that there is no record evidence to substantiate that Defendants have received a <u>direct</u> financial benefit from the uploading of Plaintiff's videos. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007) (finding that the relevant inquiry for a direct financial benefit is "whether the infringing activity constitutes a draw for subscribers, not just an added benefit"). It is undisputed that Defendants' revenues stem solely from advertising. There is no evidence that Plaintiff's copyrighted videos drew additional traffic to Defendants' Websites. Plaintiff's argument that the infringed videos somehow attracted and drew more visitors to Defendants' Websites, which allowed Defendants to receive more revenue

in advertisements, is not supported by record evidence and highly speculative. Accordingly, Defendants' Motion for Summary Judgment as to Count III is GRANTED.

### C. Count IV: Inducement of Copyright Infringement

Under Supreme Court precedent, a defendant may be liable for inducing copyright infringement if he "distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement." *See Metro-Goldwyn-Mayer Studios Inc.*, 545 U.S. at 936-37. Even where a defendant is aware of infringement, "mere knowledge of infringing potential or of actual infringing uses would not be enough to subject a distributor to liability. Nor would ordinary acts incident to product distribution . . . The inducement rule, instead, premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation of having a lawful purpose." *Id.* at 937.

Defendants argue that they cannot be liable for inducement of copyright infringement because SSM has not induced or encouraged any user to engage in direct infringement. Bolotin Decl. ¶ 40. Plaintiff neither responds to Defendants' arguments as they pertain to Count IV, nor does Plaintiff move for summary judgment as to Count IV in its briefing. Aside from Plaintiff's failure to respond to Defendants' arguments, the Court agrees with Defendants that there is no record evidence that Defendants induced the third-party users' into uploading copyrighted material. To the contrary, the record is clear that Defendants operated as passive internet service providers. Accordingly, Defendants' Motion for Summary Judgment as to Count IV is GRANTED.

Because the Court finds that Defendants are not liable for Plaintiff's copyright infringement claims, there is no need to analyze the parties' arguments as they pertain to

30

Defendants' DMCA safe harbor affirmative defense. *See Disney Enters.*, 2013 WL 6336286, at *19 ("A party asserting DMCA's safe harbor as an affirmative defense to a claim of copyright infringement has the burden of demonstrating entitlement to its protections.").

**3.     COUNT V: UNAUTHORIZED PUBLICATION OF NAME AND LIKENESS IN VIOLATION OF FLORIDA STATUTE SECTION 540.08**

Section 540.08 of the Florida Statutes provides, in pertinent part:

> No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by . . . [s]uch person; or . . . [a]ny other person, firm or corporation authorized in writing by such person to license the commercial use of her or his name or likeness; . . .
>
> In the event the consent required . . . is not obtained, the person whose name, portrait, photograph, or other likeness is so used . . . may bring an action to enjoin such unauthorized publication, printing, display or other public use, and to recover damages for any loss or injury sustained by reason thereof, including an amount which would have been a reasonably royalty, and punitive or exemplary damages.

Fla. Stat. § 540.08; *see also Lane v. MRA Holdings, LLC*, 242 F. Supp. 2d 1205, 1213 (M.D. Fla. 2002).

In moving for summary judgment as to Count V, Plaintiff reiterates the factual allegations contained within its Complaint in a conclusory fashion and fails to cite to any record evidence.  Specifically, Plaintiff argues that Plaintiff's photographs and videos depict models, who performed for Plaintiff under contract, and that pursuant to such contracts, the models released their rights and interest in their images to Plaintiff for their appearance in the video. D.E. 1 ¶¶ 156-59.  Plaintiff argues that as a result of Defendants' use of these videos, Defendants gained a pecuniary benefit, which was used for its own commercial benefit.  D.E. 1 ¶¶ 160-61.

Defendants also move for summary judgment as to this claim and argue that they cannot be held liable under section 540.08 of the Florida Statutes because: (1) pursuant to 47 U.S.C. §

31

230, no provider of an interactive computer service shall be treated as the publisher of information provided by a third-party user; (2) the fact that the models in Plaintiff's videos consented to the use of their name and likeness in Plaintiff's videos through their contracts with Plaintiff nullifies the lack of consent element necessary under section 540.08; and (3) SSM did not use the models' images for trade, commercial, or advertising purposes. In responding to Defendants' Motion as to Count V, Plaintiff fails to raise any argument.

Notwithstanding Plaintiff's failure to address Defendants' arguments, the Court agrees with Defendants that there is no record evidence that Defendants used the specific models' names, images, or likeness for trade, commercial, or advertising purposes. *See Lane*, 242 F. Supp. 2d at 1213 ("The names, likeness, and other indicia of a person's identity are used 'for the purposes of trades' . . . if they are used in advertising the user's goods or services, or are placed on merchandise marketed by the user, or are used in connection with services rendered by the user."). Furthermore, as addressed above, there is no evidence that Defendants derived any pecuniary benefit from the use of Plaintiff's copyrighted videos. The record is clear that Defendants' revenue stems solely from advertisements placed on its Websites, and Defendants did not receive a financial benefit from the copyrighted videos. SSM Int. Resp., p. 12; Bolotin Decl. ¶ 19. Accordingly, Defendants' Motion for Summary Judgment as to Count V is GRANTED.

4.  **COUNTS VI-VIII: TRADEMARK INFRINGEMENT, CONTRIBUTORY TRADEMARK INFRINGEMENT, AND FALSE DESIGNATION OF ORIGIN UNDER THE LANHAM ACT**

Defendants do not move for summary judgment as to Plaintiff's trademark infringement claims. In its Motion, Plaintiff moves for summary judgment as to its trademark infringement claims; however, Plaintiff fails to even set forth the elements necessary to succeed on its

trademark claims. To establish a prima facie case of trademark infringement under § 43(a), a plaintiff must show: "(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 358 (11th Cir. 1997); *see also Suntree Techs., Inc. v. Econsense Intern., Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012) ("In order to prevail on federal claim of trademark infringement and unfair competition, a trademark owner 'must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two.").

In blanket terms, Plaintiff argues that Defendants violated Plaintiff's trademarks by "including Hydentra's trademarks in the meta tags of SSM's web sites." To assess "use in commerce," which inquires "whether a party has established prior use of a mark sufficient to establish ownership," the Eleventh Circuit has adopted a two-part test. *Bronstein v. Bronstein*, No. 06-80656-CIV, 2007 WL 646965, at *9 (S.D. Fla. Feb. 27, 2007) (citing *Planetary Motion, Inc.*, 261 F.3d at 1195). "To prevail, a party must establish 'evidence showing, first adoption, and second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark, is competent to establish ownership, even without evidence of actual sales.'" *Id.* at *9; *see Planetary Motion*, 261 F.3d at 1195 ("[T]he use of a mark in commerce also must be sufficient to establish *ownership rights* for a plaintiff to recover against subsequent users under section 43(a) . . . Courts generally must inquire into the activities surrounding the prior use of the mark to determine whether such an association or notice is present."). Although with a little effort

Plaintiff likely could meet the standard necessary to establish that it used its Marks in commerce, it has failed to produce sufficient evidence at this stage to allow the Court to reach this conclusion.

As to the actual confusion prong, Plaintiff relies on the "initial interest confusion" doctrine. "Initial interest confusion . . . occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated." *USA Nutraceuticals Grp., Inc. v. BPO Sports, LLC*, 2016 WL 695596 (S.D. Fla. 2016) (citing *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002)). Defendants argue that "initial interest confusion" is not actionable in the Eleventh Circuit Court of Appeals. The Court disagrees with Defendants' statement; rather, the more correct statement is that the Eleventh Circuit has not yet had the opportunity to determine whether "initial interest confusion" is actionable. Because of that, district courts in this Circuit have been hesitant to adopt this approach; however, other Circuits have deemed this form of confusion to be actionable under the Lanham Act. *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 539 n.4 (2d Cir. 2005) ("[P]oint-of-sale confusion is not the only confusion which the Lanham Act seeks to prevent; other forms of confusion, including reverse confusion, initial interest confusion, and post-sale confusion may also be actionable."); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1025 (9th Cir. 2004) ("Although dispelled before an actual sale occurs, initial interest confusion impermissibly capitalizes on the goodwill associated with a mark and is therefore actionable trademark infringement.").

At this stage, the Court does not find it necessary to determine whether "initial interest confusion" is actionable. Regardless, Plaintiff still must meet the second prong of the Lanham Act analysis and prove that Defendants' use of Plaintiff's Marks resulted in consumer confusion.

34

Plaintiff's analysis fails to address the factors that are necessary to establish this element. In evaluating whether there is a likelihood of confusion between two marks, the Eleventh Circuit applies a multi-factor test, evaluating the following seven factors: (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public. *Welding Servs.*, 509 F.3d at 1360. Of these factors, the type of mark and the evidence of actual confusion are the most important in this circuit. *Dieter v. B&H Industries of Southwest Florida, Inc.*, 880 F.2d 322, 326 (11th Cir. 1989). Plaintiff has not set forth evidence to support any of these factors.

The Court does not find there is a sufficient basis upon which this Court should enter summary judgment, and accordingly, Plaintiff's Motion for Summary Judgment is DENIED.

## 5.    DEFENDANT, CONSTANTIN LUCHIAN'S MOTION FOR SUMMARY JUDGMENT

In moving for summary judgment, Plaintiff does not draw any distinction between the named Defendants and does not set forth any specific evidence that would impose liability upon Luchian. Defendant, Constantin Luchian, moves for summary judgment and argues that there is no record evidence that he uploaded any of Plaintiff's copyrighted files to Defendants' Websites (Luchian Decl. ¶ 14); Luchian did not cause or contribute the allegedly infringing behavior (*id.*); he did not induce, encourage, or profit from the copyright infringement; and he did not use any individual's name or likeness for liability under section 540.08 of the Florida Statutes.

35

In responding to Luchian's Motion for Summary Judgment, Plaintiff relies upon Tucker's Declaration for the purpose of establishing that only an individual who had access to Defendants' internal servers uploaded some of Plaintiff's copyrighted photographs. Aside from the fact that this Court has disregarded his testimony as pure speculative testimony, the record evidence is clear that Luchian did not have access or control over Defendants' Websites. Luchian Decl. ¶ 11. Plaintiff further asserts that "[b]ut for Mr. Luchian's alleged mishandling of Plaintiff's DMCA take-down and failure to deliver the notices to SSM, Plaintiff would not have incurred damages for an additional six months." D.E. 122. Plaintiff cites no case law nor has this Court been able to locate case law that would hold a DMCA Designated Agent liable for direct infringement or infringement under a secondary liability theory due to an Agent's mishandling of DMCA notices. However, based upon the legal standards addressed in this Order, there appears to be no basis to extend liability to such a situation.

In opposing a motion for summary judgment, the non-movant is required to "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). There is no record evidence whatsoever to establish that Luchian had any involvement with the facts of this case, other than being listed as the Designated DMCA Agent on the United States Copyright Office's database. The Court finds Plaintiff has failed to meet its burden in establishing that there is a genuine dispute as to Luchian's liability for the claims being asserted against him. Accordingly, Defendant, Constantin Luchian's Motion for Summary Judgment is GRANTED. It is hereby

ORDERED AND ADJUDGED that Defendant, Constantin Luchian's Motion for Summary Judgment (D.E. 72) is GRANTED. It is further

36

ORDERED AND ADJUDGED that Defendants, Sun Social Media, Inc. and Konstantin Bolotin's Motion for Summary Judgment (D.E. 73) is GRANTED IN PART and DENIED IN PART.   Defendants' Motion for Summary Judgment as to Counts I-V is GRANTED. Defendants' Motion for Summary Judgment as to Counts VI-VIII is DENIED.  It is further

ORDERED AND ADJUDGED that Plaintiff's Motion for Summary Judgment (D.E. 86) is DENIED.

DONE AND ORDERED in Chambers, Miami, Florida, this 2d day of June, 2016.

_____
UNITED STATES DISTRICT JUDGE

cc: counsel of record.