UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 1:15-cv-22134-UU

HYDENTRA HLP INT. LIMITED,
a foreign corporation d/b/a METART,

                Plaintiff,

vs.

CONSTANTIN LUCHIAN, et al.,

                Defendants.

_____/

## PLAINTIFF'S OPPOSITION TO DEFENDANTS MOTION FOR ATTORNEYS FEES
### I.        INTRODUCTION

The Internet presents an unfortunate and specific battle ground over intellectual property rights.  Content producers, within both mainstream and adult entertainment industry, spend significant money on the production and protection of intellectual property with the intent (and right) to earn money from the content.  However, others have established a business model whereby they display videos for free, often in violation of the content producer's copyrights. Many of these operators upload the pirated videos themselves, and then fake upload data.

These Internet web sites earn money from sale of advertising space on the web sites. Advertising sales are based on the amount of Internet traffic a site can get. Content is king in that the better and more desirous the content, the more viewers a website can garner and retain.

Internet web sites display free content significantly damage content producers.  Quite simply, users will not pay content producers for the right to view the content when it is readily available for free.  Content producers must police their copyrights through the constraints of

Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act.  The Act protects Internet Service Providers (ISPs) from copyright liability if, among other things, the ISP responds appropriately to take down notices *and* implements a reasonable repeat infringer policy.

Hydentra HLP Int. Ltd. ("Hydentra") is a content producer in the adult entertainment industry, producing content made available to view *for a fee* on Hydentra's paid membership web sites.  Hydentra has attempted to police and enforce its copyrights.   Such attempts include approximately 19,000 DMCA compliant take down notices sent to over 650 ISPs/web sites that display(ed) Hydentra copyrighted content for free.

In comparison to the number of take down notices issued and the number of ISPs contacted, there have been relatively few that fail to comply and continue to display Hydentra's content for free.  In these cases, other than allowing ISPs to continue to display its content for free, Hydentra was left no option but to turn to the Courts to enforce its copyrights.

This instant litigation was one of those instances. While Hydentra's copyright claims were dismissed on summary judgment, Hydentra's primary purpose of copyright enforcement was met. The web sites at issue in this case, once rampant ground for infringement of Hydentra's content, no longer infringe Hydentra's copyright protected works.

## II.   FACTS

Hydentra is the producer, distributor, and exclusive licensor of its own motion pictures that explore and deliver sensuality and sexuality through artistic photography, video, and erotic stories.  Hydentra also owns and/or operates MetArt.com, SexArt.com, and other paid membership sites through which Hydentra offers its motion pictures to the public for a fee. *Ex. 1, ¶ 3.*

Since 1999, Hydentra has grown its trademark brands into a globally recognized leader of

sensual art garnering numerous industry awards through the use of studios around the globe, exotic locations, high budget productions, engaging storylines, famed photographers and directors coupled with the dedication from its artists and technicians.  The MetArt library is comprised of exclusive content that features over 5000 models shot by 250 photographers/directors including such notables as Vivian Thomas and the late Zalman King, who also brought Hollywood films such as Wild Orchid, Two Moon Junction, 9 ½ Weeks, and the Showtime network groundbreaking series Red Shoes Diaries.  *Ex.* 1, ¶ 4.

Hydentra prides itself on high quality movies, often spending six times more than industry standards in production costs.  Hydentra expends a significant amount of resources, in locating and contracting actor/models, film makers, editors, producers, and locations to produce new films monthly.  The production model is a constant on-going process – and therefore expenditure.  Hydentra's effort in producing high quality content is recognized in the industry. In fact, SexArt.com recently won 2016 XBiz Erotic Adult Site of the Year and 2016 AVN Best Director & Film. *Ex.* 1, ¶ 5.

Hydentra has spent over $45,000 registering its works with the United States Copyright Office. Hydentra has taken industry standard steps to identify its products.  Hydentra's videos are watermarked with Hydentra's readily identifiable registered trademark.  *Ex.* 1, ¶ 6.

Hydentra's movies are intended to be available only through its paid membership sites or purchase by scene, set, or asset. The Hydentra business model is simply that a user must pay Hydentra to view Hydentra's movies.  Each member of Hydentra's membership web sites has an average value of $120. This considers that the average retention rate is three months, at $29.99 per month and the average up-sale for each member.[1] *Ex.* 1, ¶ 7.

---

[1]  Defendants asserted that Hydentra's monthly memberships are worth $8.33 per month as a means to inflate their assertion that Hydentra's motive for litigation is purely profit driven.  In doing this, the Defendants intentionally

Hydentra engages in extremely limited licensing of its content to other entities or websites for viewing, in addition to the small sample of promotional materials provided to Hydentra affiliates for the sole purpose of the affiliates' promoting Hydentra's web sites. All licensing is done with the intent for brand exposure and is limited to a small subset of hand-selected short format content. *Ex.* 1, ¶ 9.

*Numerous* web sites display free copyrighted adult content without license or authority. These video streaming sites are often portrayed as third party upload sites, analogous to Youtube.com. The existence of video streaming sites damages paid membership sites as users are less likely to pay a monthly membership fee when they can access a producer's movies for free. The display and viewing of Hydentra's movies for free results in a direct loss of revenue for Hydentra. *Ex.* 1, ¶ 10.

As Hydentra's works have grown in popularity, so has the prevalence of the unlawful display of Hydentra's videos on video streaming sites, wherein those site owners earn revenue from advertising monies. The prevalence of piracy seriously threatens every element of Hydentra's business, certainly the value of the paid membership sites and licenses to distributors. Simply put, if Hydentra videos and images are readily available for free, there is little incentive for distributors to license the product and little incentive for an end user to pay for a membership. "Free" will win, every time. *Ex.* 1, ¶¶ 11-12.

Given the prevalence of video streaming sites and the damage such sites do to Hydentra's paid membership sites, Hydentra retained the services of several vendors including Takedown

---

overlooked ALL of the other membership options provided by Hydentra, including the standard $29.99 per month. The Defendant's fail to mention that this lowest monthly price point is for members who fully pre-pay for a year's subscription, or spend $100 upfront. By their own formula, if the Defendant's applied a true value of the net worth of Hydentra's customers, the amount of equivalent memberships would be significantly lower, a fraction of what they claimed. Of course, if the Defendant's were realistic with the numbers, it would significantly downplay their reasoning. *Ex.* 1, ¶ 8.

4

Piracy and Battleship Stance LLC to investigate copyright infringement, send DMCA complaint takedown notices for detected infringement of Hydentra copyrighted works, and document infringements when takedown notices are ignored and/or the web sites are not registered as Internet Service Providers. *Ex.* 1, ¶ 13.

Since 2013, through Takedown Piracy and Battleship Stance, Hydentra has issued over 19,000 take down notices to over 650 different ISPs/ video streaming sites which have displayed Hydentra's copyrighted works.   Ex. 2, ¶ 12; Ex. 3, ¶¶ 8-9.   In addition, 2,880,299 URLs/links were reported via DMCA notices to Google for removal from their search engines.  Ex. 3, ¶ 10. When take down notices do not result in the termination of infringements on a video streaming site, Hydentra has little choice in protecting its copyrights but to seek Court intervention. Relatively speaking, with only 20 lawsuits filed, Court intervention is sought in very limited instances.

The purpose of Hydentra's actions has been, and continues to be, to thwart infringements of its copyrighted works.  Contrary to Defendants' assertions, Hydentra's copyright enforcement is not a business model.  Hydentra has spent over $500,000 to enforce its copyrights, including investigations, take down notices, and litigation.  In contrast, Hydentra has recovered less than a quarter of those costs from infringing ISPs. *Ex.* 1, ¶¶ 14-15.

Specific to the Defendants in the instant matter, investigations revealed significant infringements on Playvid.com, Playvids.com, Peekvids.com, and Feedvid.com. *Ex.* 2, ¶ 13. Beginning in 2013, Hydentra utilized Takedown Piracy to send take down notices for infringements on these sites. *Ex.* 1, ¶ 16.  These notices were sent via email.  A total of 2,268 notices were sent by Takedown Piracy regarding the Defendants sites.  While initial notices resulted in the take down of infringing videos, over time these notices were increasingly ignored

to the point where they were virtually totally ignored. *Ex.* 3, ¶¶ 12-18. Even when the Defendants' did receive a notice, it was presented at summary judgment that many times Hydentra's infringed videos were posted up to 1 year after a user had been purported to be terminated in accordance with their own Repeat Infringer Policy.

Hydentra tested the sources of infringements on the Defendants Sites by blocking IP addresses from the servers hosting Defendants' sites. This meant that persons with IP addresses from these servers could not access Hydentra's paid membership sites. This action resulted in an immediate decrease in the frequency of infringements of Hydentra content on the Defendants Sites. As a result, it appeared that someone was directly downloading Hydentra' content from its paid membership sites and posting on the Defendants Sites. *Ex.* 1, ¶¶ 17-18.

There were concerns that the take down notices sent via email regarding the Defendants Sites were not actually being received, as there was no way to be sure that the notices were actually delivered. Accordingly, Hydentra retained Battleship Stance to physically send paper notices to the DMCA Agent which would establish the delivery of the notices. Such notices were delivered in January 2015. *Ex.* 1, ¶ 19; *Ex.* 2, ¶ 15.

Five months later, Hydentra's videos that were the subject of the take down notices were still displayed. *Ex.* 2, ¶ 16. In addition, by this time TakeDown Piracy's email notices were virtually completely ignored. Given the failure to respond to any type of take down notice, it was determined that litigation was necessary to thwart the piracy on the Defendants sites. *Ex.* 1, ¶ 20.

While Hydentra lost its copyright claims on summary judgment, the primary purpose of the litigation was successful. As a result of this litigation, Hydentra's works are no longer infringed on the Defendants sites. *Ex.* 1, ¶ 21. Prior to and during this litigation, an Internet

search for MetArt or SexArt videos produced Defendants sites high in results, enabling consumers to easily find Hydentra's content for free on Defendants sites.  Since this litigation, Defendants sites do not come up in such searches.  Prior to and during this litigation, a search for MetArt or SexArt videos using the search tool on the Defendants sites resulted in the display of *numerous* Hydentra videos displayed in violation of Hydentra's copyrights.  Since this litigation, such a search on the Defendants sites results in the display of exactly zero of Hydentra's videos. *Ex.* 1, ¶¶ 22-23; *Ex.* 2, ¶¶ 17-20.

While the Court dismissed Hydentra's copyright claims, the litigation actually served its purpose under the Copyright Act.

### III.     PROCEDURAL HISTORY

Defendants, in their motion, fail to provide the Court with a complete and accurate account of each Court Order issued pursuant to the motions in this case, misleading the Court as to the true context and meaning of the decisions of the Court.

Hydentra filed this action on June 5, 2015.  Dkt. No. 1.  Defendant Suns Social and Bolotin were served on July 15 and 16, 2015.  Dkt. Nos. 12 and 13.  Hydentra was having difficulty finding Luchian to serve process.  Defendants' counsel requested that Hydentra agree to an extension of time for Defendants to file a response to the complaint.  Hydentra agreed *in exchange* for Defendants' counsel's acceptance of service of process for Defendant Luchian.

On August 6, 2015, the Court issued an Order to Show Cause as to why default should not be entered.  Dkt. No. 15.  On August 17, 2015, the Court *sua sponte* issued an order directing the clerk to enter Default *and* directed Hydentra to file a motion for Entry of Judgment.  Dkt. No. 16.  Hydentra conferred with Defendants' counsel on this issue, indicating that Hydentra would not oppose stating that a motion to vacate the default.  Defendants' counsel informed Hydentra

that they could not make any filings as they had yet to be formally retained.  Hydentra filed a motion for extension of deadline to file Motion for Entry of Judgment.  Dkt. No. 18.  This Motion was denied.  Dkt. No. 19.  Hydentra had no choice but to file a Motion for Entry of Judgment, or have the Court dismiss the action.  Hydentra recognized that this invalidated the acceptance of service on Defendant Luchian, and thereafter personally served him.

At no time was Hydentra attempting to back out of its agreement with Defendants' counsel.  Hydentra was ordered by the Court to take action.  Any argument otherwise is a wrong.

On October 29, 2015, Hydentra filed a Motion to Strike Affirmative Defenses, addressing Defendants' Amended Answer and Affirmative Defenses, after the parties had a meet and confer regarding Defendants' initial Affirmative Defendants.  A review of the subsequent Court Order, dated December 4, 2015, Dkt. No. 53, shows that of the sixteen affirmative defenses sought to be stricken, one was granted outright and 6 thereafter *deemed general denial, not affirmative defenses.*  Such clarification was necessary for the litigation.

On December 1, 2015, Hydentra filed a Motion to Compel Answers to Requests for Production.  A review of the subsequent Court Order, dated December 17, 2016, Dkt. No. 58, shows that Hydentra's Motion to Compel was granted relating to RFP Nos. 9 and 17; denied relating to RFP Nos. 6-8 and 10-16, *with* specific instruction inquiries were permissible at deposition; denied relating to RFP Nos. 5 and 19, because of Defendants' counsel's representations *at the hearing* that no such documents existed; denied relating to RFP No. 18, it *with* specific instruction that such inquiry was permissible via interrogatory; and denied relating to RFP No. 20, because No. 9 encompassed No. 20.  The denials still provided Hydentra relief.

On February 10, 2016, Hydentra filed a Motion for Sanctions for Unlicensed Practice of Law.  This Motion was denied as the Court determined it did not have jurisdiction over the issue,

but specifically found Defendants' Counsel's Action to be "suspicious." Dkt. No. 135.

On February 10, 2016, Hydentra filed a Motion for Sanctions for Failure to Comply with Rule 30(b)(6). On February 12, 2016, Plaintiff filed a Motion to Compel Arising From Instructions Not to Answer and Refusal to Answer Deposition Questions. The Court specifically found that Defendants and Defendants' counsel acted wrongfully in refusing to answer deposition questions. Dkt. No. 107.

On June 2, 2016, the Court dismissed Hydentra's copyright claims on summary judgment. Dkt. No. 138. On June 7, 2016, Hydentra filed a motion to voluntarily dismiss its trademark claims. Dkt. No. 140.

## IV.    ARGUMENT

A district court *may* award "a reasonable attorney's fee to the prevailing party" in a civil copyright-infringement action. 17 U.S.C. § 505. The district court awards § 505 attorney's fees "as a matter of the court's discretion." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, 114 S.Ct. 1023, 1033, 127 L. Ed. 2d 455 (1994). In deciding whether to make such an award, the court considers "whether imposition of attorney's fees will further the goals of the Copyright Act, i.e., ***by encouraging the raising of objectively reasonable claims*** and defenses, which may serve not only to deter infringement but also to ensure that the boundaries of copyright law are demarcated as clearly as possible." *MiTek Holdings, Inc. v. Arce Eng'g Co., Inc.,* 198 F.3d 840, 842-43 (11th Cir. 1999) (emphasis added).

Courts consider factors such as "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence," if the application of those factors furthers the purposes of the Copyright Act. *Fogerty*, 510 U.S. at 534 n.19, 114

9

S.Ct. at 1033 n.19 (quoting *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 156 (3d Cir. 1986)).

When close infringement cases are litigated, copyright law benefits from the resulting clarification of the doctrine's boundaries. But because novel cases require a plaintiff to sue in the first place, the need to encourage meritorious defenses is a factor that a district court may balance against the potentially chilling effect of imposing a large fee award on a plaintiff who, in a particular case, may have advanced a reasonable, albeit unsuccessful, claim." *Lotus Dev. Corp. v. Borland Int'l Inc*., 140 F.3d 70, 75 (1st Cir. 1998).

### A.  Award of Attorneys Fees Not Warrant In Instant Matter.

#### 1.  Prevailing Party

As Defendants were granted summary judgment, they are the prevailing party in the litigation.  However, to determine whether a fee should be awarded, the Court must also consider the rest of the non-exclusive list of factors suggested by the Supreme Court. *See Mitek Holdings*, 198 F.3d at 842 (citing *Fogerty*, 510 U.S. at 526-27).  This is especially important in the instant case when not only were Hydentra's copyright claims reasonable and with proper motivation, the primary purpose of the litigation was actually achieved – there are no longer infringements of Hydentra's copyrighted works on the Defendants sites.  Thus, Hydentra's effort to protect its intellectual property rights has been ultimately successful.

#### 2.  Frivolousness

Two elements must be proven for a valid copyright infringement claim: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991); *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999).

10

At summary judgment, the trial court found that, relating to the direct copyright claim, Hydentra failed to show that the Defendants engage in volitional conduct. As noted by the trial court, the element of volitional conduct has not yet been adopted by the Eleventh Circuit Court of Appeals. Hydentra presented evidence that Defendants operated the site for the sole purpose of streaming porn videos and attracted users through videos to increase site traffic in order to raise the value of and profit from advertising space on the sites. Hydentra also presented evidence that all videos were first kept in a holding area before public display, and displayed only after a review process. Further, Hydentra presented evidence that the email addresses associated with the purported uploaders of Hydentra's videos were fake email addresses, raising the likelihood that the videos were posted by the Defendants.

There were also invalid IP addresses around uploaded videos, where a good IP existed when that very same user signed up as a member to Defendants' websites. The invalid IPs all started in the exact same format (0.0.x.x), even though the affected users were spread out all over the world. This raises the likelihood that the videos were posted by the Defendants and assigned to these users after the fact. The information in the database is controlled and can be manipulated only by the Defendants. This evidence was disqualified by the Court merely because it was disclosed in testimony from Jason Tucker, whom the court declared was not an expert and therefore could not and should not opine. This information was strong evidence in showing there was impropriety around the uploaded videos. The IP addresses that the Defendant's identified as the IPs of users who uploaded specific infringed videos were fake.

While Hydentra's arguments were not successful with the trial court, its claims cannot be said to be frivolous. Hydentra's content *was* copyrighted and *was* copied and publically displayed on the Defendants sites. Moreover, Hydentra followed the DMCA requirements in

unsuccessful attempts to have its content removed from the sites.  It is noteworthy that other

Circuits have ruled that the public display of a copyrighted image stored on a computer server,

even when the image is stored at the behest of a third party, is direct infringement by the operator

of the computer.  *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1160 (9th Cir. 2007).

      Regarding Hydentra's contributory copyright claims, Hydentra needed to establish that

Defendants were in a position to control the use of copyrighted works on the sites and knew, or

had reason to know, of the infringements.  Hydentra presented evidence that the Defendants were

specifically made aware of the infringements and did nothing, and that Defendants were in

control of what was displayed on the sites.  The trial court noted that there was a credibility issue

with Defendant Luchian's testimony and whether he actually received the notices.  The trial

court also found that Hydentra was also required to show that the web sites were not capable for

non-fringing uses and did not do so.  This is the first time that this standard was applied to a

strict video streaming site, relying on *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545

U.S. 913 (2005) (a case against the distributor of a file sharing program).  In issuing the ruling,

the Court relied only on the testimony of the Defendant Bolotin who alleged that users of his

admittedly failed dating site wished to share videos, and thus the new video streaming sites were

created, on a totally separate URL that was not connected to the original dating site.  Because

real users were allegedly posting videos from this *alternative* dating site, the Court found that the

website was capable of substantial non-infringing use, and Hydentra's contributory copyright

claims were defeated.

      Regarding Hydentra's vicarious copyright infringement claims, Hydentra needed to

establish that the defendants profited from direct infringements while declining to exercise a

right to stop or limit it.  Hydentra presented evidence that Defendants had the ability to stop the

infringements *and* that the Defendants were made aware of the infringements and failed to act. Hydentra further presented evidence that the revenue generated by the sites were solely advertising revenue, the value of which was dependent upon the quality of content on the site. The court found that Hydentra failed to establish a *direct* financial benefit from the videos.

Regarding Hydentra's inducement of copyright infringement claim, Hydentra needed to establish that the web sites were promoted to infringe copyright. Hydentra presented evidence that the web sites were operated with such anonymity that it promoted the use of the site for infringement. Hydentra presented evidence that the Defendants purposefully failed to check valid email addresses and failed to contact its members, at any time or for any reason, in order to not scare the members away. Users needed to be a member to only to post videos. The trial court found that Defendants ran a passive internet service, and did not induce uploads.

Defendants argue that the inclusion of the individual defendants requires an award of fees. However, the inclusion of the individual defendants was not frivolous – as individuals that control the content on a web site or have the ability to supervise the infringing activity, even if ignorant of the infringement, may be held personally liable. *Southern Bell Tel. & Tel. Co. v. Assoc. Telephone Directory Publishers,* 756 F.2d 801, 811 (11th Cir. 1985). Bolotin controlled the content on the sites. Further, Luchian controlled the take down notices and was listed on at least 4 directories as a Director of Defendant Sun Social Media, Inc.

In each claim, Hydentra presented evidence and facts regarding the elements of each claim. While the trial court deemed them legally insufficient, they were not frivolous. This factor weighs in the favor of denying Defendants motion for fees.

### 3. Objective Unreasonableness of Copyright Claims

The mere fact that summary judgment was granted, in and of itself, does not speak to

13

whether Plaintiff's claims were "objectively unreasonable." *Indyne, Inc. v. Abacus Tech. Corp.*, No. 6:11-cv-137-Orl-22DAB, 2013 U.S. Dist. LEXIS 185422, at *17 (M.D. Fla. Dec. 6, 2013), *citing FASA Corp. v. Playmates Toys, Inc.*, 1 F.Supp.2d 859, 864 (N.D. Ill.1998).

In fact, as the *Indyne* Court listed, there are many cases in which fees were denied to a prevailing party in copyright cases: *Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 382-83 (5th Cir. 2004) (affirming district court's denial of fees to prevailing defendant where claims were not "frivolous, objectively unreasonable, or without proper motive" and an award would not deter future meritless lawsuits); *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 140 F.3d 70, 74-75 (1st Cir. 1998) (in a case of first impression, denial of fees was within court's discretion where "both parties had important economic interests in the litigation," deterrence was not a factor, and plaintiff's unsuccessful claim was reasonable); *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 754 (11th Cir. 1997)  (affirming denial of defendant's motion for fees in light of Fogerty factors without analysis); *Clark v. Hudson Bay Music, Inc.*, 1996 U.S. App. LEXIS 25245, 1996 WL 547186, *2 (2d Cir. 1996) (denial of plaintiff's request for fees affirmed where damages and future royalties made considerations of deterrence and compensation irrelevant); *Johnson v. Tuff-N-Rumble Mgmt., Inc.*, 2000 U.S. Dist. LEXIS 12071, 2000 WL 1145748, *11 (E.D. La. 2000) (denying defendant's request for fees where plaintiff's claims were colorable and not objectively unreasonable and where award would not deter future baseless suits); *Compaq Computer Corp. v. Procom Tech., Inc.*, 908 F.Supp. 1409, 1429 (S.D. Tex. 1995) (declining to award fees to prevailing plaintiff where deterrence was served by injunctive relief and defendant's position was not objectively unreasonable); *Bourne Co. v. Walt Disney Co.*, 1994 U.S. Dist. LEXIS 7783, 1994 WL 263482, *2 (S.D. N.Y. 1994) (denying plaintiff's motion for fees where case involved unsettled issues of law and defense raised by unsuccessful defendant

was "fair ground for litigation" even if not accepted by jury), aff'd, 68 F.3d 621 (2nd Cir. 1995);
*see also Donald Frederick Evans & Assocs. v. Continental Homes, Inc.*, 785 F.2d 897, 916 (11th
Cir. 1986) (in pre-Fogerty case, affirming denial of prevailing defendant's fee request where
plaintiff's claims were colorable)).

A number of cases post-*Fogerty* awarded fees to prevailing defendants upon a finding
that plaintiffs' claims were objectively unreasonable. *See, e.g., Amadasun v. Dreamworks, LLC*,
359 F.Supp.2d 1367, 1375-76 (N.D. Ga. 2005) (awarding fees for defense of screenwriter-
plaintiff's claims against two large film companies which were "objectively unreasonable");
*Bridgeport Music, Inc. v. Diamond Time, Ltd.,* 371 F.3d 883, 894 (6th Cir. 2004) (awarding fees
to prevailing defendant where plaintiffs chose to sue hundreds of defendants all at the same time,
regardless of the strength of the individual claims for contributory infringement and negligence
based on shaky facts and even shakier legal arguments and inevitably swept up parties against
whom they had little or no chance of succeeding and defendants prevailed on a statute of
limitations defense).

For the reasons stated above in Section A.2., Hydentra's claims were objectively
reasonable.  Further, the question must be asked:  Other than this litigation, what was Hydentra
supposed to do?  Hydentra retained a vendor to send electronic/email take down notices.
Contrary to Defendants' assertions, these were largely ignored.  Hydentra then retained a vendor
to deliver paper take down notices to the DMCA Registered Agent listed with the United States
Copyright Office.  These were ignored.

Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act was
passed by Congress with two main purposes:  (1) provide liability protection for Internet Service
Providers whose operations expose them to copyright infringement at the hands of others; and

(2) provide copyright owners with specific procedures to police their own copyrighted works on the Internet.   *See UMG Recordings, Inc. v. Shelter Capital Partners, LLC,* 718 F.3d 1006, 1022 (9th Cir. 2011).  These purposes fall hand in hand:  an ISP cannot claim liability protections if they do not follow procedures which enable copyright owners to police their works.  Receipt of and action towards take down notices is paramount.

There were simply no further steps towards policing its copyrights on the Defendants sites other than litigation.  All other avenues had been traveled without success.  Absolutely clear in this case is that Hydentra made *numerous* attempts via email take down notices and paper take down notices to police the infringement of its copyrights on the Defendants sites *and* that these efforts failed.  Further, this litigation *has* succeeded in its primary purpose – the Defendants sites are no longer infringing Hydentra's copyrighted works.

Given Hydentra's pre-litigation efforts, the evidence presented in the litigation, and the ultimate achievement of stopping infringement on the sites, this litigation was objectively reasonable.  This factor weighs in the favor of denying Defendants motion for fees.

### 4.  Motivation

Through the entirety of Hydentra's copyright enforcement actions, Hydentra's motivation has been to stop the infringement of its copyright works throughout the Internet, as the availability of its movies for free detrimentally affects revenue on its paid membership sites.  Thus, Hydentra's extensive activity sending in excess of 19,000 take down notices to over 650 ISPs.  In contrast, the fact that Hydentra has only had to initiate lawsuits against 20 ISPs/entities is testament to the select manner in which Hydentra litigates.

Defendants continue to argue that Hydentra has engaged in a business model by generating a new revenue stream in "wresting nuisance settlements."  This assertion is based

upon improper supposition, and must be so because the Defendants did not conduct any discovery of Hydentra. To the contrary, Hydentra has spent in excess of $500,000 dollars in its copyright enforcement, yet recovered far less than a quarter of that.[2]  Moreover, of 650 ISPs that have been notified of infringement of Hydentra's copyright works, only 20 have been sued.

The objective undisputed evidence is that Hydentra predominantly resolves Internet infringement issues through issuing DMCA compliant take down notices. In those certain instances where the take down notices fail, Hydentra is left with little choice but to seek court intervention. In the instant case, Hydentra first attempted email take down notices and then delivery of paper take down notices. These multiple attempts failed. In order to continue its efforts to protect its copyright works from infringement on the Defendants sites, litigation became the only option. While the litigation resulted in dismissal of Hydentra's copyright claims, it also resulted in the cessation of infringement on the Defendants sites.

Hydentra's primary purpose in this litigation was to stop the infringement of its videos on the Defendants sites. This factor weighs in the favor of denying Defendants motion for fees.

### 5.  Need to Advance Considerations of Compensation and Deterrence

The purposes of the Copyright Act are not promoted upon an award of attorneys' fees to a prevailing defendant when the plaintiff has advanced a reasonable, yet unsuccessful claim. *Indyne, Inc. v. Abacus Tech. Corp.*, No. 6:11-cv-137-Orl-22DAB, 2013 U.S. Dist. LEXIS 185422, at *37 (M.D. Fla. Dec. 6, 2013), *citing See Matthew Bender & Co. v. West Publ'g Co.*, 240 F.3d 116, 122 (2d Cir. 2001); see also *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 140 F.3d 70, 75 (1st Cir. 1998) (in close infringement cases, "the need to encourage meritorious defenses is a

---

[2]  Defendants may point to multi-million dollar judgments obtained by Hydentra. These judgments were entered in cases where defendants were in default. While the judgment establishing that the particular trial courts reviewed Hydentra's claims and valued them seriously, these judgments are likely largely uncollectable.

factor that a district court may balance against the potentially chilling effect of imposing a large fee award on a plaintiff who . . . may have advanced a reasonable, albeit unsuccessful, claim").

Hydentra's lawsuit was neither baseless nor frivolous.  Rather, it was reasonable and necessary as procedures intended for Hydentra to police its copyrights on the Defendants sites failed.  An award of Defendants' attorneys' fees will be *significantly* detrimental to other copyright owners with reasonable claims.  Copyright holders with *reasonable* claims, even ones that have attempted to resolve the display of their works for free as dictated by Congress, will be deterred from seeking valid Court intervention.  Further, and quite importantly, it will embolden the operators of video streaming sites displaying copyright infringed works to ignore take down notices when it suits them to do so.

Thus, an award of attorneys' fees in this case will unfairly shift the power in the battle of intellectual property on the Internet to those parties that are displaying infringed works without authority.  The owners and operators of such video streaming sites will have little incentive to respond to take down notices, contrary to Congressional intent, *and* owners of copyrights will be forced to sit back and suffer the damages of their content displayed for free.  This factor weighs in the favor of denying Defendants motion for fees.

### 6.  Final Balancing

Hydentra's claims were not frivolous but were objectively reasonable.  Hydentra's motivation, consistent with the entirety of its copyright enforcement, was to stop the infringements of its works on the Defendants sites.  Hydentra attempted to police its copyrights on the Defendants sites through procedures mandated by the DMCA.  These attempts failed. The litigation, however, did not ultimately fail as the Defendants sites no longer infringe any of Hydentra's copyrighted works.

The fact that Defendants were prevailing parties at summary judgment is not enough to warrant an award of attorneys fees in these circumstances, as an attorneys fees award will promote further infringements on video streaming sites and promote ISPs' failure to follow statutory requirements in responding to take down notices while also deterring copyright owners from seeking court intervention when DMCA mandated policing procedures fail.

In *UMG Recordings, Inc. v. Shelter Capital Partners, LLC,* 718 F.3d 1006. fn. 23 (2013), the trial court declined to award the defendant attorneys fees after summary judgment under the *Fogerty* factors because the plaintiff's legal challenge was not "improper, in bad faith, or contrary to the purposes of the Copyright Act," and the manner in which the claims were pursued was not objectively unreasonable.

An award of attorneys' fees in this case will result in even more piracy on the Internet.  It will deter copyright owners from seeking court intervention after all statutory attempts to police their own works fail.  This simply cannot be the result.

## B.    Asserted Attorneys Fees.

Hydentra does not take issue with the hourly rates charged in this case.  However, Defendants can only claim those litigation tasks that were specific to the copyright claims.  (This is based upon a revised invoice prepared by defense counsel.)  The copyright claims were dismissed on June 2, 2016.  Accordingly, all time entries after that date are specific to the trademark claims.  These time entries are:

- For Attorney Brady Cobb 6/6/2016, 6/6/2016, 6/6/2016, 6/7/2016, and 6/7/2016 (page 5, Dkt. No. 148-2). These entries are for 6.6 hours.  Total value, at $350 per hour, is $2,310.

- For Attorney Valentin Gurtvits: 6/5/2016, 6/6/2016, and 6/7/2016 (page 5, Dkt. No. 148-2).  These entries are for 19 hours.  Total value, at $450 per hour, is $8,550.

19

- For Attorney Evan Fray-Witzer: 6/6/2016 (page 7, Dkt. No. 148-2). These entries are for 5.25 hours. Total value, at $450 per hour, is $2,362.50.

- Attorney Matthew Shayefar: 6/6/2016, and 6/7/2016 (page 10. Dkt. No. 148-2). These entries are for 3.75 hours. Total value, at $300 per hour, is $1,125.

In total, hours incurred *after* the copyright claims were dismissed equate to $14,347.50 of the submitted fees. Should attorneys' fees be awarded, these fees should not be part of the award.

Further, Defendants have failed to separate out what charges are specific to which defendant. For instance, should one defendant be awarded fees, that defendant should not be awarded fees for tasks that were specific to another defendant. It is neither the Court's job nor Plaintiff's job to parse out these tasks. The Court may reject the entire fee submission on that basis.

## V.    CONCLUSION

The imposition of attorneys' fees will *not* further the goals of Copyright Act. The imposition of fees in this case will discourage copyright holders from bringing objectively reasonable claims – even once their efforts to police their copyrights under the DMCA have failed. This will result in the rampant failure to follow DMCA take down procedures and cause piracy to increase exponentially.

Moreover, Hydentra's claims were not frivolous, but based in actual continued display of its copyrighted works on Defendants sites after DMCA compliant take down notices were delivered. Hydentra's motivations were, and continue to be, to stop the infringement of its videos on video streaming sites throughout the Internet. Relating to the Defendants sites, these efforts have been successful.

It is respectfully requested that Defendants' Motion for Attorneys Fees be denied.

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 19th day of August, 2016 we served the foregoing with

the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing

to the following:  Brady J. Cobb, Esq.

Respectfully submitted,

BeharBehar
1840 North Commerce Parkway
Suite One
Weston, Florida 33326
Telephone: (954) 688-7642
Facsimile: (954) 332-9260
E-mail: AB@BeharBehar.com

By:   */s/Aaron Behar, Esquire*
Aaron Behar, Esquire
Florida Bar No.: 166286
Jaclyn Behar, Esquire
Florida Bar No.: 63833
***Counsel for Plaintiff***

And:   Spencer D. Freeman
Freeman Law Firm, Inc.
1107 ½ Tacoma Avenue South
Tacoma, WA 98402
Telephone:  (253) 383-4500
Facsimile:  (253) 383-4501
E-mail: sfreeman@freemanlawfirm.org
***Counsel for Plaintiff***

***(Pro Hac Vice)***